UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| J. TIMOTHY HOWARD,<br>8400 Parham Court<br>McLean, VA 22102,<br>　　　　　　　　Plaintiff, | )<br>)<br>)<br>)<br>) | |
| v. | ) | Civil No. _____ |
| | ) | |
| OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, an Office<br>within the United States Department of<br>Housing and Urban Development, and<br>JAMES B. LOCKHART III, in his official<br>capacity as Director,<br>1700 G Street, NW<br>Washington, DC 20552, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | PLAINTIFF'S MOTION FOR<br>TEMPORARY RESTRAINING ORDER |
| 　　　　　　　　Defendants. | )<br>)<br>) | |

**J. TIMOTHY HOWARD'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff J. Timothy Howard, by undersigned counsel, moves this Court for entry of a

temporary restraining order and preliminary injunction preventing the Office of Federal Housing

Enterprise Oversight ("OFHEO") and its Director from interfering with the immediate transfer to

Mr. Howard of 7,823 shares of Fannie Mae common stock that are owed to him under the terms

of his Employment Agreement and applicable Fannie Mae employee benefit plans.  As Mr.

Howard shows in the accompanying memorandum of law, this Court already has held, in two

separate decisions, that OFHEO does not have the authority to prevent the payment of

employment or severance benefits of a former executive of an enterprise that OFHEO regulates.

Thus, there is a substantial likelihood that Mr. Howard will prevail on the merits of his case.  Mr.

Howard is also suffering irreparable injury by OFHEO's ongoing action, as the agency is

interfering with Mr. Howard's ability to transfer his shares at the highest possible price; a

temporary restraining order and preliminary injunction will harm neither OFHEO nor Fannie Mae; and the public interest will be served by preventing OFHEO from acting outside the scope of its statutory authority.

On June 22, 2007, undersigned counsel for Mr. Howard requested from David A. Felt, Deputy General Counsel of OFHEO, a copy of a June 19, 2007 letter from OFHEO to Fannie Mae (described in a Form 8-K filed by Fannie Mae on June 21, 2007) directing the company to withhold payment of the 7,823 shares to Mr. Howard pending review. On that same date, undersigned counsel also submitted an expedited request to OFHEO under the Freedom of Information Act ("FOIA"), seeking a copy of the June 19 letter. The FOIA request indicated that the June 19 letter was needed by Mr. Howard in connection with a motion for temporary restraining order to be filed against OFHEO as soon as practicable.

On June 25, 2007, undersigned counsel advised Mr. Felt that the June 19 letter (as described in Fannie Mae's SEC filing) was unlawful under this Court's decisions in *Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52 (D.D.C. 2004) and *Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004). OFHEO has not provided a copy of the June 19 letter to Mr. Howard.

On Friday, June 29, 2007, undersigned counsel advised Mr. Felt that if OFHEO did not rescind its directive to Fannie Mae to withhold the transfer of shares to Mr. Howard by the end of the day on June 29, then Mr. Howard would seek judicial intervention by way of this motion. Counsel for OFHEO has not made further contact with undersigned counsel.

Mr. Howard therefore moves this Court for entry of a temporary restraining order and a preliminary injunction prohibiting OFHEO and its Director from continuing their unlawful conduct.

2

A proposed Order is attached.

Dated:  July 2, 2007

Respectfully submitted,

Steven W. Salky (D.C. Bar No. 360175)
Eric R. Delinsky (D.C. Bar No. 460958)
Miles Clark (D.C. Bar No. 489338)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036-5802
202-778-1800 (phone)
202-822-8106 (facsimile)

*Counsel for Plaintiff*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J. TIMOTHY HOWARD,<br>8400 Parham Court<br>McLean, VA 22102,<br>　　　　　　　　Plaintiff,<br><br>v.<br><br>OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, an Office<br>within the United States Department of<br>Housing and Urban Development, and<br>JAMES B. LOCKHART III, in his official<br>capacity as Director,<br>1700 G Street, NW<br>Washington, DC 20552,<br><br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil No. _____<br><br>PLAINTIFF'S MEMORANDUM OF LAW<br>IN SUPPORT OF HIS MOTION FOR<br>TEMPORARY RESTRAINING ORDER<br>AND PRELIMINARY INJUNCTION |

## J. TIMOTHY HOWARD'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff J. Timothy Howard, by undersigned counsel, moves this Court for entry of a temporary restraining order and preliminary injunction preventing the Office of Federal Housing Enterprise Oversight ("OFHEO") and its Director from depriving him of 7,823 shares of Fannie Mae common stock that are owed to him under the terms of his Employment Agreement and applicable Fannie Mae employment benefit plans. In two related cases that involved nearly identical conduct by OFHEO, this Court determined that OFHEO lacked statutory or regulatory authority to freeze the employment and severance benefits of two former senior executives of the Federal Home Loan Mortgage Corporation ("Freddie Mac") pending the outcome of administrative hearings into the executives' conduct while at Freddie Mac. *See Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52, 61-66 (D.D.C. 2004); *Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56, 63-65 (D.D.C.

2004).[1]  Despite these rulings, OFHEO is interfering with Mr. Howard immediate receipt of, and

ability to transfer, 7,823 shares of Fannie Mae common stock, forcing Mr. Howard to seek

injunctive relief from this Court.

The issue in the *Brendsel* and *Clarke* cases – whether OFHEO could interfere with an

enterprise's payment of employment and severance benefits to former senior executives – is

identical to the issue presented here.  Mr. Howard is a former senior executive of Fannie Mae

whose benefits have been effectively frozen by OFHEO through letters directed to Fannie Mae.

This Court's decisions in *Brendsel* and *Clarke* are directly on point and require OFHEO and its

Director to be enjoined from continuing to deprive Mr. Howard of his property.

## I. BACKGROUND

### A.    Mr. Howard is Entitled to the Immediate Receipt of 7,823 Shares of Fannie Mae Common Stock.

At the time of his departure from Fannie Mae, effective January 31, 2005, Mr. Howard

was a Vice Chairman and the Chief Financial Officer of Fannie Mae.

Prior to 2005, Fannie Mae granted long-term incentive awards under its performance

share program.  (*See* Exhibit 1 (Fannie Mae Form 8-K, filed June 21, 2007).)[2]  Under the

program, which was part of Fannie Mae's Stock Compensation Plan,[3] senior management

received shares of common stock of Fannie Mae if the company met certain corporate

performance objectives over a period of three calendar years, with each three-year period

constituting a single award cycle.  (*See id.*)  At the beginning of each three-year award cycle, the

---

[1] Specifically, this Court held that OFHEO could not order Freddie Mac to freeze the former executives' deferred compensation, severance payments, annual bonuses, previously awarded shares of stock, and vested stock options, among other earned compensation and severance benefits. *See Brendsel*, 339 F. Supp. 2d at 57; *Clarke*, 355 F. Supp. 2d at 61.

[2] The attached Exhibits are authenticated by the declaration of Steven M. Salky, attached as Exhibit A.

[3] Copies of Fannie Mae's Stock Compensation Plan of 1993 and Stock Compensation Plan of 2003 are attached as Exhibits 2 and 3.

Board of Directors of Fannie Mae (the "Board") set both a financial goal – based on growth in core business earnings – and non-financial goals for the entire three-year period. (*See id.*) Under the program, the Board established a minimum, target and maximum payout levels for each set of goals. (*See id.*)

For the three-year performance share cycle that ended on December 31, 2005 (the "2005 award cycle" or "PSP 19"), Mr. Howard was granted 28,162 performance shares. Based upon that grant, had Mr. Howard remained employed through the end of the 2005 award cycle, he would have qualified for a range of potential performance share payments at the end of the 2005 award cycle of between 11,265 and 42,243 shares of Fannie Mae common stock, contingent upon the extent to which Fannie Mae achieved its performance goals during the award cycle. (*See* Exhibit 4 at 4-5 (Fannie Mae Form 8-K, filed December 27, 2004).) Moreover, if Fannie Mae did not attain the minimum, or threshold, performance goals set by the Board for the 2005 award cycle, Mr. Howard – and other eligible Fannie Mae employees – would receive no shares of Fannie Mae common stock.

Although the Compensation Committee of the Board (the "Compensation Committee") typically evaluated whether the performance goals were achieved and the amount of the award payout in January of the year following the end of the award cycle, the Board decided to defer determination of the award for 2005 award cycle due to the delay in the issuance of Fannie Mae's audited financial statements for 2005. (*See* Exhibit 1.)

On May 2, 2007, Fannie Mae filed with the United States Securities and Exchange Commission (the "SEC") its annual report on Form 10-K for the year that ended December 31, 2005. Then on June 15, 2007, as reported by Fannie Mae in a Form 8-K filed with the SEC on June 21, 2007, the Compensation Committee and the Board determined to pay the award for the

2005 award cycle at the 40% level to the current and former employees eligible to receive award payments. (*See* Exhibit 1.)[4]

Pursuant to the terms of Mr. Howard's Employment Agreement, a copy of which is attached as Exhibit 5, and applicable Fannie Mae employee benefit plans, Mr. Howard is entitled to a prorated performance share award based upon the length of his service during the 2005 award cycle. Specifically, as a result of the Board's June 15, 2007 determination to pay the award at the 40% level, Mr. Howard is entitled to the immediate receipt of 7,823 shares of Fannie Mae common stock. (*See* Exhibits 1-5.)

**B.      OFHEO, Despite Having Previously Approved the Benefits at Issue, Has Prevented Mr. Howard from Receiving His Shares.**

OFHEO previously reviewed and approved, by letter dated December 13, 2004, the payment to Mr. Howard of specified compensation and benefits provided in Mr. Howard's Employment Agreement, including the post-termination payment of Fannie Mae common stock pursuant to Fannie Mae's performance share program described above. (*See* Exhibit 6, December 13, 2004 letter from OFHEO Director Armando Falcon to Joe K. Pickett, Compensation Committee Chair ("The termination benefits provided under the Agreement for Mr. Howard are approved.").)[5]

---

[4] In the same SEC filing, Fannie Mae announced that the Compensation Committee and the Board had determined to pay the award for the three-year performance share cycle that ended on December 31, 2006 at the 47.5% level.

[5] Just ten days after OFHEO's approval, and two days after Fannie Mae announced that Mr. Howard had elected to terminate his employment with the company, OFHEO's General Counsel, on December 23, 2004, issued a letter prohibiting Fannie Mae from paying any "termination benefits" to Mr. Howard until OFHEO has completed "its review" of such benefits. (Exhibit 7.) Astonishingly, the letter indicated that "[o]f specific concern is whether, at the time of termination, there have been benefits enhancements or modifications since the termination package was agreed upon." (*Id.* (emphasis added).) On January 24, 2005, Fannie Mae advised OFHEO that the Board had not extended Mr. Howard's termination benefits beyond those provided in his OFHEO-reviewed Employment Agreement and Fannie Mae's employee benefit plans.

As noted above, on June 15, 2007, the Compensation Committee and the Board determined to pay the award for the 2005 award cycle at the 40% level. On June 19, 2007, however, Fannie Mae received a letter from OFHEO requesting a report from the Board "relating to the determination and the size and appropriateness" of the award for the 2005 award cycle, "including information relating to the proposed payments to former employees." (Exhibit 1.) On June 21, 2007, Fannie Mae publicly reported that it will not pay any performance share awards for the 2005 award cycle until "the company receives the required OFHEO approval." (*Id.*)[6]

By letter dated June 27, 2007, Mr. Howard formally demanded that Fannie Mae immediately transfer to him the shares that he is owed by reason of the Board's determination regarding the award for the 2005 award cycle. (*See* Exhibit 10, June 27, 2007 letter from Steven M. Salky to Jodie L. Kelley, Vice President and Deputy General Counsel of Fannie Mae.) Fannie Mae responded on June 29, 2007, by advising Mr. Howard that the Board had provided OFHEO with the information requested by the agency on June 19 and that, without OFHEO's approval, Fannie Mae "is not in a position to provide a distribution of shares to Mr. Howard immediately." (Exhibit 11, June 29, 2007 letter from Beth A. Wilkinson, General Counsel of Fannie Mae, to Steven M. Salky.)

---

[6] On June 22, 2007, undersigned counsel requested from Fannie Mae a copy of the June 19, 2007 letter from OFHEO referenced in Fannie Mae's SEC filing. (*See* Exhibit 8.) Counsel for Fannie Mae advised that OFHEO is asserting bank examination privilege over the letter and that Mr. Howard should therefore direct any request for the letter to the agency. (*Id.*) Accordingly, on June 22, 2007, undersigned counsel for Mr. Howard requested a copy of the letter from David A. Felt, Deputy General Counsel of OFHEO, and directed an expedited request for a copy of the letter to OFHEO under the Freedom of Information Act, indicating that the letter was needed in connection with a motion for temporary restraining order to be filed against OFHEO as soon as practicable. (Exhibit 9.) On June 25, 2007, undersigned counsel for Mr. Howard also advised Mr. Felt that that the June 19 letter (as described in Fannie Mae's June 21, 2007 SEC filing) was unlawful under this Court's decisions in *Brendsel* and *Clarke*. As of the date of this filing, OFHEO has not provided a copy of the June 19 letter to Mr. Howard.

As of the date of this filing, OFHEO has not rescinded its directives to Fannie Mae. Accordingly, the 7,823 shares of Fannie Mae common stock that Mr. Howard is owed remain unpaid and effectively frozen.

## ARGUMENT

The central issue in the *Brendsel* and *Clarke* cases – whether OFHEO could order an enterprise to freeze a departed executive's employment and termination benefits pending review – is identical to the issue presented here. As this Court already has held, OFHEO does not have such authority. The agency must therefore be enjoined from interfering with Mr. Howard's immediate receipt of the 7,823 shares of Fannie Mae common stock that that are owed to him under the terms of his Employment Agreement and Fannie Mae's employment benefit plans.

When considering a motion for a temporary restraining order or a preliminary injunction, a court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction. These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999) (citation omitted). Under this sliding scale approach, if "the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak. An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

Under this standard, OFHEO and its Director should be enjoined.

First, following this Court's decisions in *Brendsel* and *Clarke*, it is all but certain that Mr. Howard will prevail on the merits of his claim. In those decisions, this Court squarely held that OFHEO is without statutory or regulatory authority to freeze or direct an enterprise to freeze a former executive's employment or termination benefits in the manner that the agency has frozen Mr. Howard's. And although OFHEO cited in the *Brendsel* and *Clarke* litigations several statutory provisions that it claimed provided the agency with such authority, this Court rejected each and every one of them.

Specifically, this Court held that neither OFHEO's authority to prohibit excessive compensation under 12 U.S.C. § 4518(a), its general authority under 12 U.S.C. § 4513, nor its power to issue permanent and temporary cease-and-desist orders under 12 U.S.C. §§ 4631, 4632 permit the agency to freeze a former executive's employment or termination benefits. *See Brendsel*, 339 F. Supp. 2d at 61-66; *Clarke*, 355 F. Supp. 2d at 63-65. And in the *Clarke* case, the Court squarely rejected OFHEO's contention that the provision in Freddie Mac's enabling statute authorizing the agency to review termination benefits, 12 U.S.C. § 1452(h)(2),[7] permitted the agency to freeze termination benefits that previously had been "reviewed and *approved* by the office." *Clarke*, 355 F. Supp. 2d at 64 (emphasis in original); *see also id.* (rejecting OFHEO's argument that it has "dual review authority" to review excessive compensation on an "ongoing basis"). Here, to the extent that the shares owed to Mr. Howard are considered "termination benefits," OFHEO already has approved of their payment to Mr. Howard. (*See* Exhibit 6.)

As this Court concluded in *Brendsel*, "Congress did not intend to grant OFHEO the power to effect a freeze of assets in the manner in which it did in this case." *Brendsel*, 339 F. Supp. 2d at 65. Because OFHEO has frozen Mr. Howard's shares in precisely the same manner

---

[7] The analogous provision in Fannie Mae's enabling statute appears at 12 U.S.C. § 1723a(d)(3)(B).

that the agency froze the assets of Messrs. Brendsel and Clarke, and having been enjoined by this Court both times for doing so, there is – to say the least – a substantial likelihood that Mr. Howard will succeed on the merits of his claims.

Second, Mr. Howard will be irreparably harmed if OFHEO is not enjoined. Because of OFHEO's action, Mr. Howard is deprived of control over his shares of Fannie Mae common stock, including the ability to transfer the shares at a time when their value is greatest. While OFHEO's unlawful action continues, the value of Fannie Mae's stock has declined. On June 15, 2007, for example, the date the Board determined the level of the 2005 award cycle payout, Fannie Mae's stock closed at $68.75/share; on June 29, 2007, the stock closed at $65.33/share.[8] Thus, Mr. Howard's shares are less valuable today than when OFHEO directed Fannie Mae not to transfer them to Mr. Howard. And during the three-month period immediately preceding June 15, 2007, the share price has closed as low as $53.84/share. (*See* Exhibit 13.) There is a real risk, therefore, that OFHEO is irreparably depriving Mr. Howard of substantial profits. *See Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 139-40 (2d Cir. 1983) (due to market volatility, appropriate measure of damages for conversion of stock is highest intermediate value reached). Moreover, as detailed in the report of a 2004 investigation conducted by the Inspector General of the Department of Housing and Urban Development, there is substantial evidence that OFHEO has used its regulatory power to drive down the price of Fannie Mae stock in the past.[9]

---

[8] *See* http://phx.corporate-ir.net/phoenix.zhtml?c=108360&p=irol-stockquotechart&s=Current+Stock+Information; http://finance.yahoo.com (symbol: FNM); Exhibit 12 (printout of share price from June 15, 2007 to June 15, 2007).

[9] The lengthy report (Special Investigations Division, U.S. Department of Housing and Urban Development, Office of Inspector General, Investigation Report, Investigation No. SID-04-0034-I (Oct. 5, 2004)), appears at Exhibit 3 of Defendant Franklin D. Raines's Memorandum of Law in Opposition to Lead Plaintiffs' Motion for Class Certification, filed on January 23, 2007 in *In re Fannie Mae Securities Litigation*, No. 04-01639 (RJL) (Dkt. No. 337).

Mr. Howard has no remedy against either OFHEO or Fannie Mae for the damages resulting from the deprivation of Mr. Howard's control over his shares. OFHEO is immune from suit because there is no relevant waiver of sovereign immunity permitting it to be sued on these claims. *See Brendsel*, 339 F. Supp. 2d at 66 (citing *Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994); *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991)); *United States v. State of New York*, 708 F.2d 92, 93 (2d Cir. 1983) (pecuniary loss constituted irreparable harm where suit against State of New York would be barred by Eleventh Amendment). And for reasons explained by this Court in *Brendsel, see* 339 F. Supp. 2d at 66-67, and *Clarke, see* 355 F. Supp. 2d at 66, Mr. Howard is unlikely to be able to sue OFHEO for damages under the Federal Tort Claims Act. Finally, if Mr. Howard attempted to sue Fannie Mae to recover his damages, the company would likely assert that it was acting pursuant to OFHEO's order. As this Court noted, "[t]his defense is potentially valid even though the orders themselves may be illegal." *Brendsel*, 339 F. Supp. 2d at 66 (citing *Eastern Airlines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 994 (5th Cir. 1976)). Thus, unless OFHEO is enjoined from its unlawful interference with Mr. Howard's property rights, Mr. Howard will be irreparably harmed because he cannot recover damages against either OFHEO or Fannie Mae.[10]

Third, neither OFHEO nor Fannie Mae will be harmed by the injunction. If neither Freddie Mac nor OFHEO were threatened by the release of nearly $60 million of assets to Mr. Brendsel, including well over $15 million in salary, bonuses and pension benefits, *see Brendsel*,

---

[10] OFHEO's actions also constitute a deprivation of Mr. Howard's property without due process of law in violation of the Due Process clause of the Fifth Amendment. *See Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 342 (1969) ("Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing [prejudgment attachment procedures] violate[] the fundamental principles of due process."). Courts consistently have held that a continuing constitutional violation is an irreparable harm. *See Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).

339 F. Supp. 2d at 57, 67, then certainly neither Fannie Mae nor OFHEO will be harmed by the release of 7,823 shares of Fannie Mae stock to Mr. Howard.

Fourth, this Court made clear that the public has a "profound" interest in ensuring that "OFHEO acts within the limits of its authority established by Congress" and that "those whose assets might be frozen by OFHEO are accorded a fair modicum of due process." *Brendsel*, 339 F. Supp. 2d at 67; *see also Clarke*, 355 F. Supp. 2d at 66; *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("The preservation of the rights in the Constitution and the legality of the process by which government agencies function certainly weighs heavily in the public interest.").

## III. CONCLUSION

For the foregoing reasons, this Court should enjoin OFHEO and its Director from freezing, placing a hold on, or otherwise interfering with or preventing Mr. Howard's immediate receipt of the 7,823 shares of Fannie Mae common stock that are owed to him under the terms of his Employment Agreement and applicable Fannie Mae employment benefit plans. OFHEO does not have such authority, so there is a substantial likelihood that Mr. Howard will prevail on the merits of his case. Moreover, Mr. Howard is suffering irreparable injury by OFHEO's ongoing action; the injunction will harm neither OFHEO nor Fannie Mae; and the public interest will be served by preventing OFHEO from acting outside of its authority.

Dated:  July 2, 2007

Respectfully submitted,

Steven M. Salky (D.C. Bar No. 360175)
Eric R. Delinsky (D.C. Bar No. 460958)
Miles Clark (D.C. Bar No. 489338)
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, DC 20036-5802
202-778-1800 (phone)
202-822-8106 (facsimile)

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2007, I caused to be served as indicated below true and correct copies of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Memorandum of Law in support thereof, Declaration of Steven M. Salky together with exhibits, and Proposed Temporary Restraining Order on:

BY HAND

Office of Federal Housing Enterprise Oversight
c/o Alfred M. Pollard, General Counsel
1700 G Street N.W.
Washington, D.C. 20552

Hon. James B. Lockhart III, Director
Office of Federal Housing Enterprise Oversight
1700 G Street N.W.
Washington, D.C. 20552

Alberto Gonzalez
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Jeffrey A. Taylor
United States Attorney for the District of Columbia
United States Attorney's Office for the District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20001

BY ELECTRONIC MAIL

Marcia Tiersky
United States Department of Justice
Federal Programs
20 Massachusetts Avenue, NW
Room 7206
Washington, DC 20530

Miles Clark

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J. TIMOTHY HOWARD,<br>8400 Parham Court<br>McLean, VA 22102,<br>        Plaintiff,<br><br>v.<br><br>OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, an Office<br>within the United States Department of<br>Housing and Urban Development, and<br>JAMES B. LOCKHART III, in his official<br>capacity as Director,<br>1700 G Street, NW<br>Washington, DC 20552,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil No. _____<br>)<br>)  DECLARATION OF<br>)  STEVEN M. SALKY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF STEVEN M. SALKY

I, **STEVEN M. SALKY**, hereby state as follows:

1.     I am a partner in the law firm of Zuckerman Spaeder LLP, and I represent J. Timothy Howard in the above-captioned matter. I submit this declaration in support of Mr. Howard's Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in support thereof.

2.     Attached as Exhibit 1 is a true and correct copy of Fannie Mae's Form 8-K, filed with the United States Securities and Exchange Commission ("SEC") on June 21, 2007.

3.     Attached as Exhibit 2 is a true and correct copy of Fannie Mae's Stock Compensation Plan of 1993.

4.     Attached as Exhibit 3 is a true and correct copy of Fannie Mae's Stock Compensation Plan of 2003.

5.      Attached as Exhibit 4 is a true and correct copy of Fannie Mae's Form 8-K, filed with the SEC on December 27, 2004.

6.      Attached as Exhibit 5 is a true and correct copy of the Employment Agreement between Fannie Mae and J. Timothy Howard, as amended on June 30, 2004, together with subsequent amendment.

7.      Attached as Exhibit 6 is a true and correct copy of a December 13, 2004 letter from Armando Falcon, Jr., Director of OFHEO, to Joe K. Pickett, Chair of the Compensation Committee of the Board of Directors of Fannie Mae.

8.      Attached as Exhibit 7 is a true and correct copy of a December 23, 2004 from Alfred M. Pollard, General Counsel of OFHEO, to Ann Kappler, Executive Vice President and General Counsel of Fannie Mae.

9.      Attached as Exhibit 8 is a true and correct copy of e-mail correspondence on June 22, 2007 between Steven M. Salky and Jodie L. Kelley, Vice President and Deputy General Counsel of Fannie Mae.

10.     Attached as Exhibit 9 is a true and correct copy of a June 22, 2007 letter from Steven M. Salky to Jeanne F. Ratchford, OFHEO FOIA Officer.

11.     Attached as Exhibit 10 is a true and correct copy of a June 27, 2007 letter from Steven M. Salky to Jodie L. Kelley, Vice President and Deputy General Counsel of Fannie Mae.

12.     Attached as Exhibit 11 is a true and correct copy of a June 29, 2007 letter from Beth A. Wilkinson, Executive Vice President and General Counsel of Fannie Mae, to Steven M. Salky.

13.     Attached as Exhibit 12 is a true and correct copy of a printout from the "Yahoo Finance" website showing Fannie Mae's share price from June 15, 2007 to June 29, 2007.

14.    Attached as Exhibit 13 is a true and correct copy of a printout from the "Yahoo Finance" website showing Fannie Mae's share price during the three-month period from March 15, 2007 to June 15, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 2, 2007.

Steven M. Salky

# EXHIBIT 1



# FORM 8-K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE - FNM

**Filed: June 21, 2007 (period: June 15, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 5.02** Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain

SIGNATURE

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, DC 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **June 15, 2007**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| Federally chartered corporation | 000-50231 | 52-0883107 |
|---|---|---|
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification Number)* |

| 3900 Wisconsin Avenue, NW | 20016 |
|---|---|
| **Washington, DC** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code: 202-752-7000**

*(Former Name or Former Address, if Changed Since Last Report):* _____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On June 15, 2007, the Board of Directors determined to make payouts under the company's long–term, incentive performance share program for the three–year award cycles ended in 2005 and 2006. The Board's decision followed its review of qualitative and quantitative analyses of company performance during these award cycles, including a review of the company's Form 10–K for the year ended December 31, 2005.

**Background**

Prior to 2005, Fannie Mae granted long–term incentive awards under its performance share program. Under the program, senior management received shares of common stock of Fannie Mae if the company met performance objectives over a period of three calendar years, with each three–year period constituting a single award cycle. In accordance with the program, the Board of Directors set both a financial goal (based on growth in core business earnings) and non–financial goals at the beginning of each three–year award cycle for the entire three–year period, with each set of goals weighted at 50 percent. Under the program, the Board of Directors established minimum, target and maximum payout levels for each set of goals. The Compensation Committee evaluated whether the goals were achieved and the amount of the award payout in January of the year following the end of the award cycle. Each participant typically then received one–half of the payout to be awarded immediately following the Compensation Committee's determination and the second half one year later.

The Compensation Committee and the Board of Directors have established no award cycles under the program since January 2004. In addition, as a result of the delay in the issuance of the company's audited financial statements for 2005 and 2006, the Compensation Committee and the Board decided to defer determination of awards for those cycles. On May 2, 2007, Fannie Mae filed with the SEC its Form 10–K for the year ended December 31, 2005.

Set forth below is a discussion of the status of performance share cycles that ended in the years 2005 and 2006.

**Performance Share Cycles ended on December 31, 2005 and December 31, 2006**

Based on qualitative and quantitative analyses relating to the company's performance during the 2005 and 2006 award cycles that were available to the Compensation Committee and the Board, the Compensation Committee and the Board reviewed the company's performance against the financial and non–financial goals originally established for each of the three–year periods covered by these award cycles. The Compensation Committee and the Board determined that the audited financial statements for 2004 and 2005, together with information available to them regarding 2006, provided a sufficient basis to make a determination with regard to the company's financial performance for both the 2005 and 2006 award cycles. Based on these reviews, the

Compensation Committee and the Board determined to pay the award for the 2005 award cycle at the 40% level and to pay the award for the 2006 award cycle at the 47.5% level to the current and former employees eligible to receive the award payments.

The payment of the awards to each of the company's "OFHEO-designated executive officers" is subject to approval of the Office of Federal Housing Enterprise Oversight, or OFHEO. The company's "OFHEO-designated executive officers" is a group of executive officers that is larger than the group of officers that Fannie Mae has determined are "executive officers" under the rules of the Securities and Exchange Commission. On June 19, 2007, the company received a letter from OFHEO requesting a report from the company's Board of Directors relating to the determination of the size and appropriateness of the proposed awards for the 2005 and 2006 award cycles, including information relating to the proposed payments to former employees. The Compensation Committee and the Board are in the process of preparing the report for submission to OFHEO.

Assuming the company receives the required OFHEO approval, each of the following named executive officers will receive the number of shares of common stock, having the dollar value, set forth opposite that officer's name:

| Named Executive Officer | 2005 Award Cycle | | 2006 Award Cycle | |
|---|---|---|---|---|
| | Number of Shares | Value(1) | Number of Shares | Value(1) |
| Daniel H. Mudd President and Chief Executive Officer | 11,438 | $792,195.88 | 15,960 | $1,105,389.60 |
| Robert J. Levin Executive Vice President and Chief Business Officer | 9,994 | $692,184.44 | 15,184 | $1,051,643.84 |
| Thomas A. Lund Executive Vice President—Single-Family Mortgage Business | 2,513 | $174,050.38 | 3,367 | $ 233,198.42 |
| Peter S. Niculescu Executive Vice President—Capital Markets | 6,238 | $432,043.88 | 8,968 | $ 621,123.68 |
| Michael J. Williams Executive Vice President and Chief Operating Officer | 8,806 | $609,903.56 | 11,150 | $ 772,249.00 |

(1)  The value of the shares represents the number of shares multiplied by the closing price of $69.26 per share of the common stock on June 15, 2007.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION

By /s/ Beth A. Wilkinson

Beth A. Wilkinson
Executive Vice President and General Counsel

Date: June 21, 2007

Created by 10KWizard    www.10KWizard.com

# EXHIBIT 2

**EXHIBIT 10.12**

FANNIE MAE

STOCK COMPENSATION PLAN OF 1993

**I.    The Plan**

1.1 Purpose. The purpose of the Fannie Mae Stock Compensation Plan of 1993 is to promote the success of the Federal National Mortgage Association by providing an additional means through the grant of Awards to provide officers and employees with stock compensation that is comparable with compensation for employment with other similar companies in order to attract, motivate, retain and reward officers and employees; to provide incentives for high levels of individual performance and improved financial performance; to attract, motivate and retain experienced and knowledgeable independent directors; and to promote a close identity of interests between directors, officers, employees and stockholders.

1.2 Definitions.

The following terms shall have the meanings set forth below:

(1) *"Award"* shall mean an award of any Option, Stock Appreciation Right, Restricted Stock, Performance Share Award, Stock Bonus, or any other award authorized under Section 1.6, or any combination thereof, whether alternative or cumulative, authorized by and granted under this Plan.

(2) *"Award Date"* shall mean the date upon which the Nonmanagement Board or the Committee, as applicable as determined pursuant to Section 1.3, takes the action granting an Award or such later date as the Nonmanagement Board or the Committee designates as the Award Date at the time of granting the Award or, in the case of Awards under Articles VI or VII, the applicable dates set forth therein.

(3) *"Award Document"* shall mean any writing, which may be an agreement, setting forth the terms of an Award that has been granted by the Nonmanagement Board or the Committee.

(4) *"Award Period"* shall mean the period beginning on an Award Date and ending on the expiration date of such Award.

(5) *"Beneficiary"* shall mean the person or persons designated by a Participant or Permitted Transferee in writing to the Benefit Plans Committee to receive the benefits specified in an Award Document and under this Plan in the event of the death of such Participant or Permitted Transferee, or, if the Participant or Permitted Transferee has not designated such person or persons, or such person or persons shall all have pre-deceased the Participant or Permitted Transferee, the executor or administrator of the estate of such Participant or Permitted Transferee.

(6) *"Benefit Plans Committee"* shall mean the Benefit Plans Committee established by the Board, consisting of employees of the Corporation.

(7) *"Board"* shall mean the Board of Directors of the Corporation.

(8) *"Change in Control Event"* shall mean any of the following:

(a) A change in the composition of a majority of the Board elected by stockholders within 12 months after any "person" (as such term is used in Sections 3(a)(9), 13(d) and 14(d) of the Securities Exchange Act of 1934) is or becomes the beneficial owner, directly or indirectly, of securities of the Corporation representing more than 25 percent of the combined voting power of the then outstanding securities of the Corporation entitled to then vote generally in the election of directors of the Corporation.

(b) A change in the authority of the Corporation to carry on its business that would materially restrict the general scope of its authorized business activities.

(c) A change in the current legal or regulatory structure, other than one sought by management, that would materially impair the Corporation's ability to borrow as a "federal agency" borrower.

(9) *"Code"* shall mean the Internal Revenue Code of 1986, as amended from time to time.

(10) *"Committee"* shall mean the Compensation Committee of the Board.

(11) *"Common Stock"* shall mean the common stock of the Corporation and, in the event such common stock is converted to another security or property pursuant to Section 8.2, such other security or property.

(12) *"Corporation"* shall mean Federal National Mortgage Association and its successors, and, where the context requires, its Subsidiaries.

(13) *"Director Term"* shall mean the period starting with the annual meeting of the stockholders at which directors are elected to serve on the Board and ending with the next annual meeting at which directors are elected.

(14) *"Early Retirement"* means separation from service with the Corporation at or after the attainment of age 60 (but before attainment of age 65) with five years of service with the Corporation, or at an earlier age only if permitted by the Nonmanagement Board or the Committee (as the case may be) in its sole discretion. For purposes of this Section 1.2(14), a year of service shall be determined in accordance with the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law.

-2-

(15) *"Eligible Employee"* shall mean any employee of the Corporation.

(16) *"ERISA"* shall mean the Employee Retirement Income Security Act of 1974, as amended.

(17) *"Escrow Agent"* shall mean Chemical Bank or any additional or successor escrow agent designated by the Benefit Plans Committee.

(18) *"Escrow Agreement"* shall mean the document approved by the Benefit Plans Committee that sets forth the agreement among the Corporation, the Participant and the Escrow Agent pursuant to which an Award of Restricted Stock, including an Award of Restricted Stock to a Nonmanagement Director pursuant to Article VII, is held in escrow pursuant to its terms.

(19) *"Fair Market Value"* shall mean

(i) for the purpose of determining the exercise price of an Option or the number of shares of Restricted Stock to be granted under Article VII, the per share value of Common Stock as determined by using the mean between the high and low selling prices of such Common Stock on the Award Date (or, if the NYSE is not open that day, the next subsequent day that the NYSE is open for trading and the Common Stock is traded) as reported for such date in the table entitled "NYSE—Composite Transactions," contained in The Wall Street Journal; and

(ii) for the purpose of valuing Common Stock used in payment upon the exercise of an Option or other Award or to satisfy a tax withholding obligation or of calculating the gain upon the exercise of a Stock Appreciation Right, the per share value of Common Stock as determined by using the closing price of such Common Stock on the day preceding the date of exercise or payment (or, if the NYSE is not open that day, the closest preceding day that the NYSE is open for trading and the Common Stock is traded) as reported for such date in the table entitled "NYSE—Composite Transactions," contained in The Wall Street Journal, or for the purpose of computing the value of a Limited SAR, the average of such closing prices of such Common Stock on each day during the period or on the date specified in the Award Document.

(20) *"Immediate Family Member"* shall mean, with respect to a Participant, (i) such Participant's child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, half-sibling, stepsibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law (including adoptive relations where the adopted individual shall not have attained the age of 18 years prior to such adoption); (ii) such Participant's Domestic Partner (as defined in Section 2.18 of the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law and determined pursuant to the guidelines and procedures established thereunder); (iii) any

-3-

lineal ascendant or descendant of any individual described in (i) or (ii) above; (iv) any partnership, limited liability company, association, corporation or other entity all of whose beneficial interests (including without limitation all pecuniary interests, voting rights and investment power) are held by and for the benefit of the Participant and/or one or more individuals described in (i), (ii) or (iii) above; or (v) any trust for the sole benefit of the Participant and/or one or more individuals described in (i), (ii) or (iii) above.

(21) *"Incentive Stock Option"* shall mean an Option that is designated as an incentive stock option within the meaning of Section 422 of the Code, or any successor provision, and that otherwise satisfies the requirements of that section.

(22) *"Limited SAR"* shall mean a Stock Appreciation Right granted pursuant to Section 3.4.

(23) *"NMD Participant"* shall mean a Nonmanagement Director who holds an Award granted pursuant to Article VI or Article VII.

(24) *"Nonmanagement Board"* shall mean the Nonmanagement Directors, as a group.

(25) *"Nonmanagement Director"* shall mean a member of the Board who is not an officer or employee of the Corporation.

(26) *"Nonqualified Stock Option"* shall mean an Option that is not an Incentive Stock Option.

(27) *"NYSE"* shall mean the New York Stock Exchange.

(28) *"Option"* shall mean an option to purchase Common Stock pursuant to an Award.

(29) *"Participant"* shall mean a Nonmanagement Director or an Eligible Employee who has been granted an Award under this Plan.

(30) *"Performance Share Award"* shall mean an Award granted under Section 5.1.

(31) *"Permitted Transferee"* shall mean (i) any Immediate Family Member with respect to the Participant, (ii) (A) an extended family member or any person who has provided or is providing long-term assistance or care to the Participant or to an individual who is an Immediate Family Member with respect to the Participant or (B) an Immediate Family Member of a person described in (A), and (iii) in the case of an Eligible Employee, any organization that is described in Section 170(c) of the Code or any intermediary designated to exercise an Option for the benefit of such organization.

(32) *"Personal Representative"* shall mean the person or persons who, upon the incompetence of a Participant, shall have acquired on behalf of the Participant, by legal proceeding or otherwise, the power to exercise the rights or receive benefits under this Plan and who shall have become the legal representative of the Participant.

(33) *"Plan"* shall mean this Fannie Mae Stock Compensation Plan of 1993.

(34) *"Plan Termination Date"* shall mean the tenth anniversary of the date of the meeting at which stockholders of the Corporation approve the Plan.

(35) *"QDRO"* shall mean a qualified domestic relations order as defined in Section 414(p) of the Code or Section 206(d)(3) of ERISA (to the same extent as if this Plan were subject thereto), or the applicable rules thereunder.

(36) *"Restricted Stock"* shall mean shares of Common Stock awarded to a Participant subject to payment of such consideration, if any, and such conditions on vesting and such transfer and other restrictions as are established in or pursuant to this Plan, for so long as such shares remain nonvested under the terms of the applicable Award Document.

(37) *"Retirement"* shall mean, in the case of an Eligible Employee, separation from service with the Corporation under conditions entitling such Eligible Employee to an immediate annuity under the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law or under the Civil Service retirement law, whichever is applicable to such Eligible Employee, at or after the attainment of age 65.

(38) *"Rule 16a-1"* shall mean Rule 16a-1 as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended from time to time, and any successor provision.

(39) *"Rule 16b-3"* shall mean Rule 16b-3 as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended from time to time, and any successor provision.

(40) *Stand-Alone SAR"* shall mean a Stock Appreciation Right granted independently of any other Award.

(41) *"Stock Appreciation Right"* shall mean a right pursuant to an Award to receive a number of shares of Common Stock or an amount of cash, or a combination of shares and cash, the aggregate amount or value of which is determined by reference to a change in the Fair Market Value of the Common Stock.

(42) *"Stock Bonus"* shall mean an Award of shares of Common Stock under Section 5.2.

(43) *"STSP"* shall mean the Federal National Mortgage Association Securities Transactions Supervision Program and the guidelines thereunder.

(44) *"Subsidiary"* shall mean an organization whose employees are identified by the Board as eligible to participate in benefit plans of the Corporation.

(45) *"Total Disability"* shall mean complete and permanent inability by reason of illness or accident to perform the duties of the occupation at which the Participant was employed when the illness commenced or accident occurred, as determined by the Corporation's independent medical consultant, and, in the case of Eligible Employees at or above the rank of Executive Vice President, ratified by the Nonmanagement Board.

(46) *"Without Consideration"* shall mean that a transfer of an Option is being made for a purely donative purpose, with no other promise or receipt of payment, goods, services or other thing of value in exchange therefor, provided, however, if the terms of a transfer of Options to an otherwise Permitted Transferee requires that, upon proper notice of exercise of such Options by or on behalf of such Permitted Transferee, (i) the Corporation may reduce the number of shares of Common Stock or sell such number of shares of Common Stock otherwise deliverable thereunder to the extent required to fund any additional withholding tax on behalf of the Eligible Employee necessitated by such exercise, delivering only the balance of the shares of Common Stock due upon the exercise of such Option to the Permitted Transferee, and/or (ii) the Permitted Transferee is required to sell the shares of Common Stock so received upon exercise of the Option, apply a portion of the net proceeds thereof to the payment of any additional taxes, fees or other costs or expenses incurred by the donor Eligible Employee in connection with or as a result of such transfer and then deliver (if an intermediary) or retain (if an organization described in Section 170(c) of the Code) the remaining net proceeds from such sales of shares of Common Stock, such transfer shall nevertheless continue to be Without Consideration for the purposes hereof. A distribution of an Option by an entity or trust described in section 1.2(20)(iv) or (v) to an owner or beneficiary thereof shall be treated as a transfer Without Consideration

1.3 Administration and Authorization; Power and Procedure.

(a) *The Nonmanagement Board and the Committee.* This Plan shall be administered by, and all Awards to Eligible Employees shall be authorized by, the Nonmanagement Board in the case of Eligible Employees at or above the rank of Executive Vice President and the Committee in the case of Eligible Employees below the rank of Executive Vice President. Action of the Nonmanagement Board or the Committee with respect to the administration of this Plan shall be taken pursuant to a majority vote or by unanimous written consent of the respective members. All references in this Plan to actions or determinations in respect of Awards by the Nonmanagement Board shall be references to Awards granted to Eligible Employees at or above the rank of Executive Vice President. All references in this Plan to actions or determinations in respect of Awards by the Committee shall be references to Awards granted to Eligible Employees below the rank of Executive

Vice President. The Nonmanagement Board shall administer this Plan with respect to all Awards held by Eligible Employees at or above the rank of Executive Vice President, including Awards granted prior to the time that any such Eligible Employee is elevated to that rank.

(b) *Plan Awards; Interpretation; Powers.* Subject to the express provisions of this Plan, the Nonmanagement Board or the Committee shall have the authority:

(i) to determine the Eligible Employees who will receive Awards;

(ii) to grant Awards to such Eligible Employees, to determine the amount of and the price at which Common Stock will be offered or awarded thereto, to determine the other specific terms and conditions of such Awards consistent with the express limits of this Plan, to establish the installments (if any) in which such Awards shall become exercisable or shall vest, and to establish the expiration date and the events of termination of such Awards;

(iii) to construe and interpret this Plan and any Award Documents, to further define the terms used in this Plan, and to prescribe, amend and rescind rules and regulations relating to the administration of this Plan;

(iv) to cancel, to modify, or waive the Corporation's rights with respect to, or modify, discontinue, suspend, or terminate any or all outstanding Awards held by Eligible Employees, subject to any required consents under Section 8.5;

(v) to accelerate or extend the ability to exercise or extend the term of any or all outstanding Awards (subject to the maximum term of Awards under Section 1.7); and

(vi) to make all other determinations and take such other actions as contemplated by this Plan or as may be necessary or advisable for the administration of this Plan and the effectuation of its purposes.

Notwithstanding the foregoing, the provisions of Articles VI and VII relating to Nonmanagement Director Awards shall be automatic and, to the maximum extent possible, self-effectuating, and the discretion of the Nonmanagement Board or the Committee shall not extend to such Awards in any manner that would be impermissible under Rule 16b-3(c)(2). Ministerial, non-discretionary actions with respect to implementation of the provisions of Articles VI and VII shall be performed by individuals who are officers or employees of the Corporation at the direction of the Benefit Plans Committee.

(c) *Binding Determinations.* Any action taken by, or inaction of, the Corporation, any Subsidiary, the Board, the Nonmanagement Board, the Committee or the Benefit Plans Committee relating or pursuant to this Plan shall be within the absolute discretion of that entity or body and shall be conclusive and binding upon all persons. Subject only to

-7-

compliance with the express provisions hereof, the Board, the Nonmanagement Board and the Committee may act in their absolute discretion in matters within their authority related to this Plan.

(d) *Reliance on Experts.* In making any determination or in taking or not taking any action under this Plan, the Board, the Nonmanagement Board or the Committee may obtain and may rely upon the advice of experts, including professional advisors to the Corporation.

(e) *Delegation.* The Committee may delegate some or all of its authority under the Plan to one or more members of the Board. The Nonmanagement Board and the Committee may delegate ministerial, non-discretionary functions to individuals who are officers or employees of the Corporation.

(f) *No Liability.* No member of the Board, the Committee or the Benefit Plans Committee, or director, officer or employee of the Corporation or any Subsidiary shall be liable, responsible or accountable in damages or otherwise for any determination made or other action taken or any failure to act by such person so long as such person is not determined to be guilty by a final adjudication of willful misconduct with respect to such determination, action or failure to act.

(g) *Indemnification.* To the extent permitted by law, each of the members of the Board, the Committee and the Benefit Plans Committee and each of the directors, officers and employees of the Corporation and any Subsidiary shall be held harmless and be indemnified by the Corporation for any liability, loss (including amounts paid in settlement), damages or expenses (including reasonable attorneys' fees) suffered by virtue of any determinations, acts or failures to act, or alleged acts or failures to act, in connection with the administration of this Plan so long as such person is not determined by a final adjudication to be guilty of willful misconduct with respect to such determination, action or failure to act.

1.4 Participation. Awards may be granted by the Nonmanagement Board or the Committee only to Eligible Employees. An Eligible Employee who has been granted an Award may, if otherwise eligible, be granted additional Awards if the Nonmanagement Board or the Committee shall so determine. Nonmanagement Directors shall not be eligible to receive any Awards except for Awards granted automatically pursuant to Articles VI and VII.

1.5 Shares Available for Awards.

(a) *Common Stock.* Subject to the provisions of Section 8.2, the Common Stock that may be delivered under this Plan shall be shares of the Corporation's authorized but unissued Common Stock, any shares of Common Stock held as treasury shares, and shares of Common Stock purchased by the Corporation on the open market.

(b) *Number of Shares.* Subject to adjustments in accordance with Section 8.2, the maximum number of shares of Common Stock that may be delivered pursuant to Awards

-8-

granted to Eligible Employees and Nonmanagement Directors under this Plan shall not exceed 13,500,000 shares plus shares previously approved by the stockholders for awards under the Fannie Mae Stock Compensation Plan, the Federal National Mortgage Association Restricted Stock Plan for Directors, the Federal National Mortgage Association 1984 Stock Option Plan and the Federal National Mortgage Association Performance Share Plan that have never been subject to awards under such plans or that have become available as of March 29, 1993 under such plans through the expiration, cancellation or termination of outstanding awards.

(c) *Calculation of Available Shares and Replenishment.* A good faith estimate of the number of shares of Common Stock subject to outstanding Awards that will be satisfied by delivery of shares of Common Stock, plus the number of shares of Common Stock referenced for purposes of determining other Awards, shall be reserved from the number of shares of Common Stock available for Awards under this Plan. The aggregate number of shares of Common Stock delivered under this Plan plus the number of shares referenced with respect to Awards paid in cash shall reduce the number of shares of Common Stock remaining available. If any Award shall expire or be canceled or terminated without having been exercised in full, or any Common Stock subject to a Restricted Stock Award or other Award shall not vest or be delivered, the unpurchased, nonvested or undelivered shares of Common Stock subject thereto or the shares of Common Stock referenced with respect thereto shall again be available under this Plan; provided, however, that no such unpurchased, nonvested or undelivered shares shall again be available if the holder received dividends with respect to such shares or any other benefits of ownership of such shares, other than voting rights or the accumulation of dividends that are never paid to the holder. In the case of Awards granted in combination such that the exercise of one results in a proportionate cancellation of the other, the number of shares of Common Stock reserved for issuance shall be the greater of the number that would be reserved if one or the other alone was outstanding. If the Corporation withholds shares of Common Stock pursuant to Section 8.4, the number of shares that would have been deliverable with respect to an Award but that are withheld pursuant to the provisions of Section 8.4 shall be treated as issued and the aggregate number of shares issuable with respect to the applicable Award and under this Plan shall be reduced by the number of shares so withheld and such shares shall not be available for additional Awards.

1.6 Grant of Awards. Subject to the express provisions of this Plan, the Nonmanagement Board or the Committee shall determine the number of shares of Common Stock subject to each Award, the price (if any) to be paid for the shares or the Award and other terms and conditions of the Award. Each Award to an Eligible Employee shall be evidenced by an Award Document signed by the Corporation and, if required by the Nonmanagement Board or the Committee, by the Eligible Employee. Awards are not restricted to any specified form or structure and may include, without limitation, the types of Awards set forth in Articles II, III, IV and V hereof or, without limitation, any other transfers of Common Stock or any options or warrants to acquire Common Stock, or any similar right with a value related to or derived from the value of Common Stock, as may be determined by the Nonmanagement Board or the Committee. An Award may consist of one such benefit, or two or more of them in any combination or alternative.

-9-

1.7 Award Period. Each Award and all executory rights or obligations under the related Award Document shall expire on such date (if any) as shall be determined by the Nonmanagement Board or the Committee, but in the case of Options or other rights to acquire Common Stock, not later than ten (10) years and one day after the Award Date.

1.8 Limitations on Exercise and Vesting of Awards.

(a) *Provisions for Exercise.* An Award shall be exercisable or shall vest as determined by the Nonmanagement Board or the Committee.

(b) *Procedure.* Any exercisable Award shall be exercised when the person appointed by the Nonmanagement Board or the Committee receives written notice of such exercise from the Participant, together with satisfactory arrangements for any required payment to be made in accordance with Sections 2.2 or 8.4 or the terms of the Award Document, as the case may be.

(c) *Fractional Shares/Minimum Issue.* Fractional share interests shall be disregarded, but may be accumulated. However, the Nonmanagement Board or the Committee may determine that cash will be paid or transferred in lieu of any fractional share interests.

1.9 Acceptance of Notes to Finance Exercise. Where the Nonmanagement Board or the Committee deems it appropriate under the circumstances as indicated by its written approval, the Corporation may accept one or more notes from any Eligible Employee Participant in connection with the exercise or receipt of any outstanding Award or the payment of the amount of any taxes that the Corporation may be required to withhold with respect to such exercise or receipt; provided that any such note shall be subject to the following terms and conditions:

(1) The principal of the note shall not exceed the amount required to be paid to the Corporation upon the exercise or receipt of one or more Awards under the Plan, including the amount of any taxes required to be withheld, and the note shall be delivered directly to the Corporation in consideration of such exercise or receipt.

(2) The initial term of the note shall be determined by the Nonmanagement Board or the Committee; provided that the term of the note, including extensions, shall not exceed ten years.

(3) The note shall provide for full recourse to the Participant, including a right of set-off against amounts otherwise payable by the Corporation to the Participant, and shall bear interest at a rate determined by the Nonmanagement Board or the Committee, but not less than the applicable federal rate determined under Section 1274, or any successor provision of the Code.

(4) If the employment of the Participant terminates, the unpaid principal balance of

-10-

the note shall become due and payable on the 10th business day after such termination; provided, however, that if a sale of shares of Common Stock would cause such Participant to incur liability under the STSP, the unpaid balance shall become due and payable on the 10th business day after the first day on which a sale of such shares can be made without incurring such liability, assuming for these purposes that, subsequent to such termination, the Participant has entered into no other transactions involving shares of Common Stock.

(5) If required by the Nonmanagement Board or the Committee or by applicable law, the note shall be secured by a pledge of any shares or rights financed thereby in compliance with applicable law.

(6) The terms, repayment provisions, and collateral release provisions of the note and the pledge securing the note shall conform with applicable rules and regulations of the Federal Reserve Board as then in effect.

1.10 Transferability.

(a) *General Restrictions.* Awards may be exercised only by the Participant; the Participant's Personal Representative, if any; the Participant's Beneficiary, if the Participant has died; in the case of any Option (other than an Incentive Stock Option), a person who was a Permitted Transferee at the time the Option was transferred to such person; or a Permitted Transferee's Beneficiary, if the Permitted Transferee has died. Amounts payable or shares of Common Stock issuable pursuant to an Award shall be paid to (or registered in the name of) such person or persons as specified by the person exercising the Award. Other than by will or the laws of descent and distribution or pursuant to a QDRO (except to the extent not permitted in the case of an Incentive Stock Option) or (subject to (b), (c), (d), (e), and (f) below) to a Permitted Transferee in the case of any Option (other than an Incentive Stock Option), no right or benefit under this Plan or any Award, including without limitation any Option, Performance Share Award or share of Restricted Stock that has not vested, shall be transferable by a Participant or Permitted Transferee or shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge (other than to the Corporation), and any such attempted action shall be void. The Corporation shall disregard any attempt at transfer, assignment or other alienation prohibited by the preceding sentences and only shall pay or deliver such cash or shares of Common Stock in accordance with the provisions of this Plan. The designation of a Beneficiary hereunder shall not constitute a transfer for these purposes.

(b) *Tax Withholding.* An Eligible Employee may not transfer Options ("Transferred Options") to a Permitted Transferee, other than a Permitted Transferee described in Section 1.2(31)(iii), unless the Eligible Employee agrees to retain, and not to exercise, until the exercise of the Transferred Options, at least 50 percent of the exercisable Options held by the Eligible Employee with the same exercise price and expiration date as the Transferred Options. The condition set forth in the preceding sentence, however, may be waived at any time by (A) the Chairman of the Committee in the case of an Eligible Employee who is either a member of the Board or the General Counsel of the Corporation,

-11-

or (B) the General Counsel of the Corporation in the case of any other Eligible Employee, and, as a condition of such waiver, the Chairman of the Committee or the General Counsel of the Corporation, as the case may be, may specify other steps that the Eligible Employee must take to provide for the collection by the Corporation of all federal, state, local and other taxes required by law to be withheld upon the exercise of such Transferred Options.

(c) *Notice of Transfer.* A transfer of an Option to a Permitted Transferee shall not be effective unless, prior to making the transfer, the transferor (i) provides written notice of the transfer to (A) the Chairman of the Committee in the case of a transfer by a Participant who is either a member of the Board or the General Counsel of the Corporation (or a transfer by a Permitted Transferee of an Option originally granted to a member of the Board or to the General Counsel of the Corporation), or (B) the General Counsel of the Corporation in the case of any other transfer, and (ii) certifies in writing to the Chairman of the Committee or the General Counsel of the Corporation, as the case may be, that the transfer will be Without Consideration.

(d) *Approval of Transfer.* A transfer of an Option to a Permitted Transferee described in section 1.2(31)(ii) or (iii) shall not be effective unless, after receiving the notice described in (c) above, the Chairman of the Committee or the General Counsel of the Corporation, as the case may be, either approves the proposed transfer in writing or does not disapprove the proposed transfer in writing within ten business days after receipt of such notice. The Chairman of the Committee or the General Counsel of the Corporation, as the case may be, may disapprove such a proposed transfer if he or she determines, in his or her good faith judgment, that (i) the proposed Permitted Transferee has philosophies, purposes, policies, objectives, goals or practices inconsistent with those of the Corporation or (ii) the Participant has not taken such steps as may be necessary or appropriate to provide for the collection by the Corporation of all federal, state, local and other taxes required by law to be withheld upon exercise of the Option.

(e) *Time of Transfer.* A transfer to a Permitted Transferee other than a Permitted Transferee described in Section 1.2(31)(iii) may be made not earlier than March 14, 1997 and not later than March 21, 1997 or, thereafter, only on the first business day of a subsequent calendar quarter.

(f) *Transfer of Nonvested Options.* A nonvested Option may be transferred to a Permitted Transferee other than a Permitted Transferee described in section 1.2(31)(iii) only with the prior consent of (A) the Chairman of the Committee in the case of a Participant who is either a member of the Board or the General Counsel of the Corporation, or (B) the General Counsel of the Corporation in the case of any other Participant.

1.11 Gain Deferral. Any participant who is eligible to participate in the Fannie Mae Stock Option Gain Deferral Plan may elect to exercise a Nonqualified Stock Option pursuant to the provisions of such plan.

1.12 Section 83(b) Elections. If a Participant shall file an election with the Internal

-12-

Revenue Service to include the value of any Award in the Participant's gross income while such Award remains subject to restrictions, the Participant shall promptly furnish the Corporation with a copy of such election.

1.13 Payments to Persons Other Than Participants or Beneficiaries. If the Nonmanagement Board or the Committee determines that any Participant or Beneficiary to whom any amount is payable under the Plan is unable to care for such person's affairs because of illness or accident, or is a minor, then any payment due to such person (unless a prior claim therefor has been made by a duly appointed legal representative) may, in the discretion of the Nonmanagement Board or the Committee, be paid to such person's spouse, child, other relative, an institution maintaining or having custody of such person, or any other person deemed by the Nonmanagement Board or the Committee to be a proper recipient on behalf of such person otherwise entitled to payment. Any such payment shall be a complete discharge of any liability under this Plan.

## II.  Options

2.1 Grants. One or more Options may be granted under this Article to any Eligible Employee. Each Option granted may be either an Incentive Stock Option or a Nonqualified Stock Option.

2.2 Option Price.

(a) *Pricing Limits.* The exercise price for shares of Common Stock covered by Options shall be determined by the Nonmanagement Board or the Committee at the time of the Award, but shall not be less than 100% of the Fair Market Value of the Common Stock on the Award Date.

(b) *Payment Provisions.* The exercise price for any shares of Common Stock purchased on exercise of an Option granted under this Article shall be paid in full at the time of each exercise in one or a combination of the following methods: (i) in cash or by electronic funds transfer; (ii) by check payable to the order of the Corporation; (iii) by notice and third party payment; (iv) by the delivery of shares of Common Stock already owned by the Participant; (v) if authorized by the Nonmanagement Board or the Committee or specified in the applicable Award Document, by a promissory note of the Participant consistent with the requirements of Section 1.9; or (vi) through simultaneous sale through a broker of shares of Common Stock acquired on exercise, as permitted under Regulation T of the Board of Governors of the Federal Reserve System; provided, however, that the Nonmanagement Board or the Committee may, in its absolute discretion, limit the Participant's ability to exercise an Option by delivering shares of Common Stock, including by imposing a requirement that the Participant satisfy a minimum holding period with respect to the shares so delivered. Shares of Common Stock used to satisfy the exercise price of an Option shall be valued at their Fair Market Value on the date of exercise.

-13-

2.3 Limitations on Incentive Stock Options. There shall be imposed in any Award Document relating to Incentive Stock Options such terms and conditions as from time to time are required in order that the Option be an "incentive stock option" as that term is defined in Section 422 of the Code, or any successor provision.

2.4 Option Period.

(a) *Award Period.* Each Option shall specify the Award Period for which the Option is granted and shall provide that the Option shall expire at the end of such Award Period. The Nonmanagement Board or the Committee may extend the Award Period by amendment of an Option. Notwithstanding the foregoing, the Award Period with respect to an Option, including all extensions, shall not exceed: (i) in the case of an Incentive Stock Option, 10 years, and (ii) in the case of any other Option, 10 years and one day.

b) *Effect of Termination of Employment.* Notwithstanding the provisions of Section 2.4(a), unless otherwise provided by the Nonmanagement Board or the Committee, (i) for a Participant who terminates employment with the Company for any reason other than Retirement, Early Retirement, Total Disability or, death or having attained age 55 with five years of service and is not covered by Section 2.5(d), an Option shall expire on the earlier to occur of (A) the end of the Award Period or (B) the date three months following the Participant's termination of employment, (ii) for a Participant who terminates employment with the Company and is covered by Section 2.5(d), an Option shall expire on the earlier to occur of (A) the end of the Award Period or (B) the date 12 months following the Participant's termination, or (iii) for a Participant who terminates employment by reason of Retirement, Early Retirement, Total Disability, death or having attained age 55 with five years of service, an Option shall expire on the end of the Award Period.

c) *Death of Permitted Transferee.* Unless otherwise provided by the Nonmanagement Board or the Committee, an Option held by a Permitted Transferee shall expire on the earlier of its expiration pursuant to Section 2.4(a) or (b) or the date 12 months following the Permitted Transferee's death.

2.5 Vesting; Forfeiture.

(a) *Vesting Generally.* An Option shall be exercisable and vested upon such terms and conditions or pursuant to such schedule as the Nonmanagement Board or the Committee shall determine at the time of the Award. Except as otherwise provided in this Section 2.5 or unless otherwise specified by the Nonmanagement Board or the Committee, an Option that is not vested upon a Participant's termination of employment shall be forfeited.

(b) *Change in Control.* Unless otherwise specified by the Nonmanagement Board, Options held for more than one year from the Award Date by Participants at or above the rank of Executive Vice President shall become immediately exercisable and

-14-

fully vested upon a Change in Control Event.

(c) *Retirement, Early Retirement, Total Disability or Death.* Unless otherwise specified by the Nonmanagement Board or the Committee, an Option shall become immediately exercisable and fully vested upon the Participant's termination of employment with the Corporation by reason of Retirement, Early Retirement, Total Disability or death.

(d) *Vesting Upon Termination with Separation Agreements.* Notwithstanding the foregoing, (i) for a Participant who executes, prior to the termination of his or her employment, a separation agreement with the Corporation pursuant to the Corporation's Voluntary Separation Agreement program ("VSA"), one-half of the portion of each Award that would have vested within 12 months of the date of such Participant's termination of employment with the Corporation shall become immediately exercisable and fully vested upon such Participant's termination; (ii) (A) for a Participant who accepts the Corporation's offer to terminate employment voluntarily and executes, prior to the termination of such Participant's employment, a separation agreement with the Corporation pursuant to an Elective Severance Window under the Federal National Mortgage Association Discretionary Severance Benefit Plan, the portion of each Award that would have vested within 12 months of the date of such Participant's termination of employment with the Corporation, and one-half of the portion of each Award that would have vested within 13-24 months of the date of such Participant's termination, shall become immediately exercisable and fully vested upon such Participant's termination, and (B) for a Participant who is not given the opportunity to terminate employment under an Elective Severance Window but voluntarily executes, prior to the termination of his or her employment, a separation agreement with the Corporation pursuant to a Displacement Program under the Federal National Mortgage Association Discretionary Severance Benefit Plan, the portion of each Award that would have vested within 12 months of the date of such Participant's termination of employment with the Corporation shall become immediately exercisable and fully vested upon such Participant's termination, and (iii) for a Participant who executes, prior to the termination of his or her employment, a separation agreement with the Corporation pursuant to the Fannie Mae Individual Severance Plan, the portion of each Award that would have vested within 12 months of the date of such Participant's termination of employment with the Corporation shall become immediately exercisable and fully vested upon such Participant's termination.

(e) *"EPS Challenge Grants."* Section 2.5(d) shall not apply to Options granted pursuant to "EPS Challenge Grants," initially granted on January 18, 2000.

2.6 Option Repricing, Cancellation, Substitution or Waiver of Restrictions. Subject to Sections 1.5 and 8.5 and the specific limitations on Awards contained in this Plan, the Nonmanagement Board or the Committee from time to time may authorize, generally or in specific cases only, for the benefit of any Participant who is an Eligible Employee, any adjustment in the exercise or purchase price, the vesting schedule, the number of shares subject to, the restrictions upon or the term of, an Award granted under this Article by cancellation of an outstanding Award and a subsequent granting of an Award, by amendment, by substitution of an outstanding Award, by waiver or by other legally valid means. Such amendment or other action may result, among

other changes, in an exercise or purchase price that is higher or lower than the exercise or purchase price of the original or prior Award, provide for a greater or lesser number of shares subject to the Award, or provide for a longer or shorter vesting or exercise period.

## III. Stock Appreciation Rights

3.1 Grants. In its discretion, the Nonmanagement Board or the Committee may grant to any Eligible Employee Stock Appreciation Rights either concurrently with the grant of another Award or in respect of an outstanding Award, in whole or in part, or may grant to any Eligible Employee Stand-Alone SARs. Any Stock Appreciation Right granted in connection with an Incentive Stock Option shall contain such terms as may be required to comply with the provisions of Section 422 of the Code (or any successor provision) and the regulations promulgated thereunder. Each Stand-Alone SAR shall specify the Award Period for which the Stand-Alone SAR is granted and shall provide that the Stand-Alone SAR shall expire at the end of such Award Period. The Nonmanagement Board or the Committee may extend the Award Period by amendment of a Stand-Alone SAR; provided, however, that the Award Period, including all extensions, shall not exceed 10 years and one day.

3.2 Exercise of Stock Appreciation Rights.

(a) *Related Awards.* Unless the Award Document or the Nonmanagement Board or the Committee otherwise provides, a Stock Appreciation Right related to another Award shall be exercisable at such time or times, and to the extent, that the related Award shall be exercisable.

(b) *Stand-Alone SARs.* Stand-Alone SARs shall be exercisable and vest upon such terms and conditions or pursuant to such schedule as the Nonmanagement Board or the Committee shall determine at the time of the Award. Unless otherwise provided by the Nonmanagement Board or the Committee, (i) in the case of a Participant's termination of employment with the Corporation by reason of Retirement, Early Retirement, Total Disability or death, Stand-Alone SARs shall become immediately exercisable and fully vested upon the Participant's termination of employment, and Stand-Alone SARs shall expire and no longer be exercisable at the end of the Award Period; and (ii) in the case of a Participant's termination of employment with the Corporation for any reason other than Retirement, Early Retirement, Total Disability or death, Stand-Alone SARs shall expire and no longer be exercisable on the earlier to occur of (A) the end of the Award Period or (B) the date three months following the Participant's termination of employment. Unless otherwise provided by the Nonmanagement Board, Stand-Alone SARs held for more than one year from the Award Date by Participants at or above the rank of Executive Vice President shall become immediately exercisable and fully vested upon a Change in Control Event.

-16-

3.3 Payment.

    (a) *Amount.* Unless the Nonmanagement Board or the Committee otherwise provides, upon exercise of a Stock Appreciation Right and surrender of the appropriate exercisable portion of any related Award, the Participant shall be entitled to receive payment of an amount determined by multiplying

        (i) the difference obtained by subtracting the exercise price per share of Common Stock under the related Award (if applicable) or the initial share value specified in the Award from the Fair Market Value upon exercise, by

        (ii) the number of shares of Common Stock with respect to which the Participant is exercising the Stock Appreciation Right.

    (b) *Form of Payment.* The Nonmanagement Board or the Committee, in its sole discretion, shall determine the form in which payment shall be made of the amount determined under paragraph (a) above, which may be solely in cash, solely in shares of Common Stock (valued at their Fair Market Value on the date of exercise of the Stock Appreciation Right), or partly in such shares and partly in cash. If the Nonmanagement Board or the Committee permits the Participant to elect to receive cash or shares (or a combination thereof) on such exercise, any such election shall be subject to such conditions as the Nonmanagement Board or the Committee may impose.

    3.4 Limited Stock Appreciation Rights. The Committee may grant to any Eligible Employee Limited SARs exercisable only upon or in respect of a Change in Control Event or any other specified event and such Limited SARs may relate to or operate in combination with or in substitution for Options, other Stock Appreciation Rights or other Awards (or any combination thereof), and may be payable in cash or shares of Common Stock based on the spread between the exercise price of the Limited SAR and a price based upon the Fair Market Value of the shares during a specified period or on a specified date within a range of six months before or after such event.

## IV.  Restricted Stock Awards

    4.1 Grants. The Nonmanagement Board or the Committee may, in its discretion, grant one or more Restricted Stock Awards to any Eligible Employee. Each Restricted Stock Award Document shall specify the number of shares of Common Stock to be issued to the Participant, the date of such issuance, the consideration for such shares, if any, by the Participant, the restrictions imposed on such shares, and the conditions of release or lapse of such restrictions. Stock certificates evidencing shares of Restricted Stock pending the lapse of the restrictions shall be held by the Corporation or by a third party designated by the Nonmanagement Board or the Committee until the restrictions on such shares shall have lapsed and the shares shall have vested in accordance with the provisions of the Award. Promptly after the lapse of restrictions, a certificate or certificates

-17-

evidencing the number of shares of Common Stock as to which the restrictions have lapsed (or such lesser number as may be permitted pursuant to Section 8.4) shall be delivered to the Participant or other person entitled under the Plan to receive the shares. The Participant or such other person shall deliver to the Corporation such further assurance and documents as the Nonmanagement Board or the Committee may require.

4.2 Restrictions.

(a) *Pre-Vesting Restraints.* Except as provided in Section 1.10, shares of Common Stock comprising any Restricted Stock Award may not be sold, assigned, transferred, pledged or otherwise disposed of or encumbered, either voluntarily or involuntarily, until the restrictions have lapsed.

(b) *Dividend and Voting Rights.* Unless otherwise provided in the applicable Award Document, a Participant receiving a Restricted Stock Award shall be entitled to cash dividend and voting rights for all shares of Common Stock issued even though they are not vested, provided that such rights shall terminate immediately as to any Restricted Stock that ceases to be eligible for vesting.

(c) *Accelerated Vesting.* Unless otherwise provided by the Nonmanagement Board or the Committee, the restrictions on Restricted Stock shall lapse upon the Participant's termination of employment with the Corporation by reason of Retirement, Early Retirement, Total Disability or death, and restrictions on Restricted Stock held for more than one year from the Award Date by Participants at or above the rank of Executive Vice President shall lapse upon a Change in Control Event.

(d) *Forfeiture.* Unless otherwise specified by the Nonmanagement Board or the Committee, Restricted Stock as to which the restrictions have not lapsed in accordance with the provisions of the Award or pursuant to Section 4.2(c) shall be forfeited upon a Participant's termination of employment. Upon the occurrence of any forfeiture of shares of Restricted Stock, such forfeited shares shall be automatically transferred to the Corporation without payment of any consideration by the Corporation and without any action by the Participant.

**V.   Performance Share Awards and Stock Bonuses**

5.1 Grants of Performance Share Awards. The Nonmanagement Board or the Committee may, in its discretion, grant Performance Share Awards to Eligible Employees. An Award shall specify the maximum number of shares of Common Stock (if any) subject to the Performance Share Award and its terms and conditions. The Nonmanagement Board shall establish the specified period (a "performance cycle") for the Performance Share Award and the measure(s) of the performance of the Corporation (or any part thereof) or the Participant. The Nonmanagement Board may, during the performance cycle, make such adjustments to the measure(s) of performance as it may deem appropriate to compensate for, or reflect, any significant changes that may occur in accounting practices, tax laws, other laws or regulations that alter or affect the computation of the measure(s). The Award Document shall specify how the degree of attainment of the measure(s)

-18-

over the performance cycle is to be determined. The Nonmanagement Board or the Committee may provide for full or partial credit, prior to completion of such performance cycle or the attainment of the performance achievement specified in the Award, in the event of the Participant's death or other termination of employment. Unless otherwise provided by the Nonmanagement Board, upon a Change in Control Event payments shall be made with respect to a Performance Share Award held for more than one year from the Award Date by a Participant at or above the rank of Executive Vice President, based on the assumption that the performance achievement specified in the Award would have been attained by the end of the performance cycle.

5.2 Grants of Stock Bonuses. The Nonmanagement Board or the Committee may grant a Stock Bonus to any Eligible Employee to reward exceptional or special services, contributions or achievements, in such amounts of Common Stock and on such terms and conditions as determined from time to time by the Nonmanagement Board or the Committee.

5.3 Deferred Payments. The Nonmanagement Board or the Committee may authorize for the benefit of any Eligible Employee the deferral of any payment of cash or shares of Common Stock that may become due or of cash otherwise payable under this Plan, and provide for accredit benefits thereon based upon such deferment, at the election or at the request of such Participant, subject to the other terms of this Plan. Such deferral shall be subject to such further conditions, restrictions or requirements as the Nonmanagement Board or the Committee may impose, subject to any then-vested rights of the Participant.

## VI. Nonmanagement Director Options

6.1 Participation. Awards under this Article VI shall be made only to Nonmanagement Directors.

6.2 Annual Option Grants.

(a) *Time of Initial Award.* After approval of this Plan by the stockholders of the Corporation, each Nonmanagement Director shall be granted automatically (without any action by the Board, the Nonmanagement Board or the Committee) a Nonqualified Stock Option (the Award Date of which shall be the date of stockholder approval of the Plan) to purchase 4000 shares of Common Stock.

(b) *Subsequent Annual Awards.* Following the initial award described in Section 6.2(a), on the first day of each Director Term for each Nonmanagement Director (which shall be the Award Date) each year prior to the Plan Termination Date, there shall be granted automatically (without any action by the Board, the Nonmanagement Board or the Committee) to each such Nonmanagement Director then in office a Nonqualified Stock Option to purchase 4000 shares of Common Stock. Any Nonmanagement Director appointed or elected to office during a Director Term shall be granted automatically (without any action by the Board, the Nonmanagement Board or the Committee) a Nonqualified Stock Option (the Award Date of which shall be the date such person takes

-19-

office) to purchase the nearest whole number of shares of Common Stock equal to 4000 multiplied by the number of partial or full calendar months (not to exceed 12) remaining in such Director Term divided by 12.

(c) *Maximum Number of Shares.* Annual grants that would otherwise cause the total Awards under this Plan to exceed the maximum number of shares of Common Stock under Section 1.5(b) shall be prorated to come within such limitation.

6.3 Option Price. The exercise price per share of Common Stock covered by each Option granted pursuant to Section 6.2 shall be 100 percent of the Fair Market Value. The exercise price of any Option granted under this Article shall be paid in full at the time of each purchase, in cash or by check or in shares of Common Stock valued at their Fair Market Value on the date of exercise of the Option, or partly in such shares and partly in cash.

6.4 Option Period and Ability to Exercise. Each Option granted under this Article VI and all rights or obligations thereunder shall commence on the Award Date and expire ten years and one day thereafter and shall be subject to earlier termination as provided below. Each Option granted under Section 6.2 shall be immediately exercisable.

6.5 Termination of Directorship. If an NMD Participant's services as a member of the Board terminate for any reason after at least ten years of service as a NMD, or by reason of such NMD Participant's death, Total Disability or not having been renominated for election by the stockholders of the Corporation after reaching age 70, any Option granted pursuant to this Article VI held by such NMD Participant shall remain exercisable until the earlier of one year after the date of such termination and the expiration of the stated term of such Option. If an NMD Participant's services as a member of the Board terminate for any other reason, any then-outstanding Option may be exercised until the earlier of three months after the date of such termination and the expiration of the stated term of such Option.

6.6 Adjustments. Options granted under this Article VI shall be subject to adjustment as provided in Section 8.2, but only to the extent that such adjustment is based on objective criteria and is consistent with adjustments to Options or other Awards held by persons other than Nonmanagement Directors.

6.7 Limitation on Amendments. The provisions of this Article VI shall not be amended more than once every six months (other than as may be necessary to conform to any applicable changes in the Code or the rules thereunder), unless any such amendment would be consistent with the provisions of Rule 16b-3(c)(2)(ii) (or any successor provision).

## VII.  Nonmanagement Director Restricted Stock

7.1 Participation. Awards under this Article VII shall be made only to Nonmanagement Directors.

-20-

7.2 Amount of Awards. There shall be a five-year cycle of Awards under this Article VII commencing on the date of the annual meeting of the stockholders of the Corporation during the year 2001 and ending on the fifth anniversary of such date in the year 2006. Awards shall be made to each Nonmanagement Director according to the appropriate provision set forth below. No Awards shall be granted later than the end of the five-year cycle. Neither the Plan nor any action taken thereunder shall be construed as giving any NMD Participant the right to be reappointed or renominated to serve as a member of the Board.

(i) Each Nonmanagement Director who is a member of the Board immediately following the annual meeting of the stockholders of the Corporation in the year 2001 shall receive an Award (rounded to the nearest full share) of shares of Restricted Stock having an aggregate Fair Market Value on the date of the first meeting of the Board following such annual meeting equal to the amount computed by adjusting $60,000 for inflation between 1996 and 2001. The computation shall be done by multiplying $60,000 by 100 percent plus the percentage increase in the 12-month Consumer Price Index for All Urban Consumers ("CPI-U"), as published by the U.S. Bureau of Labor Statistics, for the year 2000 over the 12-month CPI-U for 1996. If the CPI-U is not published or otherwise available at the time of the 2001 annual meeting of stockholders of the Corporation, the Benefit Plans Committee is authorized to choose another measure of the inflation between 1996 and 2001 for purposes of this computation.

(ii) A Nonmanagement Director who is newly appointed or elected thereafter shall receive an Award equal to the number of shares (rounded to the nearest full share) that would have been granted had such person been a member of the Board on the date of the first meeting of the Board following the annual meeting of the stockholders of the Corporation in the year 2001 multiplied by the number of partial or full calendar months (not to exceed 60) remaining in the cycle from the date of the Nonmanagement Director's appointment or election divided by 60.

7.3 Terms and Conditions. Each NMD Participant who receives an Award pursuant to Section 7.2 shall execute an Escrow Agreement and appropriate blank stock powers with respect to his or her Restricted Stock. Stock certificates for such Restricted Stock registered in the name of each such NMD Participant shall be issued and deposited, together with the Escrow Agreement and stock powers, with the Escrow Agent. An NMD Participant shall be entitled to the delivery of such stock certificates out of escrow only in accordance with the provisions of Sections 7.6 and 7.7. Except as provided in Section 7.4, all Common Stock, all cash, or other property received by the Escrow Agent on account of the Restricted Stock shall be treated in the same manner as Restricted Stock, shall be subject to all of the terms and conditions of the Escrow Agreement and shall be delivered out of escrow to the NMD Participant or to the Corporation at the same time as the Restricted Stock with respect to which it was issued.

7.4 Rights of NMD Participants. Except for the restrictions under Section 7.5, each NMD Participant who receives an Award pursuant to Section 7.2 shall have all of the rights and privileges of a stockholder of the Corporation as to the Restricted Stock subject to such Award, including the

-21-

right to receive any cash and stock dividends declared with respect to such Restricted Stock and to direct the Escrow Agent as to the exercise of voting rights; provided, however, that in the case of a stock split in the form of a stock dividend, such dividend shares shall be subject to the same restrictions as the Restricted Stock and held under the Escrow Agreement.

7.5 Restrictions. Restricted Stock covered by an Award under this Article VII shall be subject to the following restrictions, which shall apply from the date the Award is granted and shall continue until such Restricted Stock becomes vested under Section 7.6 or 7.7:

(i)    The Restricted Stock shall not be transferable other than to the NMD Participant's Beneficiary upon the NMD Participant's death.

(ii)   Each NMD Participant's right to the Restricted Stock shall be forfeited if and when such NMD Participant ceases to be a Nonmanagement Director, except to the extent that the NMD Participant's right to receive the Restricted Stock without restrictions shall have vested under Section 7.6 or 7.7. If forfeited, all such stock shall become the property of the Corporation and all of the rights of such NMD Participant to such Restricted Stock and as a stockholder (including the right to any accrued but unpaid dividends) shall terminate without further obligation on the part of the Corporation.

7.6 Vesting. The right of each NMD Participant to removal of the restrictions from Restricted Stock held for the account of such NMD Participant shall vest in accordance with the provisions of this Section 7.6 and the restrictions for those shares shall lapse, whereupon the Escrow Agent shall deliver to the NMD Participant or the NMD Participant's Beneficiary or Personal Representative a stock certificate evidencing such Restricted Stock, free of the restrictions set forth in the Award and Section 7.5. Except for NMD Participants described in Section 7.7, upon termination of a Nonmanagement Director's service on the Board, all shares awarded under this Article VII that remain subject to restrictions, after the provisions of subsections (i) through (iii) below are applied, shall be forfeited by the NMD Participant and become the property of the Corporation and all of the rights of such NMD Participant to such Restricted Stock and as a stockholder (including the right to accrued but unpaid dividends) shall terminate without further obligation on the part of the Corporation.

(i)    Each NMD Participant who is a member of the Board at the first meeting following the annual meeting of the stockholders of the Corporation in the year 2001 shall vest on the day before each subsequent annual meeting of the stockholders during the remainder of the cycle (if he or she is a member of the Board on such date) in the number of full shares closest to and not exceeding 20 percent of the Restricted Stock awarded at the beginning of the full cycle. If an NMD Participant is not reelected or reappointed to membership on the Board, upon such NMD Participant's ceasing to be a Nonmanagement Director all Restricted Stock awarded under this Article VII that then remains subject to restrictions, shall be forfeited.

(ii)   An NMD Participant who is elected or appointed to the Board for a complete

-22-

Director Term after the first year of the cycle shall vest on the day before each subsequent annual meeting of the stockholders during the remainder of the cycle (if he or she is a member of the Board on such date) as to the number of shares of Restricted Stock in which such NMD Participant would have vested on such date if such NMD Participant had been granted an Award at the beginning of the cycle.

(iii)    The rights of an NMD Participant who is elected or appointed to the Board during a Director Term shall vest on the day before each subsequent annual meeting during the remainder of the cycle (if he or she is a member of the Board on such date) as to the number of shares of Restricted Stock in which the replaced predecessor would have vested had the predecessor remained a Nonmanagement Director, except that for the initial partial Director Term, the NMD Participant shall vest in only a fraction of the shares (rounded to the nearest full share) in which an NMD Participant serving for the full Director Term would have vested for that Director Term, such fraction being the number of such shares multiplied by the number of partial or full calendar months (not to exceed 12) of the Director Term served by the NMD Participant, divided by 12.

7.7 Disability, Death or Termination After Age 70. If any NMD Participant's membership on the Board terminates because of (i) Total Disability, (ii) such NMD Participant's death, or (iii) as to a Nonmanagement Director who is elected to the Board by the stockholders, not being renominated after reaching age 70, the restrictions on all of the Restricted Stock held in the account of such NMD Participant shall lapse on the date of such termination of membership on the Board and the full balance of Restricted Stock in such account shall be delivered out of escrow as provided in Section 7.6.

7.8 Adjustments. Restricted Stock granted under this Article VII shall be subject to adjustment as provided in Section 8.2, but only to the extent that such adjustment is based on objective criteria and is consistent with adjustments to Restricted Stock or other Awards held by persons other than Nonmanagement Directors.

7.9 Limitation on Amendments. The provisions of this Article VII shall not be amended more than once every six months (other than as may be necessary to conform to any applicable changes in the Code or the rules thereunder), unless any such amendment would be consistent with the provisions of Rule 16b-3(c)(2)(ii) (or any successor provision).

**VIII. Other Provisions**

8.1 Rights of Eligible Employees, Participants and Beneficiaries.

(a) *Employment Status.* Status as an Eligible Employee shall not be construed as a commitment that any Award will be made under this Plan to an Eligible Employee or to

-23-

Eligible Employees generally.

(b) *No Employment Contract.* Nothing contained in this Plan (or in any other documents related to this Plan or to any Award) shall confer upon any Participant any right to continue in the employ or other service of the Corporation or constitute any contract or agreement of employment or other service, nor shall this Plan interfere in any way with the right of the Corporation to change such person's compensation or other benefits or to terminate the employment of such person, with or without cause; provided, however, that nothing contained in this Plan or any document related hereto shall adversely affect any independent contractual right of any Participant without his or her consent.

(c) *Plan Not Funded.* Awards payable under this Plan shall be payable in shares of Common Stock or from the general assets of the Corporation, and (except as provided in Section 1.5(c)) no special or separate reserve, fund or deposit shall be made to assure payment of such Awards. No Participant, Beneficiary or other person shall have any right, title or interest in any fund or in any specific asset (including shares of Common Stock, except as expressly otherwise provided) of the Corporation by reason of any Award hereunder. Neither the provisions of this Plan (or of any related documents), nor the creation or adoption of this Plan, nor any action taken pursuant to the provisions of this Plan shall create, or be construed to create, a trust of any kind or a fiduciary relationship between the Corporation and any Participant, Beneficiary or other person. To the extent that a Participant, Beneficiary or other person acquires a right to receive payment pursuant to any Award hereunder, such right shall be no greater than the right of any unsecured general creditor of the Corporation.

8.2 Adjustments.

(a) *Events Requiring Adjustments.* If any of the following events occur, the Nonmanagement Board or the Committee shall make the adjustments described in Section 8.2(b): (i) any extraordinary dividend or other extraordinary distribution in respect of the Common Stock (whether in the form of cash, Common Stock, other securities, or other property), (ii) any recapitalization, stock split (including a stock split in the form of a stock dividend), reverse stock split, reorganization, merger, combination, consolidation, split-up, spin-off, combination, repurchase, or exchange of Common Stock or other securities of the Corporation, (iii) any issuance of warrants or other rights to purchase shares of Common Stock or other securities of the Corporation (other than to employees) at less than 80 percent of fair value on the date of such issuance, or (iv) any other like corporate transaction or event in respect of the Common Stock or a sale of substantially all the assets of the Corporation.

(b) *Adjustments to Awards.* If any of the events described in Section 8.2(a) occurs, then the Nonmanagement Board or the Committee shall, in such manner and to such extent (if any) as it deems appropriate and equitable, (i) proportionately adjust any or all of (1) the number and type of shares of Common Stock that thereafter may be made the subject of Awards (including the specific maximum set forth in Section 1.5), (2) the number, amount

-24-

and type of shares of Common Stock subject to any or all outstanding Awards, (3) the grant, purchase, or exercise price of any or all outstanding Awards, (4) the Common Stock or cash deliverable upon exercise of any outstanding Awards, or (5) the performance standards appropriate to any outstanding Awards; or (ii) make provision for a cash payment or for the substitution or exchange of any or all outstanding Awards based upon the distribution or consideration payable to holders of Common Stock upon or in respect of the event; provided, however, in each case, that with respect to Awards of Incentive Stock Options, no such adjustment shall be made that would cause the Plan to violate Section 422 or Section 424(a) of the Code or any successor provisions thereto.

8.3 Compliance with Laws. This Plan, the granting and vesting of Awards under this Plan and the issuance and delivery of shares of Common Stock and the payment of money under this Plan or under Awards granted hereunder are subject to compliance with all applicable federal and state laws, rules and regulations (including but not limited to state and federal securities law and federal margin requirements) and to such approvals by any listing, regulatory or governmental authority as may, in the opinion of counsel for the Corporation, be necessary or advisable in connection therewith. Any securities delivered under this Plan shall be subject to such restrictions, and the person acquiring such securities shall, if requested by the Corporation, provide such assurances and representations to the Corporation as the Corporation may deem necessary or desirable to assure compliance with all applicable legal requirements.

8.4 Tax Withholding. Upon any exercise, vesting, or payment of any Award or upon the disposition of shares of Common Stock acquired pursuant to the exercise of an Incentive Stock Option prior to satisfaction of the holding period requirements of Section 422 of the Code (or any successor provision), the Nonmanagement Board or the Committee may make such provisions and take such steps as it may deem necessary or appropriate for the withholding by the Corporation of all federal, state, local and other taxes required by law to be withheld, including without limitation, the right, at its option, (i) to require the Participant (or Personal Representative or Beneficiary, as the case may be) to pay or provide for payment of the amount of any taxes that the Corporation may be required to withhold with respect to such transaction as a condition to the release of Common Stock or the making of any payment or distribution, (ii) to deduct from any amount payable in cash, (iii) to reduce the number of shares of Common Stock otherwise deliverable (or otherwise reacquire such shares), based upon their Fair Market Value on the date of delivery, or to grant the Participant the right to elect such reduction in the number of shares upon such terms and conditions as it may establish, or (iv) to permit the Corporation to accept a note for the amount of any taxes that the Corporation may be required to withhold with respect to such transaction in accordance with Section 1.9.

8.5 Plan Amendment, Termination and Suspension.

(a) *Board Authorization.* Subject to this Section 8.5, the Board may, at any time, terminate or, from time to time, amend, modify or suspend this Plan, in whole or in part. No Awards may be granted during any suspension of this Plan or after termination of this Plan, but the Nonmanagement Board or the Committee shall retain jurisdiction as to Awards then outstanding in accordance with the terms of this Plan.

-25-

(b) *Stockholder Approval.* If any amendment would (i) materially increase the benefits accruing under this Plan, or (ii) materially increase the aggregate number of shares of Common Stock that may be issued under this Plan (except as provided in Section 8.2), then to the extent deemed necessary or advisable by the Board, such amendment shall be subject to stockholder approval.

(c) *Amendments to Awards.* Without limiting any other express authority granted under this Plan, but subject to its express limits, the Nonmanagement Board or the Committee by agreement or resolution may waive conditions of or limitations on Awards to Eligible Employees that the Nonmanagement Board or the Committee in the prior exercise of its discretion has imposed, without the consent of the Participant, and may make other changes to the terms and conditions of Awards that do not affect the Participant's rights and benefits under an Award in any materially adverse manner.

(d) *Limitations on Amendments to Plan and Awards.* No amendment, suspension or termination of the Plan or any change affecting any outstanding Award shall, without the written consent of the Participant, Beneficiary or Personal Representative, as applicable, affect in any manner materially adverse to such person any rights or benefits of any such person or any obligations of the Corporation under any Award granted under this Plan prior to the effective date of such change; however, any changes made pursuant to Section 8.2 shall not be deemed to constitute changes or amendments for purposes of this Section 8.5.

8.6 Privileges of Stock Ownership. Except as otherwise expressly authorized by the Nonmanagement Board or the Committee or this Plan and expressly stated in an Award Document, a Participant shall not be entitled to any privilege of stock ownership as to any shares of Common Stock not actually delivered to and held of record by the Participant. No adjustment shall be made for dividends or other stockholder rights for which a record date is prior to the date of delivery of such shares.

8.7 Effective Date of the Plan. This Plan shall be effective as of the date of the meeting at which the stockholders of the Corporation approve it.

8.8 Term of the Plan. Except for any Award pursuant to Section 7.2 granted to a Nonmanagement Director who is newly appointed or elected to the Board during the 2001-2006 cycle, no Award shall be granted after the Plan Termination Date. Unless otherwise expressly provided in this Plan or in an applicable Award Document, any Award may extend beyond such date, and all authority of the Nonmanagement Board or the Committee with respect to Awards hereunder shall continue during any suspension of this Plan and in respect of Awards outstanding on the Plan Termination Date.

8.9 Governing Law/Construction/Severability.

(a) *Choice of Law.* This Plan, the Awards, all documents evidencing Awards, and all other related documents shall be governed by, and construed in accordance with the laws

-26-

of the District of Columbia, without reference to its principles of conflicts of law.

(b) *Severability.* If any provision shall be held by a court of competent jurisdiction to be invalid and unenforceable, the remaining provisions of this Plan shall continue in effect.

(c) *Plan Construction.* It is the intent of the Corporation that this Plan and the Awards satisfy and be interpreted so that Participants who are or may be subject to the applicable requirements of the STSP will not be subjected to avoidable liability under the STSP. If any provision of this Plan or of any Award would otherwise frustrate or conflict with this intent, to the extent possible that provision shall be interpreted and deemed amended so as to avoid such conflict; if there is any remaining irreconcilable conflict with such intent, such provision shall be deemed void.

8.10 Captions. Captions and headings are given to the sections and subsections of this Plan solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of the Plan or any provision thereof.

8.11 Effect of Change of Subsidiary Status. For purposes of this Plan and any Award hereunder, if an entity ceases to be a Subsidiary, the employment of all Participants who are employed by such entity shall be deemed to have terminated, except any such Participant who continues as an employee of another entity within the Corporation.

8.12 Nonexclusivity of Plan. Nothing in this Plan shall limit or be deemed to limit the authority of the Board or the Committee to grant awards or authorize any other compensation, with or without reference to the Common Stock, under any other plan or authority.

8.13 Plan Binding on Successors. The obligations of the Corporation under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of the Corporation, or upon any successor corporation or organization succeeding to substantially all of the assets and business of the Corporation. The Corporation agrees that it will make appropriate provisions for the preservation of all Participants' rights under the Plan in any agreement or plan that it may enter into or adopt to effect any such merger, consolidation, reorganization or transfer of assets.

# EXHIBIT 3

**FANNIE MAE**
**STOCK COMPENSATION PLAN OF 2003**
**Effective as of May 20, 2003**

**AMENDED MARCH 1, 2004**

## FANNIE MAE STOCK COMPENSATION PLAN OF 2003

### I.  The Plan

1.1  *Purpose.*  The purpose of the Fannie Mae Stock Compensation Plan of 2003 is to promote the success of Fannie Mae by providing stock compensation to employees and directors that is comparable to that provided by similar companies; to attract, motivate, retain and reward employees of Fannie Mae; to provide incentives for high levels of individual performance and improved financial performance of Fannie Mae; to attract, motivate and retain experienced and knowledgeable independent directors; and to promote a close identity of interests between directors, officers, employees and shareholders.

1.2  *Definitions.*

The following terms shall have the meanings set forth below:

(1)  *"Award"* shall mean an award of any Option, Stock Appreciation Right, Restricted Stock, Performance Share Award, Stock Bonus or any other award authorized under Section 1.6, or any combination thereof, whether alternative or cumulative, or an award of any Options or Restricted Stock authorized under Articles VI and VII.

(2)  *"Award Date"* shall mean the date upon which the Committee takes the action granting an Award or a later date designated by the Committee as the Award Date at the time it grants the Award, or, in the case of Awards under Sections 6.2 or 7.2, the applicable dates set forth therein.

(3)  *"Award Document"* shall mean any writing (including in electronic or other form approved by the Committee), which may be an agreement, setting forth the terms of an Award that has been granted by the Committee.

(4)  *"Award Period"* shall mean the period beginning on an Award Date and ending on the expiration date of such Award.

(5)  *"Beneficiary"* shall mean the person or persons designated by a Participant or Permitted Transferee in writing to the senior-ranking officer in the Human Resources department of Fannie Mae to receive the benefits specified in an Award Document and under the Plan in the event of the death of the Participant or Permitted Transferee.

(6)  *"Benefit Plans Committee"* shall mean the Benefit Plans Committee established by the Board, consisting of employees of Fannie Mae.

(7)  *"Board"* shall mean the Board of Directors of Fannie Mae.

(8)  *"Cause"* shall mean significant harm to Fannie Mae in connection with a Participant's employment by Fannie Mae, by the Participant's engaging in dishonest or fraudulent actions or willful misconduct or performing the Participant's duties in a negligent manner, as determined by the Committee for a member of the Board who is an officer or employee of Fannie Mae and for the General Counsel of Fannie Mae, and by the General Counsel of Fannie Mae for all other employees; provided that no act or failure to act will be considered "willful" unless it is done, or omitted to be done, by the Participant in bad faith or without reasonable belief that the act or failure to act was in the interest of Fannie Mae.

(9)  *"Change in Control Event"* shall mean a change in the composition of a majority of the Board elected by shareholders within 12 months after any "person" (as such term is used in Sections 3(a)(9), 13(d)(3) and 14(d)(2) of the Securities Exchange Act of 1934) is or becomes the beneficial owner, directly or indirectly, of securities of Fannie Mae representing more than 25 percent of the combined voting power of the then-outstanding securities of Fannie Mae entitled to then vote generally in the election of directors of Fannie Mae.

(10) *"Code"* shall mean the Internal Revenue Code of 1986, as amended from time to time.

(11) *"Committee"* shall mean the Compensation Committee of the Board.

(12) *"Common Stock"* shall mean the common stock of Fannie Mae and, in the event such common stock is converted to another security or property pursuant to Section 8.2, such other security or property.

(13) *"Director Term"* shall mean the period starting immediately following the annual meeting of the shareholders at which directors are elected to serve on the Board and ending at the close of the next annual meeting at which directors are elected.

(14) *"Early Retirement"* means separation from service with Fannie Mae at or after the attainment of age 60 (but before attainment of age 65) with five years of service with Fannie Mae, or at an earlier age only if permitted by the Committee in its sole discretion. For purposes of this Section 1.2(14), a year of service shall be determined in accordance with the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law.

(15) *"Eligible Employee"* shall mean any employee of Fannie Mae.

(16) *"ERISA"* shall mean the Employee Retirement Income Security Act of 1974, as amended.

(17) *"Fair Market Value"* shall mean the per share value of Common Stock as determined by using the mean between the high and low selling prices of such Common Stock, on the date of determination, as reported on the NYSE. If such prices are not available the Fair Market Value shall be the mean of (1) the mean between the high and low selling prices of the common stock, as reported on the NYSE, for the first trading day immediately preceding the date of determination and (2) the mean between the high and low selling prices of the common stock, as reported on the NYSE, for the first trading day immediately following the date of determination. If the Common Stock is no longer traded on the NYSE, or if for any other reason using the foregoing methods to determine Fair Market Value is not possible or logical under the circumstances, the Committee may determine the Fair Market Value, in good faith, using any reasonable method.

(18) *"Fannie Mae"* shall mean Fannie Mae and its successors and, where the context requires, its Subsidiaries.

(19) *"Immediate Family Member"* shall mean, with respect to a Participant, (i) the Participant's child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, half-sibling, stepsibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law (including adoptive relations where the adopted individual shall not have attained the age of 18 years prior to such adoption); (ii) the Participant's Domestic Partner (as defined in Section 2.18 of the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law and determined pursuant to the guidelines and procedures established thereunder); (iii) any lineal ascendant or descendant of any individual described in (i) or (ii) above; (iv) any partnership, limited liability company, association, corporation or other entity all of whose beneficial interests (including without limitation all pecuniary interests, voting rights and investment power) are held by and for the benefit of the Participant and/or one or more individuals described in (i), (ii) or (iii) above; or (v) any trust for the sole benefit of the Participant and/or one or more individuals described in (i), (ii) or (iii) above.

(20) *"Incentive Stock Option"* shall mean an Option that is designated as an incentive stock option within the meaning of Section 422 of the Code, or any successor provision, and that otherwise satisfies the requirements of that section.

(21) *"NMD Participant"* shall mean a Nonmanagement Director who has been granted an Award under Article VI or Article VII.

2

(22) *"Nonmanagement Director"* shall mean a member of the Board who is not an officer or employee of Fannie Mae.

(23) *"Nonqualified Stock Option"* shall mean an Option that is not an Incentive Stock Option.

(24) *"NYSE"* shall mean the New York Stock Exchange.

(25) *"Option"* shall mean an option to purchase shares of Common Stock pursuant to an Award.

(26) *"Participant"* shall mean a Nonmanagement Director who has been granted an Award under the Plan or an Eligible Employee who has been granted an Award under the Plan.

(27) *"Performance Share Award"* shall mean an Award granted under Section 5.1.

(28) *"Permitted Transferee"* shall mean (i) any Immediate Family Member with respect to the Participant, and (ii) in the case of an Eligible Employee, any organization described in Section 170(c) of the Code that is eligible to receive tax-deductible, charitable contributions or any intermediary designated to exercise an Option for the benefit of such organization.

(29) *"Personal Representative"* shall mean the person or persons who, upon the incompetence of a Participant or Permitted Transferee, shall have acquired, by legal proceeding or power of attorney, the power to exercise the rights under the Plan, and who shall have become the legal representative of the Participant or Permitted Transferee, or, in the event of the death of the Participant or the Permitted Transferee, the executor or administrator of the estate of the Participant or Permitted Transferee.

(30) *"Plan"* shall mean this Fannie Mae Stock Compensation Plan of 2003.

(31) *"Plan Termination Date"* shall mean the tenth anniversary of the date of the meeting at which shareholders of Fannie Mae approve the Plan.

(32) *"QDRO"* shall mean a qualified domestic relations order as defined in Section 414(p) of the Code or Section 206(d)(3) of ERISA (to the same extent as if this Plan were subject thereto) and the applicable rules thereunder.

(33) *"Restricted Stock"* shall mean shares or bookkeeping units of Common Stock awarded to a Participant subject to payment of the consideration, if any, and the conditions on vesting and transfer and other restrictions as are established under the Plan, for so long as such shares or units remain nonvested under the terms of the applicable Award Document.

(34) *"Retirement"* shall mean, in the case of an Eligible Employee, separation from service with Fannie Mae under conditions entitling such Eligible Employee to an immediate annuity under the Federal National Mortgage Association Retirement Plan for Employees Not Covered Under Civil Service Retirement Law or under the Civil Service retirement law, whichever is applicable to such Eligible Employee, at or after the attainment of age 65.

(35) *"Stand-Alone SAR"* shall mean a Stock Appreciation Right granted independently of any other Award.

(36) *"Stock Appreciation Right"* shall mean a right pursuant to an Award to receive a number of shares of Common Stock or an amount of cash, or a combination of shares of Common Stock and cash, the aggregate amount or value of which is determined by reference to a change in the Fair Market Value of the Common Stock.

(37) *"Stock Bonus"* shall mean an Award of shares of Common Stock under Section 5.2.

(38) *"STSP"* shall mean the Fannie Mae Securities Transactions Supervision Program and the guidelines thereunder.

(39) *"Subsidiary"* shall mean an organization whose employees are identified by the Board as eligible to participate in benefit plans of Fannie Mae.

(40) *"Total Disability"* shall mean complete and permanent inability by reason of illness or accident to perform the duties of the occupation at which the Participant was employed when the illness commenced or accident occurred, as determined by Fannie Mae's independent medical consultant.

(41) *"Without Consideration"* shall mean, with respect to a transfer of an Option, that the transfer is being made purely as a gift or donation, with no promise or receipt of payment, goods, services or other thing of value in exchange for the Option; provided, however, if the terms of a transfer of Options to an otherwise Permitted Transferee require that, upon proper notice of exercise of such Options, (i) Fannie Mae may reduce the number of shares of Common Stock or sell such number of shares of Common Stock otherwise deliverable thereunder to the extent required to fund any additional withholding tax on behalf of the Eligible Employee necessitated by the exercise, delivering only the balance of the shares of Common Stock due upon exercise of the Option to the Permitted Transferee, and/or (ii) the Permitted Transferee sell the shares of Common Stock so received upon exercise of the Option, apply a portion of the net proceeds of the exercise to the payment of any additional taxes, fees or other costs or expenses incurred by the donor Eligible Employee in connection with or as a result of such transfer and then deliver (if an intermediary) or retain (if an organization described in Section 170(c) of the Code) the remaining net proceeds from such sales of shares of Common Stock, the transfer shall nevertheless continue to be Without Consideration for the purposes hereof. A distribution of an Option by an entity or trust described in Section 1.2(19)(iv) or (v) to an owner or beneficiary thereof shall be treated as a transfer Without Consideration.

1.3 *Administration and Authorization; Power and Procedure.*

(a) *The Committee.* The Plan shall be administered by, and all Awards to Eligible Employees shall be authorized by, the Committee, unless otherwise required by law or regulation. Action of the Committee with respect to the administration of the Plan shall be taken by majority vote or unanimous written consent of the respective members.

(b) *Plan Awards; Interpretation; Powers.* Subject to the express provisions of the Plan, the Committee shall have the authority:

(i) to determine the Eligible Employees who will receive an Award;

(ii) to grant an Award to such Eligible Employees, to determine the amount of and the price at which shares of Common Stock will be offered or awarded, to determine the other specific terms and conditions of such Award consistent with the express limits of the Plan, to establish the installments (if any) in which such Award shall become exercisable or shall vest, and to establish the expiration date and the events of termination of such Award;

(iii) to construe and interpret the Plan and any Award Documents, to further define the terms used in the Plan, and to prescribe, amend and rescind rules and regulations relating to the administration of the Plan;

(iv) to cancel, modify or waive Fannie Mae's rights with respect to, or modify, discontinue, suspend or terminate, an Award being granted or an outstanding Award granted to or held by an Eligible Employee, subject to any required consents under Section 8.5;

(v) as part of any Eligible Employee's employment agreement approved by the Committee, to modify or change an Award;

(vi) to accelerate the vesting of, extend the ability to exercise, or extend the term of an Award being granted or an outstanding Award; and

(vii) to make all other determinations and take such other actions as contemplated by the Plan or as may be necessary or advisable for the administration of the Plan and the effectuation of its purposes.

Notwithstanding the foregoing, the provisions of Articles VI and VII (except Sections 6.7 and 7.5) relating to Nonmanagement Director Awards shall be automatic and, to the maximum extent possible, self-effectuating. Ministerial, non-discretionary actions with respect to implementation of the Plan shall be performed by individuals who are officers or employees of Fannie Mae at the direction of the senior ranking officer in the Human Resources department of Fannie Mae. The senior ranking officer in the Human Resources department of Fannie Mae may also direct that certain administrative functions shall be performed by service providers outside of Fannie Mae.

(c) *Binding Determinations.*   Any action taken by, and any inaction of, Fannie Mae, any Subsidiary, the Board, the Committee or the Benefit Plans Committee relating or pursuant to the Plan shall be within the absolute discretion of that entity or body and shall be conclusive and binding upon all persons. Subject only to compliance with the express provisions of the Plan, the Board, the Committee and the Benefit Plans Committee may act in their absolute discretion in matters within their authority related to this Plan.

(d) *Reliance on Experts.*   In making any determination or in taking or not taking any action under the Plan, the Board, the Committee and the Benefit Plans Committee may obtain and may rely upon the advice of experts, including professional advisors to Fannie Mae.

(e) *Delegation.*   The Committee may delegate, subject to such terms and conditions as it may impose, some or all of its authority under the Plan to one or more members of the Board or, for Awards to Eligible Employees below the rank of Senior Vice President, to the senior-ranking officer in the Human Resources department. In addition, the Committee may delegate ministerial, non-discretionary functions to individuals who are officers, employees, contractors or vendors of Fannie Mae.

(f) *No Liability.*   No member of the Board, the Committee or the Benefit Plans Committee, or director, officer or employee of Fannie Mae or any Subsidiary shall be liable, responsible or accountable in damages or otherwise for any determination made or other action taken or any failure to act by such person in connection with the administration of the Plan, so long as such person is not determined by a final adjudication to be guilty of willful misconduct with respect to such determination, action or failure to act.

(g) *Indemnification.*   To the extent permitted by law, each of the members of the Board, the Committee and the Benefit Plans Committee and each of the directors, officers and employees of Fannie Mae and any Subsidiary shall be held harmless and be indemnified by Fannie Mae for any liability, loss (including amounts paid in settlement), damages or expenses (including reasonable attorneys' fees) suffered by virtue of any determinations, acts or failures to act, or alleged acts or failures to act, in connection with the administration of the Plan so long as such person is not determined by a final adjudication to be guilty of willful misconduct with respect to such determination, action or failure to act.

1.4 *Participation.*   Awards may be granted by the Committee to Eligible Employees. An Eligible Employee who has been granted an Award may be granted, if otherwise eligible, additional Awards if the Committee shall so determine. Nonmanagement Directors shall be eligible to receive Awards granted automatically under Sections 6.2 and 7.2 and Awards granted under Sections 6.7 and 7.5.

5

1.5  *Shares Available for Awards.*

(a) *Common Stock.*    Subject to the provisions of Section 8.2, the shares of Common Stock that may be delivered under this Plan shall be shares of Fannie Mae's authorized but unissued Common Stock, shares of Common Stock held by Fannie Mae as treasury shares or shares of Common Stock purchased by Fannie Mae on the open market.

(b) *Number of Shares.*  The maximum number of shares of Common Stock that may be delivered under Awards granted to Eligible Employees and Nonmanagement Directors under the Plan shall not exceed 40,000,000 shares, and, subject to such overall maximum as applied to all Awards, the maximum number of shares of Common Stock that may be delivered under Specified Stock Awards (as hereinafter defined) shall not exceed, in the aggregate, 2,000,000 shares.  For purposes of this Section 1.5(b),

(i)     a Specified Stock Award is (A) an Award granted pursuant to Article IV ("Restricted Stock Awards") that is scheduled to vest in full before the third anniversary of the date of grant, or (B) an Award granted pursuant to Section 5.1 ("Grants of Performance Share Awards") with a performance cycle that ends less than one year from the date of grant, or (C) an Award granted pursuant to Section 5.2 ("Grants of Stock Bonuses") that is fully and immediately vested or that has vesting or performance features described in (A) or (B) above;

(ii)    an Award that is described in both Article IV and Section 5.1 shall be considered a Specified Stock Award only if it is described in both of clauses (A) and (B) of Section 1.5(b)(i) above;

(iii)   in applying Sections 1.5(b)(i), there shall be disregarded any Award or Plan provision that could result in accelerated vesting of or delivery of Common Stock under an Award; and

(iv)    the 40,000,000 and 2,000,000 limitations shall be subject to adjustment in accordance with Section 8.2."

(c) *Calculation of Available Shares and Replenishment.*    A good faith estimate of the number of shares of Common Stock subject to outstanding Awards that will be satisfied by delivery of shares of Common Stock, plus the number of shares of Common Stock referenced in calculating an Award paid in cash, shall be reserved from the number of shares of Common Stock available for Awards under the Plan. The aggregate number of shares of Common Stock delivered under the Plan plus the number of shares of Common Stock referenced with respect to Awards paid in cash shall reduce the number of shares of Common Stock remaining available for Awards under the Plan. If any Award shall expire or be canceled or terminated without having been exercised in full, or any Common Stock subject to a Restricted Stock Award or other Award shall not vest or be delivered, the unpurchased, nonvested or undelivered shares of Common Stock subject thereto or the shares of Common Stock referenced with respect thereto shall again be available under the Plan. In the case of Awards granted in combination such that the exercise of one results in a proportionate cancellation of the other, the number of shares of Common Stock reserved for issuance shall be the greater of the number that would be reserved if one or the other alone were outstanding. If Fannie Mae withholds shares of Common Stock pursuant to Section 8.4, the number of shares of Common Stock that would have been deliverable with respect to an Award but that are withheld pursuant to the provisions of Section 8.4 shall be treated as delivered, and the aggregate number of shares of Common Stock deliverable with respect to the

6

applicable Award and under the Plan shall be reduced by the number of shares of Common Stock so withheld, and such withheld shares shall not be available for additional Awards.

1.6 *Grant of Awards.*    Subject to the express provisions of the Plan, the Committee shall determine the number of shares of Common Stock subject to each Award, the price (if any) to be paid for such shares or Award and other terms and conditions of the Award. Each Award to an Eligible Employee shall be evidenced by an Award Document, which, if required by the Committee, shall be signed by the Eligible Employee. Awards are not restricted to any specified form or structure and may include, without limitation, the types of Awards set forth in Articles II, III, IV and V or, without limitation, any other transfers of Common Stock or any options or warrants to acquire shares of Common Stock, or any similar right with value related to or derived from the value of Common Stock, as may be determined by the Committee. An Award may consist of one such benefit, or two or more of them in any combination or alternative.

1.7 *Award Period.*    Each Award and all executory rights or obligations under the related Award Document shall expire on such date (if any) as shall be determined by the Committee.

1.8 *Limitations on Exercise and Vesting of Awards.*

   (a) *Provisions for Exercise.*    An Award shall be exercisable or shall vest as determined by the Committee.

   (b) *Procedure.*    Any exercisable Award shall be exercised when the person appointed by the Committee or the Committee's designee receives written notice of exercise from the Participant or by any other method, including in electronic form, approved by the Committee, together with satisfactory arrangements for any required payment to be made in accordance with Sections 2.2 or 8.4 or the terms of the Award Document, as the case may be.

   (c) *Fractional Shares.*    Fractional share interests shall be disregarded, but may be accumulated, or the Committee may determine that cash will be paid or transferred in lieu of any fractional share interests.

1.9 *Transferability.*

   (a) *General Restrictions.*    Awards may be exercised only by the Participant; the Participant's Personal Representative, if any; the Participant's Beneficiary, if the Participant has died; the recipient of an Award by will or the laws of descent and distribution or, in the case of a Nonqualified Stock Option, pursuant to a QDRO; in the case of a Nonqualified Stock Option, a person who was a Permitted Transferee at the time the Option was transferred to such person; a Permitted Transferee's Personal Representative, if any; or a Permitted Transferee's Beneficiary, if the Permitted Transferee has died. Amounts payable or shares of Common Stock issuable upon an Award shall be paid to (or registered in the name of) the person or persons specified by the person exercising the Award. Other than (i) by will or the laws of descent and distribution or, in the case of a Nonqualified Stock Option, pursuant to a QDRO or (ii) to a Permitted Transferee in the case of any Nonqualified Stock Option and (subject to (b), (c), (d), and (e) below), no right or benefit under this Plan or any Award, whether vested or not vested, shall be transferable by a Participant or Permitted Transferee or shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge (other than to Fannie Mae), and any such attempted action shall be void. Fannie Mae shall disregard any attempt at transfer, assignment or other alienation prohibited by the preceding sentences and shall pay or deliver such cash or shares of Common Stock only in accordance with the provisions of this Plan. The designation of a Beneficiary hereunder shall not constitute a transfer for these purposes.

   (b) *Tax Withholding.*    An Eligible Employee may not transfer Options ("Transferred Options") to a Permitted Transferee, other than a charitable organization described in Section 1.2(28)(ii), unless the Eligible Employee agrees to retain, and not to exercise until the exercise of the Transferred Options, at least 50 percent of the exercisable Options held by the Eligible Employee with the same exercise price and expiration date as the Transferred Options. The condition set forth in the first sentence of this Section 1.9(b), however, may be waived at any time by (A) the Chairman of the Committee in the case of an Eligible Employee who is either a member of the Board or the senior-ranking officer in the

Human Resources department of Fannie Mae, or (B) the senior-ranking officer in the Human Resources department of Fannie Mae in the case of any other Eligible Employee, and, as a condition of such waiver, the Chairman of the Committee or the senior-ranking officer in the Human Resources department of Fannie Mae, as the case may be, may specify other steps that the Eligible Employee must take to provide for the collection by Fannie Mae of all federal, state, local and other taxes required by law to be withheld upon the exercise of such Transferred Options.

(c)   *Notice of Transfer.*   A transfer of an Option to a Permitted Transferee shall not be effective unless, prior to making the transfer, the transferor (i) provides written notice of the transfer to (A) the Chairman of the Committee in the case of a transfer by a Participant who is either a member of the Board, the senior-ranking officer in the Human Resources department of Fannie Mae or the General Counsel of Fannie Mae (or a transfer by a Permitted Transferee of an Option originally granted to a member of the Board or to the senior-ranking officer in the Human Resources department of Fannie Mae), or (B) the senior-ranking officer in the Human Resources department of Fannie Mae in the case of any other transfer, and (ii) certifies in writing to the Chairman of the Committee or the senior-ranking officer in the Human Resources department of Fannie Mae, as the case may be, that the transfer will be Without Consideration.

(d)  *Approval of Transfer.*   A transfer of an Option to a charitable organization described in section 1.2(28)(ii) shall not be effective unless, after receiving the notice described in (c) above, the Chairman of the Committee or, after consultation with the General Counsel of Fannie Mae, the senior-ranking officer in the Human Resources department of Fannie Mae, as the case may be, either approves the proposed transfer in writing or does not disapprove the proposed transfer in writing within ten business days after receipt of such notice. The Chairman of the Committee or, after consultation with the General Counsel of Fannie Mae, the senior-ranking officer in the Human Resources department of Fannie Mae, as the case may be, may disapprove a proposed transfer if he or she determines, in his or her good faith judgment, that (i) the proposed Permitted Transferee has philosophies, purposes, policies, objectives, goals or practices inconsistent with those of Fannie Mae or (ii) the Participant has not taken such steps as may be necessary or appropriate to provide for the collection by Fannie Mae of all federal, state, local and other taxes required by law to be withheld upon exercise of the Option.

(e)   *Transfer of Nonvested Options.*   A nonvested Option may be transferred only to an Immediate Family Member described in section 1.2(28)(i) and only with the prior consent of (A) the Chairman of the Committee in the case of a Participant who is either a member of the Board, the senior-ranking officer in the Human Resources department of Fannie Mae or the General Counsel of Fannie Mae, or (B) after consultation with the General Counsel, the senior-ranking officer in the Human Resources department of Fannie Mae, after consultation with the General Counsel of Fannie Mae, in the case of any other Participant.

1.10  *Section 83(b) Elections.*   If a Participant shall file an election with the Internal Revenue Service under Section 83(b) of the Code to include the value of any Award in the Participant's gross income while the Award remains subject to restrictions, the Participant shall promptly furnish Fannie Mae with a copy of such election.

## II.  Options

2.1  *Grants.*   One or more Options may be granted under this Article II to any Eligible Employee. Each Option granted may be either an Incentive Stock Option or a Nonqualified Stock Option.

2.2  *Option Price.*

(a)   *Pricing Limits.*   The exercise price for shares of Common Stock covered by an Option shall be determined by the Committee at the time of the Award, but shall not be less than 100 percent of the Fair Market Value of the Common Stock on the Award Date. Notwithstanding any provision of the Plan, an Option may not be modified so as to reduce the exercise price of the Option.

(b)   *Payment Provisions.*   The exercise price for any shares of Common Stock purchased on exercise

of an Option granted under this Article II shall be paid in full at the time of each exercise in one or a combination of the following methods: (i) by electronic funds transfer; (ii) by check payable to the order of Fannie Mae; (iii) by notice and third party payment; (iv) by the delivery of shares of Common Stock already owned by the Participant; or (v) by cashless exercise, or any other method, if permitted by law and authorized by the Committee, in its discretion, or specified in the applicable Award Document; provided, however, that the Committee, in its discretion, may limit the Participant's ability to exercise an Option by delivering shares of Common Stock, including by imposing a requirement that the Participant satisfy a minimum holding period with respect to the shares so delivered. Shares of Common Stock used to satisfy the exercise price of an Option shall be valued at their Fair Market Value on the date of exercise.

2.3 *Limitations on Incentive Stock Options.* There shall be imposed in any Award Document relating to Incentive Stock Options such terms and conditions as from time to time are required in order that the Option be an "incentive stock option" as that term is defined in Section 422 of the Code, or any successor provision.

2.4 *Option Period.*

(a) *Award Period.* Each Option shall specify the Award Period for which the Option is granted and shall provide that the Option shall expire at the end of such Award Period. The Committee may extend the Award Period by amendment of an Option or in an Eligible Employee's employment agreement approved by the Committee. Notwithstanding the foregoing, the Award Period with respect to an Incentive Stock Option, including all extensions, shall not exceed ten years.

(b) *Effect of Termination of Employment.* Notwithstanding the provisions of Section 2.4(a), unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, (i) for a Participant whose employment is terminated for any reason other than for Cause, Retirement, Early Retirement, Total Disability, death or having attained at least age 55 with at least five years of service and is not covered by Section 2.5(d), an Option shall expire on the earlier to occur of (A) the end of the Award Period or (B) the date three months following the Participant's termination of employment, (ii) for a Participant whose employment is terminated and is covered by Section 2.5(d), an Option shall expire on the earlier to occur of (A) the end of the Award Period or (B) the date 12 months following the Participant's termination of employment, (iii) for a Participant whose employment is terminated by reason of Retirement, Early Retirement, Total Disability, death or having attained at least age 55 with at least five years of service, an Option shall expire on the end of the Award Period and (iv) for a Participant whose employment is terminated by Fannie Mae for Cause, an Option shall expire upon the Participant's termination.

(c) *Death of Permitted Transferee.* Unless otherwise provided by the Committee, an Option held by a Permitted Transferee shall expire on the earlier of the date on which it would expire pursuant to Section 2.4(a) or (b) or the date 12 months following the Permitted Transferee's death.

2.5 *Vesting; Forfeiture.*

(a) *Vesting Generally.* An Option shall be exercisable and vested upon such terms and conditions or pursuant to such schedule as the Committee shall determine. Except as otherwise provided in this Section 2.5 or unless otherwise specified by the Committee or in an Eligible Employee's employment agreement approved by the Committee, an Option that is not vested upon a Participant's termination of employment shall be forfeited. If a Participant's employment is terminated by Fannie Mae for Cause, an Option that is not vested upon the Participant's termination shall be forfeited.

(b) *Change in Control.* The Committee, in its discretion, may grant Options that by their terms shall become immediately exercisable and fully vested upon a Change in Control Event.

(c) *Retirement, Early Retirement, Total Disability or Death.* Unless otherwise specified by the Committee, an Option shall become immediately exercisable and fully vested upon the Participant's Total Disability or the Participant's termination of employment by reason of Retirement, Early Retirement or death.

9

(d) *Vesting Upon Termination with Separation Agreements.* Notwithstanding the foregoing, (i) for a Participant who, prior to the termination of employment, executes a separation agreement with Fannie Mae pursuant to Fannie Mae's Voluntary Separation Agreement program ("VSA") or Voluntary Separation Option program ("VSO"), one-half of the portion of each Award that would have vested within 12 months of the date of such Participant's termination of employment shall become immediately exercisable and fully vested upon the Participant's termination; (ii) for a Participant who accepts Fannie Mae's offer to terminate employment voluntarily and, prior to such termination, executes a separation agreement with Fannie Mae pursuant to an Elective Severance Window under the Federal National Mortgage Association Discretionary Severance Benefit Plan, the portion of each Award that would have vested within 12 months of the date of such Participant's termination of employment by Fannie Mae, and one-half of the portion of each Award that would have vested within 13-24 months of the date of termination, shall become immediately exercisable and fully vested upon termination; and (iii) for a Participant who, prior to the termination of his or her employment, executes a separation agreement with Fannie Mae pursuant to a Displacement Program under the Federal National Mortgage Association Discretionary Severance Benefit Plan or pursuant to the Fannie Mae Individual Severance Plan, the portion of each Award that would have vested within 12 months of the date of termination of employment shall become immediately exercisable and fully vested upon the Participant's termination. If the Committee approves an employment agreement with an Eligible Employee that provides for vesting of certain Awards upon the employee's termination, such Awards shall vest in accordance with the terms of such Eligible Employee's employment agreement.

(e) *"EPS Challenge Grants."* Section 2.5(d) shall not apply to Options granted under the "EPS Challenge Grant" program established by the Board on January 18, 2000 or, if so provided by the Committee, to Options granted under other special incentive Option programs.

2.6 *Option Amendments or Waiver of Restrictions.* Subject to Sections 1.5 and 8.5 and the specific limitations on Awards contained in the Plan, the Committee from time to time may authorize, generally or in specific cases only, for the benefit of any Participant who is an Eligible Employee, any adjustment in the vesting schedule, the restrictions upon or the term of an Award granted under this Article II by amendment, waiver or other legally valid means. The amendment or other action may provide, among other changes, for a longer or shorter vesting or exercise period.

2.7 *Gain Deferral.* Any Participant who is eligible to participate in the Fannie Mae Stock Option Gain Deferral Plan may elect to exercise a Nonqualified Stock Option under the provisions of such plan.

## III. Stock Appreciation Rights

3.1 *Grants.* In its discretion, the Committee may grant to any Eligible Employee Stock Appreciation Rights either concurrently with the grant of another Award or in respect of an outstanding Award, in whole or in part, or may grant to any Eligible Employee Stand-Alone SARs. Any Stock Appreciation Right granted in connection with an Incentive Stock Option shall contain such terms as may be required to comply with the provisions of Section 422 of the Code (or any successor provision). Each Stand-Alone SAR shall specify the Award Period for which the Stand-Alone SAR is granted and shall provide that the Stand-Alone SAR shall expire at the end of such Award Period. The Committee may extend the Award Period by amendment of a Stand-Alone SAR.

3.2 *Exercise of Stock Appreciation Rights.*

(a) *Related Awards.* Unless the Award Document or the Committee otherwise provides, a Stock Appreciation Right related to another Award shall be exercisable at such time or times, and to the extent, that the related Award shall be exercisable.

10

(b) *Stand-Alone SARs.*    Stand-Alone SARs shall be exercisable and vest upon such terms and conditions or pursuant to such schedule as the Committee shall determine at the time of the Award. Unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, (i) in the case of a Participant's termination of employment for Cause, Stand-Alone SARs shall expire and no longer be exercisable upon the Participant's termination; (ii) in the case of a Participant's Total Disability or a Participant's termination of employment by reason of Retirement, Early Retirement or death or having attained at least age 55 with at least five years of service, Stand-Alone SARs shall become immediately exercisable and fully vested upon the Participant's Total Disability or termination of employment, and Stand-Alone SARs shall expire and no longer be exercisable at the end of the Award Period; and (iii) in the case of a Participant's termination of employment for any reason other than for Cause, Retirement, Early Retirement, Total Disability or death or having attained at least age 55 with at least five years of service, Stand-Alone SARs shall expire and no longer be exercisable on the earlier to occur of (A) the end of the Award Period or (B) the date three months following the Participant's termination. The Committee, in its discretion, may grant Stand-Alone SARs that by their terms shall become immediately exercisable and fully vested upon a Change in Control Event.

3.3 *Payment.*

(a) *Amount.*    Unless the Committee otherwise provides, upon exercise of a Stock Appreciation Right and surrender of the appropriate exercisable portion of any related Award, the Participant shall be entitled to receive payment of an amount determined by multiplying

(i) the difference obtained by subtracting the exercise price per share of Common Stock under the related Award (if applicable) or the initial share value specified in the Award from the Fair Market Value on the date of exercise, by

(ii) the number of shares of Common Stock with respect to which the Participant is exercising the Stock Appreciation Right.

(b) *Form of Payment.*    The Committee, in its discretion, shall determine the form in which payment shall be made of the amount determined under paragraph (a) above, which may be solely in cash, solely in shares of Common Stock (valued at their Fair Market Value on the date of exercise of the Stock Appreciation Right), or partly in shares and partly in cash. If the Committee permits the Participant to elect to receive cash or shares of Common Stock (or a combination thereof) on such exercise, any such election shall be subject to such conditions as the Committee may impose.

**IV. Restricted Stock Awards**

4.1 *Grants.*    The Committee, in its discretion, may grant one or more Restricted Stock Awards to any Eligible Employee. Each Restricted Stock Award Document shall specify the number of shares or units of Common Stock to be issued to the Participant, the date of such issuance, the consideration for the Restricted Stock, if any, to be paid by the Participant, the restrictions imposed on the Restricted Stock, and the conditions of release or lapse of such restrictions. Promptly after the lapse of restrictions on Restricted Stock, shares of Common Stock equal to the number of shares or units as to which the restrictions have lapsed (or such lesser number as may be permitted pursuant to Section 8.4) shall be delivered or credited to the Participant or other person entitled under the Plan to receive the shares. The Participant or such other person shall deliver to Fannie Mae such further assurance and documents as the Committee may require.

4.2 *Restrictions.*

(a) *Pre-Vesting Restraints.*    Except as provided in Section 1.9, shares or units of Restricted Stock may not be sold, assigned, transferred, pledged or otherwise disposed of or encumbered, either voluntarily or involuntarily, until the restrictions have lapsed.

11

(b) *Dividend and Voting Rights.*    Unless otherwise provided in the applicable Award Document, a Participant receiving shares (but not units) of Restricted Stock shall be entitled to cash dividend and voting rights for all shares of Common Stock issued even though they are not vested, provided that such rights shall terminate immediately as to any shares of Restricted Stock that cease to be eligible for vesting. If provided in the applicable Award Document, a Participant receiving units of Restricted Stock shall be entitled to cash dividend and voting rights for such units even though they are not vested, provided that such rights shall terminate immediately as to any units of Restricted Stock that cease to be eligible for vesting.

(c) *Accelerated Vesting.*    Unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, the restrictions on Restricted Stock shall lapse upon the Participant's Total Disability or termination of employment by reason of Retirement, Early Retirement, or death, and, if provided in the applicable Award Document, restrictions on Restricted Stock held for more than one year from the Award Date by Participants shall lapse upon a Change in Control Event.

(d) *Vesting Upon Termination with Separation Agreements.*    Notwithstanding the foregoing, (i) for a Participant who, prior to the termination of employment, executes a separation agreement with Fannie Mae pursuant to Fannie Mae's Voluntary Separation Agreement program ("VSA") or Voluntary Separation Option program ("VSO"), one-half of the portion of each Award of Restricted Stock that would have vested within 12 months of the date of such Participant's termination of employment shall become fully vested upon the Participant's termination; (ii) for a Participant who accepts Fannie Mae's offer to terminate employment voluntarily and, prior to such termination, executes a separation agreement with Fannie Mae pursuant to an Elective Severance Window under the Federal National Mortgage Association Discretionary Severance Benefit Plan, the portion of each Award of Restricted Stock that would have vested within 12 months of the date of such Participant's termination of employment by Fannie Mae, and one-half of the portion of each Award of Restricted Stock that would have vested within 13-24 months of the date of termination, shall become fully vested upon termination; and (iii) for a Participant who, prior to the termination of his or her employment, executes a separation agreement with Fannie Mae pursuant to a Displacement Program under the Federal National Mortgage Association Discretionary Severance Benefit Plan or pursuant to the Fannie Mae Individual Severance Plan, the portion of each Award of Restricted Stock that would have vested within 12 months of the date of termination of employment shall become fully vested upon the Participant's termination. If the Committee approves an employment agreement with an Eligible Employee that provides for vesting of certain Awards upon the employee's termination, such Awards shall vest in accordance with the terms of such Eligible Employee's employment agreement.

(e) *Forfeiture.*    Unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, Restricted Stock as to which the restrictions have not lapsed in accordance with the provisions of the Award or pursuant to Section 4.2(c) shall be forfeited upon a Participant's termination of employment. Upon the occurrence of any forfeiture of Restricted Stock, the forfeited Restricted Stock shall be automatically transferred to Fannie Mae without payment of any consideration by Fannie Mae and without any action by the Participant.

## V.   Performance Share Awards and Stock Bonuses

5.1 *Grants of Performance Share Awards.*

(a)   The Committee, in its discretion, may grant Performance Share Awards to Eligible Employees. An Award shall specify the maximum number of shares of Common Stock (if any) subject to the Performance Share Award and its terms and conditions. The Committee shall establish the specified period (a "performance cycle") for the

12

Performance Share Award and the measure(s) of the performance of Fannie Mae (or any part thereof) or the Eligible Employee. The Committee, during the performance cycle, may make such adjustments to the measure(s) of performance as it may deem appropriate to compensate for, or reflect, any significant changes that may occur in accounting practices, tax laws and other laws or regulations that alter or affect the computation of the measure(s). The Award Document shall specify how the degree of attainment of the measure(s) over the performance cycle is to be determined.

(b) In its discretion, the Committee may grant Performance Share Awards which, by their terms, provide that, upon a Change in Control Event, payments shall be made with respect to a Performance Share Award held for more than one year from the Award Date by an Eligible Employee, based on the assumption that the performance achievement specified in the Award would have been attained by the end of the performance cycle. If the Committee approves an employment agreement with an Eligible Employee that provides for payments with respect to a Performance Share Award upon the employee's termination, payments shall be made with respect to such Performance Share Awards in accordance with the terms of such Eligible Employee's employment agreement.

(c) Unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, if an Eligible Employee's employment is terminated because of Retirement, Total Disability or Early Retirement prior to the end of the performance cycle, but at least 18 months after the first day of the performance cycle, such Eligible Employee shall receive a pro rata Performance Share Award, calculated as if the Eligible Employee were employed by Fannie Mae at the end of the performance cycle but adjusted to reflect the portion of the performance cycle in which the Participant actually was employed by Fannie Mae, payable in full as soon as practicable after the end of the performance cycle.

(d) Unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, if an Eligible Employee's employment is terminated because of the Eligible Employee's death prior to the end of the performance cycle, but at least 18 months after the first day of the performance cycle, the Eligible Employee shall receive a pro rata Performance Share Award, payable in full as soon as practicable after the Eligible Employee's death, in an amount that is based upon the Committee's assessment of the likelihood of Fannie Mae's success in attaining the performance measures by the end of the performance cycle and the portion of the performance cycle during which the Eligible Employee was employed by Fannie Mae, and calculated using the date of the Eligible Employee's death as the date for establishing the Fair Market Value of such Award.

(e) Unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, if, after the end of the performance cycle, an Eligible Employee's employment is terminated because of the Eligible Employee's Retirement, Total Disability, death or Early Retirement, all portions of the Eligible Employee's Performance Share Award not yet paid shall be paid in full as soon as practicable thereafter, except to the extent subject to a deferral election under Section 5.3.

(f) Unless otherwise provided by the Committee or in an Eligible Employee's employment agreement approved by the Committee, any Eligible Employee who is not employed by Fannie Mae on the last day of a performance cycle or on the date of a scheduled payment of any portion of a Performance Share Award (determined without regard to any deferral election under Section 5.3), other than by reason of the Eligible Employee's Retirement, Total Disability, death or Early Retirement, shall forfeit such payment and all future payments with respect to such performance cycle.

5.2  *Grants of Stock Bonuses.*  The Committee may grant a Stock Bonus to any Eligible Employee in such amounts of shares of Common Stock and on such terms and conditions as determined from time to time by the Committee.

13

5.3 *Deferred Payments.* The Committee, in its discretion, may permit any Eligible Employee to defer receipt of a Performance Share Award. Such deferral shall be subject to such further conditions, restrictions or requirements as the Committee may impose, subject to any vested rights of the Eligible Employee.

## VI.  Nonmanagement Director Options

6.1 *Participation.* Awards under this Article VI shall be made only to Nonmanagement Directors.

6.2 *Annual Option Grants.*

(a) *Annual Awards.* On the first day of the Director Term in 2004 and in each subsequent year prior to the Plan Termination Date (each of which shall be the Award Date), there shall be granted automatically (without any action by the Board or the Committee) to each Nonmanagement Director then in office a Nonqualified Stock Option to purchase 4,000 shares of Common Stock. Any Nonmanagement Director appointed or elected to office during a Director Term shall be granted automatically (without any action by the Board or the Committee) a Nonqualified Stock Option (the Award Date of which shall be the date such person takes office) to purchase the nearest whole number of shares of Common Stock equal to 4,000 multiplied by the number of partial or full calendar months remaining in the Director Term in which the Award is granted divided by 12.

(b) *Maximum Number of Shares.* Annual grants that would otherwise cause the total Awards under this Plan to exceed the maximum number of shares of Common Stock under Section 1.5(b) shall be prorated to come within such limitation.

6.3 *Option Price.* The exercise price per share of Common Stock covered by each Option granted under Sections 6.2 or 6.7 shall be 100 percent of the Fair Market Value on the Award Date. Notwithstanding any provision of the Plan, an Option may not be modified so as to reduce the exercise price of the Option. The exercise price of any Option granted under this Article shall be paid in full at the time of each purchase, in cash or by check or in shares of Common Stock valued at their Fair Market Value on the date of exercise of the Option, or partly in shares and partly in cash.

6.4 *Option Period and Ability to Exercise.* Each Option granted under Sections 6.2 or 6.7 shall provide that the Option shall expire ten years from the Award Date and shall be subject to earlier termination as provided below. Each Option granted under Sections 6.2 or 6.7 shall vest and become exercisable over a four-year period at a rate of 25 percent each year on the anniversary of the date of grant.

6.5 *Termination of Directorship.* If an NMD Participant's services as a member of the Board terminate for any reason, any Option granted under Sections 6.2 or 6.7 held by the NMD Participant shall immediately vest and may be exercised until the earlier of one year after the date of such termination or the expiration of the stated term of the Option.

6.6 *Adjustments.* Options granted under Sections 6.2 or 6.7 shall be subject to adjustment as provided in Section 8.2, but only to the extent that such adjustment is based on objective criteria and is consistent with adjustments to Options or other Awards held by persons other than Nonmanagement Directors.

6.7 *Additional Option Awards.* Under this Article VI, the Committee may grant additional Option Awards to Nonmanagement Directors as appropriate, based on market compensation data or other information or circumstances.

## VII.  Nonmanagement Director Restricted Stock

7.1 *Participation.* Awards under this Article VII shall be made only to Nonmanagement Directors. Neither the Plan nor any action taken under the Plan shall give any NMD Participant the right to be reappointed or renominated to serve as a member of the Board.

14

7.2 *Amount of Awards.*   Each Nonmanagement Director who is a member of the Board immediately following the annual meeting of the shareholders of Fannie Mae in 2006 or 2010 shall be granted, immediately following such annual meeting, an Award of shares of Restricted Stock (rounded to the nearest full share) having an aggregate Fair Market Value on the date of grant equal to $75,000 in 2006 and $90,000 in 2010. A Nonmanagement Director who is newly appointed or elected after the annual meeting of shareholders in 2006 or 2010 shall receive an Award of shares of Restricted Stock equal to the number of shares (rounded to the nearest full share) that would have been granted to such newly appointed or elected Nonmanagement Director had he or she been a member of the Board on the date of the annual meeting of the shareholders of Fannie Mae in the year 2006 or 2010, as the case may be, multiplied by the number of partial or full calendar months remaining in the four-year Award cycle from the date of the Nonmanagement Director's appointment or election divided by 48.

7.3 *Restrictions and Vesting.*

(a) *Pre-Vesting Restrictions.*   Except as provided in Section 1.9, shares of Restricted Stock may not be sold, assigned, transferred, pledged or otherwise disposed of or encumbered, either voluntarily or involuntarily, until the restrictions have lapsed.

(b) *Dividend and Voting Rights.*   A NMD Participant receiving shares of Restricted Stock shall be entitled to cash dividend and voting rights for all shares of Common Stock issued even though they are not vested, provided that such rights shall terminate immediately as to any Restricted Stock that is forfeited under Section 7.3(e).

(c) *Vesting.*   Unless otherwise provided by the Committee for Restricted Stock granted under Section 7.5, the restrictions on Restricted Stock granted under this Article VII shall lapse as follows. On the day before each annual meeting of Fannie Mae's shareholders, each Restricted Stock Award granted to a NMD Participant under this Article VII shall vest, and the restrictions on such Restricted Stock shall lapse, at a rate of 25% per year (or by the appropriate pro-rata percentage for Nonmanagement Directors newly appointed or elected after the annual meeting in 2006 or 2010). Promptly after the lapse of restrictions on Restricted Stock, shares of Common Stock equal to the number of shares or units as to which the restrictions have lapsed (or such lesser number as may be permitted pursuant to Section 8.4) shall be delivered or credited to the NMD Participant or other person entitled under the Plan to receive the shares.

(d) *Accelerated Vesting.*   Unless otherwise provided by the Committee for Restricted Stock granted under Section 7.5, the restrictions on Restricted Stock granted under this Article VII shall lapse upon the NMD Participant's membership on the Board terminating because of (i) Total Disability, (ii) death, or (iii) as to a Nonmanagement Director who is elected to the Board by the shareholders, not being renominated after reaching age 70.

(e) *Forfeiture.*   Unless otherwise provided by the Committee for Restricted Stock granted under Section 7.5, Restricted Stock granted under Article VII as to which the restrictions have not lapsed in accordance with the provisions of the Award or pursuant to Section 7.3(c) or (d) shall be forfeited upon the termination of a NMD Participant's membership on the Board. Upon the occurrence of any forfeiture of Restricted Stock, the forfeited Restricted Stock shall be automatically transferred to Fannie Mae without payment of any consideration by Fannie Mae and without any action by the NMD Participant.

7.4 *Adjustments.*   Restricted Stock granted under this Article VII shall be subject to adjustment as provided in Section 8.2, but only to the extent that such adjustment is based on objective criteria and is consistent with adjustments to Restricted Stock or other Awards held by persons other than Nonmanagement Directors.

7.5 *Additional Restricted Stock Awards.*   Under this Article VII, the Committee may grant additional Restricted Stock Awards to Nonmanagement Directors as appropriate, based on market compensation data or other information or circumstances.

**VIII. Other Provisions**

8.1 *Rights of Eligible Employees, Participants and Beneficiaries.*

(a) *Employment Status.*    Status as an Eligible Employee shall not be construed as a commitment that any Award will be made under this Plan to an Eligible Employee or to Eligible Employees generally.

(b) *No Employment Contract.*    Nothing contained in the Plan (or in any other documents related to the Plan or to any Award) shall confer upon any Participant any right to continue in the employ or other service of Fannie Mae or constitute any contract or agreement of employment or other service, nor shall the Plan interfere in any way with the right of Fannie Mae to change such person's compensation or other benefits or to terminate the employment of such person, with or without cause; provided, however, that nothing contained in the Plan or any related document shall adversely affect any independent contractual right of any Participant without the Participant's consent.

(c) *Plan Not Funded.*    Awards payable under the Plan shall be payable in shares of Common Stock or from the general assets of Fannie Mae, and (except as provided in Section 1.5(c)) no special or separate reserve, fund or deposit shall be made to assure payment of Awards. No Participant, Beneficiary or other person shall have any right, title or interest in any fund or in any specific asset (including shares of Common Stock, except as expressly otherwise provided) of Fannie Mae by reason of any Award hereunder. Neither the provisions of the Plan (or of any related documents), nor the creation or adoption of the Plan, nor any action taken pursuant to the provisions of the Plan shall create, or be construed to create, a trust of any kind or a fiduciary relationship between Fannie Mae and any Participant, Beneficiary or other person. To the extent that a Participant, Beneficiary or other person acquires a right to receive payment pursuant to any Award hereunder, such right shall be no greater than the right of any unsecured general creditor of Fannie Mae.

8.2 *Adjustments.*

(a) *Events Requiring Adjustments.*    If any of the following events occur, the Committee shall make the adjustments described in Section 8.2(b): (i) any recapitalization, stock split (including a stock split in the form of a stock dividend), reverse stock split, reorganization, merger, combination, consolidation, split-up, spin-off, combination, repurchase or exchange of Common Stock or other securities of Fannie Mae, (ii) any issuance of warrants or other rights to purchase shares of Common Stock or other securities of Fannie Mae (other than to employees) at less than 80 percent of Fair Market Value on the date of such issuance, (iii) a sale of substantially all the assets of Fannie Mae, or (iv) any other similar corporate transaction or event with respect to the Common Stock.

(b) *Adjustments to Awards.*    If any of the events described in Section 8.2(a) occurs, then the Committee shall, in the manner and to the extent (if any) as it deems appropriate and equitable, (i) proportionately adjust any or all of (1) the number and type of shares of Common Stock that thereafter may be made the subject of Awards (including the specific maximum set forth in Section 1.5), (2) the number, amount and type of shares of Common Stock subject to any or all outstanding Awards, (3) the grant, purchase or exercise price of any or all outstanding Awards, (4) the shares of Common Stock or cash deliverable upon exercise of any outstanding Awards, or (5) the performance standards appropriate to any outstanding Awards; or (ii) make provision for a cash payment or for the substitution or exchange of any or all outstanding Awards based upon the distribution or consideration payable to holders of Common Stock upon or in respect of the event; provided, however, in each case, that with respect to Awards of Incentive Stock Options, no adjustment shall be made that would cause the Plan to violate Section 422 or 424(a) of the Code or any successor provisions thereto.

16

8.3 *Compliance with Laws.*  The Plan, the granting and vesting of Awards under the Plan and the issuance and delivery of shares of Common Stock and the payment of money under the Plan or under Awards granted hereunder are subject to compliance with all applicable federal and state laws, rules and regulations (including but not limited to state and federal securities law and federal margin requirements) and to approvals by any listing, regulatory or governmental authority as may, in the opinion of counsel for Fannie Mae, be necessary or advisable in connection therewith. Any securities delivered under the Plan shall be subject to such restrictions, and the person acquiring the securities shall, if requested by Fannie Mae, provide such assurances and representations to Fannie Mae, as Fannie Mae may deem necessary or desirable to assure compliance with all applicable legal requirements.

8.4 *Tax Withholding.*  Upon any exercise, vesting or payment of any Award or upon the disposition of shares of Common Stock acquired pursuant to the exercise of an Incentive Stock Option prior to satisfaction of the holding period requirements of Section 422 of the Code (or any successor provision), the Committee may make such provisions and take such steps as it may deem necessary or appropriate for the withholding by Fannie Mae of all federal, state, local and other taxes required by law to be withheld, including without limitation, the right, at its option, to the extent permitted by law (i) to require the Participant (or Personal Representative or Beneficiary, as the case may be) to pay or provide for payment of the amount of any taxes that Fannie Mae may be required to withhold with respect to the transaction as a condition to the release of the shares of Common Stock or the making of any payment or distribution, or (ii)(a) to deduct from any amount payable in cash, or (b) to reduce the number of shares of Common Stock otherwise deliverable (or otherwise reacquire such shares), based upon their Fair Market Value on the date of delivery, or (c) to grant the Participant the right to elect reduction in the number of shares upon such terms and conditions as it may establish for the amount of any taxes that Fannie Mae may be required to withhold.

8.5 *Plan Amendment, Termination and Suspension.*

   (a) *Board Authorization.*  Subject to this Section 8.5, the Board may, at any time, terminate or amend, modify or suspend the Plan, in whole or in part. No Awards may be granted during any suspension of the Plan or after termination of the Plan, but the Committee shall retain jurisdiction as to Awards then outstanding in accordance with the terms of the Plan.

   (b) *Shareholder Approval.*  If any amendment would (i) materially increase the benefits accruing under the Plan, or (ii) materially increase the aggregate number of shares of Common Stock that may be issued under the Plan (except as provided in Section 8.2), then to the extent deemed necessary or advisable by the Board or as required by law or the rules of the NYSE, such amendment shall be subject to shareholder approval.

   (c) *Amendments to Awards.*  Without limiting any other express authority granted under the Plan, but subject to its express limits, the Committee may waive conditions of or limitations on Awards, without the consent of the Participant, and may make other changes to the terms and conditions of Awards that do not affect the Participant's rights and benefits under an Award in any materially adverse manner.

   (d) *Limitations on Amendments to Plan and Awards.*  No amendment, suspension or termination of the Plan or any change affecting any outstanding Award shall, without the written consent of the Participant, Beneficiary or Personal Representative, as applicable, affect in any manner materially adverse to such person any rights or benefits of any such person or any obligations of Fannie Mae under any Award granted under the Plan prior to the effective date of such change; however, any changes made pursuant to Section 8.2 shall not be deemed to constitute changes or amendments for purposes of this Section 8.5.

8.6 *Privileges of Stock Ownership.*    Except as otherwise expressly authorized by the Committee or the Plan and expressly stated in an Award Document, a Participant shall not be entitled to any privilege of stock ownership as to any shares of Common Stock not actually delivered to and held of record by the Participant. No adjustment shall be made for dividends or other shareholder rights for which a record date is prior to the date of delivery of such shares.

8.7 *Effective Date of the Plan.*    The Plan shall be effective as of the date of the meeting at which the shareholders of Fannie Mae approve it.

8.8 *Term of the Plan.*    Except for any Award pursuant to Section 7.2 granted to a Nonmanagement Director who is newly appointed or elected to the Board during the 2010-2014 cycle, no Award shall be granted after the Plan Termination Date. Unless otherwise expressly provided in the Plan or in an applicable Award Document, any Award may extend beyond the Plan Termination Date, and all authority of the Committee with respect to Awards hereunder shall continue during any suspension of the Plan and in respect of Awards outstanding on the Plan Termination Date.

8.9 Governing Law/Construction/Severability.

    (a) *Choice of Law.*    The Plan, the Awards, all documents evidencing Awards, and all other related documents shall be governed by, and construed in accordance with the laws of the District of Columbia, without reference to its principles of conflicts of law.

    (b) *Severability.*    If any provision shall be held by a court of competent jurisdiction to be invalid and unenforceable, the remaining provisions of the Plan shall continue in effect.

8.10 *Captions.*    Captions and headings are given to the sections and subsections of the Plan solely as a convenience to facilitate reference. The headings shall not be deemed in any way material or relevant to the construction or interpretation of the Plan or of its provisions.

8.11 *Effect of Change of Subsidiary Status.*    For purposes of the Plan and any Award, if an entity ceases to be a Subsidiary, the employment of all Participants who are employed by such entity shall be deemed to have terminated, except any Participant who continues as an employee of another entity within Fannie Mae.

8.12 *Nonexclusivity of Plan.*    Nothing in the Plan shall limit or be deemed to limit the authority of the Board or the Committee to grant awards or authorize any other compensation, with or without reference to the Common Stock, under any other plan or authority.

8.13 *Plan Binding on Successors.*    The obligations of Fannie Mae under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of Fannie Mae, or upon any successor corporation or organization succeeding to substantially all of the assets and business of Fannie Mae. Fannie Mae agrees that it will make appropriate provisions for the preservation of all Participants' rights under the Plan in any agreement or plan that it may enter into or adopt to effect any such merger, consolidation, reorganization or transfer of assets.

# EXHIBIT 4


10k WIZARD
NET POWER SEARCH

# FORM 8-K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE – FNM

**Filed: December 27, 2004 (period: December 19, 2004)**

Report of unscheduled material events or corporate changes.



Item 1.02.    Termination of a Material Definitive Agreement.

Item 5.02    Departure of Directors or Principal Officers; Election of Directors; Appointment of Princi

Item 8.01    Other Events.

Item 9.01    Financial Statements and Exhibits.

SIGNATURE
EXHIBIT INDEX
EX-99.1 (EXHIBIT 99.1)

EX-99.2 (EXHIBIT 99.2)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

Washington, DC 20549

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **December 19, 2004**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | | |
|---|---|---|
| **Federally chartered corporation** | **000-50231** | **52-0883107** |
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *IRS Employer Identification Number)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | | **20016** *(Zip Code)* |
| *(Address of principal executive offices)* | | |

**Registrant's telephone number, including area code: 202-752-7000**

*(Former Name or Former Address, if Changed Since Last Report):* _____

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.02. Termination of a Material Definitive Agreement.**

On December 21, 2004, Fannie Mae (formally the Federal National Mortgage Association) announced the retirement of the company's Chairman and Chief Executive Officer, Franklin D. Raines, and the resignation of the company's Vice Chairman and Chief Financial Officer, J. Timothy Howard.

As a result of his retirement, Mr. Raines' employment under his employment agreement with Fannie Mae and service on the Board of Directors terminated on December 21, 2004. Mr. Howard's employment under his employment agreement with Fannie Mae will terminate on January 31, 2005. Mr. Howard ceased his duties as Chief Financial Officer as of December 21, 2004, upon the appointment of Robert J. Levin as interim Chief Financial Officer as described in item 5.02 below. Mr. Howard will serve on the Board of Directors until January 31, 2005. Copies of the agreements with Messrs. Raines and Howard, as entered into in May 2004 and amended on June 30, 2004, were filed with Fannie Mae's quarterly report on Form 10−Q for the quarter ended June 30, 2004. The agreements were subsequently amended in September 2004, and copies of the amendments were filed as exhibits to a Form 8−K Fannie Mae filed on September 23, 2004. The Office of Federal Housing Enterprise Oversight ("OFHEO") approved the termination benefits in the agreements with Mr. Raines and Mr. Howard on November 17, 2004 and December 13, 2004, respectively.

On December 23, 2004, Fannie Mae received a letter from OFHEO informing Fannie Mae that OFHEO would review Mr. Raines' and Mr. Howard's termination benefits that accrue as a result of Mr. Raines' retirement and Mr. Howard's resignation and requesting information regarding those benefits. OFHEO indicated that, among other matters, it is concerned with whether, at the time of termination, there have been enhancements or modifications to benefits since the termination package was agreed upon. OFHEO also stated in the December 23 letter that Fannie Mae should not pay any termination benefits to Mr. Raines or Mr. Howard until OFHEO has completed its review thereof.

Fannie Mae will provide OFHEO the information it has requested. Fannie Mae will also consider its legal and contractual obligations regarding payment of compensation and benefits to Mr. Raines and Mr. Howard and will discuss these matters with OFHEO.

*Agreement with Mr. Raines*

In accordance with the terms of his employment agreement and Fannie Mae's employee benefit plans, Mr. Raines is entitled to receive the compensation and benefits described below.

- Stock options. As of December 21, 2004, Mr. Raines held vested and exercisable options to purchase a total of 1,628,071 shares of common stock at exercise prices ranging from $60.3125 to $80.95 per share. Based on the closing price of Fannie Mae's common stock on December 21, 2004 of $70.35, the market price of the shares underlying these options exceeded the exercise price by an aggregate of $5,545,270. Upon Mr. Raines' retirement, options to purchase an additional 233,799 shares at $69.43 per share and an additional 135,020 shares at $78.315

–1–

per share became vested and exercisable, and options to purchase 69,334 shares of common stock at $80.95 per share were canceled. The market price of the shares underlying the vesting options exceeded the exercise price by an aggregate of $215,095, based on the December 21, 2004 closing price. Under Fannie Mae's stock compensation plans, all options held at the time of retirement by any option holder who is at least 55 years old and who has at least 5 years of service with Fannie Mae remain exercisable until their initial expiration date, which is generally 10 years after grant. As a result, Mr. Raines' vested options, including those vesting by reason of his retirement, will expire between May 2008 and January 2014.

• Performance Share Payouts. Under Fannie Mae's Performance Share program, as a member of Fannie Mae's senior management Mr. Raines has previously received awards that entitle him to receive shares of Fannie Mae common stock subject to meeting corporate performance objectives over three−year periods. Each year, the Compensation Committee of Fannie Mae's Board of Directors establishes an award cycle of three years. At the beginning of a cycle, Fannie Mae's Board of Directors establishes program targets based on both financial and non−financial goals, equally weighted. The financial goals currently are tied to growth in core business earnings per share and the non−financial goals are tied to Fannie Mae's strategic plan and mission. Fannie Mae will restate its previously issued financial statements for 2001 through 2004 and re−evaluate previously issued non−GAAP financial information, including core business earnings. The Compensation Committee of the Board will consider the impact thereof on both unpaid performance shares and uncompleted performance share cycles. For the performance cycle completed in 2003, Mr. Raines was determined in January 2004 to be entitled to receive 139,155 shares, of which he has been paid 69,577 shares in accordance with the program. For the cycles concluding in 2004 through 2006, Mr. Raines has been granted awards that would result in him receiving no shares if the threshold goals are not attained or receiving an amount of shares between the threshold and maximum numbers set forth in following table based on attainment of the goals at or above the threshold.

| Award Cycle | Range of Potential Performance Share Payments | | |
|---|---|---|---|
| | threshold | target | maximum |
| 2004 to 2006 | 39,987 | 99,967 | 149,951 |
| 2003 to 2005 | 43,002 | 107,505 | 161,258 |
| 2002 to 2004 | 48,185 | 120,462 | 180,693 |

The table above presents the total number of shares that Mr. Raines could have become entitled to had his employment with the company continued. If shares are paid out under the program for a given period, the number of shares Mr. Raines will receive will be reduced on a pro rata basis depending on the length of his service during the applicable award cycle. Shares payable to retirees are typically paid out shortly after the conclusion of an award cycle.

−2−

- Annual cash bonus. If the company pays bonuses under its Annual Incentive Plan for 2004, pursuant to his agreement Mr. Raines will be entitled to be considered for a pro–rated bonus. The total amount of bonuses that may be paid under the Annual Incentive Plan to all eligible employees is typically determined based on the achievement of corporate financial goals, measured by core business earnings per share growth. The Compensation Committee of the Board may adjust the goals, with Board approval, in certain specified situations and has discretion to pay bonuses under the plan for individual performance if financial goals are not achieved. Although corporate performance may result in the creation of a bonus pool, the amount of an individual's bonus is based on personal performance. Fannie Mae will restate its financial statements for periods from January 2001 through the second quarter of 2004 and will re–evaluate corresponding non–GAAP financial information including core business earnings. The Compensation Committee of the Board of Directors will consider the impact of the restatement and re–evaluation of the company's non–GAAP financial information on bonuses under the plan. At this time, it cannot be determined whether Mr. Raines will receive a bonus for 2004.

- Pension plans. Under Fannie Mae's pension plans, estimated monthly payments of $114,393 will be payable during the lives of Mr. Raines and his surviving spouse.

- Payout of compensation that Mr. Raines previously earned and deferred under Fannie Mae's deferred compensation plans. Under company plans, Mr. Raines elected to defer the receipt of earned salary and other compensation. The plans permit participants to invest the deferred compensation in various hypothetical portfolios, all of which are tied to the performance of mutual funds available in the market. As of November 30, 2004, Mr. Raines' deferred balance was approximately $8.7 million. This amount will be paid out to Mr. Raines in accordance with elections he previously made in installments of varying amounts through at least 2020. Pending payout, deferred amounts will be allocated by Mr. Raines among the hypothetical investment options in accordance with the plans and will receive a corresponding rate of return.

- Medical and dental coverage. Pursuant to his agreement, Mr. Raines is entitled to lifetime medical and dental coverage for himself and his spouse, and coverage for his dependents until they reach the age of 21 or so long as they remain his dependents, at no cost to Mr. Raines.

- Life insurance. Consistent with Fannie Mae's executive life insurance program, Fannie Mae will pay the premiums on a life insurance policy for Mr. Raines with a benefit of $5,000,000 until he reaches age 60, and a benefit of $2,500,000 thereafter.

- Retirement savings plan. Mr. Raines will receive retirement savings he has accumulated in the company's retirement savings plan (a 401(k) plan) in accordance with the terms of that plan.

- Charitable gift program. Consistent with Fannie Mae's charitable gift program available to all retirees, Mr. Raines will be eligible to have up to $10,000 in charitable contributions matched by the Fannie Mae Foundation per year, up to $500 of which may be matched at a rate of 2–for–1.

- Administrative support. Pursuant to his agreement, Fannie Mae will provide administrative services to support the provision of an office and related secretarial and administrative services for Mr. Raines' benefit during such time as Mr. Raines is not employed on a full–time basis. Mr. Raines must reimburse the company for the fair market value of this benefit, including Fannie Mae's cost of administration.

The company will provide the compensation and benefits described above based on Mr. Raines' retirement from the company on December 21, 2004 pursuant to Section 4.2(b) of his employment agreement, which governs retirement. The Board of Directors waived the requirement under Section 4.2(b) that Mr. Raines provide the company with six months' notice of his retirement. Mr. Raines has asserted to the company that his retirement is not effective until June 22, 2005, which would result in him being entitled to receive approximately $600,000 in salary between December 22, 2004 and his retirement date, and would also result in related adjustments to the benefits described above. Mr. Raines' monthly pension payments would commence after June 22, 2005 in an estimated monthly amount of $116,300. The increased amount is due to the additional six months of service.

–3–

Mr. Raines has also suggested that he may have "Good Reason" to terminate his employment under Section 4.2(a) of his employment agreement. If Mr. Raines' termination were for Good Reason, he would be entitled to the benefits described above relating to retirement under Section 4.2(b) of his agreement. In addition, options to purchase an additional 69,334 shares of common stock at $80.95 per share would vest. These options would expire in November 2011. Under Mr. Raines' employment agreement, any dispute regarding the terms of the agreement will be resolved through arbitration, with the company bearing Mr. Raines' legal expenses unless he does not prevail.

### Agreement with Mr. Howard

In accordance with the terms of his employment agreement and Fannie Mae's employee benefit plans, Mr. Howard is entitled to receive the compensation and benefits described below. For purposes of the benefits described below, Mr. Howard's resignation is deemed a retirement due to his age and years of service.

- Salary. Mr. Howard will receive approximately $84,000 in salary for the period from December 20, 2004 through January 2005.

- Stock options. As of January 31, 2005, Mr. Howard and his transferees will hold vested and exercisable options to purchase a total of 481,600 shares of common stock at exercise prices ranging from $27.125 to $80.95 per share. Based on the closing price of Fannie Mae's common stock on December 20, 2004 of $69.42, the market price of the shares underlying these options exceeded the exercise price by an aggregate of $4,395,864. As a result of Mr. Howard's resignation, no additional options will become vested after January 31, 2005, and options to purchase 139,048 shares of common stock at prices ranging from $69.43 to $80.95 per share will be canceled without vesting. Under Fannie Mae's stock compensation plans, all options held at the time of retirement by any option holder who is at least 55 years old and who has at least 5 years of service with Fannie Mae remain exercisable until their initial expiration date, which is generally 10 years after grant. As a result, Mr. Howard's vested options will expire between November 2005 and January 2014.

- Performance Share Payouts. Under Fannie Mae's Performance Share program, which is discussed above in connection with Mr. Raines' compensation and benefits, Mr. Howard was determined in January 2004 to be entitled to receive 48,600 shares for the performance cycle completed in 2003. Of these shares, he has been paid 24,300 shares in accordance with the program. For the cycles concluding in 2004 and 2005, Mr. Howard has been granted awards that would result in him receiving no shares if the threshold goals are not attained or receiving an amount of shares between the threshold and maximum numbers set forth in following table based on attainment of the goals at or above the threshold.

-4-

| Award Cycle | Range of Potential Performance Share Payments | | |
|---|---|---|---|
| | threshold | target | maximum |
| 2003 to 2005 | 11,265 | 28,162 | 42,243 |
| 2002 to 2004 | 13,138 | 32,844 | 49,266 |

The table above presents the total number of shares that Mr. Howard could have become entitled to had his employment with the company continued. If shares are paid out under the program for a given period, the number of shares Mr. Howard will receive will be reduced on a pro rata basis depending on the length of his service during the applicable award cycle. Mr. Howard will not be entitled to shares for any cycle during which he was employed by Fannie Mae for less than 18 months. Shares payable to retirees are typically paid out shortly after the conclusion of an award cycle.

Fannie Mae will restate its previously issued financial statements for 2001 through 2004 and re–evaluate previously issued non–GAAP financial information. The Compensation Committee of the Board will consider the impact thereof on both unpaid performance shares and uncompleted performance share cycles.

- Annual cash bonus. If the company pays bonuses under its Annual Incentive Plan for 2004, pursuant to his agreement Mr. Howard will be entitled to be considered for a bonus. Mr. Howard would also be eligible to be considered for a pro–rated bonus for 2005. At this time, it cannot be determined whether Mr. Howard will receive a bonus for 2004 or 2005.

- Pension plans. Under Fannie Mae's pension plans, estimated monthly payments of $36,071 will be payable during the lives of Mr. Howard and his surviving spouse.

- Payout of compensation that Mr. Howard previously earned and deferred under Fannie Mae's deferred compensation plans. Under company plans, Mr. Howard elected to defer the receipt of earned salary and other compensation. The plans permit participants to invest the deferred compensation in various hypothetical portfolios, all of which are tied to the performance of mutual funds available in the market. As of November 30, 2004, Mr. Howard's deferred balance was approximately $4.0 million. This amount will be paid out to Mr. Howard in accordance with elections he previously made in installments of varying amounts through 2010. Pending payout, deferred amounts will be allocated by Mr. Howard among the hypothetical investment options in accordance with the plans and will receive a corresponding rate of return.

- Medical coverage. Mr. Howard is entitled to participate in the same medical coverage plan available to other Fannie Mae retirees and at the same reduced cost paid by other retirees.

- Life insurance. Consistent with Fannie Mae's executive life insurance program, Fannie Mae will pay the premiums on a life insurance policy for Mr. Howard with a benefit of $2,000,000 until January 2009, and a benefit of $1,000,000 thereafter.

–5–

- Retirement savings plan. Mr. Howard will receive retirement savings he has accumulated in the company's retirement savings plan (a 401(k) plan) in accordance with the terms of that plan.

- Charitable gift program. Consistent with Fannie Mae's charitable gift program available to all retirees, Mr. Howard will be eligible to have up to $10,000 in charitable contributions matched by the Fannie Mae Foundation per year, up to $500 of which may be matched at a rate of 2−for−1.

The company will provide the compensation and benefits described above based on Mr. Howard's resignation from the company as of January 31, 2005 pursuant to Section 4.2(b) of his employment agreement, which governs resignation other than for "Good Reason." Mr. Howard has asserted to the company that his resignation was instead for "Good Reason" under Section 4.2(a) of the employment agreement. If Mr. Howard's termination were for Good Reason, he would be entitled to the benefits described above relating to resignation under Section 4.2(b), except that:

- Mr. Howard would be entitled to receive his salary through June 30, 2007. This would result in Mr. Howard being paid an additional approximately $1.7 million, subject to reduction for income from other employment or self−employment (other than board service).

- Medical and dental coverage. Until June 30, 2007, Mr. Howard would be entitled to medical and dental coverage for himself and his spouse, and coverage for his dependents until they reach the age of 21 or so long as they remain his dependents, at no cost to Mr. Howard.

Under Mr. Howard's employment agreement, any dispute regarding the terms of the agreement will be resolved through arbitration, with the company bearing Mr. Howard's legal expenses unless he does not prevail.

### Additional Information

Each employment agreement obligates the officer not to compete with the company in the United States, solicit any officer or employee of the company or its affiliates to terminate his or her relationship with the company or to engage in prohibited competition, or to assist others to engage in activities in which the officer would be prohibited from engaging, in each case for at least one year following termination. If Mr. Howard's termination were determined to have been for "Good Reason" under his employment agreement, he would be required to comply with this prohibition through June 30, 2007.

−6−

**Item 5.02 Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

As referred to in Item 1.02 above, on December 21, 2004, Franklin Raines' retirement from his position as Fannie Mae's Chairman and Chief Executive Officer, including his membership on the Board of Directors, was effective immediately. On December 19, 2004, Mr. Howard notified the Board of Directors of his intention to resign his positions. On December 20, 2004, Mr. Howard delivered his resignation as an employee of the company effective January 31, 2005. Mr. Howard will serve on the Board of Directors until January 31, 2005.

On December 21, 2004, Fannie Mae's Board of Directors appointed the company's Vice Chairman and Chief Operating Officer, Daniel H. Mudd, interim Chief Executive Officer and Executive Vice President, Robert J. Levin, interim Chief Financial Officer. Upon Mr. Levin's appointment, Mr. Howard's duties as Chief Financial Officer ceased.

Daniel Mudd, age 46, has been Vice Chairman of the Board and Chief Operating Officer of Fannie Mae since February 2000. Prior to his employment with Fannie Mae, Mr. Mudd was President and Chief Executive Officer of GE Capital, Japan, a diversified financial services company and a wholly-owned subsidiary of the General Electric Company, from April 1999 to February 2000. He also served as President of GE Capital, Asia Pacific, from May 1996 to June 1999.

Robert Levin, age 49, has been Fannie Mae's Executive Vice President—Housing and Community Development since June 1998. He was Executive Vice President—Marketing from June 1990 to June 1998. He joined Fannie Mae in 1981.

Mr. Levin's sister is employed as a non-officer employee in Fannie Mae's Enterprise Systems Operations division. Since January 1, 2003, Mr. Levin's sister has been paid approximately $163,300 in bonus and salary. She also receives benefits under the company's compensation and benefit plans that are generally available to Fannie Mae employees, including Fannie Mae's employee stock purchase plan and employee stock ownership plan. The Enterprise Systems Operations division does not report, nor has it ever reported, to Mr. Levin.

*Employment Agreements with Messrs. Mudd and Levin*

Fannie Mae previously entered into agreements with Mr. Mudd and Mr. Levin, and has previously filed those agreements with the SEC. The company has not entered into new agreements with either of them in connection with their interim appointments. The information below relates to their existing agreements.

–7–

The employment agreements with Messrs. Mudd and Levin do not specify salary, bonus or other compensation arrangements, except as described below. Compensation arrangements for Messrs. Mudd and Levin are determined annually by the Compensation Committee of the Fannie Mae Board of Directors. In addition to their base salary, Messrs. Mudd and Levin participate in the Annual Incentive Plan and are eligible to receive variable long–term incentive awards, such as performance shares and stock options, as described in Fannie Mae's proxy for its annual 2004 shareholders meeting.

Mr. Mudd's employment agreement with Fannie Mae, as entered into in May 2004 and amended on June 30, 2004, was filed with Fannie Mae's quarterly report on Form 10–Q for the quarter ended June 30, 2004. The agreement was subsequently amended in September 2004. A copy of the September 2004 amendment was filed as an exhibit to a Form 8–K Fannie Mae filed on September 23, 2004.

Mr. Mudd's employment agreement with the company provides for employment through June 30, 2007. Mr. Mudd's salary (currently $746,209) is subject to periodic review and possible increases, but not decreases, by the Board. Mr. Mudd is entitled to participate in the company's Executive Pension Plan but at age 46 and his current years of service, he is not currently entitled to a retirement benefit under that plan. During the employment term, Mr. Mudd will also be eligible to be considered for awards under the company's stock option, restricted stock, annual incentive and performance share programs, and to receive life insurance benefits, all in accordance with the company's compensation philosophy and life insurance policies and programs. Mr. Mudd will also be eligible to receive certain fringe benefits specified in his employment agreement, including up to $25,000 in tax and investment assistance and advice per year, legal expenses incurred in negotiating his employment agreement, access to a car and driver for business related transportation, and a complete annual physical examination. He is also eligible to participate generally in company benefit programs.

Mr. Mudd's employment agreement provides that if Mr. Mudd is terminated by the company other than for cause, or if Mr. Mudd terminates his employment because of a reduction in base salary, certain changes adversely affecting his authority or position, or any of certain other specified "Good Reason" events, he would be entitled to receive base salary for the period through June 30, 2007 or until the first anniversary of termination of his employment, if later (subject to offset for income from other employment or self–employment, other than board service), a prorated Annual Incentive Plan payment for the year of termination, a prorated Performance Share program payment for any award cycle as to which at least 18 months had elapsed as of the date of termination, full vesting of any unvested restricted stock awarded on February 23, 2000, continued vesting for any other awards of restricted stock as if Mr. Mudd had remained employed through June 30, 2007, and, until June 30, 2007, medical and dental coverage for Mr. Mudd and his spouse and coverage for his dependents (so long as they remain his dependents or, if later, until they reach the age of 21), at no cost. The same benefits would be payable in the event Mr. Mudd's employment were to terminate at the end of the employment term by reason of a failure of the company to extend the agreement on comparable terms, or were to terminate by reason of serious illness or disability, subject to an offset against salary continuation for any employer–provided disability benefits. In the event of Mr. Mudd's death during the employment term,

–8–

his beneficiary would be entitled to an Annual Incentive Plan award for any year ended prior to his death plus a pro-rated award for the year of death, and a pro-rated Performance Share program payment for any award cycle as to which at least 18 months had elapsed as of the date of death, in each case of pro-rated awards based on the Board's determination of the likelihood that performance targets would have been achieved, plus vesting of any restricted stock on the same basis as described above in the case of an involuntary termination other than for cause. If Mr. Mudd were to terminate his employment voluntarily other than for "Good Reason" as defined in his agreement or were to be terminated for cause, he would be entitled only to accrued but unpaid base salary plus such vested benefits, if any, to which he would be entitled under the terms of separate benefit programs in which he participates. Mr. Mudd's employment agreement with the company also obligates him not to compete with the company in the United States, solicit any officer or employee of the company or its affiliates to terminate his or her relationship with the company or to engage in prohibited competition, or to assist others to engage in activities in which Mr. Mudd would be prohibited from engaging, in each case for at least one year following termination or, in the case of a termination without cause or a voluntary termination by Mr. Mudd with "Good Reason," until June 30, 2007, if longer. Disputes arising under the employment agreement are to be resolved through arbitration, with the company bearing Mr. Mudd's legal expenses unless he does not prevail. OFHEO approved the termination benefits in Mr. Mudd's agreement on November 17, 2004.

Under an agreement dated June 19, 1990 between Mr. Levin and Fannie Mae, which was filed as Exhibit 10.5 to Fannie Mae's Form 10 filed on March 31, 2003, if Mr. Levin is terminated for reasons other than for cause, he will continue to receive his base salary for a period of 12 months from the date of termination and will continue to be covered by Fannie Mae's life, medical, and long-term disability insurance plans for a 12-month period, or until re-employment that provides certain coverage, whichever occurs first. Any disability benefits that he receives during the 12-month period will reduce the amount otherwise payable by Fannie Mae, but only to the extent the benefits are attributable to payments made by Fannie Mae. For this purpose, a termination will be for cause if it is based upon reasonable evidence Mr. Levin has materially breached his duties by engaging in dishonest or fraudulent actions or willful misconduct.

## Item 8.01 Other Events.

On December 21, 2004, Fannie Mae's Board of Directors appointed Stephen B. Ashley to serve as non-executive Chairman of the Board, effective immediately.

On December 21, 2004, the Office of Federal Housing Enterprise Oversight ("OFHEO") issued a letter to Fannie Mae's Board of Directors stating that Fannie Mae was significantly undercapitalized at September 30, 2004. In accordance with the provisions of the Federal Housing Enterprise Financial Safety and Soundness Act of 1992, Fannie Mae must submit a capital restoration plan proposal to OFHEO for review and approval, and is prohibited from making any capital distribution that would result in Fannie Mae being reclassified as critically undercapitalized. In addition, even if a capital distribution would not cause the company to become critically undercapitalized, the

-9-

company is prohibited from making the capital distribution unless OFHEO provides prior approval of the distribution after it finds that the distribution (i) will enhance the ability of the company to meet its capital requirements promptly, (ii) will contribute to long term safety and soundness, or (iii) is otherwise in the public interest. As a result, Fannie Mae must obtain OFHEO's prior approval before it may, among other actions, pay dividends on shares of its common stock. The letter further states that the reclassification to significantly undercapitalized may lead to structural changes and restrictions on growth, as well as OFHEO directives to terminate or modify any business activities that OFHEO believes pose excessive risk.

On December 23, 2004, Fannie Mae announced that the company received a letter from OFHEO that approved Fannie Mae's payment of dividends on all series of Fannie Mae preferred stock due to be paid on December 31, 2004. The letter also stated that, at this time, OFHEO is not prepared to issue an approval for subsequent periods and will continue to review dividend payment requests for each quarter based upon the facts and conditions existing at the time. Fannie Mae's news release regarding this matter is filed as Exhibit 99.1 to this report and is incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits.**

The exhibit index filed herewith is incorporated herein by reference.

–10–

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE ASSOCIATION

By        /s/ Ann M. Kappler
               Ann M. Kappler
               Executive Vice President and General Counsel

Date: December 27, 2004

EXHIBIT INDEX

The following exhibits are submitted herewith:

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 99.1 | December 23, 2004 statement by Chuck Greener on December 22, 2004 letter from the Office of Federal Housing Enterprise Oversight. |
| 99.2 | December 21, 2004 news release by Fannie Mae. |

EXHIBIT 99.1

 **FannieMae.**

**Statement by Chuck Greener**
**Senior Vice President — Communications**
**Fannie Mae**
**December 23, 2004**

On December 22, 2004, Fannie Mae received a letter from our safety and soundness regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), that approved Fannie Mae's payment of dividends on all series of Fannie Mae preferred stock due to be paid on December 31, 2004. In rendering its decision, OFHEO in its letter stated that the December 31 dividend payment would enhance Fannie Mae's ability to restore capital to minimum required levels, enhance the long−term safety and soundness of Fannie Mae, and is in the public interest.

OFHEO also stated that, at this time, it is not prepared to issue an approval for subsequent periods and will continue to review dividend payment requests for each quarter based upon the facts and conditions existing at the time. OFHEO said that, in each case, OFHEO would continue to assess the impact on safety and soundness, the impact on achievement and maintenance of appropriate capital levels, and the public interest.

We are appreciative of OFHEO's quick review and responsiveness on this issue.

**Contact:**      Janice Daue
                  (202) 752−2131

Exhibit 99.2

**News Release**

December 21, 2004

**Fannie Mae Board of Directors Announces Chairman and Chief Executive Officer Raines and Chief Financial Officer Howard To Depart From Company, Selection of Interim CEO and CFO**

WASHINGTON, DC — Fannie Mae's (FNM/NYSE) Board of Directors announced today the retirement of Chairman and Chief Executive Officer Franklin D. Raines and the resignation of Vice Chairman and Chief Financial Officer J. Timothy Howard.

Effective immediately, board member Stephen B. Ashley will become the non−executive chairman of the board, Vice Chairman and Chief Operating Officer Daniel H. Mudd will serve as interim chief executive officer, and Executive Vice President Robert Levin will serve as interim chief financial officer. The executive search firm Spencer Stuart has been retained to work with the board. The board further announced that the audit committee has dismissed the firm KPMG LLP as the company's independent auditors, and has initiated a search for a new independent auditor.

"Fannie Mae is a great company deeply committed to its mission of expanding the dream of homeownership to all Americans and serving the nation's housing needs," said Ann Korologos, the presiding director of the non−management members of the board. "We appreciate the many contributions of Frank Raines and Tim Howard, their devotion to Fannie Mae and their commitment to its mission. Fannie Mae's Board of Directors takes these steps today to move the company forward to serve its critical mission in a safe and sound manner."

"We are confident in the leadership ability of Dan Mudd and Rob Levin to work with the board as well as the company's safety and soundness regulator, Congress, the housing industry, and all of the company's stakeholders. Together, we will continue responding to the issues identified by OFHEO to ensure that the Fannie Mae of tomorrow is safe, sound, stable and even more able to achieve its mission," Korologos added.

Mudd, as Vice Chairman and Chief Operating Officer, has been overseeing the company's single−family, multifamily, credit, housing and community development, e−Business, technology, corporate marketing and administrative divisions. Prior to joining Fannie Mae in 2000, he was President and Chief Executive Officer of GE Capital, Japan.

Levin joined Fannie Mae in May 1981, and has served as Executive Vice President in various roles at the company since 1990. During this time, Levin has overseen Fannie Mae's single−family mortgage business, multifamily mortgage business, and its mortgage−backed securities business. He also has been responsible for mortgage capital markets transactions, and disposition of real estate−owned properties. Among other various positions in the company, Levin served as senior vice president for corporate finance. Currently, Levin heads the company's Housing and Community Development division.

Ashley, a Fannie Mae board director since 1995, is a former president of the Mortgage Bankers Association of America, and has been Chairman and Chief Executive Officer of The Ashley Group, a group of commercial and multifamily real estate, brokerage, and investment companies, since January 1997.

The Board of Directors today further said it continues to move forward to comply with Fannie Mae's September 27, 2004 agreement with its safety and soundness regulator, the Office of Federal Housing Enterprise Oversight (OFHEO). Board member H. Patrick Swygert, who leads the board's compliance committee that was established to oversee implementation of the OFHEO agreement, said, "We are mindful of our obligations under the agreement with OFHEO, we are working diligently in cooperation with OFHEO to comply with the agreement, and we are making progress on implementing its terms."

− 1 −

Providing an update on the company's efforts to date to comply with the agreement, the Board said that measures taken so far include the hiring of independent organizational and compensation consultants; submission and approval of a detailed implementation plan for the agreement; and submission of detailed work plans for the organizational and compensation reviews. Board member Donald B. Marron will continue leading the work on the company's capitalization plan.

"The Board will be moving expeditiously to implement the letter and spirit of the September 27th agreement and continuing to make regular reports to OFHEO, maintaining a positive, constructive and candid dialogue with the regulator," Swygert said.

The Board further said that the independent investigation commissioned by its Special Review Committee is proceeding to look into the findings of OFHEO's September 21, 2004 special examination report. The investigation, led by former Senator Warren Rudman of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, is focused on: accounting issues, including accounting policies procedures and controls regarding FAS 91 and FAS 133; organization, structure and governance, including board oversight and management responsibilities and resources; and executive compensation. Paul, Weiss' work continues as it thoroughly examines these areas and other issues that may arise in the course of their review, reporting regularly to the Board.

"The Board of Directors is confident that Fannie Mae, working with OFHEO, will resolve the matters before us, make the necessary changes, and emerge as an even stronger company with an even greater future working in the best interest of our shareholders and investors," Director Korologos said.

*Fannie Mae is a New York Stock Exchange company and the largest non-bank financial services company in the world. It operates pursuant to a federal charter and is the nation's largest source of financing for home mortgages. Fannie Mae has pledged through its "American Dream Commitment" to expand access to homeownership for millions of first-time home buyers; help raise the minority homeownership rate to 55 percent; make homeownership and rental housing a success for millions of families at risk of losing their homes; and expand the supply of affordable housing where it is needed most. Since 1968, Fannie Mae has provided $6.3 trillion of mortgage financing for 63 million families.*

*Style Usage: Fannie Mae's Board of Directors has authorized the company to operate as "Fannie Mae," and the company's stock is now listed on the NYSE as "FNM." In order to facilitate clarity and avoid confusion, news organizations are asked to refer to the company exclusively as "Fannie Mae."*

– 2 –

Created by 10KWizard    www.10KWizard.com

# EXHIBIT 5



# Form 10-Q

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE - FNM

Filed: August 09, 2004 (period: June 30, 2004)

Quarterly report which provides a continuing view of a company's financial position

Exhibit 10.3

EMPLOYMENT AGREEMENT

between

FANNIE MAE

and

J. TIMOTHY HOWARD

As Amended on June 30, 2004

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 1 |
| Section 1.1. | Agreement Term | 1 |
| Section 1.2. | Annual Incentive Plan | 1 |
| Section 1.3. | Award Period | 1 |
| Section 1.4. | Base Salary | 1 |
| Section 1.5. | Board | 2 |
| Section 1.6. | Cause | 2 |
| Section 1.7. | Compete | 2 |
| Section 1.8. | Corporation | 2 |
| Section 1.9. | Effective Date | 2 |
| Section 1.10. | Employee | 2 |
| Section 1.11. | Employment | 2 |
| Section 1.12. | Executive Pension Plan | 3 |
| Section 1.13. | Existing Agreement | 3 |
| Section 1.14. | Failure to Extend | 3 |
| Section 1.15. | Good Reason | 3 |
| Section 1.16. | OFHEO | 3 |
| Section 1.17. | Option | 3 |
| Section 1.18. | Performance Share Award | 3 |
| Section 1.19. | Qualifying Termination | 4 |
| Section 1.20. | Restricted Stock | 4 |
| Section 1.21. | Serious Illness or Disability | 4 |
| Section 1.22. | Stock Compensation Plan | 4 |
| Section 1.23. | Surviving Spouse | 4 |
| Section 1.24. | Termination of Employment | 4 |
| ARTICLE 2 | PERIOD OF EMPLOYMENT AND DUTIES | 4 |
| Section 2.1. | Period of Employment | 4 |
| Section 2.2. | Duties | 5 |
| ARTICLE 3 | COMPENSATION AND BENEFITS | 5 |
| Section 3.1. | Base Salary | 5 |
| Section 3.2. | Benefits | 6 |
| ARTICLE 4 | TERMINATION OF EMPLOYMENT | 9 |
| Section 4.1. | Termination of Employment By the Corporation | 9 |
| Section 4.2. | Termination of Employment By Employee | 11 |
| Section 4.3. | Other Termination of Employment | 12 |
| Section 4.4. | Resignation as Member of the Board of Directors | 12 |
| ARTICLE 5 | COMPENSATION AND BENEFITS FOLLOWING TERMINATION OF EMPLOYMENT | 12 |

| | | |
|---|---|---|
| Section 5.1. | Voluntary Termination Pursuant to Section 4.2(b) | 12 |
| Section 5.2. | Termination for Cause | 12 |
| Section 5.3. | Qualifying Termination (Other Than by Reason Of Death) | 13 |
| Section 5.4. | Termination of Employment By Reason of Death | 16 |
| ARTICLE 6 | MISCELLANEOUS | 17 |
| Section 6.1. | Noncompetition | 17 |
| Section 6.2. | Payment of Certain Expenses | 19 |
| Section 6.3. | Assignment by Employee | 19 |
| Section 6.4. | No Funding Required | 20 |
| Section 6.5. | Disclosure of Information to the Corporation | 20 |
| Section 6.6. | Nondisclosure of Confidential Information | 20 |
| Section 6.7. | Waiver | 20 |
| Section 6.8. | Notice | 21 |
| Section 6.9. | Applicable Law | 21 |
| Section 6.10. | Taxes | 21 |
| Section 6.11. | Benefit | 21 |
| Section 6.12. | Entire Agreement | 22 |
| Section 6.13. | Arbitration | 22 |
| Section 6.14. | Severability | 22 |
| Section 6.15. | Regulatory Approval | 23 |

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is between FANNIE MAE (the "Corporation") and J. TIMOTHY WARD ("Employee").

WHEREAS, the Corporation and Employee are parties to an employment agreement dated as of July 1, 2003, which terminates on June 30, 2004 (the "Existing Agreement");

WHEREAS, under the termination provisions of the Existing Agreement, which were approved by OFHEO, Employee is contractually entitled to certain compensation and benefits if, among other circumstances, Employee's employment is not extended; and

WHEREAS, Employee has successfully discharged his responsibilities under the Existing Agreement and has earned certain vested amounts, as described in his Existing Agreement, over the course of his employment;

NOW, THEREFORE, the Corporation and Employee agree as follows:

### ARTICLE 1

### DEFINITIONS

The following terms shall have the meanings set forth below:

Section Section 1.1. Agreement Term means the period of time beginning on the Effective Date and ending on June 30, 2007 or such later date as may be agreed to pursuant to Section 2.1.

Section 1.2. Annual Incentive Plan means the Federal National Mortgage Association Annual Incentive Plan as from time to time amended and in effect, or any successor plan.

Section 1.3. Award Period is defined in the Stock Compensation Plan.

Section 1.4. Base Salary means the dollar amount of Employee's annual base compensation as determined by the Board.

Section 1.5. Board means the Board of Directors of the Corporation, acting without the participation of the Vice Chairmen of the ird of Directors.

Section 1.6. Cause is defined in Section 4.1(b).

Section 1.7. Compete means directly or indirectly to manage, operate, control, participate in the ownership, management, operation or control of, be connected as an officer, employee, partner, director, consultant or otherwise with, or have any financial interest in, (i) any business if a substantial part of such business involves originating, purchasing, selling, servicing or otherwise dealing in the residential mortgage market (provided, that Employee shall not be deemed, directly or indirectly, to Compete solely by virtue of Employee's employment by a business that engages in transactions in the residential mortgage market so long as Employee himself does not participate directly in the residential mortgage business), (ii) Freddie Mac, or (iii) any part of the Federal Home Loan Bank System (including any one of the Federal Home Loan Banks or the Federal Home Loan Banks Office of Finance). Employee shall not be deemed to Compete solely by reason of ownership, for personal investment purposes only, of less than 2% of the voting interests of any business.

Section 1.8. Corporation means Fannie Mae.

Section 1.9. Effective Date means July 1, 2004, subject, however, to the provisions of Section 6.15 ("Regulatory Approval").

Section 1.10. Employee means J. Timothy Howard.

Section 1.11. Employment means Employee's employment by the Corporation under this Agreement.

-2-

Section 1.12. Executive Pension Plan means the Executive Pension Plan of the Federal National Mortgage Association as from time to time amended and in effect, or any successor plan.

Section 1.13. Existing Agreement is defined in the preamble to this Agreement.

Section 1.14. Failure to Extend means notification of Employee by the Corporation that it does not desire to extend the Agreement Term (or the term of any successor agreement) or that it desires to do so only on terms in the aggregate that are materially less favorable to Employee than those applicable to Employee at the time of said notice. If the Corporation notifies Employee that it desires to extend the Agreement Term (or the term of any successor agreement) on terms that are in the aggregate substantially similar to or more favorable than those applicable to Employee at the time of said notice, any nonextension shall not be deemed to be a Failure to Extend.

Section 1.15. Good Reason means (a) a material reduction by the Corporation of Employee's authority or a material change in Employee's functions, duties or responsibilities that in any material way would cause Employee's position to become less important, (b) a reduction in Employee's Base Salary, (c) a requirement by the Corporation that Employee relocate his office outside of the Washington, D.C. area, or (d) a breach by the Corporation of any material obligation of the Corporation under this Agreement, unless, within 30 days of the written notice given by Employee and specifying a circumstance constituting Good Reason, the Corporation eliminates such circumstance.

Section 1.16. OFHEO means the Office of Federal Housing Enterprise Oversight.

Section 1.17. Option is defined in the Stock Compensation Plan.

Section 1.18. Performance Share Award is defined in the Stock Compensation Plan.

-3-

Section 1.19. <u>Qualifying Termination</u> means Termination of Employment (i) by the Corporation without Cause, (ii) by Employee Good Reason, (iii) upon expiration of the Agreement Term (or the term of any successor agreement) if there has been a Failure to tend, (iv) by reason of Employee's acceptance of an appointment to a senior position in the U.S. Federal Government, (v) by reason of Serious Illness or Disability or (vi) by reason of Employee's death.

Section 1.20. <u>Restricted Stock</u> is defined in the Stock Compensation Plan.

Section 1.21. <u>Serious Illness or Disability</u> means a serious physical or mental illness or disability which, in the reasonable determination of the Board, prevents Employee from performing his duties under this Agreement for a period of at least six months in any twelve-month period.

Section 1.22. <u>Stock Compensation Plan</u> means either or both, as the context requires, of the Fannie Mae Stock Compensation Plan of 1993 and the Fannie Mae Stock Compensation Plan of 2003, in each case as from time to time amended and in effect, or any successor plan.

Section 1.23. <u>Surviving Spouse</u> is defined in the Executive Pension Plan.

Section 1.24. <u>Termination of Employment</u> means the cessation of Employment for any reason.

## ARTICLE 2

## PERIOD OF EMPLOYMENT AND DUTIES

Section 2.1. <u>Period of Employment.</u> The Corporation shall continue to employ Employee, and Employee shall continue to serve, as Vice Chairman of the Corporation's Board of Directors and Chief Financial Officer of the Corporation, upon the terms and conditions of this Agreement, for the period July 1, 2004 through the last day of the Agreement Term unless

-4-

there is an earlier Termination of Employment. The Agreement Term may be extended by mutual written agreement of the parties ~red into at any time prior to the date the Agreement Term would otherwise expire.

Section 2.2. Duties. Employee shall serve the Corporation under this Agreement as Vice Chairman of the Corporation's Board of Directors and as Chief Financial Officer. Employee shall devote his full business time and attention to the Corporation and shall faithfully and diligently perform such duties for the Corporation as may be determined from time to time by the Chairman of the Board of Directors, provided that such duties are reasonable and customary for a corporate vice chairman and chief financial officer. Employee shall be subject to the Corporation's standards of conduct and similar policies and procedures applicable generally to members of the Board of Directors or to the Corporation's executive officers, as the case may be. Employee may (a) serve on corporate, civic or charitable boards or committees or (b) manage personal investments, so long as such activities do not materially interfere with the performance of his responsibilities under this Agreement and so long as such activities comply with the aforementioned standards, policies and procedures of the Corporation. During his Employment, Employee shall be nominated for election to the Corporation's Board of Directors and shall be identified as a nominee recommended for election by the Board, at each annual meeting of the stockholders of the Corporation.

## ARTICLE 3

### COMPENSATION AND BENEFITS

Section 3.1. Base Salary. During Employee's Employment, the Corporation shall pay to Employee Base Salary of not less than his base salary at June 30, 2004. The Board shall from

-5-

time to time review Employee's Base Salary and may increase (but in no event decrease) such Base Salary by such amounts as it deems proper. Section 3.2. Benefits.

(a) Executive Pension Plan. The parties acknowledge that the Corporation has previously designated Employee as a participant in the Executive Pension Plan. Employee's "Pension Goal" under the Executive Pension Plan shall at all times be equal to at least 50% of his "High-Three Total Compensation," as those terms are defined in the Executive Pension Plan. The Corporation may amend the Executive Pension Plan from time to time; provided, however, that no such amendment shall decrease Employee's Pension Goal or the vested benefits to which Employee or his Surviving Spouse, if any, would have been entitled under such Plan, as modified in this Agreement, as in effect on the Effective Date or, if benefits are improved, as of the date of such improvement.

(b) Options. Employee shall be considered for grants of Options consistent with the compensation philosophy of the Corporation set forth in the charter of the Compensation Committee of the Board.

(c) Annual Incentive Plan. Employee shall be considered for a potential award under the Annual Incentive Plan for each year during Employment consistent with the compensation philosophy of the Corporation set forth in the charter of the Compensation Committee of the Board.

(d) Performance Share Awards. Employee shall be considered for grants of Performance Share Awards consistent with the compensation philosophy of the Corporation set forth in the charter of the Compensation Committee of the Board.

-6-

(e) <u>Restricted Stock.</u> Employee shall be considered for grants of Restricted Stock consistent with the compensation philosophy of Corporation set forth in the charter of the Compensation Committee of the Board.

(f) <u>Life Insurance and Death Benefits.</u> Employee shall receive life insurance benefits consistent with the Corporation's life insurance policies and programs as from time to time in effect.

(g) <u>Other Benefits.</u> The Corporation shall provide Employee with the following additional benefits during Employment:

(i) The Corporation shall pay or reimburse Employee for reasonable expenses incurred by Employee in obtaining tax and investment assistance and advice, up to $25,000 per calendar year.

(ii) The Corporation shall pay or reimburse the legal expenses incurred by Employee in connection with the negotiation of this Agreement.

(iii) The Corporation shall provide Employee with access to a car and driver for transportation relating to the Corporation's business purposes.

(iv) The Corporation shall pay or reimburse Employee for actual expenses incurred by Employee for a complete annual physical examination at a medical facility of his choice.

(h) <u>General Rights Under Benefit Plans.</u>

(i) Employee shall at all times during the Employment Term be entitled to participate in all long- or short-term bonus, stock option, restricted stock, and other executive compensation plans, and in all perquisite programs and disability, retirement, stock purchase, thrift and savings, health, medical, life insurance, expense reimbursement

-7-

and similar plans of the Corporation which are from time to time in effect and in which other senior officers of the Corporation generally are entitled to participate. Except as otherwise provided in this Agreement, Employee's participation in such plans and programs shall be in accordance with the provisions of such plans and programs applicable from time to time, it being the intent of the parties hereto that nothing in this Agreement shall decrease the rights and benefits of Employee under any such plans and programs as may be in effect from time to time. Employee's rights as a participant under any compensation, benefit or fringe benefit plan or arrangement of the Corporation that is from time to time in effect and in which other senior officers of the Corporation generally are entitled to participate shall be subject to this Agreement and modified to the extent expressly provided herein, but except as so modified shall be determined under the applicable provisions of such plans and programs, including, without limitation, the provisions thereof applicable to retirement; provided, that all such plans and programs and this Agreement shall be construed and administered to avoid any duplication of benefits under any such plan or program and this Agreement.

(ii) Except as specifically set forth in this Agreement, or as specifically permitted by the terms of any such plan or program, no right or benefit under any such plan or program shall become vested or exercisable after Termination of Employment.

-8-

## ARTICLE 4

## <u>TERMINATION OF EMPLOYMENT</u>

Section 4.1. <u>Termination of Employment By the Corporation.</u>

(a) <u>Without Cause.</u> The Corporation shall have the right to terminate Employee's Employment without Cause at any time for any reason in the Corporation's sole discretion by giving at least 90 days' prior written notice to Employee.

(b) <u>For Cause.</u> The Corporation may terminate Employee's Employment for Cause. For purposes of this Agreement, termination for "Cause" shall have the meaning set forth at Section 4.1(b)(i) below, and Employee's Employment shall not be treated as having been terminated for Cause unless such termination is accomplished in accordance with Section 4.1(b)(ii) below.

(i) For purposes of this Agreement, Employee shall be treated as having been terminated for "Cause" only if Employee has (A) been convicted of, or pleaded *nolo contendere* with respect to, a felony, or (B) participated personally in an act of fraud in the discharge of his duties under this Agreement that demonstrably discredits the Corporation and that cannot be cured, or (C) continued for 30 days following written notice from the Corporation to engage in activities that are not contemplated or permitted by this Agreement and that involve a material conflict of interest with Employee's duties and responsibilities under this Agreement, or (D) continued for 30 days following written notice from the Corporation to fail substantially to perform the material duties of his office (other than as a result of total or partial incapacity due to physical or mental illness or disability), or (E) failed to cure, within 30 days following written notice from the Corporation, any material breach of the material terms of this Agreement or of any written noncompetition, nondisclosure or nonsolicitation policy or agreement to which

-9-

Employee is at the time subject or by which he is at the time bound. The Corporation's written notice to Employee referred to in (C), (D) and (E) above will not be deemed to have been given unless it identifies with particularity the asserted basis or bases for a for-Cause termination and requests, with specific reference to this Section 4.1(b)(i), that it or they be corrected or cured.

(ii) The Corporation by written notice may terminate Employee's employment for Cause at any time following the occurrence of an event described in Section 4.1(b)(i)(A) above. Within 10 days following the occurrence of an act described in Section 4.1(b)(i)(B) above, or following the end of the 30-day correction or cure period described in any of Section 4.1(b)(i)(C), (D) or (E) above, if the basis or bases asserted by the Board for a for-Cause termination thereunder have not been corrected or cured, the Board shall give written notice to Employee setting forth with particularity the asserted basis or bases for a for-Cause termination and giving Employee a reasonable opportunity, including reasonable access to information and documents, to appear with counsel before the Board to contest the asserted basis or bases for such termination. Employee shall not be treated as having been terminated for Cause unless, following such opportunity to contest the basis or bases for termination, the Board determines in writing by the affirmative vote of a majority of its members that the asserted basis or bases for termination exist under Section 4.1(b)(i)(B) through (E), as applicable, above and that Employee is therefore terminated for Cause. During the pendency of any process described in the immediately preceding sentence, the Corporation may transfer some or all of Employee's duties and responsibilities to one or more other persons, but until Employee's employment is terminated in accordance with the preceding provisions of

-10-

this Section 4.1(b)(ii) he shall continue during the Agreement Term to be entitled to all the remuneration and employee benefits to which he would otherwise be entitled as an active employee under this Agreement. In any proceeding before the Board described in this Section 4.1(b)(ii), where Employee's good faith in the performance of his duties is in question, such good faith shall be presumed unless the preponderance of the evidence indicates otherwise.

(c) By Reason of Serious Illness or Disability. In the event of Employee's Serious Illness or Disability during Employment, the Corporation may terminate Employee's Employment by giving Employee at least 60 days' advance written notice specifying the date of termination. If, on or before the date of termination specified in such notice, Employee recovers and is again able to perform his duties hereunder, such notice shall be void, and Employee's Employment shall not be terminated thereby.

Section 4.2. Termination of Employment By Employee.

(a) For Good Reason, etc. Employee shall have the right to terminate his Employment for Good Reason, unless the Corporation prior to such termination shall have cured the asserted basis for the Good Reason claim, by giving not less than 30 days' prior written notice to the Corporation, which notice must be given within six calendar months after the event giving rise to the Good Reason. Employee shall also have the right to terminate his Employment at any time by written notice to the Corporation in the circumstances described in Section 1.19(iv).

(b) Other Than For Good Reason. Employee shall have the right to terminate his Employment at any time for any reason other than as described in Section 4.2(a) above in his sole discretion by giving not less than 90 days' prior written notice to the Corporation, which notice may not be given after the Corporation has provided a written notice of termination to

-11-

Employee under Section 4.1(b). Upon receipt of any such notice from Employee, the Corporation shall have the option, exercisable giving Employee written notice within 30 days of such receipt, to designate any date (not earlier than 30 days after the date of ployee's notice) as the date on which Employee's Employment shall cease. The effective date of the Termination of Employment ...reunder shall be the date so designated by the Corporation if earlier than the date specified by Employee. In no event shall the Termination of Employment by the Corporation without Cause, by Employee as described in Section 4.2(a) or by reason of a Failure to Extend be deemed to be a Termination of Employment by Employee pursuant to this Section 4.2(b).

Section 4.3. Other Termination of Employment. Employee's Employment shall also terminate on Employee's death.

Section 4.4. Resignation as Member of the Board of Directors. A Termination of Employment shall constitute, unless otherwise requested by the Board, Employee's resignation as a member of the Corporation's Board of Directors, effective on the date of the Termination of Employment.

## ARTICLE 5

## COMPENSATION AND BENEFITS FOLLOWING TERMINATION OF EMPLOYMENT

Section 5.1. Voluntary Termination Pursuant to Section 4.2(b). If the Termination of Employment is a voluntary termination pursuant to Section 4.2(b), Employee shall be entitled to payment of all accrued but unpaid Base Salary amounts.

Section 5.2. Termination for Cause. In the event of a Termination of Employment for Cause, Employee shall be entitled to payment of all accrued but unpaid Base Salary amounts.

-12-

Any award made on or after the Effective Date under the Annual Incentive Plan that is outstanding at the time of the Termination of Employment, and all awards, if any, of Options, Performance Share Awards, and/or Restricted Stock that were made on or after the Effective Date and that are outstanding at the time of the Termination of Employment shall be forfeited or canceled without payment.

Section 5.3. <u>Qualifying Termination (Other Than by Reason Of Death).</u> If there is a Qualifying Termination (other than by reason of Employee's death), Employee shall be entitled to prompt payment of all accrued but unpaid Base Salary amounts and all amounts payable (but unpaid) under the Annual Incentive Plan with respect to any year ended on or prior to the Qualifying Termination, plus the following:

(a) <u>Continuation of Base Salary.</u> Unless such Qualifying Termination shall have been by reason of a Qualifying Termination described in Section 1.19(iv):

(i) The Corporation shall pay to Employee in cash, on the normal payroll schedule applicable to his Base Salary, cash compensation at an annual rate equal to his Base Salary as in effect at the time of the Qualifying Termination. Such cash compensation shall continue to be paid until the later of the expiration of the Agreement Term or the first anniversary of the date of the Qualifying Termination; provided, that if the Qualifying Termination is by reason of a Failure to Extend, such cash compensation shall continue to be paid following the date of the Termination of Employment only until the first anniversary of the date of notification by the Corporation constituting the Failure to Extend. The Corporation may accelerate the payment of any portion or all of any amount payable under this Section 5.3(a)(i).

-13-

(ii) Notwithstanding (i) above, if Employee obtains other employment (including self-employment, but excluding service on boards of directors) following his Termination of Employment hereunder, any income received by Employee from such employment shall reduce, on a dollar-for-dollar basis (but not below zero), the Corporation's obligation to pay cash compensation to Employee pursuant to this Section 5.3(a). If the Corporation has already paid any cash compensation under Section 5.3(a)(i) to which an offset would otherwise have applied, Employee shall promptly reimburse the Corporation the amount of such compensation. In the event of a Qualifying Termination by reason of Serious Illness or Disability, if Employee becomes entitled to and receives disability benefits under any disability payment plan, including disability insurance, the amount of cash compensation otherwise payable by the Corporation to Employee pursuant to Section 5.3(a) shall be paid at a rate equal to the excess of (A) the rate at which such cash compensation would otherwise be paid over (B) the disability benefits for which Employee is eligible under such plan or insurance to the extent those benefits are attributable to premium payments made by the Corporation.

(b) Annual Incentive Plan. Except in the case of a Qualifying Termination by reason of a Failure to Extend and except as hereinafter provided, the Corporation shall pay to Employee at the time of payment of awards to other participants in the Annual Incentive Plan for the year in which the Qualifying Termination occurs (even if Employee is not employed by the Corporation on the last day of such year) a prorated amount equal to (i) the award that would have been payable to Employee for such year had he remained in Employment, based on actual results for such year, multiplied by (ii) a fraction, the numerator of which is the number of days of Employment during such year and the denominator of which is 365. In the case of a Qualifying

-14-

Termination described in Section 1.19(iv), the Corporation shall promptly accelerate the payment of the prorated Annual Incentive Plan payment described in this Section 5.3(b). In the case of any other Qualifying Termination subject to this Section 5.3, the Corporation in its discretion may accelerate the payment of any portion or all of such prorated Annual Incentive Plan payment. In any case where payment under this Section 5.3(b) is accelerated, the amount determined under clause (i) above shall be the award that the Board determines Employee would have received for the year in which the Qualifying Termination occurs based on the Board's determination of the likelihood of the Corporation's achievement of targets for such year.

(c) <u>Performance Share Awards.</u> Notwithstanding any provision of the Stock Compensation Plan to the contrary, in the case of any Qualifying Termination, the Corporation shall deliver to Employee all amounts payable (but unpaid) under any Performance Share Award with respect to an Award Cycle that had ended as of the date of the Termination of Employment plus, with respect to each Performance Share Award then held by Employee as to which at least 18 months of the related Award Period has elapsed as of the date of the Termination of Employment, after the end of such Award Period, the product of (i) the award that would have been payable to Employee for such Award Period had he remained in Employment, based on actual results for such Award Period, and (ii) a fraction, the numerator of which is the number of days of Employment in such Award Period and the denominator of which is the total number of days in such Award Period. In the case of a Qualifying Termination described in Section 1.19(iv), the Corporation shall promptly accelerate the payment of all prorated Performance Share Award payments described in this Section 5.3(c). In the case of any other Qualifying Termination subject to this Section 5.3, the Corporation in its discretion may accelerate the payment of any portion or all of any such payments. In any case where payment

-15-

'er this Section 5.3(c) is accelerated, the amount determined under clause (i) above shall be the award that the Board determines ₊ ₊loyee would have received for the Award Period in which the Qualifying Termination occurs based on the Board's determination ₊ the likelihood of the Corporation's achievement of targets for such Award Period.

(d) <u>Restricted Stock.</u> All Restricted Stock granted to Employee after July 1, 2003 shall continue to vest on the same basis as if Employee had remained employed through June 30, 2007.

(e) <u>Medical and Dental Coverage.</u> In the case of a Qualifying Termination by reason of a termination by the Corporation without Cause or by Employee for Good Reason, to the extent permitted under the Corporation's medical and dental plans the Corporation shall continue the medical and dental coverage elected by Employee for Employee and Employee's spouse and dependents (but in the case of employee's dependents only for so long as they remain dependents or until age 21 if later), without premium payments by Employee, until the end of the Agreement Term. If, for any reason, it is not possible for Employee, Employee's spouse or the other eligible dependents of Employee to participate in medical and dental coverage pursuant to the immediately preceding sentence, the Corporation shall make arrangements to provide comparable coverage.

Section 5.4. <u>Termination of Employment By Reason of Death.</u> If there is a Termination of Employment by reason of Employee's death, then in addition to the payment to Employee's estate of Employee's accrued but unpaid Base Salary:

(a) <u>Annual Incentive Plan.</u> The Corporation shall pay to Employee's designated beneficiary or, if none, to Employee's estate, as soon as is practicable after the date of Employee's death, all amounts payable (but unpaid) under the Annual Incentive Plan with

-16-

~pect to any year ended on or prior to death plus, for the year of death, a prorated amount equal to (i) the award that the Board :rmines Employee (had he lived) would have received for the year in which his death occurs based on the Board's determination of .e likelihood of the Corporation's achievement of targets for such year, multiplied by (ii) a fraction, the numerator of which is the number of days of Employment during such year prior to his death and the denominator of which is 365.

(b) Performance Share Awards. The Corporation shall pay to Employee's designated beneficiary or, if none, to Employee's estate, as soon as is practicable after the date of Employee's death, all amounts payable (but unpaid) under any Performance Share Award with respect to an Award Cycle that had ended on or prior to the date of death, plus an amount with respect to Performance Share Awards made for each Award Period that had not ended prior to the date of death and as to which at least 18 months had elapsed prior to the date of death equal to the award that the Board determines Employee (had he lived) would have received for the Award Period in which his death occurs based on the Board's determination of the likelihood of the Corporation's achievement of targets for such Award Period, multiplied by a fraction, the numerator of which is the number of days in the Award Period that had elapsed prior to Employee's death and the denominator of which is the total number of days in the Award Period.

(c) Restricted Stock. All Restricted Stock granted to Employee after July 1, 2003 shall continue to vest on the same basis as if Employee had remained employed through June 30, 2007.

## ARTICLE 6

## MISCELLANEOUS

Section 6.1. Noncompetition.

-17-

(a) Following Termination of Employment for any reason other than for Cause or by reason of a voluntary termination by ployee pursuant to Section 4.2(b), during the period from the date of the Termination of Employment to the later of the last day of Agreement Term or the first anniversary of the date of the Termination of Employment Employee shall not, directly or indirectly, (i) Compete in the United States, (ii) solicit any officer or employee of the Corporation or any of its affiliates to engage in any conduct prohibited hereby for Employee or to terminate any existing relationship with the Corporation or such affiliate or (iii) assist any other person to engage in any activity in any manner prohibited hereby to Employee. Following Termination of Employment for Cause or by reason of a voluntary termination by Employee pursuant to Section 4.2(b), Employee shall not, directly or indirectly, engage in any of the activities described in (i), (ii) or (iii) of the immediately preceding sentence during the one-year period following the date of the Termination of Employment. In any case where Employee is contemplating an activity described in Section 6.1(a)(i) above, other than an activity described in Section 1.7(ii) or (iii) or an activity described in Section 1.7(i) as it relates to the secondary mortgage market, the Board, upon the request of Employee for a waiver, shall determine in good faith whether Employee's engaging in the proposed activity would prejudice the interests of the Corporation and shall not unreasonably withhold its consent to such request for a waiver if it determines that the proposed activity would not prejudice the interests of the Corporation.

(b) The need to protect the Corporation against Employee's competition, as well as the nature and scope of such protection, has been carefully considered by the parties hereto in light of the uniqueness of Employee's talent and his importance to the Corporation. Accordingly, Employee agrees that, in addition to any other relief to which the Corporation may be entitled, the Corporation shall be entitled to seek and obtain injunctive relief (without the requirement of a

-18-

bond) from a court of competent jurisdiction for the purpose of restraining Employee from any actual or threatened breach of the covenant contained in Section 6.1(a).

(c) If for any reason a final decision of any court determines that the restrictions under this Section 6.1 are not reasonable or that the consideration therefore is inadequate, such restrictions shall be interpreted, modified or rewritten by such court to include as much of the duration, scope and geographic area identified in this Section 6.1 as will render such restrictions valid and enforceable.

Section 6.2. Payment of Certain Expenses. As promptly as permitted by law the Corporation shall pay or advance to Employee all legal fees and expenses that Employee may reasonably incur as a result of any contest or arbitration requested by the Corporation, Employee or others of the validity or enforceability of, or liability under, any provision of this Agreement (including any contest initiated by Employee concerning the amount of any payment due pursuant to this Agreement), plus in each case interest at the applicable federal rate provided for in Section 7872(f)(2)(A) of the Internal Revenue Code of 1986, as amended, on any payment of legal fees and expenses that is delayed by more than 10 days following delivery by Employee to the Corporation of a proper request for payment. If as to any such contest or arbitration Employee does not prevail, and only in such case, within 10 days following written demand from the Corporation Employee shall repay any advance made by the Corporation pursuant to the immediately preceding sentence with respect to such contest or arbitration, with interest at the applicable federal rate provided for in Section 7872(f)(2)(A) of the Internal Revenue Code of 1986, as amended, from the date of the Corporation's payment.

Section 6.3. Assignment by Employee. Except as otherwise expressly provided herein or in the Corporation's benefit plans, the obligations, rights and benefits of Employee hereunder

-19-

are personal to him, and no such obligation, right or benefit shall be subject to voluntary or involuntary alienation, assignment, gation or transfer.

Section 6.4. No Funding Required. Nothing in this Agreement shall be construed as requiring the Corporation to establish a trust or otherwise to fund any payments to be made under this Agreement, but the Corporation in its discretion may establish such nonqualified trusts or other arrangements as it determines to be appropriate to assist it in meeting its obligations under this Agreement.

Section 6.5. Disclosure of Information to the Corporation. In the event Section 5.3 becomes applicable, Employee or, in the event of Employee's incapacity or death, his personal representative shall make available to the Corporation on a confidential basis such records, documents and other information reasonably necessary to enable the Corporation to verify the amount of income available to offset the payments otherwise due Employee.

Section 6.6. Nondisclosure of Confidential Information. Employee acknowledges that he is bound by the terms of an Agreement on Ideas, Inventions and Confidential Information dated March 16, 2001. Nothing in this Agreement shall be construed as limiting Employee's obligations under the aforesaid Agreement on Ideas, Inventions and Confidential Information or any successor thereto, which shall be treated for all purposes also as obligations of Employee under this Agreement. This Agreement in no way limits the ability of Employee to provide information covered by this Agreement to a government entity in order to assist the government entity in the fulfillment of its duties.

Section 6.7. Waiver. The failure of either party hereto to insist upon strict compliance by the other party with any term, covenant or condition of this Agreement shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment or failure to

-20-

insist upon strict compliance of any right or power hereunder at any one time or more times be deemed a waiver or relinquishment of h right or power at any other time or times.

Section 6.8. Notice. Any notice required or desired to be given pursuant to this Agreement shall be sufficient if transmitted in writing by hand delivery or sent by prepaid courier or by registered or certified mail, postage prepaid, (i) if notice is to the Corporation, to the Corporation's address hereinafter set forth, or (ii) if notice is to Employee, to Employee's address in the metropolitan District of Columbia area contained in the records of the Corporation, or, in either such case, to such other address of a party as such party may designate in writing and transmit to the other party in such manner. Any such notice shall be deemed given, if transmitted by hand delivery, one business day after deposit with a prepaid courier service or, if sent by registered or certified mail, three business days after deposit in the United States mail.

Section 6.9. Applicable Law. This Agreement shall be governed by the laws of the District of Columbia without regard to any otherwise applicable conflict of laws principles.

Section 6.10. Taxes. The Corporation shall deduct from all amounts payable under this Agreement all federal, state, local and other taxes required by law to be withheld with respect to such amounts.

Section 6.11. Benefit. Except as otherwise expressly provided herein, this Agreement shall inure to the benefit of and be binding upon the Corporation, its successors and assigns, and upon Employee, his spouse, heirs, executors and administrators. The Corporation shall require any successor (whether direct or indirect, by purchase, merger, reorganization, consolidation, acquisition of property or stock, liquidation or otherwise) to all or a substantial portion of its assets, by agreement in form and substance reasonably satisfactory to Employee, expressly to

-21-

⸱ and agree to perform this Agreement in the same manner and to the same extent that the Corporation would be required to ⸱orm this Agreement if no such succession had taken place. Regardless of whether such an agreement is executed, this Agreement ⸱all be binding upon any successor of the Corporation, and such successor shall be deemed the "Corporation" for purposes of this Agreement.

   Section 6.12. Entire Agreement. This Agreement contains the entire understanding and agreement between the parties relating to the terms of Employee's employment by the Corporation and, except as otherwise provided in Section 6.15, supersedes all prior written or oral agreements between them, other than the Agreement on Ideas, Inventions and Confidential Information dated March 16, 2001 and an Indemnification Agreement between the Corporation and Employee. This Agreement cannot be amended, modified or supplemented in any respect except by an agreement in writing signed by both parties hereto.

   Section 6.13. Arbitration. Any controversy or claim arising out of or relating to this Agreement or the breach of this Agreement shall be settled by arbitration in the District of Columbia in accordance with the laws of the District of Columbia. The arbitration shall be conducted in accordance with the applicable rules of the American Arbitration Association. The costs and expenses of the arbitrator(s) shall be borne by the Corporation. Except as otherwise provided in Section 6.2, each party shall pay his or its own legal costs and other expenses (other than the costs and expenses of the arbitrator(s)) relating to an arbitration. The award of the arbitrator(s) shall be binding upon the parties. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

   Section 6.14. Severability. Except as otherwise provided in Section 6.15, it is the intent and understanding of each party hereto that, if any term, restriction, covenant or promise herein

-22-

nd to be invalid or otherwise unenforceable, then such term, restriction, covenant or promise shall not thereby be invalid or orceable but shall be deemed modified to the extent necessary to make it enforceable and, if it cannot be so modified, shall be eemed amended to delete therefrom such provision or portion found to be invalid or unenforceable, such modification or amendment in any event to apply only with respect to the operation of this Agreement in the particular jurisdiction in which such finding is made.

Section 6.15. Regulatory Approval.

The parties hereto acknowledge and agree that pursuant to Section 309(d) of the Federal National Mortgage Association Charter Act, as amended by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (as so amended, the "Act"); 12 U.S.C. 1723a(d), no provision of this Agreement relating to Employee's benefits upon termination of employment shall be effective unless and until such provision has been reviewed and approved by the Director (the "Director") of the Office of Federal Housing Enterprise Oversight ("OFHEO"). If, following OFHEO's review and approval of such provisions, any benefit plans of the Corporation affecting final termination benefits under this Agreement are altered, such alteration will require OFHEO's review and approval at the time of termination of the Employee's employment with the Corporation and prior to the payment of any such benefits. Upon determining that Employee's Employment is terminating or has terminated, the Corporation shall timely seek OFHEO's review and approval of any alteration referred to in the immediately preceding sentence.

The parties therefore agree as follows:

-23-

(a) The Corporation shall promptly hereafter submit this Agreement to the Director for his review and approval of those terms hereof relating to benefits upon termination of employment and shall seek diligently to obtain such approval;

(b) This Agreement shall take effect as of the Effective Date if the Director's approval of terms hereof relating to benefits upon termination of employment is given by January 1, 2005.

-24-

September 17, 2004


Mr. J. Timothy Howard
Vice Chairman and Chief Financial Officer
Fannie Mae
3900 Wisconsin Avenue, NW
Washington, DC 20016

Dear Tim:

The Fannie Mae Board of Directors proposes that the following amendments be made to
your Employment Agreement, executed by Fannie Mae in April 2004 and previously
amended on June 30, 2004:

- Amend Section 4.1(b) to read as follows:

  (b) For Cause: Notwithstanding any other provision
  hereunder, the Corporation may terminate Employee's
  employment for "Cause," which shall mean that Employee
  has (A) materially harmed the Corporation by, in connection
  with his service under this Agreement, engaging in
  dishonest or fraudulent actions or willful misconduct, or
  performing his duties in a grossly negligent manner, or (B)
  been convicted of, or pleaded *nolo contendere* with respect
  to, a felony. The Corporation by written notice may
  terminate Employee's employment for Cause at any time
  following the occurrence of an event described in (B).
  Employee shall not be deemed to have been terminated for
  Cause following the occurrence of an event described in (A)
  unless the Corporation shall have provided (i) reasonable
  notice to Employee setting forth the Corporation's intention
  to terminate for Cause, (ii) where remedial action is feasible,
  a reasonable opportunity for such action, (iii) an opportunity
  for Employee, together with his counsel, to be heard before
  the Board and (iv) Employee with a notice of termination
  stating that Employee was guilty of the conduct set forth in
  this Section 4.1(b)(A) and specifying the particulars thereof
  in detail. No act or failure to act will be considered
  "willful" unless it is done, or omitted to be done, by
  Employee in bad faith or without reasonable belief that his

action or omission was in the best interests of the
Corporation.

- Amend Section 5.2 to read as follows:
  Section 5.2.  <u>Termination for Cause</u>.  In the event of a
  Termination of Employment for Cause, Employee shall not
  be entitled to any payments or benefits except as follows:
  Employee shall be entitled to all of Employee's Base Salary
  which has accrued to the date of termination and any
  benefits or awards (whether of options, stock or other
  property) which have vested prior to such date.  The
  Corporation shall have no further obligations to Employee.

If you agree to the foregoing, please so indicate by signing the enclosed copy of this letter
in the space indicated below and returning a fully executed copy of the letter to my
attention, whereupon your Employment Agreement will be amended.

Sincerely,


Anne Mulcahy
Chairman, Compensation Committee


**AGREED TO AND ACCEPTED:**


_____    9/20/04
J. Timothy Howard                  Date

# EXHIBIT 6

**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
*1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800*
*Office of the Director*

December 13, 2004

Mr. Joe K. Pickett
Chair, Compensation Committee
    of the Board of Directors
Fannie Mae
3900 Wisconsin Avenue NW
Washington DC 20016-2892

Dear Mr. Pickett:

OFHEO has reviewed the new three-year Employment Agreement (Agreement) between Fannie Mae and Vice Chairman and Chief Financial Officer J. Timothy Howard. The termination benefits contained in this Agreement are subject to OFHEO's prior approval, and OFHEO and Fannie Mae's staff have worked over the past several months to resolve issues of concern to OFHEO.

The Agreement was first submitted to OFHEO in a letter with accompanying materials from Senior Vice President and General Counsel Ann Kappler to Patrick Lawler dated May 5, 2004. It was amended as described in a June 30, 2004 letter from Judith Dunn to Mr. Lawler, and further amended as described in a September 17, 2004 letter from Anne Mulcahy to Mr. Howard.

The termination benefits provided under the Agreement for Mr. Howard are approved. This approval does not extend to any new or additional termination benefits that may accrue to Mr. Howard as a result of other actions by Fannie Mae.

With respect to portions of the Agreement other than those dealing with termination benefits, I am concerned about what factors may be used to determine the annual bonus amounts. In the past, Fannie Mae has based bonuses largely on the Enterprise's success in meeting earnings per share targets. The results on our special examination are persuasive on this matter; reliance in determining bonus amounts on metrics that are potentially subject to management manipulation should be avoided. I appreciate our conversations on this matter.

Sincerely,

Armando Falcon, Jr.
Director

cc: J. Timothy Howard

# EXHIBIT 7

**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800
Office of the General Counsel

December 23, 2004

Ann Kappler
Executive Vice President and General Counsel
Fannie Mae
Legal Department
3900 Wisconsin Avenue, N.W.
Washington, D.C.  20016-2899

Dear Ms. Kappler:

Pursuant to statute and OFHEO regulation at 12 CFR Part 1770, please provide information
detailing and explaining termination benefits being paid to Franklin D. Raines and J. Timothy
Howard under the determination of the Board that they should retire and resign, respectively. As
noted in the preamble to its regulation, OFHEO reviews termination benefits in the employment
agreement of an executive officer when the agreement is entered into, as well as at the time the
officer leaves. Review includes consideration of the effect on termination benefits if the officer
departs prior to the expiration of the employment term, either on a voluntary or an involuntary
basis. Of specific concern is whether, at the time of termination, there have been benefits
enhancements or modifications since the termination package was agreed upon; 66 FR 47553
(September 12, 2001). Accordingly, no termination benefits should be paid by Fannie Mae to
either Mr. Raines or Mr. Howard until OFHEO has completed its review.

In particular, please provide information on actions taken by the Board that accelerate, add to or
otherwise would provide additional or less benefits than provided in the employment agreements
of Messrs. Raines and Howard than previously were approved by OFHEO. Such information
should include Compensation Committee and Board resolutions and any related materials that
address the basis of termination of each officer and his associated benefits.

Information provided should include specific breakdowns regarding termination benefits, such as
deferred compensation, 401(k), SERP, and vested and unvested options. With respect to options,
provide a Black-Scholes estimate for options held by each officer, and the value if all "in the
money" options were exercised. Additionally, provide information regarding the annual pension
benefits that Mr. Raines and Mr. Howard will receive and the pro rata AIP eligibility for 2004 for
each. Also, the amount of PSP compensation each is entitled to in each of the 3 year cycles –

2

looking back in time as well as forwards. Moreover, please advise whether Mr. Howard will be entitled to receive salary between now and the end of his employment with Fannie Mae.

If you have any questions regarding this directive, please contact Tina Dion at (202) 414-3838.

Sincerely,

Alfred M. Pollard.
General Counsel

co: Joseph Pickett
Chair, Compensation Committee

# EXHIBIT 8

**Salky, Steven M.**

| | |
|---|---|
| **From:** | Kelley, Jodie L [jodie_l_kelley@fanniemae.com] |
| **Sent:** | Friday, June 22, 2007 3:01 PM |
| **To:** | Salky, Steven M. |
| **Cc:** | Delinsky, Eric |
| **Subject:** | RE: Long Term Incentive Awards under Fannie Mae's Performance Share Program |

Steve:

OFHEO has indicated that they are asserting the bank examination privilege over the June 19 letter, and that you should direct any request for this material to OFHEO.  Please let me know if you have any questions.

Jodie

Jodie L. Kelley
Vice President and
Deputy General Counsel
Fannie Mae
3900 Wisconsin Ave., NW
Washington, DC  20016
202-752-1611 (ph)
202-752-4474 (fax)

This e-mail and its attachments are confidential and solely for the intended addressee(s). Do not share or use them without Fannie Mae's approval. If received in error, contact the sender and delete them.

**From:** Salky, Steven M. [mailto:Ssalky@zuckerman.com]
**Sent:** Friday, June 22, 2007 10:54 AM
**To:** Kelley, Jodie L
**Cc:** Delinsky, Eric
**Subject:** Long Term Incentive Awards under Fannie Mae's Performance Share Program

Jodie: As counsel for J. Timothy Howard, please forward me today a copy of the June 19, 2007 letter from OFHEO described in the Form 8-K filed by the company on June 21, 2007, as "a letter from OFHEO requesting a report from the company's Board of Directors relating to the determination of the size and appropriateness of the proposed wards for the 2005 and 2006 award cycles, including information relating to the proposed payments to former employees." Time is of the essence. Thank you.

 **ZUCKERMAN SPAEDER** LLP

Steven M. Salky
ssalky@zuckerman.com

_____

1800 M STREET, NW • SUITE 1000 • WASHINGTON, DC 20036-5802
202.778.1828 direct • 202.822.8106 fax

> Download V-card | Office | Website | My Bio

This transmission (including any attachments) from the law firm of Zuckerman Spaeder LLP may contain information that is confidential and/or subject to the attorney-client privilege or the work product doctrine. Use or dissemination of this information by anyone other than the intended recipient is prohibited and may be unlawful. If you have received this transmission in error, please immediately notify the sender by return email or contact us by telephone at 202.778.1800, and permanently delete all copies.

7/1/2007

# EXHIBIT 9

**ZUCKERMAN SPAEDER LLP**

1800 M STREET, NW   WASHINGTON, DC 20036-5802
202.778.1800   202.822.8106 fax   www.zuckerman.com

Steven M. Salky
Partner
202-778-1828
ssalky@zuckerman.com

June 22, 2007

VIA FIRST-CLASS MAIL
AND E-MAIL (foia.office@ofheo.gov)

Jeanne F. Ratchford
FOIA Officer
Office of Federal Housing Enterprise Oversight
1700 G Street, N.W.
Washington, D.C. 20552

      Re:    Freedom of Information Act Request

Dear Ms. Ratchford:

This is a request for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the regulations issued by the Office of Federal Housing Enterprise Oversight ("OFHEO") concerning FOIA requests.

We request the June 19, 2007 letter from OFHEO to Fannie Mae, described in the Form 8-K filed by Fannie Mae on June 21, 2007, as "a letter from OFHEO requesting a report from the company's Board of Directors relating to the determination of the size and appropriateness of the proposed awards for the 2005 and 2006 award cycles, including information relating to the proposed payments to former employees."

Should OFHEO determine that any portion of a record is exempt from disclosure, then we ask that the agency use its discretion to release it anyway. In the event an exemption is claimed, please provide to us all segregable non-exempt portions of any withheld record, as required by 5 U.S.C. § 552(b). When deleting material, please "black out" rather than "white out" or "cut out" any portions as to which an exemption is claimed.

If this request for records is denied either in part or in whole, please specify in writing the exemption(s) claimed for each portion of a record withheld, along with a detailed description of each record withheld, including the author(s) and any recipient(s), the date of its creation, its subject matter, and its current physical location. 5 U.S.C. § 552(b). In addition, please provide the reason that each record falls within each exemption claimed for it. Please also specify the

1364078.1

BALTIMORE    MIAMI    NEW YORK    TAMPA    WASHINGTON, DC    WILMINGTON, DE

 **ZUCKERMAN SPAEDER** LLP

Jeanne F. Ratchford
June 22, 2007
Page 2

number of pages of each record withheld in its entirety and the total number of pages responsive to this request.

We believe that this request qualifies for a waiver of the fees associated with processing this request because disclosure of the requested records would be "in the public interest" and would not be "primarily in the commercial interest" of the requestor. 5 U.S.C. § 552(a)(4)(A)(iii). Nevertheless, to expedite our request, we agree to pay up to $100.00 in fees. If it becomes evident that your fees will exceed $100.00, please contact our office before proceeding only in the event that the fee is in excess of $100.00.

Please send a memorandum, with a copy to my attention, to the appropriate divisions, branches and other components in OFHEO to notify them that they must search for responsive records and to assure that no such records are destroyed. Please advise us of any destruction of records and identify the authority of any such destruction.

If you have any questions concerning this request, please contact me at (202) 778-1800. As time is of the essence, we prefer that you call rather than write if you have any questions or require additional information.

Pursuant to 12 C.F.R. § 1703.17, we request expedited processing of this FOIA request. The basis for expedited processing is to obtain the requested item in connection with a motion for temporary restraining order to be filed against OFHEO as soon as practicable. We request waiver of any further certification.

Please be advised that I have earlier today requested to be provided a copy of this letter by OFHEO and have been directed by David Felt, Esquire, the OFHEO FOIA appeals officer, to direct this FOIA letter to you for expedited processing.

Sincerely,

Steven M. Salky

SMS/bjt

1364078.1

# EXHIBIT 10



ZUCKERMAN SPAEDER LLP

1800 M STREET, NW    WASHINGTON, DC 20036-5802
202.778.1800    202.822.8106 fax    www.zuckerman.com

Steven M. Salky
Partner
202-778-1828
ssalky@zuckerman.com

June 27, 2007

**VIA E-MAIL, FACSIMILE AND REGULAR MAIL**

Jodie L. Kelley
Vice President and Deputy General Counsel
Fannie Mae
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016

      Re:    <u>Fannie Mae and Performance Share Program Stock Award</u>

Dear Jodie:

      Fannie Mae's Board of Directors determined on June 15, 2007, to make payouts under the company's long-term, incentive performance share program for the three year award cycle ended in 2005 (PSP 19). Tim Howard is a former executive officer who is entitled to receive shares of common stock pursuant to that Board determination.

      Fannie Mae has not transferred the shares of common stock to which Mr. Howard is entitled. While I have done so informally, I hereby formally demand that Fannie Mae transfer the shares due to Mr. Howard immediately.

      According to a Form 8-K filed by Fannie Mae on June 21, 2007, Fannie Mae received a letter from OFHEO regarding transfer of the shares awarded to Mr. Howard, among others, which apparently requires OFHEO's approval before the shares are transferred. I have requested a copy of the OFHEO letter, which request has been denied. Regardless of the contents of the letter, OFHEO lacks any legal authority to interfere with the immediate payment of the PSP 19 shares to Mr. Howard, having previously approved the termination benefit portion of his employment agreement. See *Brendsel v. OFHEO*, 339 F. Supp. 2d 52, 61-63 (D.D.C. 2004); *Clarke v. OFHEO*, 355 F. Supp. 2d 56, 63-65 (D.D.C. 2004). We must therefore demand that Fannie Mae transfer Mr. Howard's shares to him forthwith, notwithstanding OFHEO's letter. If

 **ZUCKERMAN SPAEDER** LLP

Jodie L. Kelley
June 27, 2007
Page 2

the transfer does not occur by the close of business Friday, June 29, 207, we will be forced to seek appropriate judicial intervention.

Sincerely,

Steven M. Salky

SMS/bjt

# EXHIBIT 11

 **FannieMae**

Beth A. Wilkinson

Executive Vice President
General Counsel and Corporate Secretary
Legal Department

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
202 752 1943
202 752 6952 (fax)
beth_a_wilkinson@fanniemae.com

June 29, 2007

**VIA FACSIMILE AND FEDERAL EXPRESS**

Mr. Steven M. Salky, Esq.
Zuckerman Spaeder LLP
1800 M Street, N.W.
Washington, DC 20036

Dear Mr. Salky:

I write in response to your letter of June 27, 2007 demanding on behalf of your client, J. Timothy Howard, an award under Fannie Mae's Performance Share Program ("PSP") for the three-year cycle ending in 2005.

As you know, on June 15, 2007, Fannie Mae's Compensation Committee and Board of Directors determined to pay a PSP award for the 2005 award cycle at the 40% level. The Board's PSP determination did not distinguish in any way between PSP participants. Thus, each eligible participant will receive the PSP payment to which he or she is entitled, subject to the review by OFHEO discussed below.

As you also know, we received a letter from OFHEO on June 19, 2007 requesting that our Board provide OFHEO with additional information concerning the proposed award. The Board has provided the requested report to OFHEO.

We are now awaiting OFHEO's approval of the proposed payments. Thus, pending that approval, we are not in a position to provide a distribution of shares to Mr. Howard immediately, as you have requested.

Sincerely,

Beth A. Wilkinson

# EXHIBIT 12

FNM: Case 1:07-cv-01196-RMU Document 3-2 Filed 07/02/2007 Page 138 of 144

Historical Prices for FANNIE MAE - Yahoo! Finance    Page 1 of 3

Yahoo!   My Yahoo!   Mail   More   New   Make Y! your home page   Help

# YAHOO! FINANCE    Web Search

Dow ↑ 0.71% Nasdaq ↑ 0.89%          Monday, July 2, 2007, 1:12PM ET - **U.S. Markets close in 2 hours**

Enter Symbol(s)    **GET QUOTES**    Symbol Lookup    Finance Search

## FANNIE MAE (FNM)                                    At 12:52PM ET: **66.26** ↑



Switch to **Scottrade** and get up to $100 back    Member SIPC

**AMERITRADE** The Independent Spirit

**100** FREE TRADES    E*TRADE Securities

Active Traders Fidelity

## Historical Prices                    Get **Historical Prices** for:    GO

**SET DATE RANGE**

| | | | | |
|---|---|---|---|---|
| **Start Date:** Jun | 15 | 2007 | Eg. Jan 1, 2003 | ● Daily |
| **End Date:** Jun | 29 | 2007 | | ○ Weekly |
| | | | | ○ Monthly |
| | | | | ○ Dividends Only |

Get Prices

First | Prev | Next | Last

**PRICES**

| Date | Open | High | Low | Close | Volume | Adj Close* |
|---|---|---|---|---|---|---|
| 29-Jun-07 | 66.50 | 66.88 | 64.76 | 65.33 | 4,550,500 | 65.33 |
| 28-Jun-07 | 66.65 | 67.25 | 65.41 | 65.53 | 4,521,500 | 65.53 |
| 27-Jun-07 | 66.15 | 66.69 | 65.61 | 66.40 | 5,118,800 | 66.40 |
| 26-Jun-07 | 66.91 | 67.49 | 65.89 | 66.69 | 4,269,700 | 66.69 |
| 25-Jun-07 | 66.00 | 67.17 | 65.98 | 66.24 | 27,213,300 | 66.24 |
| 22-Jun-07 | 67.34 | 67.47 | 65.79 | 66.00 | 5,156,800 | 66.00 |
| 21-Jun-07 | 66.56 | 67.56 | 66.06 | 67.33 | 4,205,300 | 67.33 |
| 20-Jun-07 | 69.23 | 69.28 | 66.59 | 66.79 | 4,593,700 | 66.79 |
| 19-Jun-07 | 69.26 | 69.94 | 68.65 | 68.98 | 3,089,500 | 68.98 |
| 18-Jun-07 | 68.95 | 69.82 | 68.71 | 69.49 | 4,063,800 | 69.49 |
| 15-Jun-07 | 68.79 | 69.14 | 68.11 | 68.75 | 6,162,600 | 68.75 |

* Close price adjusted for dividends and splits.

First | Prev | Next | Last

⬇ Download To Spreadsheet

ADVERTISEMENT

# EXHIBIT 13

FNM: Historical Prices for FANNIE MAE - Yahoo! Finance                    Page 1 of 3

Case 1:07-cv-01196-RJL     Document 3-2     Filed 07/02/2007     Page 140 of 144

Yahoo!   My Yahoo!   Mail   More        New Make Your Home page Help

# YAHOO! FINANCE     Web Search

Dow ↓ 0.10% Nasdaq ↓ 0.20%              Sunday, July 1, 2007, 6:32PM ET - U.S

---

Enter Symbol(s)   ( GET QUOTES )   Symbol Lookup   Finance Search

## Fannie Mae (FNM)

On Jun 29: **65.33** ↓

Switch to Scottrade and get up to $100 back     Member SIPC

TD AMERITRADE The Independent Spirit

Active Traders Fidelity

5.05% APY SAVINGS ACCOUNT NO MINIMUMS   E*TRADE Bank, Member FDIC

## Historical Prices

Get **Historical Prices** for:   [ GO ]

### SET DATE RANGE

| | | | | |
|---|---|---|---|---|
| Start Date: | Mar | 15 | 2007 | Eg. Jan 1, 2003 |
| End Date: | Jun | 15 | 2007 | |

- ● Daily
- ○ Weekly
- ○ Monthly
- ○ Dividends Only

( Get Prices )

First | Prev | Next | Last

### PRICES

| Date | Open | High | Low | Close | Volume | Adj Close* |
|---|---|---|---|---|---|---|
| 15-Jun-07 | 68.79 | 69.14 | 68.11 | 68.75 | 6,162,600 | 68.75 |
| 14-Jun-07 | 68.87 | 69.29 | 68.07 | 68.46 | 3,119,300 | 68.46 |
| 13-Jun-07 | 67.61 | 68.87 | 67.29 | 68.87 | 5,751,200 | 68.87 |
| 12-Jun-07 | 67.16 | 68.48 | 66.89 | 67.43 | 7,726,000 | 67.43 |
| 11-Jun-07 | 64.40 | 67.25 | 64.22 | 66.72 | 4,855,600 | 66.72 |
| 8-Jun-07 | 63.45 | 64.74 | 63.20 | 64.35 | 5,142,700 | 64.35 |
| 7-Jun-07 | 64.39 | 64.40 | 63.39 | 63.44 | 4,446,100 | 63.44 |
| 6-Jun-07 | 64.83 | 65.08 | 64.01 | 64.05 | 3,217,500 | 64.05 |
| 5-Jun-07 | 63.88 | 65.69 | 63.78 | 64.82 | 3,701,900 | 64.82 |
| 4-Jun-07 | 63.53 | 64.91 | 63.53 | 64.61 | 2,724,900 | 64.61 |
| 1-Jun-07 | 63.92 | 64.37 | 63.58 | 64.37 | 2,400,000 | 64.37 |
| 31-May-07 | 63.99 | 64.41 | 63.45 | 63.92 | 2,759,500 | 63.92 |
| 30-May-07 | 63.75 | 64.09 | 63.37 | 64.09 | 2,930,000 | 64.09 |
| 29-May-07 | 64.77 | 64.99 | 63.70 | 64.16 | 2,806,300 | 64.16 |
| 25-May-07 | 64.75 | 65.03 | 64.08 | 64.56 | 1,679,600 | 64.56 |

ADVERTISEMENT

| | | | | | |
|---|---|---|---|---|---|
| 24-May-07 | 65.64 | 65.72 | 63.75 | 64.75 | 4,796,700 | 64.75 |
| 23-May-07 | 63.68 | 66.12 | 63.68 | 65.63 | 5,655,400 | 65.63 |
| 22-May-07 | 63.30 | 63.73 | 62.91 | 63.43 | 2,276,000 | 63.43 |
| 21-May-07 | 62.94 | 63.42 | 62.82 | 63.29 | 3,827,200 | 63.29 |
| 18-May-07 | 63.11 | 63.48 | 62.80 | 63.18 | 2,802,500 | 63.18 |
| 17-May-07 | 63.00 | 63.20 | 62.83 | 62.99 | 1,685,300 | 62.99 |
| 16-May-07 | 62.05 | 63.44 | 61.79 | 63.23 | 5,286,700 | 63.23 |
| 15-May-07 | 62.15 | 62.69 | 61.72 | 61.95 | 2,550,800 | 61.95 |
| 14-May-07 | 62.81 | 62.95 | 61.96 | 62.19 | 2,952,200 | 62.19 |
| 11-May-07 | 62.26 | 62.78 | 62.17 | 62.59 | 5,848,100 | 62.59 |
| 10-May-07 | 62.83 | 62.83 | 62.02 | 62.06 | 2,934,600 | 62.06 |
| 9-May-07 | 62.44 | 62.95 | 61.65 | 62.83 | 10,011,400 | 62.83 |
| 8-May-07 | 61.40 | 62.69 | 61.33 | 62.46 | 3,050,300 | 62.46 |
| 7-May-07 | 61.50 | 61.86 | 61.34 | 61.68 | 2,803,400 | 61.68 |
| 4-May-07 | 61.39 | 61.81 | 61.07 | 61.19 | 4,018,500 | 61.19 |
| 3-May-07 | 60.15 | 61.18 | 59.65 | 61.10 | 12,135,200 | 61.10 |
| 2-May-07 | 59.00 | 60.08 | 58.17 | 59.82 | 2,907,100 | 59.82 |
| 1-May-07 | 58.94 | 59.52 | 58.25 | 59.28 | 2,443,600 | 59.28 |
| 30-Apr-07 | 59.30 | 59.50 | 58.92 | 58.92 | 3,441,600 | 58.92 |
| 27-Apr-07 | 59.06 | 59.18 | 58.72 | 59.00 | 1,537,700 | 59.00 |
| 26-Apr-07 | 58.29 | 59.35 | 58.02 | 59.10 | 3,095,500 | 59.10 |
| 26-Apr-07 | | | $ 0.40 Dividend | | | |
| 25-Apr-07 | 58.09 | 59.04 | 57.75 | 58.94 | 14,438,000 | 58.54 |
| 24-Apr-07 | 58.31 | 58.39 | 57.35 | 57.87 | 2,612,400 | 57.48 |
| 23-Apr-07 | 59.15 | 59.19 | 58.40 | 58.49 | 2,632,600 | 58.09 |
| 20-Apr-07 | 58.88 | 59.25 | 58.36 | 59.07 | 18,733,600 | 58.67 |
| 19-Apr-07 | 58.85 | 58.85 | 57.06 | 58.03 | 2,606,500 | 57.64 |
| 18-Apr-07 | 56.90 | 58.36 | 56.75 | 57.84 | 3,767,500 | 57.45 |
| 17-Apr-07 | 56.77 | 57.50 | 56.12 | 56.97 | 2,858,000 | 56.58 |
| 16-Apr-07 | 55.00 | 56.96 | 54.97 | 56.92 | 5,607,900 | 56.53 |
| 13-Apr-07 | 54.37 | 54.37 | 53.69 | 53.94 | 3,282,100 | 53.57 |
| 12-Apr-07 | 54.37 | 54.37 | 53.30 | 53.97 | 3,021,700 | 53.60 |
| 11-Apr-07 | 54.15 | 54.30 | 53.70 | 53.84 | 2,856,400 | 53.47 |
| 10-Apr-07 | 54.30 | 54.42 | 53.63 | 54.27 | 2,664,500 | 53.90 |
| 9-Apr-07 | 54.33 | 54.50 | 53.96 | 54.43 | 2,296,000 | 54.06 |
| 5-Apr-07 | 54.33 | 54.54 | 54.00 | 54.33 | 2,467,500 | 53.96 |
| 4-Apr-07 | 54.66 | 54.66 | 54.04 | 54.33 | 3,079,400 | 53.96 |
| 3-Apr-07 | 54.80 | 55.55 | 54.60 | 54.65 | 3,687,000 | 54.28 |
| 2-Apr-07 | 54.58 | 54.58 | 53.60 | 54.47 | 4,462,200 | 54.10 |



Upgrade your trading experience with Fidelity.

**Fidelity Active Trader Services**

Don't settle. Trade smarter now.

**Fidelity**
Smart move.

Fidelity Brokerage Services,
Member NYSE, SIPC 431477.3

| | | | | | |
|---|---|---|---|---|---|
| 30-Mar-07 | 55.19 | 55.45 | 53.86 | 54.58 | 3,470,100 | 54.21 |
| 29-Mar-07 | 54.70 | 55.51 | 54.70 | 55.19 | 4,775,100 | 54.82 |
| 28-Mar-07 | 55.64 | 55.94 | 54.32 | 54.50 | 5,375,300 | 54.13 |
| 27-Mar-07 | 56.19 | 56.51 | 55.82 | 56.06 | 2,661,800 | 55.68 |
| 26-Mar-07 | 56.52 | 56.70 | 55.62 | 56.55 | 5,552,000 | 56.17 |
| 23-Mar-07 | 56.52 | 56.99 | 56.08 | 56.63 | 4,867,700 | 56.25 |
| 22-Mar-07 | 57.60 | 57.75 | 56.38 | 56.75 | 5,769,800 | 56.36 |
| 21-Mar-07 | 55.28 | 57.74 | 55.10 | 57.46 | 3,949,600 | 57.07 |
| 20-Mar-07 | 54.60 | 55.69 | 54.46 | 55.32 | 2,546,500 | 54.94 |
| 19-Mar-07 | 54.04 | 54.99 | 54.04 | 54.69 | 2,893,800 | 54.32 |
| 16-Mar-07 | 54.32 | 54.77 | 53.60 | 53.79 | 5,081,100 | 53.42 |
| 15-Mar-07 | 53.67 | 54.78 | 53.39 | 54.09 | 4,241,400 | 53.72 |

\* Close price adjusted for dividends and splits.

First | Prev | Next | Last

Download To Spreadsheet

Add to Portfolio    Set Alert    Email to a Friend

Get **Historical Prices** for Another Symbol:    GO  Symbol Lookup

- Stock Screener                                    • Splits
- Mergers & Acquisitions

Copyright © 2007 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily
updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information
supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be
turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are
available through our premium service. You may turn streaming quotes on or off. All information provided "as is" for
informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is
liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained
herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J. TIMOTHY HOWARD,<br>8400 Parham Court<br>McLean, VA 22102,<br>                 Plaintiff,<br><br>v.<br><br>OFFICE OF FEDERAL HOUSING<br>ENTERPRISE OVERSIGHT, an Office<br>within the United States Department of<br>Housing and Urban Development, and<br>JAMES B. LOCKHART III, in his official<br>capacity as Director,<br>1700 G Street, NW<br>Washington, DC 20552,<br><br>                 Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>TEMPORARY RESTRAINING ORDER</u>

Based upon the motion of J. Timothy Howard for a temporary restraining order, it is this

_____ day of July, 2007 hereby

**ORDERED** that the Office of Federal Housing Enterprise Oversight ("OFHEO") and its

Director, James B. Lockhart III are enjoined from freezing, placing a hold on, or otherwise

interfering with or preventing the immediate transfer of 7,823 shares of Fannie Mae common

stock from Fannie Mae to J. Timothy Howard;

**ORDERED** that OFHEO shall file and serve papers, if any, in opposition to Mr.

Howard's motion for a preliminary injunction by no later than July _____, 2007;

**ORDERED** that Mr. Howard's motion for a preliminary injunction be and hereby is set

down for a hearing on July _____, 2007, at _____;

**ORDERED** that this Temporary Restraining Order shall remain in effect until this Court rules on Mr. Howard's motion for a preliminary injunction or until such other time that this Court determines.

_____
The Honorable Richard J. Leon
United States District Court Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| J. TIMOTHY HOWARD, | ) | |
| 8400 Parham Court | ) | |
| McLean, VA 22102, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. _____ |
| | ) | |
| OFFICE OF FEDERAL HOUSING | ) | |
| ENTERPRISE OVERSIGHT, an Office | ) | |
| within the United States Department of | ) | |
| Housing and Urban Development, and | ) | |
| JAMES B. LOCKHART III, in his official | ) | |
| capacity as Director, | ) | |
| 1700 G Street, NW | ) | |
| Washington, DC 20552, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATION OF COMPLIANCE WITH LCvR 65.1</u>

Undersigned counsel hereby certifies that I have complied with Local Rule 65.1

regarding applications for temporary restraining orders and preliminary injunctions.  I first

informed the Deputy General Counsel of OFHEO on June 25, 2007 of the intent to file an

application for temporary restraining order or preliminary injunction as soon as practicable.  On

June 29, 2007, I advised the Deputy General Counsel that the filing would be made today, absent

withdrawal by OFHEO of its letter interfering with the transfer of Fannie Mae common stock to

Mr. Howard.

Dated:  July 2, 2007                              Respectfully submitted,

                                                  Steven M. Salky (D.C. Bar No. 360175)
                                                  Eric R. Delinsky (D.C. Bar No. 460958)
                                                  Miles Clark (D.C. Bar No. 489338)
                                                  ZUCKERMAN SPAEDER LLP
                                                  1800 M Street, N.W., Suite 1000
                                                  Washington, DC 20036-5802
                                                  202-778-1800 (phone)
                                                  202-822-8106 (facsimile)

                                                  *Counsel for Plaintiff*

2