# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| J. TIMOTHY HOWARD, | ) | |
| | ) | |
| | ) | No. 1:07-cv-01196 (RJL) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF FEDERAL HOUSING | ) | |
| ENTERPRISE OVERSIGHT, and | ) | |
| JAMES B. LOCKHART, III, | ) | |
| | ) | |
| Defendants. | ) | |

and

| | | |
|---|---|---|
| FRANKLIN D. RAINES, | ) | |
| | ) | |
| | ) | No. 1:07-cv-01202 (RJL) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF FEDERAL HOUSING | ) | |
| ENTERPRISE OVERSIGHT, and | ) | |
| JAMES B. LOCKHART, III, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

<u>INTRODUCTION</u>

Plaintiffs J. Timothy Howard and Franklin D. Raines brought the instant motions[1] for a temporary restraining orders ("TROs") and preliminary injunctions ("PIs") in order to prematurely obtain stock that may be due to them under their contracts with their former employer, the Federal National Mortgage Association ("Fannie Mae"). Plaintiffs' complaints and briefs avoid providing the full picture of how the performance share payment ("PSP") benefits program functions, the fact that they are seeking preferential treatment under the PSP program, or the legal authority for the Office of Federal Housing Enterprise Oversight ("OFHEO") to review Fannie Mae's determination of PSP benefits before the stock can be released.

First, in order to obtain TROs or PIs, Plaintiffs must establish irreparable injury. They have not done so. Plaintiffs are not entitled to receive the stock on any particular date. Rather, they are entitled to receive the stock once the process of determining the amount of stock to be paid out is complete. One step in that process is OFHEO's review of Fannie Mae's proposed PSP benefit payout. Because OFHEO's review is not complete, Plaintiffs' right to the stock has not vested, and they have not been injured by the fact that they have not received the stock yet. Further, Plaintiffs' claim of harm is highly speculative, as it relies on the assumption that stock prices will fall, when there is no way of knowing whether that will be the case. The speculative nature of Plaintiffs' claims prevent them from establishing irreparable injury.

_____

[1] Both Messrs. Raines and Howard filed substantially identical suits on July 2, 2007, seeking the same relief and raising the same legal arguments. The Court ordered briefing on both cases to be filed on July 5, with a joint hearing on both cases on the same day. In the interest of efficiency, Defendants are therefore filing this brief and attached exhibits in both suits.

Next, Plaintiffs contend that there is no statutory or regulatory basis for OFHEO to interfere with the payment of stock to them pursuant to the PSP program. This is incorrect. Pursuant to 12 U.S.C. §§ 4612 and 4614, OFHEO deemed Fannie Mae to be significantly undercapitalized on December 21, 2004. Subsequently, as required by § 4614, Fannie Mae proposed a Capital Restoration Plan to address its undercapitalization issues, which went into effect on February 17, 2005. One component of that plan is that OFHEO is to review any non-salary compensation to executives. Pursuant to that provision, OFHEO has the authority to review the PSP benefits. OFHEO is similarly authorized to review PSP benefits pursuant to the Consent Order entered into by OFHEO and Fannie Mae on May 23, 2006, which incorporates the Capital Restoration Plan.

Plaintiffs would like this Court to treat this case as if it presented the same set of facts and legal issues as two cases that this Court heard regarding former employees of Federal Home Loan Mortgage Corporation ("Freddie Mac")–Vaughn Clarke and Leland Brendsel. See Clarke v. OFHEO, 355 F. Supp. 2d 56 (D.D.C. 2004); Brendsel v. OFHEO, 339 F. Supp. 2d 52 (D.D.C. 2004). However, the Clarke and Brendsel cases are not analogous legally or factually. The letters in Clarke and Brendsel instructed Freddie Mac to freeze all of their benefits for an indefinite period of time, and Clarke and Brendsel were the only people affected. Here, by contrast. Plaintiffs complain about a letter that simply seeks additional information from the Fannie Mae Board of Directors so that OFHEO can review the Board's deliberations and the basis for its proposal to award PSP benefits to everyone who is a participant in PSP for the relevant years. OFHEO is reviewing only one type of benefit, and its review is not aimed at any individuals, but at the Fannie Mae Board's overall PSP proposal. Further, OFHEO's authority to

review the PSP benefits is based on the Capital Restoration Plan and Consent Order, neither of which existed in Brendsel or Clarke.

The Complaints assert claims under the Administrative Procedure Act ("APA"), the Declaratory Judgment Act, and the Fifth Amendment. Plaintiffs are unlikely to succeed on any of their claims because they all presuppose that OFHEO lacks the authority to review the PSP benefits. As noted above, the Capital Restoration Plan and Consent Order provide ample authority for this review. Additionally, Plaintiffs are unlikely to succeed on their APA claims because there can be no judicial review of an APA claim where, as here, there has been no final agency action taken. Plaintiffs are unlikely to succeed on their Fifth Amendment claims because they have not been deprived of any property interests.[2]

Because Plaintiffs have not established irreparable injury or a likelihood of success on the merits, the motions for TROs and PIs should be denied.

STATUTORY BACKGROUND

OFHEO was created by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992. 12 U.S.C. § 4501, et seq. Recognizing that the Federal Home Loan Mortgage Corporation ("Freddie Mac") and Fannie Mae (collectively "the enterprises") have important public missions affecting the health of the national economy, Congress created OFHEO to provide more effective federal regulation to reduce the risk of failure of these two enterprises. 12 U.S.C. § 4501. OFHEO is headed by a Director, who is appointed by the President and confirmed by the Senate. Id. §§ 4512, 4513. OFHEO's primary responsibilities include, among

---

[2]    Mr. Howard's Declaratory Judgment Act claim is indistinguishable from his other two claims, and it fails for the same reasons that they do. Mr. Raines did not allege a Declaratory Judgment Act claim.

other things, ensuring the capital adequacy and safe and sound operation of the enterprises.  Id.
§ 4513(a).  As part of the Director's duties pertaining to the safety and soundness of the
enterprises, he has authority to monitor the enterprises' capital situation and require the
enterprises to correct undercapitalization.  The minimum amount of capital an enterprise is
required to maintain is set by statute.  12 U.S.C. §§ 4612; 4613.  It is the Director's duty to
ascertain what level of capitalization an enterprise has maintained.  Id. § 4614.   There are four
possible levels of capitalization: adequately capitalized, undercapitalized, significantly
undercapitalized, and critically undercapitalized.  Id.  § 4614(a).  When an enterprise has been
deemed significantly undercapitalized, as was the case with Fannie Mae, it must submit a capital
restoration plan to OFHEO.  12 U.S.C. §§ 4616(a)(1); 4622.

        OFHEO also has the authority to instruct the enterprises to submit  reports to aid OFHEO
in its regulatory function.  12 U.S.C. § 4514.  "The Director may require an enterprise to submit
reports of financial condition and operations (in addition to the annual and quarterly reports. . .)."
Id. § 4514(a)(1).  "The Director may also require an enterprise to submit special reports
whenever, in the judgment of the Director, such reports are necessary to carry out the purposes
of this chapter."  Id. at § 4514(a)(2).

                                    FACTUAL BACKGROUND

        As former executive-level employees of Fannie Mae, Messrs. Franklin D. Raines and J.
Timothy Howard were eligible for performance-based compensation heavily contingent upon the
achievement of long-term corporate performance goals set by the Compensation Committee of
the Board of Directors of Fannie Mae. Declaration of Patrick Lawler ("Lawler Decl.") ¶ 2
(attached).   Mr. Raines served as Chief Executive Officer ("CEO")-designate in 1998 and then

as Chairman of the Board and CEO from January 1999 until December 21, 2004.[3] Id. Mr.

Howard was an Executive Vice President and Chief Financial Officer from 1990 to 2005.[4] Id.

Under their respective employment contracts, Messrs. Raines and Howard, among other things,

were eligible for annual incentive awards, long-term incentive awards, stock options,

performance shares and restricted stock grants. Raines Memo at Exh. 1[5]; Howard Memo at Exh.

5. At issue here is their claim to an immediate distribution of Performance Share Awards under

the Performance Share Plan ("PSP") for periods during which Messrs. Raines and Howard

qualified.[6]

<u>OFHEO Determined in 2004 that Fannie Mae Was Significantly Undercapitalized</u>

On December 15, 2004, the Office of the Chief Accountant of the Securities and

Exchange Commission ("SEC") delivered its views that Fannie Mae's accounting practices did

not comply in material respects with generally accepted accounting practices and advised the

---

[3]      By virtue of an arbitration agreement with the enterprise, Mr. Raines' final day of employment at the Enterprise is considered to be June 22, 2005. Id. During his employment as Chairman and Chief Executive Officer, Mr. Raines was responsible for the day-to-day management of Fannie Mae. Id.

[4]      At various points within his employment with the enterprise, Mr. Howard served as Vice-Chairman of Fannie Mae and sat on the Board of Directors. Id. Mr. Howard reported to Mr. Raines. Id.

[5]      The Memorandum in support of Mr. Raines' Motion for Temporary Restraining Order and Preliminary Injunction will be referred to as "Raines Memo." The Memorandum in support of Mr. Howard's Motion for Temporary Restraining Order and Preliminary Injunction will be referred to as "Howard Memo."

[6]      Since the restatement of its financial statements was ordered by the Securities Exchange Commission, Fannie Mae has deferred the award of any PSP stock grants, among other things, to any eligible executive or former executive until "reliable financial data for the relevant periods" became available. Fannie Mae Form 8-K, dated January 21, 2005 (attached at Exhibit 6).

enterprise to restate its financial statements for the years 2001 through 2004.  See 2005 Fannie

Mae Report to Congress, 1, fn.2 (attached at Exhibit 13).  See also Report of Findings to Date of

the Special Examination of Fannie Mae, dated September 17, 2004,

http://www.ofheo.gov/media/pdf/FNMfindingstodate17sept04.pdf.  Fannie Mae provided

estimates to OFHEO that the negative impact on earnings of the accounting errors could be as

high as 10.8 billion dollars.  Lawler Decl. ¶ 3.  This decrease in reported earnings appeared to

directly impact the company's capital, reducing it to below the company's statutory minimum

capital level.[7]  Id.  See also 12 U.S.C. § 4612.  Accordingly, on December 16, 2004, OFHEO

notified Fannie Mae of its intent to classify the Enterprise as significantly undercapitalized.

Letter from Leonard F. Reid, Jr., to Franklin D. Raines, dated December 15, 2004 (attached at

Exhibit 1).  Following supervisory review of Fannie Mae's response to the proposed action, the

Director classified Fannie Mae as significantly undercapitalized as of September, 30, 2004.

Letter from Armando Falcon to Fannie Mae's Board of Directors, dated December 21, 2004

(attached at Exhibit 2).   Fannie Mae did not object to this classification.  Letter from Ann M.

Kappler to Leonard F. Reid, Jr., dated December 21, 2004 (attached at Exhibit 12).   That same

day, Franklin D. Raines announced his retirement from Fannie Mae,[8] and Mr. Howard

announced his resignation.  Raines Exh. 2; Howard Exh. 4; Lawler Decl. ¶ 4.

---

[7]     Pursuant to 12 C.F.R. § 1777.20, if an enterprise holds core capital less than the minimum level, but greater than the critical capital level, as of the date of classification, it must be classified as significantly undercapitalized.

[8]     As noted above, while Mr. Raines tendered his resignation and concluded his employment obligations on December 21, 2004, his resignation did not become effective until June 22, 2005.  Lawler Decl. ¶ 2.

<u>Fannie Mae is Operating Under a Capital Restoration Plan</u>

The determination that Fannie Mae was significantly undercapitalized triggered several mandatory supervisory actions, and empowered the Director of OFHEO to take a number of severe supervisory actions, including the requirement that Fannie Mae submit a Capital Restoration Plan for approval by OFHEO.  <u>See</u> 12 U.S.C. §§ 4616(a)(1), 4622; <u>see also</u> 12 C.F.R. § 1777.23(a) (time limits and other requirements for a capital restoration plan).  On December 21, 2004, Fannie Mae submitted to OFHEO a proposed capital restoration plan as required by 12 U.S.C. § 4616(a)(1), but OFHEO rejected that plan and advised Fannie Mae that an acceptable plan was to have a provision requiring that OFHEO approve in advance any payment of non-salary benefits to its executive officers.[9]  Letter from Armando Falcon to Daniel Mudd, dated January 27, 2005 (attached at Exhibit 3); Lawler Decl. ¶ 5.

On February 10, 2005, the enterprise submitted a revised Capital Restoration Plan in which Fannie Mae (among numerous other provisions) "committed to seek the agency's prior approval for all payment of bonuses or other non-salary compensation awards for executive officers" as part of a larger cost-cutting plan integral to the enterprise's capital restoration.  This Capital Restoration Plan was approved by OFHEO on February 17, 2005.  <u>See</u> Capital

---

[9]     The consequences of a failure to obtain OFHEO approval of a capital restoration plan or the failure to make reasonable, good faith efforts to comply with a plan can be severe. In the case of a significantly undercapitalized enterprise, it would provide grounds for the Director to change the classification to "critically undercapitalized," triggering the appointment of a conservator. 12 U.S.C. § 4616(b)(5). As a clear violation of the Safety and Soundness Act (failure to file) or a supervisory agreement (failure to comply), it would also permit the imposition of a cease and desist order under 12 U.S.C. § 4631(a).

Restoration Plan, at 5, 8 (attached at Exhibit 4); Letter from X to X, dated February 17, 2005 (attached at Exhibit 5).[10]

Fannie Mae is Operating Under a Consent Order

On May 23, 2006, OFHEO released its Report of the Special Examination of Fannie Mae. http://www.ofheo.gov/media/pdf/FNMSPECIALEXAM.pdf.  Among the many findings of this report were serious deficiencies in executive compensation practices, which created improper incentives and disincentives and contributed to the accounting and governance failures at the company.  Id.  Contemporaneous with the release of the 2006 Report, OFHEO and Fannie Mae entered into a Consent Order intended to address the findings of the Special Examinations. Consent Order No. 2006-1, dated May 23, 2006 (attached at Exhibit 7).  The Consent Order addressed issues which would otherwise have been the subject of cease and desist proceedings. Id.  The Consent Order provides: "Fannie Mae will continue diligent and good faith pursuit of commitments set forth in the capital restoration plan as approved by OFHEO on February 17, 2005."  Id. at 5.  As noted above, pursuant to the Capital Restoration Plan submitted by Fannie Mae in accordance with 12 U.S.C. § 4616 and approved by OFHEO, Fannie Mae had undertaken to seek OFHEO's approval for any "payment of bonuses or other non-salary compensation," such as PSP benefits.

---

[10]     The Capital Restoration Plan, as well as the letters found at Exhibits 3, 5, and 8, have been redacted because they contain confidential and/or privileged material.  Lawler Decl. ¶¶ 11-13.  See In re Subpoena, 967 F.2d 630, 633 (D.C. Cir. 1992) (examiner's privilege).  If this Court wishes to see any redacted document in its entirety, Defendants are willing to file such documents under seal, pursuant to a court order.

<u>Compliance with the Capital Restoration Plan and the Consent Order</u>

In approving payment of bonuses or other non-salary compensation, Fannie Mae has committed to act and has consistently acted in accordance with both the Capital Restoration Plan and the Consent Order agreements and notified the public of its obligations under the same.  For example, Fannie Mae has released the following public comments:

> The actions the Board and the Committee took with respect to the compensation of officers considered "executive officers" under OFHEO rules were reviewed by OFHEO in advance, and were taken only after the Board and the Committee received the views of OFHEO. The restricted stock grant awards for Fannie Mae's executive officers were approved in advance by OFHEO.

Fannie Mae Form 8-K, dated March 11, 2005 (attached at Exhibit 11); and:

> In accordance with Fannie Mae's capital restoration plan, as agreed to with its regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), all of the non-salary compensation decisions for Fannie Mae's "OFHEO-designated executive officers" (which is a larger group of executive officers than those Fannie Mae has determined are "executive officers" under the rules of the Securities and Exchange Commission) require OFHEO's approval.

Fannie Mae Form 8-K, dated January 26, 2007 (attached at Exhibit 9).

On June 15, 2007, Fannie Mae made its recommendation as to the appropriate level of PSP benefits and requested OFHEO's approval.  Howard Exh. 1; Raines Exh. 3.  OFHEO responded by letter requesting additional information pursuant to 12 U.S.C. § 4514 to aid in its review.  Letter from James Lockhart III to Stephen Ashley, dated June 19, 2007 (attached at Exhibit 8).   Pursuant to OFHEO's request, Fannie Mae has submitted to OFHEO materials pertaining to the Board's decision regarding Cycles 19 and 20.  Lawler Decl. ¶ 6.  Once OFHEO has received and reviewed all relevant materials and its analysis is complete, OFHEO will approve, disapprove or issue guidance to Fannie Mae regarding the proposed payment of Cycles 19 and 20 to eligible participants in the PSP program. Lawler Decl. ¶ 6.

<u>The Performance Share Plan Benefits Program</u>

Fannie Mae used performance shares to compensate senior management for meeting performance objectives over designated three-year award cycles.  <u>Id.</u> at ¶ 7.  At the beginning of each cycle, the Board of Directors established PSP performance goals for both earnings-per-share ("EPS") and strategic goals.  <u>Id.</u>  Each employee in the Plan was designated a number of shares to be paid if the goals were met.  <u>Id.</u>  The EPS goals were tied directly to targeted percentage increases.  <u>Id.</u>  The strategic goals were tied to a scorecard, known as the Corporate Performance Assessment ("CPA"), used to measure achievement of rgoals in the Fannie Mae strategic plan.  <u>Id.</u>   During the relevant periods, the scorecard reflected the following: leadership in increasing access to affordable housing; leading presence in the secondary mortgage market; development of a corporate culture to enhance strategy execution; and development of an e-commerce infrastructure to increase capabilities and lower costs.  <u>Id.</u>

The EPS goals and the strategic goals were equally weighted (<u>i.e.</u>, 50 percent each) in determining performance share awards at the conclusion of each cycle.  <u>Id.</u>  Achievement of the targeted level of performance for both would result in 100 percent Performance Share Plan payout, but the score for EPS goals and the score for strategic goals could each range from 40 percent, for barely meeting a threshold achievement level, to150 percent for goal achievement at maximum levels.  <u>Id.</u>  Once the scores for both components have been established, they are combined to create a final score.[11]  <u>Id.</u>  Generally, if a retiree completes at least 18 months

---

[11]     The two scores are added together, divided by two, and converted into a percentage.

employment in the cycle but did not work for the entire period, his or her share is reduced on a pro rata basis based upon the percentage of months worked.  Id.

These cases concern two PSP cycles: Cycle 19, which encompasses the period from 2003 to 2005; and Cycle 20, which encompasses the period from 2004 to 2006.  Id. at ¶ 8.  No payments whatsoever have been made for these cycles, because awards under Cycles 19 and 20 are subject to ongoing regulatory review pursuant to the above-mentioned Capital Restoration Plan and a Consent Order.[12]  Id.

With regard to Cycles 19 and 20, the PSP benefit analysis is as follows: At the end of the cycle (and after accurate earnings information for all years was available), the Board evaluated the quantitative and qualitative components.  Id. at ¶ 9.  The Board found that Fannie Mae did not reach its EPS goal threshold in either cycle.  Id.  Consequently, the quantitative component was valued at zero. The Board proposed that Fannie Mae qualitative goals achievement percentage would be 80% for Cycle 19 and 95% for Cycle 20.  Id.  The payout percentage is then calculated, as noted above (0 + 80 divided by two, converted to a percentage; 0 + 95 divided by two and converted), giving a total overall payout percentage of 40% for Cycle 19 and 47.5% for Cycle 20. Id.  That percentage would be applied to all eligible employees who participate in the PSP program.  Id.

---

[12]    Mr. Raines' contrary contention that "Fannie Mae has distributed shares for PSP Cycles 19 and 20 to most participants" is not only factually inaccurate, but at odds with the exhibit Mr. Raines' cites in support of his contention.  Raines Memo at 3.  As the Fannie Mae's June 21, 2007 Form 8-K makes clear, the award of shares for both cycles is dependent upon OFHEO's approval for each potential recipient. Howard Memo at Exh 1; Raines Memo at Exh 3.  Moreover, contrary to Mr. Raines' implication that OFHEO is reviewing awards of PSP individually, OFHEO is, in fact, reviewing the awards of Cycles 19 and 20 in their respective totalities.  Lawler Decl. ¶ 9.

For Mr. Howard, for example, 40% of his targeted PSP payment constitutes 11,265 shares. However, Mr. Howard was not employed at Fannie Mae for the entire cycle, and his benefit is therefore reduced pro rata, making Fannie Mae's proposed PSP benefit for him 7823 shares. Mr. Howard did not work at Fannie Mae for 18 months in Cycle 20, so he would be entitled to nothing in that period. For Mr. Raines, his target for Cycle 19 was 107,505 shares, and his target for Cycle 20 was 99,967 shares. Multiplied by 40% and 47.5%, respectively, and reduced for on a pro rata basis because Mr. Raines did not work at Fannie Mae for either complete cycle, Mr. Raines' proposed combined PSP benefit is 58,812 shares.

As described above, Fannie Mae has proposed that the PSP payout percentage should be 40% for Cycle 19 and 47.5%. for Cycle 20. Howard Memo at Exh 1; Raines Memo at Exh 3. It is these numbers that are subject to OFHEO's review. OFHEO is determining whether Fannie Mae's performance in Cycles 19 and 20 is consistent with the conclusion that the qualitative goals achievement percentage was 80% for Cycle 19 and 95% for Cycle 20. Lawler Decl. ¶ 9.

Regulatory approval for awards of non-salary compensation to current or former employees of Fannie Mae for the time period that encompasses Cycles 19 and 20 is expressly required in Fannie Mae's February 10, 2005, Capital Restoration Plan, which, as noted above, is incorporated into the Consent Order entered into by Fannie Mae and OFHEO on May 23, 2006. See Exhs. 4 at 5 & 7 at 5. Both the Capital Restoration Plan and the Consent Order address efforts by Fannie Mae to remediate unsafe and unsound conditions at the enterprise that had caused OFHEO to find that the enterprise was significantly undercapitalized for years 2002, 2003, and 2004, years implicated in cycles 19 and 20. See 12 U.S.C. § 4614(a)(3).

<u>DISCUSSION</u>

I.      <u>Standards for Issuance of a TRO or PI</u>

The purpose of a TRO or PI  "is to <u>preserve the status quo</u> and prevent imminent harm

pending fuller briefing and a hearing on [a] request for injunctive relief."  <u>Bradshaw v.</u>

<u>Veneman</u>, 338 F. Supp. 2d 139, 141 (D.D.C. 2004) (emphasis added).  In deciding whether to

issue a TRO or PI, the Court considers four factors to determine whether preliminary injunctive

relief is appropriate.  <u>See</u> <u>Morgan Stanley DW, Inc. v. Rothe</u>, 150 F. Supp. 2d 67, 72 (D.D.C.

2001); <u>see also</u> <u>Al- Fayed v. CIA</u>, 254 F.3d 300, 303 n.2 (D.C. Cir. 2001).  Under this inquiry, a

movant must demonstrate (1) a substantial likelihood of success on the merits, (2) irreparable

injury if the injunction is not granted, (3) that an injunction would not substantially injure other

interested parties, and (4) that the public interest would be furthered by the injunction.

<u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations

omitted).

The most salient factor in the injunctive-relief analysis is irreparable injury.  <u>See</u> <u>Biovail</u>

<u>Corp. v. U.S. Food & Drug Admin.</u>, No. 06-1487, 2007 WL 891365, *2 (D.D.C. March 22,

2007).  "A movant must 'demonstrate at least some injury' to warrant the granting of an

injunction."  <u>Id.</u> (quoting <u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 747

(D.C. Cir.1995)) (internal quotations omitted). Indeed, if a movant makes no showing of

irreparable injury, the court may deny the motion for injunctive relief without considering the

other factors.  <u>CityFed Fin.</u>, 58 F.3d at 747.

It is also extremely "important for the movant to demonstrate a substantial likelihood of

success on the merits."  <u>See</u> <u>Biovail Corp.</u>, 2007 WL 891365, *2.  Indeed, absent a "substantial

indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." <u>Am. Bankers Ass'n v. Nat'l Credit Union Admin.</u>, 38 F. Supp. 2d 114, 140 (D.D.C. 1999) (internal quotation omitted).

Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997). The Supreme Court has noted that, "[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Id.</u> (citation omitted). In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. <u>Nat'l Treasury Employees Union v. Yeutter</u>, 918 F.2d 968, 977 (D.C. Cir. 1990) (citation omitted).

II.    <u>Plaintiffs Have Not Established Any Irreparable Injury.</u>

The quintessential basis for preliminary injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies. <u>See</u> <u>Wisc. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting <u>Sampson v. Murray</u>, 415 U.S. 61, 88 (1974)). In other words, irreparable harm is "the single most important prerequisite for the issuance" of a TRO or preliminary injunction. <u>Bell & Howell: Mamiya Co. v. Masel Supply Co.</u>, 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2948, at 431 (1973)). The absolute necessity of irreparable injury derives from the fact that "[p]reliminary injunctions are issued to forestall imminent and irreversible injury to the plaintiff's rights." <u>Comic Strip, Inc. v. Fox Television Stations, Inc.</u>, 710 F. Supp. 976, 981 (S.D.N.Y. 1989).

Here, Plaintiffs' argument for irreparable injury ultimately boils down to a loss of money due to possible changes in the stock market while OFHEO conducts its review. This argument is highly speculative. Plaintiffs have no way of knowing whether the value of the stock will fall or rise in the next few weeks. If it rises or remains stable, Plaintiffs will not suffer any injury at all, much less an irreparable one, from the delay in receiving their stock while OFHEO conducts its review.[13] Cf. Dopp v. Franklin Nat'l Bank, 461 F.2d 873, 881-82 (2d Cir. 1972) (finding no irreparable injury where plaintiff sought to prevent the sale of stock that was alleged to be unique). That Plaintiffs' concerns about the stock market are speculative is demonstrated by the list of stock prices provided by Plaintiffs. See Howard Memo at Exhs. 12 and 13; Raines Memo at Exh. 6. Fannie Mae's stock has risen and fallen in the time period between March 15 and June 29, 2007. Id. There is no reason to believe that the stock price on June 29 (the date upon which Plaintiffs requested the stock be paid, see Howard Memo at Exh. 10; Raines Memo at Exh. 5) will be higher than the price after the review process is complete. Such speculation as to the changing prices of stock is insufficient to establish an irreparable injury. See Cont'l Group, Inc. v. Amoco Chems. Corp., 614 F.2d 351, 359 (3d Cir. 1980) (noting that for irreparable injury there must be a presently existing actual threat, not merely a remote future injury); Nat'l Conference on Ministry to Armed Forces v. James, 278 F. Supp. 2d 37, 52 (D.D.C. 2003) (noting that speculative injury does not constitute irreparable injury).

---

[13]    To the extent that Plaintiffs assert an injury based on the decision that OFHEO ultimately will make as to whether the Board's proposed percentage is acceptable, such claim is premature. OFHEO has not made any determination with regard to that issue and is still in the process of gathering information. Lawler Decl. ¶ 6.

Furthermore, Plaintiffs have not established <u>any</u> injury, much less an irreparable one, as they have no right to receive the stock at this time. Plaintiffs' claim of harm from delay presupposes that there is a particular date upon which they should have received the stock, and that they have been prevented from receiving the stock on that date. However, this is not the case. See Lawler Decl. ¶ 11. In fact, the Board can choose any date for the payment of stock compensation benefits. <u>See</u> Howard Memo at Exh. 2, p1.[14] The benefits at issue relate to work performed by Plaintiffs in 2003, 2004, and 2005. Normally, PSP benefits are awarded soon after the three-year cycle is over. However, because Fannie Mae's finances for several years had to be restated, the Board determined that it would not decide on PSP benefits for the years covered by the restatement until the restatement process was completed. <u>See</u> Exh. 6. Fannie Mae belatedly stated its earnings for 2005 on May 2, 2007. Howard Memo at Ex. 1; Raines Memo at Ex. 3. Consequently, potential benefits for Cycles 19 and 20 were only recently calculated by the Board.[15] The timing of the Board's calculation was not mandatory or pre-determined by any rule, regulation, or statute. The Board made clear that its calculation was subject to OFHEO review, as is proper pursuant to the Consent Order, the Capital Restoration Plan, 12 U.S.C. § 4518, and 12 U.S.C. § 4514(a)(2). Plaintiffs have no reasonable expectation of receipt of any stock pursuant to the PSP for Cycles 19 and 20 until OFHEO has reviewed the proposed payments. Thus, the asserted delay in payments does not constitute an injury at all, because

---

[14]    The Board can also make changes in the terms under which such awards become available, such as agreeing to permit review by OFHEO. <u>Id.</u> at 7, 18.

[15]    The Board had previously determined that no awards were to be given under PSP Cycles 17 and 18 because Fannie Mae did not meet 40% of either its ESP or its strategic goals.

Plaintiffs are not entitled to receive the stock any earlier than they will receive it once OFHEO's review is completed.[16]

Plaintiffs' argument that OFHEO's letter has delayed the release of stock to them also presupposes that Fannie Mae would otherwise have released the stock to Plaintiffs without waiting for OFHEO's approval of the proposed PSP benefits. However, that presupposition of fact is wholly incorrect. To the contrary, the Board affirmatively sought OFHEO's approval and explicitly noted that the PSP benefits for Cycles 19 and 20 required OFHEO's approval. FNMA 8-K 6/21/07. In any event, such approval is required by the Consent Order and the Capital Restoration Plan, and the Board and its members would have been subject to a cease and desist order and civil money penalties if they had not complied with those documents. See Exhs. 4 & 7. Indeed, the letter from Fannie Mae's Board requested such approval. Lawler Decl. ¶ 6. Therefore, it is not OFHEO's letter that is delaying the release of the stock–it is the reality that OFHEO must approve the proposed PSP benefits before Fannie Mae is permitted to release them to anyone. Thus, any letter that OFHEO sent reminding Fannie Mae of its obligation to await OFHEO's review is not the cause of what Plaintiffs view as a delay in the payment of stock. Enjoining OFHEO not to "interfere" in Fannie Mae's payment of said stock would not alter the fact that Fannie Mae is legally prohibited by the Capital Restoration Plan and Consent Order

---

[16]     Nor would Plaintiffs have any legitimate basis for a claim of undue delay. The Board provided its calculations of PSP benefits for Cycles 19 and 20 to OFHEO for review on June 15, 2007. OFHEO promptly responded by letter on June 19, 2007, asking the Board for additional information to assist OFHEO in conducting its review. Exh. 8. That letter gave the Board until July 9, 2007, to respond. Id. Once OFHEO has received a complete set of information, it can then proceed to review the Board's calculations and determine whether the proposed stock payments are appropriate. At this point, any claim of undue delay on OFHEO's part would be both premature and unsupported by the facts.

from releasing the Cycle 19 and 20 stock to anyone until OFHEO has had an opportunity to determine whether the proposed 40% benefit payment is appropriate.

Finally, Plaintiffs' burden for establishing irreparable injury is all the greater where, as here, Plaintiffs are seeking to alter the status quo. See Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (quotation marks omitted), aff'd, 159 F.3d 636 (D.C. Cir 1998) (quoting Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997)). In the status quo, the Board has recommended that the PSP benefit for Cycle 19 is 40% and for Cycle 20 is 47.5%, pending OFHEO's review. Howard Memo at Exh. 1; Raines Memo at Exh. 3. OFHEO is currently reviewing this proposal and gathering information as to whether such benefit is appropriate. Exh. 8; Lawler Decl. ¶ 6. Plaintiffs propose to alter the status quo by having Fannie Mae release the stock to Plaintiffs before OFHEO has had an opportunity to complete its review. A district court should not grant a TRO or PI that will alter the status quo unless the facts and the law clearly favor the moving party. Nat'l Conference on Ministry to Armed Forces v. James, 278 F. Supp. 2d 37, 43 (D.D.C. 2003). That Plaintiffs' proposed TROs to change the status quo are inapt is particularly notable in that there is nothing temporary about them. If the Court grants the TROs, Fannie Mae will be required to release the stock, and Plaintiffs will have obtained all the relief that they seek under this suit. It is improper to use a TRO or PI to obtain the ultimate relief sought. See Heckler v. Redbud Hosp. Dist., 473 U.S. 1308, 1313-14 (1985); Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); Enercons Virginia, Inc. v. Am. Sec. Bank, N.A., 720 F.2d 28, 29 (D.C. Cir. 1983) (quoting Sims v. Stuart, 291 F. 707, 707-08 (S.D.N.Y. 1922)).

Because Plaintiffs have not established any injury, much less any irreparable injury, resulting from OFHEO's review of the PSP benefits, and because Plaintiffs are seeking to irreversibly alter the status quo in TROs and PIs, the Court should deny Plaintiffs' motions.

III.     Plaintiffs Have Not Established a Likelihood of Success on the Merits.

Plaintiffs are unlikely to succeed on the merits for several reasons.  First, OFHEO was well within its regulatory authority to send to Fannie Mae the letter about which Plaintiffs complain.  Both the Capital Restoration Plan and the Consent Order provide authority for such an action, as well as the statutes pertinent to those plans.  Further, Plaintiffs' APA claim fails because this Court lacks jurisdiction over it.  There has been no final agency action, but merely an intermediate step in the process of OFHEO's determination as to whether to approve the PSP benefits.  Plaintiffs' due process claims fail because they have no property interest in the stock until there has been a final determination as to how much stock will be awarded under the PSP benefits program for Cycles 19 and 20.  OFHEO's approval is required for any such final determination.

A.     OFHEO is authorized to review the PSP benefits pursuant to 12 U.S.C.
        §§ 4614(a)(2); 4622, the Consent Order, and the Capital Restoration Plan.

Plaintiffs argue that OFHEO lacks the authority to review the PSP benefits pursuant to the excessive compensation authority set out at 12 U.S.C. § 4518 or the cease and desist authority set out at §§ 4631; 4632.  Howard Memo at 6-7; Raines Memo at 6-8.  However, OFHEO clearly has the authority to review the PSP benefits pursuant to the Consent Order and the Capital Restoration Plan, making excessive compensation and cease and desist authority irrelevant to the analysis of this case.  See Exhs. 4 & 7.

Plaintiffs also ignore the special enforcement powers of the Director with regard to a significantly undercapitalized enterprise, which authorize, among other things, the Director to order the termination, reduction, or modification of any activity that the Director determines creates a risk to the enterprise. 12 U.S.C. § 4616(b)(4).  There can be no serious question that the authorities of the Director permitted him to enter into a supervisory agreement or to impose requirements on a capital restoration plan which included his approval of discretionary bonus awards by the Board of Directors.

The enterprises are statutorily required to maintain certain minimum capital levels.  12 U.S.C. § 4612.  It is OFHEO's responsibility to determine the level of capitalization that has been maintained by the enterprises.  There are four possible levels of capitalization: adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized.  Id. § 4614(a).  In December 2004, OFHEO determined that Fannie Mae was significantly undercapitalized. FNMA 8K Dec 04.   Due to this determination, Fannie Mae was required by statute to submit a capital restoration plan to OFHEO for approval.  Id. § 4622.  OFHEO worked with Fannie Mae to reach agreement on a plan that would help Fannie Mae return to the "adequately capitalized" level and maintain that level into the future. Fannie Mae Form 8-K, dated February 23, 2005 (attached at Exhibit 10).

The Capital Restoration Plan took effect on February 17, 2005.  It requires, inter alia, that Fannie Mae "seek the agency's prior approval for all payment of bonuses or other non-salary compensation awards for executive officers." Exh. 4 at 5.  The Capital Restoration Plan is enforceable pursuant to OFHEO's cease and desist authority and other enforcement provisions. See 12 U.S.C. §§ 4631(a)(3)(B); 4636(a)(1)(3).   PSP benefits are non-salary compensation

awards paid to executive officers. Consequently, PSP benefits are reviewable by OFHEO. It is for this reason that once Fannie Mae had determined that its proposed PSP benefit was at the 40% level, Fannie Mae wrote to OFHEO and sought approval for the PSP benefit. OFHEO is presently gathering information from Fannie Mae to help evaluate the proposed benefit and determine whether it approves.

On May 23, 2006, Fannie Mae and OFHEO entered into a Consent Order. The authority for that agreement is 12 U.S.C. §§ 4631(a)(3)(B) and 4636(a)(1)(3). See Abercrombie v. Clarke, 920 F.2d 1351, 1353 (7th Cir. 1990) (cease and desist orders can be entered into by consent); see also Henry v. Office of Thrift Supervision, 43 F.3d 507, 512-13 (10th Cir. 1994) (consent order is an "order"); Stanley v. Bd. of Governors, 940 F.2d 267 (7th Cir. 1991) (enforcing consent order). It is enforceable pursuant to 12 U.S.C. §§ 4635; 4636(d); The Consent Order incorporates all of the provisions of the Capital Restoration Plan, including the requirement that OFHEO review any non-salary compensation awards to executive officers. Exh. 7 at 5. Thus, pursuant to the Consent Order, OFHEO is authorized to review compensation such as the PSP benefits.

OFHEO's June 17, 2007 letter to Fannie Mae which requested additional information regarding the proposed PSP benefits is authorized not only by the sources of review authority described above, but more specifically by 12 U.S.C. § 4514(a)(2), which authorizes OFHEO to order an enterprise to provide a special report. Plaintiffs' contention that this letter somehow constitutes some sort of interference in their benefits is mistaken. The letter is a proper exercise of OFHEO's regulatory authority to obtain special reports from the enterprises on matters of

import.  OFHEO will then use the special report to aid in its review of the proposed PSP

benefits.        Contrary to Plaintiffs' assertions, OFHEO's letter to Fannie Mae did not "freeze"

their benefits.  See Raines Memo at 6; Howard Memo at 6.  It reminded Fannie Mae that PSP

benefit stock could not be released until OFHEO's review is complete and it sought information

that would assist in the review.  Such actions are clearly authorized by the Capital Restoration

Plan, the Consent Order, and the statutory and regulatory provisions  identified above.  Plaintiffs,

like all other participants in the PSP benefit program for Cycles 19 and 20, need to wait while

the process of determining what the benefits will be is completed.

      B.      <u>Plaintiffs' APA claim is not subject to judicial review because there has been no final agency action.</u>

"Agency action made reviewable by statute and final agency action for which there is no

other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704.  Where, as

here, there is no final agency action, there can be no judicial review.  See <u>Nat'l Ass'n of Home</u>

<u>Builders v. Norton</u>, 415 F.3d 8, 13 (D.C. Cir. 2005) ("[A]n agency action must be final in order

to be judicially reviewable."); <u>Ctr. for Law & Educ. v. Dep't of Educ.</u>, 396 F.3d 1153, 1165

(D.C. Cir. 2005); <u>Clifton Power Corp. v. FERC</u>, 294 F.3d 108, 110 (D.C. Cir. 2002).  "Courts

must not interfere with the executive function, whether exercised by executive officials or

administrative agencies,  by entertaining a lawsuit that challenges an action that is not final."

<u>Sabella v. United States</u>, 863 F. Supp. 1, 3 (D.D.C. 1994).  At this point, the only action that

OFHEO has taken is to instruct Fannie Mae to provide it with information necessary to conduct a

review of the proposed PSP benefits.  See 12 U.S.C. § 4514(a)(2) (authorizing the Director to

require an enterprise to provide him with a special report); Lawler Decl. ¶ 6.  OFHEO has made

no determination as to whether the proposed benefits are appropriate.   To the extent that

Plaintiffs are contending that they are entitled to a fixed value of benefit under PSP Cycles 19 and 20 (7823 shares and 58,812 shares), such challenge is premature, as OFHEO has taken no final agency action on that point.

To the extent that Plaintiffs are contending that the delay while OFHEO makes its final decision is in and of itself a final decision subject to APA review, they are mistaken. Finality is to be interpreted in a flexible and pragmatic way. Sabella, 863 F. Supp. at 3. In determining whether an agency action is "final" for APA purposes, the "core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Mass., 505 U.S. 788, 797 (1992). Here, it is clear that the decisionmaking process is not complete. Pursuant to its explicit statutory authority, OFHEO is currently in the midst of determining whether PSP benefits are appropriate. There has not yet been a "definitive statement of [the agency's] position." Hindes v. FDIC, 137 F.3d 148, 162 (3rd Cir. 1998) (alteration in original). Rather, here, as in Hindes, the action at issue constitutes the "first step in a multi-step" procedure of determining the appropriateness of the PSP benefits. Id. By its nature, the first step in the process is not the final agency action. It does not constitute the "consummation of the administrative process," but, rather, the beginning. Id. Preliminary steps leading up to an administrative proceeding simply do not constitute final agency action. Id. at 163-64; see also Aerosource, Inc. v. Slater, 142 F.3d 572, 579-81 (3rd Cir. 1998) (orders not final when part of an ongoing investigation); Schmidt v. Ivey, No. 99-1319, 1999 WL 767448 *2 (E.D. La. Sept. 24, 1999) (noting that there is no subject matter jurisdiction when the case involves an intermediate, preliminary, or procedural agency action); Saratoga Savings & Loan Assoc. v. Federal Home Loan Bank of San Francisco, 724 F. Supp. 683, 687 (N.D. Cal. 1989)

("The mere threat of future agency action does not, in and of itself, constitute final agency action.").

Bennett v. Spear, 520 U.S. 154 (1997), sets out the standard for determining whether an order is "final," and thus reviewable, under 12 U.S.C. § 704:

> As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'

Id. at 177-78 (citation omitted). Neither condition is satisfied here.

OFHEO's decisionmaking process is clearly not yet complete. OFHEO has instructed Fannie Mae to provide it with information by July 9, 2007, to enable OFHEO to conduct its review. Only after OFHEO has had an opportunity to review the information provided and reach a determination regarding the appropriateness of the PSP benefits will there be final agency action appropriate for APA review. The act of reviewing information constitutes an interlocutory step which does not constitute final agency action.

If OFHEO determines in the course of its review to approve payment of the proposed PSP benefits, then Plaintiffs will receive them at the same time as everyone else who is eligible for PSP Cycles 19 and 20, and there will have been no need for judicial action, which is why judicial action at an interlocutory stage is inappropriate. If OFHEO determines not to approve the proposed benefits, Plaintiffs can attempt to bring suit at that time. Judicial review is inappropriate where, as here, such review would "undermine the authority of the agency acting within the scope of its discretion." Cities of Anaheim & Riverside, Cal. v. FERC, 692 F.2d 773, 779 (D.C. Cir. 1982); see also Papago Tribal Utility Auth. v. FERC, 628 F.2d 235, 242 (D.C.

Cir. 1980) ("courts have no jurisdiction to review agency orders where such review would necessarily infringe on the statutory role of the agency").  Because no judicial review is available for Plaintiffs' APA claims, Plaintiffs have not established a likelihood of success on the merits.[17]

      C.    <u>Plaintiffs are Unlikely to Succeed on their Fifth Amendment Claims.</u>

Plaintiffs contend that OFHEO's instruction to Fannie Mae not to release the stock until its review was completed constitutes a violation of their due process rights under the Fifth Amendment.  In order to state a claim under the Due Process Clause, a plaintiff must have been deprived of a property right without due process of law.  <u>PDK Labs, Inc. v. Reno</u>, 134 F. Supp. 2d 24, 32 (D.D.C. 2001) (to make out a due process claim, a party must show that (1) it has a protected interest, (2) the government deprived it of this interest, and (3) the deprivation occurred without proper procedural protections).  Here, Plaintiffs have not been deprived of any property interest.  Under the Fifth Amendment Due Process Clause, a person must have a legitimate claim of entitlement to the property at issue, not just a unilateral expectation.[18]  <u>Town of Castle Rock v. Gonzales</u>, 545 U.S. 748, 756 (2005); <u>Webb's Fabulous Pharmacies, Inc. v. Beckwith</u>, 449 U.S. 155, 161 (1980).

---

[17]      The lack of final agency action also means that the case is not ripe and should therefore be dismissed.  <u>See</u> <u>Tex. v. United States Dep't of Energy</u>, 764 F.2d 278, 283 (5th Cir. 1985) (citing <u>Abbott Labs v. Gardner</u>, 387 U.S. 136, 149-54 (1967)); <u>Flagship Federal Savings Bank v. Wall</u>, 748 F. Supp. 742, 746 (S.D. Cal. 1990).

[18]      At most, Plaintiffs could claim a contingent interest in whatever amount of stock is ultimately determined to be appropriate once the process of determining PSP benefits for Cycles 19 and 20 is complete.  But they have not been deprived of such contingent interest.  Once the process is complete, Plaintiffs, along with all other participants in Cycles 19 and 20, will receive whatever amount of stock to which they are deemed entitled.

As noted above, Plaintiffs' right to the stock has not yet vested.  See supra, Part II; Lawler Decl. ¶ 11.  To the extent that it is not known at this point what quantity of stock anyone, including Plaintiffs, will ultimately be deemed to be entitled to under the PSP benefit program for Cycles 19 and 20, they cannot establish a property interest in the stock at this point.  See Bloch v. Powell, 348 F.3d 1060, 1069-70 (D.C. Cir. 2003) (no property right in receiving an immediate annuity).  Their property interest will not vest until the process of determining the amount of stock to be paid out under the PSP program is completed.  One step in that process is review by OFHEO.  Until OFHEO has had a chance to review the proposed benefit, therefore, the right to the stock has not vested, and Plaintiffs have no property right in the stock.  See Pennie v. Reis, 132 U.S. 464, 471 (1889); Lawler Decl. ¶ 11.

Because Plaintiffs do not yet have a property interest in the stock, Plaintiffs are unlikely to succeed on the merits of their Due Process Clause claims.

IV.    The Remaining Factors Do Not Justify Entry of a TRO or PI.

The remaining factors are whether an injunction would substantially injure other interested parties and whether the grant of an injunction would further the public interest.  Al-Fayed v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001).  Neither of these factors favor Plaintiffs.

If the Court orders Fannie Mae to release the stock to Plaintiffs before OFHEO has completed its review, and OFHEO ultimately determines that the PSP benefit proposed by the Board is too high, Plaintiffs will have received more stock than the amount to which they are entitled.  That result would be unfair to the many other individuals whose PSP benefits will be affected by OFHEO's review.  It is also harmful to Fannie Mae, who will be in a position of having paid out stock benefits that it did not owe.  To get the stock back from Plaintiffs if it is

determined that they received amounts to which they were not entitled would be problematic for either Fannie Mae or OFHEO, especially if Plaintiffs elect to sell the stock before OFHEO's review is complete, as they have implied that they will.  Howard's Memo at 8; Raines' Memo at 8-9.

Further, the entry of a TRO would undermine OFHEO's role as regulator by interfering with one of its critical roles: reviewing compensation to determine whether it is excessive.  As noted above, 12 U.S.C. § 4518 and 12 U.S.C. § 4514 require that OFHEO undertake such a review.  Additionally, the Capital Restoration Plan and the Consent Order provide for such review.  See Exhs. 4 at 5 & 7 at 5.  OFHEO should not be prevented from doing its job.

There is no reason that the public benefits by releasing stock prematurely to the former Chief Financial Officer of Fannie Mae.  Other employees whose PSP benefits for Cycles 19 and 20 are being determined as part of the same process about which Plaintiffs complain are required to await OFHEO's review.  It is unfair to them for Plaintiffs to be able to avoid the minimal delay and to potentially receive more stock than they will be entitled to when the review process is completed.

V.      The Instant Case Is Not Analogous to *Brendsel* or *Clarke*.

Plaintiffs' primary argument throughout their briefs is that this case is the same as the Brendsel and Clarke cases. Howard Memo at 1-2, 6-10; Raines Memo at 6-9.  However, there are at least three reasons that this case is distinct from Brendsel and Clarke.  First, the decision about the PSP Cycles 19 and 20 benefits affects everyone who is eligible for these PSP benefits. It is not limited to Plaintiffs, nor is it limited to former Fannie Mae executives.  Brendsel and Clarke's compensation review was limited only to them.  Second, the letters in Brendsel and

Clarke ordered Freddie Mac to indefinitely freeze benefits that Freddie Mac would otherwise

have released.  Clarke v. OFHEO, 355 F. Supp. 2d 56, 60 (D.D.C. 2004); Brendsel v. OFHEO,

339 F. Supp. 2d 52, 57 (D.D.C. 2004).   The letter at issue here has as its primary purpose to

instruct Fannie Mae to provide OFHEO with additional information to aid in the review of the

proposed benefits.  See Exh. 8.  Third, as noted previously, OFHEO's authority to conduct this

review is pursuant to the Capital Restoration Plan, the Consent Order, and the statutes

authorizing those agreements.  See 12 U.S.C. §§ 4622; 4631.  Brendsel and Clarke, by contrast,

focused on excessive compensation authority pursuant to 12 U.S.C. § 4518.  355 F. Supp. 2d at

61-62; 339 F. Supp. 2d at 63-64.  These three points are discussed in greater detail below.

        As an initial matter, everyone who participated in the PSP benefit program for Cycles 19

and 20 is awaiting the completion of OFHEO's review of Fannie Mae's proposed benefits.  No

payments have been made to any employees for Cycles 19 or 20.  The review that OFHEO is

undertaking is a review of the appropriateness of the 40% figure proposed by Fannie Mae.

OFHEO is not reviewing individual employees' possible PSP payments.  To the contrary, all

employees under the plan will be subject to the same percentage in determining their individual

benefits.  In Brendsel and Clarke, by contrast, OFHEO had issued letters instructing Freddie Mac

to freeze Messrs. Brendsel and Clark's retirement benefits pending excessive compensation

review.  355 F. Supp. 2d at 60; 339 F. Supp. 2d at 57.  Only Brendsel and Clarke were affected

by that instruction.  In short, in the Freddie Mac cases, it was Brendsel and Clarke who were

being singled out for special treatment by OFHEO.[19]  In this case, it is Plaintiffs who are seeking

_____

        [19]     Further, in Brendsel and Clarke, the amount of benefits owed under their
contracts had been determined by Freddie Mac and pre-approved by OFHEO.  Here, by contrast,
the quantity of stock has not yet been finally determined because Fannie Mae awaits OFHEO's

to receive special treatment rather than to have their PSP benefits determined according to the same process as everyone else, notwithstanding that Plaintiffs' contracts contemplate that they will receive their PSP benefits at the same time as others in the PSP program and pursuant to the same process for determining the value of their PSP benefits.  Raines Memo at Exh. 1; Howard Memo at Exhs. 2, 3, and 5.

Second, the letters in the <u>Brendsel</u> and <u>Clarke</u> cases instructed Freddie Mac to indefinitely freeze benefits pending excessive compensation review.  355 F. Supp. 2d at 60; 339 F. Supp. 2d at 57.  In the absence of these letters, Freddie Mac had intended to release those benefits that were due at the time.  The sole purpose of those letters was to stop payment of all benefits to Brendsel and Clarke while OFHEO completed its administrative action against them and determined whether their benefits were excessive under the circumstances.  The letter in the instant case, by contrast, is primarily a request by OFHEO for information, and it deals with only one type of benefit, and it is not related to the ongoing administrative enforcement proceedings against Plaintiffs.  Pursuant to 12 U.S.C. § 4514, it seeks a special report from the enterprise explaining how the 40 and 47.5 percent figures were determined for Cycles 19 and 20, respectively.  The letter does mention that stock should not be released until OFHEO's review is complete.  However, Fannie Mae already understood that OFHEO's approval was required before the stock could be released.  Howard Memo at Exh. 1; Raines Memo at Exh. 3; Exh. 9.  Even if the letter had said nothing about what Fannie Mae should do with the stock while OFHEO's review was ongoing, Fannie Mae would not have released it.

---

approval and OFHEO has not had any prior opportunity to consider the amount of stock that would be awarded under the PSP program for Cycles 19 or 20, as that amount was only recently proposed by Fannie Mae.

Third, the <u>Clarke</u> and <u>Brendsel</u> cases address excessive compensation authority pursuant to 12 U.S.C. § 4518.  While Defendants believe that they would be justified in reviewing the PSP benefits pursuant to § 4518, it is clear that OFHEO has the authority pursuant to the Capital Restoration Plan and Consent Order.  Both of these agreements between Fannie Mae and OFHEO authorize OFHEO to review non-salary executive compensation.  The PSP benefits are non-salary executive compensation, so review of such benefits is clearly within the auspices of the Capital Restoration Plan and Consent Order.  There is no language in <u>Clarke</u> or <u>Brendsel</u> that addresses circumstances in which a capital restoration plan, supervisory agreement and consent order required regulatory approval of benefit payments so those cases are wholly inapposite.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motions for TROs and PIs should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

_____/s/_____Marcia N. Tiersky_____

| | |
|---|---|
| OF COUNSEL: | ARTHUR R. GOLDBERG, D.C. Bar 180661 |
| DAVID FELT | MARCIA N. TIERSKY, Ill. Bar 6270736 |
| OFHEO | Attorneys, Department of Justice |
| 1700 G Street, N.W. | 20 Mass. Ave., N.W., Room 7206 |
| Washington, D.C. 20552 | Washington, D.C.  20530 |
| Tel: (202) 414-3750 | Tel: (202) 514-1359 |
| | Fax: (202) 318-0486 |
| | E-mail: marcia.tiersky@usdoj.gov |
| | Attorneys for Defendants |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J. TIMOTHY HOWARD,       ) | |
|                        ) | |

J. TIMOTHY HOWARD,          )

                     )

              Plaintiff,   )    No. 1:07-cv-01196 (RJL)

                     )

       v.            )

                     )

OFFICE OF FEDERAL HOUSING   )

ENTERPRISE OVERSIGHT, and    )

JAMES B. LOCKHART, III,      )

                     )

           Defendants.   )

and

FRANKLIN D. RAINES,       )

                     )

              Plaintiff,   )    No. 1:07-cv-01202 (RJL)

                     )

       v.            )

                     )

OFFICE OF FEDERAL HOUSING   )

ENTERPRISE OVERSIGHT, and    )

JAMES B. LOCKHART, III,      )

                     )

           Defendants.   )

I, Patrick Lawler, hereby declare as follows:

1.    I am the Chief Economist at the Office of Federal Housing Enterprise Oversight. In the course of my work, I have become familiar with the Federal National Mortgage Association (Fannie Mae or the Enterprise) and the factual issues pertaining to this lawsuit. This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motions for a Temporary Restraining Order and Preliminary Injunction.

2.      As former executive-level employees of Fannie Mae, Messrs. Franklin D. Raines and J. Timothy Howard were eligible for performance-based compensation heavily contingent upon the achievement of long-term corporate performance goals set by the Compensation Committee of the Board of Directors of Fannie Mae. Mr. Raines served as Chief Executive Officer (CEO)-designate in 1998 and then as Chairman of the Board and CEO from January 1999 until December 21, 2004. By virtue of an arbitration agreement with the Enterprise, Mr. Raines' final day of employment at the Enterprise is considered to be June 22, 2005. During his employment as Chairman and CEO, Mr. Raines was responsible for the day-to-day management of Fannie Mae. Mr. Howard was an Executive Vice President and Chief Financial Officer from 1990 to 2005. At various points within his employment with the enterprise, Mr. Howard served as Vice-Chairman of Fannie Mae and sat on the Board of Directors. Mr. Howard reported to Mr. Raines.

3.      Between September 2004 and December 2004, Fannie Mae provided estimates to OFHEO that the negative impact on earnings of the accounting errors identified by the Special Examination could be as high as 10.8 billion dollars. This decrease in reported earnings directly impacted the company's capital, reducing it to below the company's statutory minimum capital level.

4.      On December 16, 2004, OFHEO sent notice to Fannie Mae that it was preliminarily classifying the Enterprise as significantly undercapitalized. In response, Fannie Mae submitted materials to the Director of OFHEO for his review in regard to the proposed action. After consideration of that material, the Director classified the Enterprise as significantly undercapitalized as of September, 30, 2004, by letter dated December 21, 2004. That same day, Franklin D. Raines announced his retirement from Fannie Mae, and Mr. Howard announced his resignation.

5.    On December 21, 2004, Fannie Mae submitted to OFHEO a proposed capital restoration plan as required by 12 U.S.C. § 4616(a)(1), but OFHEO rejected that plan and advised Fannie Mae that an acceptable plan was to have a provision requiring that OFHEO approve in advance any payment of non-salary benefits to its executive officers. On February 10, 2005, the Enterprise submitted a revised Capital Restoration Plan in which Fannie Mae (among numerous other provisions) "committed to seek the agency's prior approval for all payment of bonuses or other non-salary compensation awards for executive officers" as part of a larger plan integral to the Enterprise's capital restoration designed to cut costs and otherwise conserve capital. This Capital Restoration Plan was approved by OFHEO on February 17, 2005.

6.    On June 15, 2007, Fannie Mae made its recommendation as to the appropriate level of PSP benefits and requested OFHEO's approval. On June 19, 2007, OFHEO responded by letter requesting additional information pursuant to 12 U.S.C. § 4514 to aid in its review. Fannie Mae has submitted to OFHEO materials pertaining to the Board's decision regarding Cycles 19 and 20. OFHEO is reviewing the submitted materials and, when its work is complete, will approve, disapprove, request additional information or issue guidance to Fannie Mae regarding the proposed payment of Cycles 19 and 20 by the Board of Directors.

7.    Fannie Mae used performance shares to compensate senior management for meeting performance objectives over designated three-year award cycles. At the beginning of each cycle, the Board of Directors established PSP performance goals for both earnings-per-share ("EPS") and strategic goals. Each employee in the Plan was designated a number of shares to be paid if the goals were met. The EPS goals were tied directly to targeted percentage increases. The strategic goals were tied to a scorecard, known as the Corporate Performance Assessment ("CPA"), used to measure achievement of goals in the Fannie Mae strategic plan. During the relevant periods, the scorecard reflected the following: leadership in increasing access

to affordable housing; leading presence in the secondary mortgage market; development of a corporate culture to enhance strategy execution; development of an e-commerce infrastructure to increase capabilities and lower costs; and, for cycle 20 only, optimal operational risk management. The EPS goals and the strategic goals were equally weighted (i.e., 50 percent each) in determining performance share awards at the conclusion of each cycle. Achievement of the targeted level of performance for both would result in 100 percent Performance Share Plan payout, but the score for EPS goals and the score for strategic goals could each range from 40 percent, for barely meeting a threshold achievement level, to 150 percent for goal achievement at maximum levels. Once the scores for both components have been established, they are combined to create a final score, which is converted into a percentage. That percentage is then used to determine the PSP benefits for those eligible to receive such benefits. Generally, if a retiree completes at least 18 months employment in the cycle but did not work for the entire period, his or her share is reduced on a pro rata basis based upon the percentage of months worked. Mr. Raines contract provided pro rata payments in other circumstances as well.

8.      Cycle 19 encompasses the period from 2003 to 2005. Cycle 20 encompasses the period from 2004 to 2006. Because awards under Cycles 19 and 20 are currently undergoing regulatory review, no payment regarding Cycles 19 or 20 has been made by Fannie Mae to any person potentially entitled to receive compensation regarding these cycles.

9.      With regard to Cycles 19 and 20, the PSP benefit analysis is as follows: At the end of the cycle (and after the earnings for the relevant years had been restated), the Board evaluated the quantitative and qualitative components. The Board found that Fannie Mae did not reach its EPS goal threshold in either cycle. Consequently, the quantitative component was valued at zero. The Board proposed that Fannie Mae qualitative goals achievement percentage would be 80% for Cycle 19 and 95% for Cycle 20. The payout percentage is then calculated, as

noted above (0 + 80 divided by two, converted to a percentage), giving a total overall payout

percentage of 40% for Cycle 19 and 47.5% for Cycle 20. That percentage would be applied to all

eligible employees who participate in the PSP program. For Mr. Howard, for example, 40% of

his targeted PSP payment constitutes 11,265 shares. However, Mr. Howard was not employed at

Fannie Mae for the entire cycle, and his benefit is therefore reduced pro rata, making Fannie

Mae's proposed PSP benefit for him 7823 shares. Mr. Howard did not work at Fannie Mae for

18 months in Cycle 20, so he would be entitled to nothing in that period. For Mr. Raines, who

was contractually exempted from the 18 month requirement, his target for Cycle 19 was 107,505

shares, and his target for Cycle 20 was 99,967 shares. Multiplied by 40% and 47.5%,

respectively, and reduced for on a pro rata basis because Mr. Raines did not work at Fannie Mae

for either complete cycle, Mr. Raines' proposed combined PSP benefit is 58,812 shares. In its

review, OFHEO is determining whether Fannie Mae's performance in Cycles 19 and 20 is

consistent with the conclusion that the qualitative goals achievement percentage was 80% for

Cycle 19 and 95% for Cycle 20.

     10.    Both the Capital Restoration Plan and the Consent Agreement address efforts by

Fannie Mae to remediate unsafe and unsound conditions at the Enterprise that had caused

OFHEO to find that the Enterprise was significantly undercapitalized for years 2002, 2003, and

2004, years implicated in Cycles 19 and 20. 12 U.S.C. § 4614(a)(3).

     11.    As stated in Fannie Mae's annual compensation report to Congress dated June 30,

2005, stock incentives vest over a period of time and the valuation of stock grants and options

are estimated when granted even though they may never result in cash payments to the executive

officer: "Compensation components are valued at the time they are granted even though they

may never result in payments to the executive officer. . . . Actual cash payments under the stock-

based incentives depend upon Fannie Mae's stock price performance and whether the stock

incentives have vested.  Stock incentives vest over a period of time and, until such incentives have vested, have no value and cannot be converted to cash."

12.    The June 19, 2007 letter from James B. Lockhart, III to Stephen Ashley has been redacted to omit privileged or proprietary information.

13.    The Fannie Mae Capital Restoration Plan has been redacted to omit privileged or proprietary information.  The redacted information does not pertain to the issues raised in this lawsuit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 5th day of July 2007.

Patrick Lawler

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

J. TIMOTHY HOWARD,                              )
                                                )
                              Plaintiff,         )        No. 1:07-cv-01196 (RJL)
                                                )
              v.                                )               .
                                                )
OFFICE OF FEDERAL HOUSING                       )
ENTERPRISE OVERSIGHT, and                       )
JAMES B. LOCKHART, III,                         )
                                                )
                              Defendants.        )
_____          )

and

FRANKLIN D. RAINES,                             )
                                                )
                              Plaintiff,         )        No. 1:07-cv-01202 (RJL)
                                                )
              v.                                )
                                                )
OFFICE OF FEDERAL HOUSING                       )
ENTERPRISE OVERSIGHT, and                       )
JAMES B. LOCKHART, III,                         )
                                                )
                              Defendants.        )
_____          )

**DECLARATION OF CHARLOTTE A. REID**

I, **Charlotte A Reid**, hereby state as follows:

1.      I am employed as an Associate General Counsel at the Office of Federal Housing
Enterprise Oversight (OFHEO). I submit this declaration in support of the
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

2.      I know the following attached Exhibits to be true and correct copies, (selected Exhibits may have been redacted in accordance with the Trade Secrets and Deceptive Practices Act, or otherwise as noted below):

a.      Exhibit 1 is a letter dated December 15, 2004 from Leonard F. Reid, Jr., OFHEO Office of Supervision, to the Fannie Mae Board of Directors proposing to classify Fannie Mae as significantly undercapitalized.

b.      Exhibit 2 is a letter dated December 21, 2004 from Armando Falcon, Director of OFHEO, to the Fannie Mae Board of Directors classifying Fannie Mae as significantly undercapitalized.

c.      Exhibit 3 is a letter dated January 27, 2005 from Director Armando Falcon to Mr. Daniel Mudd, Interim CEO of Fannie Mae, requiring that the Capital Restoration Plan include a provision requiring approval by OFHEO of all non-salary payments. The Exhibit is redacted to exclude privileged or proprietary matters discussed therein.

d.      Exhibit 4 is a copy of relevant portions of Fannie Mae's Capital Restoration Plan, dated February 10, 2005. The Exhibit is redacted to exclude privileged or proprietary matters discussed therein.

e.      Exhibit 5 is a letter dated February 17, 2005, approving Fannie Mae's February 10, 2005, Capital Restoration Plan.  The Exhibit is redacted to exclude privileged or proprietary matters discussed therein.

f.      Exhibit 6 is a Fannie Mae Form 8-K, which was filed with the Securities and Exchange Commission on January 21, 2005, describing the Board's decision to defer consideration of PSP bonuses until reliable financial data was available.

g.      Exhibit 7 is the Stipulation and Consent to a Consent Order, executed by Fannie Mae and OFHEO on May 23, 2006, and Consent Order issued by OFHEO on May 23, 2006.

h.      Exhibit 8 is a redacted copy of a June 19, 2007, letter from Director James Lockhart, III., to Mr. Stephen Ashley, Chairman of the Board of Directors of Fannie Mae. The Exhibit is redacted to exclude privileged or proprietary matters discussed therein.

i.      Exhibit 9 is a Fannie Mae Form 8-K, which was filed with the Securities and Exchange Commission on January 26, 2007, stating Fannie Mae had received the requisite OFHEO approval for the setting of non-salary employee benefits.

j.      Exhibit 10 is a Fannie Mae Form 8-K, which was filed with the Securities and Exchange Commission on February 23, 2005, describing OFHEO working together with Fannie Mae to reach an agreement to return Fannie Mae to adequately capitalized.

k.      Exhibit 11 is a Fannie Mae Form 8-K, which was filed with the Securities and
Exchange Commission on March 11, 2005, describing restricted stock grants that were
approved in advance by OFHEO.

l.      Exhibit 12 is a letter dated December 21, 2004 from Ms. Ann M. Kappler, former
General Counsel of Fannie Mae, to Mr. Leonard F. Reid, Jr., stating that the Enterprise
did not object to the classification of Fannie Mae as "significantly undercapitalized."

m.      Exhibit 13 is a Fannie Mae Report on Compensation to Congress, dated June 30,
2005.


        I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 5, 2007.


                                        Charlotte A. Reid
                                        D.C. Bar No.  360414

# EXHIBIT

# 1



**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
*1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800*
*Office of the Capital Supervision*

December 16, 2004

Franklin D. Raines
Chairman of the Board and
 Chief Executive Officer
Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, DC  20016-2899

**Re: Preliminary Capital Classification at**
**September 30, 2004**

Dear Mr. Raines:

The Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "Safety and Soundness Act") at section 1364 requires that the Office of Federal Housing Enterprise Oversight (OFHEO) determine the capital classification of the Federal National Mortgage Association (Fannie Mae) not less than quarterly.  Consistent with section 1368 of the Safety and Soundness Act, OFHEO hereby provides Fannie Mae with this notice of proposed action to classify Fannie Mae as significantly undercapitalized at September 30, 2004.  This notification is in accordance with 12 CFR §1777.21, using the capital adequacy definitions as described in § 1777.20.

OFHEO's capital classification of Fannie Mae is based on financial information and the application of accounting policies currently under review by OFHEO.  Further, this capital classification is based upon a determination by the Securities and Exchange Commission (SEC) on December 15, 2004 that Fannie Mae inappropriately applied hedge accounting status to its derivatives.  As a result of the SEC's decision, the $9 billion estimate disclosed by Fannie Mae must be deducted from the core capital for September 30, 2004.

In making this proposed capital classification, OFHEO has reviewed Fannie Mae's minimum capital report for September 30, 2004 submitted October 29, 2004 and resubmitted November 18, 2004 and, Fannie Mae's published November 15, 2004 news release which provided an estimate of the impact of the reversal of hedge accounting treatment.  OFHEO has also incorporated into the proposed classification the uncertainties surrounding the potential impact of other accounting weaknesses still under review.  Relying on this information, OFHEO has calculated that Fannie Mae's core capital falls below the minimum capital requirement by $2.8 billion.  Fannie Mae does, however, meet the critical capital requirement with a remaining surplus after the $9 billion deduction of $12.6 billion.

OFHEO has also applied the risk-based capital (RBC) stress test specified in OFHEO regulations to the RBC Report data delivered by Fannie Mae on November 15, 2004 and resubmitted on November 18, 2004 and determined that Fannie Mae's total capital exceeds the required level.

The attachments summarize OFHEO's calculation of Fannie Mae's critical, minimum and risk-based capital level as of September 30, 2004, as adjusted for the SEC's decision.

Given the seriousness of the capital deficit, Fannie Mae needs to take prompt action to ensure that the deficit and the conditions that caused the deficit are quickly remedied. It is in the public interest for Fannie Mae to waive the 30-day response period for this proposed notice of classification, enabling OFHEO and Fannie Mae to move forward to address the weaknesses at Fannie Mae. Please send your acknowledgement of this notice of preliminary classification and, assuming you concur, your agreement with the proposed classification and concurrence with the waiver of the comment period to me or Mary L. Johnson of my staff.

Sincerely,

Leonard F. Reid, Jr.
Associate Director,
Office of Capital Supervision

Enclosures

cc:     Peter Niculescu

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**
**Minimum Capital Level**
**September 30, 2004**

<u>SUMMARY</u>

**(Dollars in millions)**

| COMPONENTS OF THE MINIMUM CAPITAL LEVEL | |
|---|---:|
| ON-BALANCE SHEET ASSETS | 25,209 |
| OFF-BALANCE SHEET OBLIGATIONS | |
| MBS and Equivalents | 6,194 |
| Commitments | 247 |
| OTHER OFF-BALANCE SHEET OBLIGATIONS | |
| Interest Rate and Foreign Exchange Rate Contracts | 121 |
| Other Off-Balance Sheet Obligations | 67 |
| MINIMUM CAPITAL LEVEL | 31,837 |
| CORE CAPITAL | 38,032 |
| FAS 133 IMPACT *(FNM estimate; Unaudited)* | (9,176) |
| SURPLUS/(DEFICIENCY) | (2,981) |

Note: Totals may not add due to rounding.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**
**Critical Capital Level**
**September 30, 2004**

**<u>SUMMARY</u>**

**(Dollars in millions)**

| COMPONENTS OF THE CRITICAL CAPITAL LEVEL | |
|---|---|
| ON-BALANCE SHEET ASSETS | 12,604 |
| OFF-BALANCE SHEET OBLIGATIONS | 3,683 |
| **CRITICAL CAPITAL LEVEL** | **16,287** |
| **CORE CAPITAL** | **38,032** |
| **FAS 133 IMPACT** *(FNM estimate; Unaudited)* | **(9,176)** |
| **SURPLUS/(DEFICIENCY)** | **12,569** |

Note: Totals may not add due to rounding.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**
**Risk-Based Capital Level**
**September 30, 2004**

**SUMMARY**

(Dollars in millions)

| STRESS TEST SCENARIO RESULTS | |
|---|---:|
| UP-RATE SCENARIO | 13,026 |
| DOWN-RATE SCENARIO | 18,342 |
| **RISK-BASED CAPITAL LEVEL** | **18,342** |
| TOTAL CAPITAL | 38,762 |
| SURPLUS/(DEFICIENCY) | **20,420** |

Note: Totals may not add due to rounding.

# EXHIBIT

# 2



**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
*1700 G STREET NW WASHINGTON, D.C. 20552 (202) 414-3800*

December 21, 2004

Board of Directors
Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, D.C. 20016

Re: Capital Classification at September 30, 2004

Dear Members of the Board:

In accordance with section 1364 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 and section 1777.21(a) of title 12 of the Code of Federal Regulations, the Office of Federal Housing Enterprise Oversight (OFHEO) is required to determine the capital level and classification of the Federal National Mortgage Association (Fannie Mae) not less than quarterly. Consistent with 12 CFR § 1777.21(a)(3), OFHEO hereby provides this notice of final capital classification classifying Fannie Mae as significantly undercapitalized at September 30, 2004. Fannie Mae's capital calculation is based on financial information and the application of accounting policies currently under review by OFHEO. The outcome of the review may result in a restatement of prior period results and a revision of the respective capital calculations.

On December 16, 2004, OFHEO issued a notice of proposed action indicating its intention to classify Fannie Mae as significantly undercapitalized at September 30, 2004 and requesting that Fannie Mae notify OFHEO of its agreement to waive the 30-day comment period and accept the classification as soon as practicable given the seriousness of the classification. Fannie Mae provided OFHEO with this waiver on December 21, 2004.

After consideration of the information provided by Fannie Mae, OFHEO has determined it is appropriate to issue this final letter of capital classification. This letter, therefore, constitutes the required written notice of final capital classification. Fannie Mae is classified as significantly undercapitalized at September 30, 2004.

By statute, Fannie Mae must produce a capital restoration plan. Such plan shall address, in light of the downgrade to significantly undercapitalized, the restoration of capital to receive a classification of adequately capitalized including a thirty percent targeted surplus. Such plan shall address all potential strategies, including the use of equity and other approaches. Within ten days, Fannie Mae must submit the capital restoration proposal for OFHEO review and approval.

Also, by statute, Fannie Mae shall make no capital distribution that would result in Fannie Mae being reclassified as critically undercapitalized. Fannie Mae shall make no capital distribution unless OFHEO specifically approves that distribution in writing upon a showing by Fannie Mae that the distribution will enhance the ability of Fannie Mae to meet and maintain its required capital

requirements, will contribute to the long term financial safety and soundness of the Enterprise or is otherwise in the public interest.

Additionally, Fannie Mae should be aware that— in addition to limits on dividend payments or other capital distributions (with OFHEO approval for issuance of payments or dividends)— the reclassification to significantly undercapitalized, by statute, may lead to structural changes, restrictions on growth (including reduction of assets) as well as OFHEO directives to terminate or modify any business activities that pose excessive risk. Non-cooperation may trigger a further reclassification or other enforcement actions.

Based on information provided by Fannie Mae, the Enterprise fails to meet the minimum capital requirement. The attached enclosures illustrate Fannie Mae's position as of September 30, 2004. In particular, Fannie Mae's minimum capital requirement was $31.837 billion, its critical capital level was $16.287 billion, and its risk-based capital level was $18.342 billion at September 30, 2004. Thus, Fannie Mae's core capital— after adjustment for the estimated $9.176 FAS 133 cumulative impact— was $28.856 billion on that date reflecting a deficit of $2.981 billion from the minimum requirement and excess of $12.569 billion over the critical level. Fannie Mae's total capital of $38.762 billion on that date exceeded the risk-based capital requirement by $20.420 billion.

Sincerely,

Armando Falcon, Jr.
Director

Enclosures

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**
**Minimum Capital Level**
**September 30, 2004**

<u>SUMMARY</u>

**(Dollars in millions)**

| | |
|---|---:|
| **COMPONENTS OF THE MINIMUM CAPITAL LEVEL** | |
| **ON-BALANCE SHEET ASSETS** | 25,209 |
| **OFF-BALANCE SHEET OBLIGATIONS** | |
| MBS and Equivalents | 6,194 |
| Commitments | 247 |
| **OTHER OFF-BALANCE SHEET OBLIGATIONS** | |
| Interest Rate and Foreign Exchange Rate Contracts | 121 |
| Other Off-Balance Sheet Obligations | 67 |
| **MINIMUM CAPITAL LEVEL** | 31,837 |
| **CORE CAPITAL** | 38,032 |
| **FAS 133 IMPACT** *(FNM estimate; Unaudited)* | (9,176) |
| **SURPLUS/(DEFICIENCY)** | **(2,981)** |

Note: Totals may not add due to rounding.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**
Critical Capital Level
September 30, 2004

<u>SUMMARY</u>

(Dollars in millions)

| COMPONENTS OF THE CRITICAL CAPITAL LEVEL | |
|---|---:|
| ON-BALANCE SHEET ASSETS | 12,604 |
| OFF-BALANCE SHEET OBLIGATIONS | 3,683 |
| CRITICAL CAPITAL LEVEL | 16,287 |
| CORE CAPITAL | 38,032 |
| FAS 133 IMPACT *(FNM estimate; Unaudited)* | (9,176) |
| SURPLUS/(DEFICIENCY) | 12,569 |

Note:  Totals may not add due to rounding.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION**
**Risk-Based Capital Level**
**September 30, 2004**

**SUMMARY**

(Dollars in millions)

| | |
|---|---:|
| **STRESS TEST SCENARIO RESULTS** | |
| UP-RATE SCENARIO | 13,026 |
| DOWN-RATE SCENARIO | 18,342 |
| **RISK-BASED CAPITAL LEVEL** | **18,342** |
| **TOTAL CAPITAL** | **38,762** |
| **SURPLUS/(DEFICIENCY)** | **20,420** |

Note: Totals may not add due to rounding.

# EXHIBIT

# 3



**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800
*Office of the Director*

January 27, 2005

Mr. Daniel H. Mudd
Interim Chief Executive Officer
Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, D.C.  20016

Dear Mr. Mudd:

This letter communicates OFHEO's conclusion, pursuant to 12 U.S.C. 4622(c) and 12 CFR 1777.23(d), regarding Fannie Mae's capital restoration plan submitted on December 30, 2004 as required by the December 21, 2004 capital classification of Fannie Mae by OFHEO as significantly undercapitalized.

OFHEO has reviewed the plan, discussed various aspects of the plan with Fannie Mae staff, and assessed the content and acceptability of the plan. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, prior to accepting the plan
OFHEO requires several changes and additional enhancements to the plan.

Within 10 business days, Fannie Mae should submit to OFHEO a revised plan which incorporates the following changes:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- Fannie Mae must seek prior approval from OFHEO for all payment of bonuses or other non-salary cash or stock-based awards.
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



When the capital restoration plan is re-submitted to OFHEO incorporating the changes above, the plan must be certified as required under 12 CFR 1777.23(b)(2). This includes a declaration by the CEO, treasurer, or other officer designated by the Board of Directors of the Enterprise "...

that the material contained in the plan is true and correct to the best of such officer's knowledge and belief."

OFHEO would also like to engage in a discussion with Fannie Mae regarding the confidentiality and public disclosure of either aspects or additional details of the capital restoration plan. OFHEO recognizes the need to keep the public apprised of Fannie Mae's capital restoration efforts without disclosing proprietary information. Likewise, OFHEO recognizes Fannie Mae's need to discuss certain information with rating agencies. A discussion and agreement will benefit all parties.

If you have further questions, please contact Leonard Reid at (202) 414-3754.

Sincerely,

Armando Falcon
Director

cc: Michael Williams
Peter Niculescu
Robert Levin
Stephen Blumenthal
Leonard Reid
Alfred Pollard

# EXHIBIT

# 4



# Fannie Mae Capital Restoration Plan

### Submitted to:

## The Office of Federal Housing Enterprise Oversight

### February 10, 2005

**CONFIDENTIAL AND PROPRIETARY**
**CONFIDENTIAL TREATMENT REQUESTED**
**BY FANNIE MAE**

05.0284

**DECLARATION**

I declare that the material contained in the Capital Restoration Plan submitted to the Director of the Office of Federal Housing Enterprise Oversight in response to the letter of the Director of January 27, 2005, is true and correct to the best of my knowledge and belief.

In making this declaration, I note that, as previously announced, Fannie Mae must restate its financial statements for periods from January 1, 2001, through June 30, 2004, due to its misapplication of FAS 133 and FAS 91. The numbers contained in this Capital Restoration Plan reflect management's best estimate at this time of the financial impact of the restatement. The restatement process may result in additional adjustments, perhaps material adjustments, to prior and current period financial results that are not reflected in the Capital Restoration Plan.


_Linda K. Knight_
Linda K. Knight
Senior Vice President & Treasurer

Date:

**CONFIDENTIAL AND PROPRIETARY**
**CONFIDENTIAL TREATMENT REQUESTED**
**BY FANNIE MAE**

2

05.0284

**Capital Restoration Plan Summary**

On December 21, 2004, the Office of Federal Housing Enterprise Oversight (OFHEO) classified Fannie Mae as significantly undercapitalized as of September 30, 2004. The agency directed the company to submit a capital restoration plan that would (a) achieve the company's minimum capital requirements; and (b) provide for a 30 percent capital surplus by September 30, 2005. Pursuant to OFHEO's directive, Fannie Mae has submitted this proposed Capital Restoration Plan ("the Plan") for the agency's review.

The Board of Directors and management of Fannie Mae appreciate the assistance of OFHEO in developing the submitted Plan. Fannie Mae is committed to work closely and cooperatively with OFHEO to make any necessary changes to the Plan, and once approved, to keep the agency informed and up to date as we take actions to implement the Plan. We will seek OFHEO's input and approval at the earliest stages possible for such actions under the Plan, as well as any additional or contingency actions that may be needed. More broadly, Fannie Mae will keep OFHEO apprised of all significant business actions and changes in market conditions that might affect the company's capital position.

Fannie Mae is committed to building and maintaining a strong and productive relationship with OFHEO. The agency's mandate that Fannie Mae restore its capital, restate its financial results and strengthen its financial and accounting organization will help the company to restore public confidence and trust in its internal controls and accounting practices. Public confidence is crucial to Fannie Mae's ability to achieve its affordable housing mission.



**CONFIDENTIAL AND PROPRIETARY**
**CONFIDENTIAL TREATMENT REQUESTED**
**BY FANNIE MAE**

3

05.0284



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

4

**Cost-cutting actions**

 Cost-cutting actions began in January with the nonpayment of 2004 non-salary cash awards for the top 43 senior managers. As OFHEO has directed, Fannie Mae also has committed to seek the agency's prior approval for all payment of bonuses or other non-salary compensation awards for executive officers.

CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284

5



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

6

05.0284



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284

7



Cost-cutting actions began in January with the nonpayment of 2004 non-salary cash awards to the top 43 senior officers. Under the Plan, Fannie Mae will now seek approval from OFHEO before making any non-salary compensation awards to this group of executive officers.

CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

8

05.0284



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284





CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284

10



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

11

05.0284



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284

13





**CONFIDENTIAL AND PROPRIETARY**
**CONFIDENTIAL TREATMENT REQUESTED**
**BY FANNIE MAE**

05.0284

14



Fannie Mae welcomes OFHEO's full oversight on all aspects of the Plan's implementation. Toward that end, the company has committed to both formal and informal weekly, monthly and quarterly reporting mechanisms. Regulatory concurrence will be sought prior to any relevant management action. It is hoped the envisioned process of ongoing dialogue and review helps build a strong and productive working relationship that extends well beyond the Plan's attainment. Recognized effective OFHEO oversight is a key ingredient in both the restoration and maintenance of public and investor confidence in Fannie Mae's safety and soundness going forward.

CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284

15



CONFIDENTIAL AND PROPRIETARY
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284

16



PROPRIETARY AND CONFIDENTIAL
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.0284



PROPRIETARY AND CONFIDENTIAL
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

18



PROPRIETARY AND CONFIDENTIAL
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

05.02284



PROPRIETARY AND CONFIDENTIAL
CONFIDENTIAL TREATMENT REQUESTED
BY FANNIE MAE

# EXHIBIT

# 5



# OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT
### 1700 G STREET NW WASHINGTON DC 20552 (202) 414-3801

*OFFICE OF THE DIRECTOR*

February 17, 2005

Mr. Daniel H. Mudd
Interim Chief Executive Officer
Federal National Mortgage Association
3900 Wisconsin Avenue, NW
Washington, D.C. 20016

Dear Mr. Mudd:

This letter communicates OFHEO's approval, pursuant to 12 U.S.C. 4622(c) and 12 CFR 1777.23(d), of Fannie Mae's capital restoration plan submitted on February 10, 2005 as required by OFHEO's letter to you dated January 27, 2005.

OFHEO approves the capital restoration plan proposed by Fannie Mae as submitted on February 10, 2005. OFHEO believes Fannie Mae has made a good faith effort to put forth a plan to both restore capital to above minimum required levels and work towards the 30% required surplus. Your commitment to work with OFHEO throughout this process is acknowledged. This type of open and ongoing communication will help to ensure capital is restored to acceptable levels as soon as practical.



OFHEO and Fannie Mae have also met to discuss the appropriateness of public disclosure of the capital restoration plan. OFHEO believes it is in the best public interest to disclose OFHEO's acceptance of your capital restoration plan, including the September 30, 2005 deadline for achieving 30%. Fannie Mae will share with OFHEO prior to disclosure any planned public discussion of the capital restoration plan, including drafts of 8-K filings. Fannie Mae, in the normal course of business, may also discuss appropriate details of the plan with rating agencies.

If you have further questions, please contact Leonard Reid at (202) 414-3754.

Sincerely,

Stephen Blumenthal
Deputy Director

cc: Michael Williams
Peter Niculescu
Robert Levin
Stephen Blumenthal
Leonard Reid
Alfred Pollard

# EXHIBIT

# 6



# FORM 8-K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE - FNM

**Filed: January 21, 2005 (period: January 17, 2005)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 1.01.** Entry into a Material Definitive Agreement.

**Item 5.02.** Departure of Directors or Principal Officers; Election of Directors; Appointment of Princ

**Item 9.01.** Financial Statements and Exhibits.

SIGNATURES
Exhibit Index
EX-3.1 (EX-3.1)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):                    January 17, 2005

# Federal National Mortgage Association

(Exact name of registrant as specified in its charter)

| Federally Chartered Corporation | 000-50231 | 52-0883107 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 3900 Wisconsin Avenue, NW, Washington, District of Columbia | 20016 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:                    202-752-7000

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Top of the Form**

**Item 1.01. Entry into a Material Definitive Agreement.**

Senior Management Compensation

On January 17, 2005 and January 18, 2005, the Compensation Committee and the Board of Directors of Fannie Mae (formally, the Federal National Mortgage Association) determined that for 2004 no cash bonuses would be paid to the company's executive officers or senior vice presidents under the company's Annual Incentive Plan or otherwise.

The Compensation Committee and the Board also determined to defer certain actions under Fannie Mae's performance share program until Fannie Mae has reliable financial data for prior fiscal years. Under the program, each year members of senior management become entitled to receive shares of common stock in an amount based upon and subject to Fannie Mae's meeting corporate performance objectives over a three–year period. These objectives are based on both financial and non–financial goals, equally weighted. The financial goals under the performance share program are currently tied to growth in core business earnings per share. Generally, the Compensation Committee determines in January of the year following completion of the cycle the number of shares of common stock each awardee is entitled to receive, and the shares are paid out in two annual installments beginning that January. Accordingly, in January 2004 awardees received 50% of the shares they were determined to be entitled to receive for the three–year performance cycle ended December 31, 2003, and the remaining shares were expected to be paid in January 2005.

As previously announced, Fannie Mae will restate its previously issued financial statements and re–evaluate previously issued non–GAAP financial information, including core business earnings. The Board and Compensation Committee have determined to defer consideration of the impact of Fannie Mae's restatement and re–evaluation on both unpaid performance shares and the performance share cycle completed on December 31, 2004 until reliable financial data for the relevant periods are available.

The Board and Compensation Committee also established base salaries for executive officers. The executive officers named below represent the six executive officers of Fannie Mae as of December 31, 2004 who received the highest compensation for 2004. Presented below are the 2005 and 2004 annual salaries for such officers:

Daniel H. Mudd, Vice Chairman and interim Chief Executive Officer, $746,209 and $746,209. (The Compensation Committee and the independent directors will consider Mr. Mudd's 2005 salary at the February Board meeting in light of his new duties as interim Chief Executive Officer.)

Robert J. Levin, Executive Vice President and interim Chief Financial Officer, $675,000 and $592,250. (Mr. Levin will receive the 2005 salary rate as long as he serves as interim Chief Financial Officer.)

Thomas E. Donilon, Executive Vice President—Law and Policy and Secretary to the Board, $669,760 and $644,000.

Louis W. Hoyes, Executive Vice President, Single–Family Mortgage Business, $540,800 and $520,000.

Julie St. John, Executive Vice President and Chief Information Officer, $516,724 and $496,850.

Michael J. Williams, President—Fannie Mae e–Business, $516,724 and $496,850.


Compensation and Duties of Non–Executive Chairman of the Board

On January 18, 2005, the Board of Directors of Fannie Mae approved a new compensation arrangement for the non–executive Chairman of the Board, Stephen B. Ashley, in recognition of the substantial amount of time and effort Mr. Ashley is expected to spend fulfilling the duties and responsibilities of non–executive Chairman of the Board of Directors. Prior to Mr. Ashley's becoming non–executive Chairman on December 21, 2004, the Chairman of the Board of Directors had been the company's Chief Executive Officer.

As Non–Executive Chairman, Mr. Ashley is expected to
– provide leadership to the Board of Directors,
– provide for the proper flow of information to and from the Board,
– oversee closely management's implementation of the strategies and actions adopted by the Board,
– assist and advise the chief executive officer,
– assist in promoting effective relations between the company and external stakeholders, and
– promote the highest standards of ethical conduct and integrity by the company and its employees.

Fannie Mae's non–management directors each receive an annual retainer of $35,000, and a $1,500 fee for each board or board committee meeting attended. Committee chairmen receive an additional annual retainer of $10,000, plus an additional $500 for each in–person committee meeting chaired and $300 for each telephone committee meeting chaired. Non–management directors also receive compensation in the form of stock options and restricted stock, as described in Fannie Mae's 2004 proxy statement.

Under the new arrangement, Mr. Ashley will not receive the annual cash retainer and fees for each meeting attended or chaired. In lieu thereof, Mr. Ashley will receive an annual fee of $500,000. Mr. Ashley's equity compensation remains unchanged.


**Item 5.02. Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

On January 17, 2005, Leanne G. Spencer, Fannie Mae's principal accounting officer, stepped down as Fannie Mae's Senior Vice President and Controller effective January 31, 2005. Under the terms of an agreement with Fannie Mae, Ms. Spencer will continue her employment with Fannie Mae in a non–officer capacity as Special Advisor to Michael Williams until January 31, 2006 or, if earlier, Ms. Spencer's resignation, employment by another employer, death, disability, or termination for cause. In her role as Special Advisor, Ms. Spencer will perform such duties and assignments as are assigned to her by Mr. Williams. As Special Advisor, Ms. Spencer will be entitled to continuation of her salary, benefits and plan coverage.

Source: FEDERAL NATIONAL MOR, 8-K, January 21, 2005

On January 18, 2005, the company appointed David C. Hisey Senior Vice President and Controller effective February 1, 2005. As Controller, Mr. Hisey will be Fannie Mae's principal accounting officer. Mr. Hisey, 44, has been Fannie Mae's Senior Vice President, Financial Controls and Operations since January 3, 2005. Prior to joining Fannie Mae, Mr. Hisey was Managing Director and practice leader of the Lending and Leasing Group and Vice President of Financial Services Consulting at BearingPoint, Inc. (formerly known as KPMG Consulting, Inc., which acquired KPMG LLP's consulting practice in 2000), a management consulting and systems integration company. Prior to joining BearingPoint in 2000, Mr. Hisey was a partner with KPMG LLP. As an audit partner with KPMG LLP, he consulted on lending and capital markets matters including risk management, finance and regulatory advisory, business strategy, operations improvement, technology, securitization, performance measurement, and mergers and acquisitions, and conducted financial statement audits. While at KPMG LLP, Mr. Hisey was not engaged on the Fannie Mae financial statement audit. Mr. Hisey is a Certified Public Accountant. Compensation arrangements for Mr. Hisey will be determined annually by the Compensation Committee of Fannie Mae's Board of Directors. Under the terms of his employment arrangement with Fannie Mae, Mr. Hisey currently receives a base salary of $275,000 per year. Under his employment arrangement, Mr. Hisey received (1) 7,500 shares of restricted stock, subject to vesting in equal annual installments over three years, and (2) options to purchase 10,000 shares of Fannie Mae common stock at a price equal to the fair market value of the stock on the date of grant. The options vest in four equal annual installments beginning on the first anniversary of their grant date. Mr. Hisey also received a bonus of $150,000 upon starting employment with Fannie Mae and is entitled to receive an additional bonus of $100,000 at the beginning of July 2005 subject to his satisfactory performance. If Mr. Hisey decides to terminate his employment prior to January 3, 2006, he is required to return these bonuses to Fannie Mae. If Fannie Mae terminates his employment before such date without cause, then Mr. Hisey's 7,500 shares of common stock will become fully vested. Mr. Hisey is also eligible to participate in the Annual Incentive Plan and to receive variable long–term incentive awards, and to participate in Fannie Mae's other compensation and benefits programs that are available to Fannie Mae senior vice presidents generally.

**Item 5.03. Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

On January 19, 2005, the Board of Directors of Fannie Mae approved an amendment to Fannie Mae's bylaws to eliminate the requirement that the Chairman of the Board of Directors of Fannie Mae also be its Chief Executive Officer. The amended bylaws provide that the Chairman of the Board of Directors may, but need not, be the Chief Executive Officer of the company. In light of the elimination of the requirement that the Chairman be the company s Chief Executive Officer, the amendment also modified the Chairman s duties established under the bylaws and eliminated provisions relating to (1) the Chairman s authority over the manner in which the company s business is conducted, (2) the Chairman or his delegee s authority to appoint officers and agents of the company and (3) the role of the Vice Chairman and Chief Operating Officer during the Chairman's absence or inability to act. Since December 21, 2004, Stephen Ashley has served as non–executive Chairman of Fannie Mae, and Daniel Mudd has served as interim Chief Executive Officer. A copy of the company's amended bylaws, marked in Section 4.08 to show the amendment, is filed with this report as Exhibit 3.1.

**Item 9.01. Financial Statements and Exhibits.**

The exhibit index filed herewith is incorporated herein by reference.

Top of the Form

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Federal National Mortgage Association

*January 21, 2005*

By:     *Ann M. Kappler*

        *Name: Ann M. Kappler*
        *Title: Executive Vice President and General Counsel*

Exhibit Index

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Fannie Mae Bylaws, as of January 19, 2005 |

**FANNIE MAE BYLAWS**

**As amended through [Deleted: July 15, 2003]January 19, 2005**

1

Source: FEDERAL NATIONAL MOR, 8-K, January 21, 2005

**Article 1: General Provisions**

**Section 1.01.** *Name.* The name of the corporation is Federal National Mortgage Association. The corporation may also do business under the name Fannie Mae.

**Section 1.02.** *Principal Office and Other Offices.* The principal office of the corporation shall be in the District of Columbia. Other offices of the corporation shall be in such places as may be deemed by the Board of Directors or the Chairman of the Board to be necessary or appropriate.

**Section 1.03.** *Seal.* The seal of the corporation shall be of such design as shall be approved and adopted from time to time by the Board of Directors, and the seal or a facsimile thereof may be affixed by any person authorized by the Board of Directors or these Bylaws by impression, by printing, by rubber stamp, or otherwise.

**Section 1.04.** *Fiscal Year.* The fiscal year of the corporation shall end on the 31st day of December of each year.

**Section 1.05.** *Corporate Governance Practices and Procedures.* Pursuant to Section 1710.10(b) of the Office of Federal Housing Enterprise Oversight ("OFHEO") corporate governance regulation, 12 CFR 1710.1 et seq., to the extent not inconsistent with the Charter Act and other Federal law, rules, and regulations, the corporation has elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law, as the same may be amended from time to time. The inclusion of provisions in these Bylaws shall constitute inclusion in the corporation's "certificate of incorporation" for all purposes of the Delaware General Corporation Law.

**Article 2: Capital Stock**

**Section 2.01.** *Common Stock.* The common stock, all of which is voting and has no par value, shall have a stated value per share as determined from time to time by the Board of Directors. Shares of the corporation may be acquired and held in the treasury of the corporation, and may be disposed of by the corporation for such consideration and for such purposes as may be determined from time to time by the Board of Directors.

**Section 2.02.** *Preferred Stock.* The corporation shall have authority to issue up to 200,000,000 shares of preferred stock having no par value. The preferred stock may be issued from time to time in one or more series upon approval by the Board of Directors, or a committee thereof appointed for such purpose, and the Board of Directors or such committee may, by resolution providing for the issuance of such preferred stock, designate with respect to such shares: (a) their voting powers; (b) their rights of redemption; (c) their right to receive dividends (which may be cumulative or non–cumulative) including the dividend rate or rates, conditions to payment, and the relative preferences in relation to the dividends payable on any other class or classes or series of stock; (d) their rights upon the dissolution of, or upon any distribution of the assets of, the corporation; (e) their rights to convert into, or exchange for, shares of any other class or classes of stock of the corporation, including the price or prices or the rate of exchange; and (f) other relative, participating, optional or special rights, qualifications, limitations or restrictions. Notwithstanding Sections 4.12(a)(6) and 4.15 of these Bylaws, the Board of Directors may authorize a committee of the Board to declare dividends on preferred stock.

**Section 2.03.** *Payment for Shares.* The consideration to be received by the corporation for the issuance of common shares shall be fixed from time to time by the Board of Directors. A subscriber shall be entitled to issuance of shares upon receipt by the corporation of the consideration for which the shares are to be issued. No certificates shall be issued for any share until the share is fully paid, and, when issued, such shares shall be nonassessable.

**Section 2.04.** *Certificates Representing Shares.* Each registered holder of the capital stock of the corporation shall be entitled to a certificate or certificates signed by the Chairman of the Board of Directors or the President and by the Secretary or an Assistant Secretary of the corporation, and sealed with the seal of the corporation certifying the number of shares owned by him in the corporation. The certificates shall be in such form as the Board, from time to time, may approve. If any certificate is manually signed (i) by a transfer agent other than the corporation or its employee, or (ii) by a registrar other than the corporation or its employee, any other signature on the certificate, including those of the aforesaid officers of the corporation, may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

**Section 2.05.** *Transfers of Stock.* Transfers of stock shall be made upon the books of the corporation (i) upon presentation of the certificates by the registered holder in person or by duly authorized attorney, or (ii) upon presentation of proper evidence of succession, assignment or authority to transfer the stock, and upon surrender of the appropriate certificate(s).

**Section 2.06.** *Holder of Record.* The corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof and accordingly shall not be bound to recognize any equitable or other claim to or interest in such share on the part of any other person whether or not it shall have express or other notice thereof, save as expressly provided by the laws of the State of Delaware insofar as they are applicable to the stock of stock corporations organized under the Delaware General Corporation Law.

**Section 2.07.** *Loss or Destruction of Certificate of Stock.* In case of loss or destruction of any certificate of stock, another may be issued in its place, pursuant to such requirements and procedures as may be established by the Secretary of the corporation with the concurrence of the General Counsel (including, without limitation, requiring provision of a surety bond).

**Section 2.08.** *Stockholder Records.*

(a) The corporation shall keep at its principal place of business, or at the office of its transfer agent or registrar, a record of its stockholders, giving the names and addresses of all stockholders and the number of shares held by each.

(b) The officer who has charge of the stock ledger of the corporation shall prepare and make, at least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at said meeting, arranged in alphabetical order, showing the address of and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, for a period of at least 10 days prior to the meeting, during ordinary business hours, at the principal place of business of the corporation or as may otherwise be permitted by the Delaware General Corporation Law. The list shall be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present.

**Section 2.09.** *Registration of Common Stock.* The corporation shall register its common stock with the Securities and Exchange Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended, and shall take appropriate steps to maintain such registration. Notwithstanding anything to the contrary contained in Article 7 of these Bylaws, this Section 2.09 may be altered, amended, or repealed only by the unanimous vote or consent of all the then incumbent Members of the Board then in office.

### Article 3: The Stockholders

**Section 3.01.** *Place of Meetings.* Meetings of the stockholders of the corporation shall be held at such place or places, within or without the District of Columbia, as shall be determined by the Board of Directors; and the Chairman of the Board shall preside at all such meetings.

**Section 3.02.** *Annual Meeting.* The annual meeting of the stockholders shall be held at ten o'clock in the morning of the third Thursday in May of each year, if that day is not a legal holiday, and if a holiday, then on the first following day that is not a legal holiday. If any annual meeting is not held at the designated time, the meeting shall be held as promptly as practicable thereafter at a time to be determined by the Board of Directors.

**Section 3.03.** *Special Meetings.* Special meetings of the stockholders may be called by the Board of Directors or the Chairman of the Board, or at the request of the holders of not less than one–third of all the shares entitled to vote, to be determined as of the close of the first day of the month preceding the month in which the request is presented to the Secretary. Business transacted at all special meetings shall be confined to the subjects stated in the notice of special meeting.

**Section 3.04.** *Notice of Meetings — Waiver and Adjourned Meetings.* Written notice stating the place, date and hour of the meeting, and the purpose or purposes for which the meeting is called, shall be delivered not less than 20, nor more than 55, days before the date of the meeting, by the Secretary of the corporation, to each registered holder entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the registered holder at his address as it appears on the stock transfer books of the corporation, with first class postage prepaid. Waiver by a stockholder in writing of notice of a stockholders' meeting, signed by him either before or after the time of the meeting, shall be equivalent to the giving of such notice. Attendance by a stockholder at a stockholders' meeting, whether in person or by proxy, without objection to the notice or lack thereof, shall constitute a waiver of notice of the meeting. Any meeting of stockholders may be adjourned by the chair of the meeting to reconvene at another time or place. When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

**Section 3.05.** *Fixing Record Date.*

(a) For the purpose of determining stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a date as the record date. Such date, in any case, shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and shall be not more than 55 days before the date of the meeting, by the Secretary of the corporation, nor less than 20 days prior to the date of such meeting. If no such record date is fixed, the close of business on the day next preceding the day on which notice is given, or, if notice is waived, the close of business on the day next preceding the date on which the meeting is held shall be the record date for the determination of stockholders entitled to notice of or to vote at a meeting of stockholders. When a determination of stockholders entitled to vote at any meeting of stockholders has been made, as provided in this section, the determination shall apply to any adjournment thereof, provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b) For the purpose of determining stockholders entitled to receive payment of any dividend, or in order to make a determination of stockholders for any other purpose (except as provided in Section 3.05(a)), the Board of Directors or a duly authorized Committee thereof may fix a date as the record date. Such date, in any case, shall not precede the date upon which the resolution fixing the record date is adopted and shall be not more than 55 days prior to the date on which the particular action is to be taken. If no such record date is fixed, the close of business on the day on which the resolution relating thereto is adopted shall be the record date for the determination of stockholders.

**Section 3.06.** *Quorum.* A majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders. The stockholders present at a duly organized meeting may continue to do business until adjournment, notwithstanding the withdrawal of the holders of enough shares to leave less than a quorum. If a meeting cannot be organized because a quorum has not attended, either the chair of the meeting, or those stockholders present, in person or by proxy, by a majority of the votes cast by such stockholders so present, may adjourn the meeting from time to time until a quorum is present when any business may be transacted that may have been transacted at the meeting as originally called.

**Section 3.07.** *Proxies.* A stockholder may vote either in person or by proxy executed in writing by the stockholder or his duly authorized representative. No proxy shall be valid after 11 months from the date of its execution, unless otherwise expressly provided in the proxy.

**Section 3.08.** *Voting.* At every meeting of the stockholders, every holder of the common stock shall be entitled to one vote for each share of common stock registered in the name of such holder on the stock transfer books of the corporation at the close of the record date. A proxy purporting to be executed by a corporation shall be presumed to be valid and the burden of proving invalidity shall rest on any challenger. A proxy purporting to be executed by a partnership shall be presumed to be valid and the burden of proving invalidity shall rest on any challenger. At each election for Members of the Board of Directors, every such holder of the common stock shall have the right to cast, for each Board position to be filled, a number of votes equal to the number of shares held by such holder. Such holders shall have no right to cumulate their votes for directors. Unless a higher percentage of affirmative votes is required by the Charter Act, these Bylaws, applicable stock exchange rules or regulations, or other applicable Federal law, rules, or regulations, the stockholders will have approved any matter if, at a meeting at which a quorum is present, the votes cast by the stockholders present, either in person or by proxy and entitled to vote thereon, in favor of such matter exceed the votes cast by such stockholders against such matter. Members of the Board of Directors shall be elected by a plurality of the votes cast.

**Section 3.09.** *Inspectors of Votes.* The Board of Directors, in advance of any meeting of stockholders, shall appoint one or more Inspectors of Votes to act at the meeting or any adjournment thereof and make a written report thereof. One or more persons may be designated as alternates to replace any Inspector of Votes who fails to act. In case any person so appointed Inspector of Votes or alternate resigns or fails to act, the vacancy shall be filled by appointment made by the chairman of the meeting. The Inspectors of Votes shall (a) ascertain the number of shares outstanding and the voting power of each and determine all questions concerning the qualification of voters; (b) determine the shares represented at the meeting and the validity of proxies and ballots; (c) determine all questions concerning the acceptance or rejection of votes and, with respect to each vote by ballot, shall collect and count all votes and ballots; (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the Inspectors of Votes; and (e) report in writing to the secretary of the meeting their determination of the number of shares represented at the meeting, and their count of all votes and ballots. The Inspectors of Votes need not be stockholders of the corporation. No person who is an officer or Member of the Board of Directors of the corporation, or who is a candidate for election as a Member of the Board of Directors, shall be eligible to be an Inspector of Votes. Any report or certificate by the Inspectors of Votes shall be prima facie evidence of the facts stated and of the votes as certified by them.

**Section 3.10.** *Stockholder Notices to the Corporation.* Whenever notice is to be given to the corporation by a stockholder under any provision of law or of these Bylaws, such notice shall be delivered to the Secretary at the principal executive offices of the corporation. If delivered by electronic mail or facsimile, the stockholder's notice shall be directed to the Secretary at the electronic mail address or facsimile number, as the case may be, specified in the corporation's most recent proxy statement.

**Section 3.11.** *Conduct of Meetings.* The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at such meeting by the person presiding over the meeting. The Board of Directors may adopt by resolution such rules or regulations for the conduct of meetings of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chair of any meeting of stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chair of the meeting, may include, without limitation, the following: (a) the establishment of an agenda or order of business for the meeting; (b) rules and procedures for maintaining order at the meeting and the safety of those present; (c) limitations on attendance at or participation in the meeting to stockholders of record of the corporation, their duly authorized and constituted proxies, or such other persons as the chair shall permit; (d) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (e) limitations on the time allotted to questions or comments by participants. Meetings of stockholders shall not be required to be held in accordance with rules of parliamentary procedure.

**Section 3.12.** *Notice of Stockholder Proposal.* At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors; (b) otherwise properly brought before the meeting by or at the direction of the Board of Directors; or (c) otherwise properly brought before the meeting by a stockholder. For business to be properly brought before an annual meeting by a stockholder (other than the nomination of a person for election as a director, which is governed by Section 4.19 of these Bylaws), the stockholder must have given timely notice thereof in writing to the Secretary of the corporation. To be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the corporation not later than the following dates (1) 60 days in advance of such meeting if such meeting is to be held on a day that is within 30 days preceding the anniversary of the previous year's annual meeting, or 90 days in advance of such meeting if such meeting is to be held on or after the anniversary of the previous year's annual meeting; and (2) with respect to an annual meeting of stockholders held on any other date, the close of business on the 10th day following the date of public disclosure of the date of such meeting. (For purposes of these Bylaws, public disclosure shall be deemed to include a disclosure made in a press

release reported by the Dow Jones News Services, Associated Press or a comparable national news service or in a document filed by the corporation with the Securities and Exchange Commission pursuant to Section 13 of the Securities Exchange Act of 1934, as amended.) A stockholder's notice to the Secretary shall set forth as to each matter the stockholder proposes to bring before the annual meeting (A) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting; (B) the name and address, as they appear on the corporation's books, of the stockholder proposing such business; (C) the class and number of shares of the corporation that are beneficially owned by the stockholder; and (D) any material interest of the stockholder in such business. Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at any annual meeting except in accordance with the procedures set forth in this Section 3.12. The chair of the annual meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting in accordance with the provisions of this Section 3.12, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

**Article 4: The Board of Directors**

**Section 4.01.** *General Policies.* General policies governing the operations of the corporation shall be determined by the Board of Directors.

**Section 4.02.** *Membership.* The Board of Directors shall consist of those Members appointed and elected as provided by law.

**Section 4.03.** *Term of Members.* Each Member shall hold office for the term for which he is elected or appointed and until his successor is chosen and qualified, or his death, resignation, retirement, or removal in accordance with law, whichever event shall first occur.

**Section 4.04.** *Regular Meetings.* The Board of Directors shall meet in regular meeting at such times as shall be determined by the Board from time to time, except as provided in section 4.05 and except when the Chairman of the Board shall notify the Secretary of a different date prior to a scheduled regular meeting. Each regular meeting shall be held at the principal office of the corporation in the District of Columbia, unless special provision is made by the Board, in advance of any such regular meeting, to hold that meeting at another place, either within or without the District of Columbia.

**Section 4.05.** *Annual Meeting.* Immediately following the annual meeting of the stockholders, the Board of Directors shall meet each year for the purpose of considering any business that may properly be brought before the meeting, and such annual meeting of the Board shall be a regular meeting.

**Section 4.06.** *Special Meetings.* Other meetings of the Board of Directors may be held upon the call of the Chairman of the Board of Directors, or of a majority of the then incumbent Members of the Board. Each special meeting shall be held at the principal office in the District of Columbia unless the Chairman of the Board prescribes and the notice specifies another place.

**Section 4.07.** *Notice of Meetings — Waiver.* No notice of any kind to Members of the Board of Directors shall be necessary for any regular meeting that is held on a date determined by the Board, or for the annual meeting. In the case of a regular meeting on a different date, notice shall be given to each Member by the Secretary; in the case of a special meeting, notice shall be given to each Member by the Secretary at the direction of the calling authority. Such notice shall be in writing and sent to the address on file with the Secretary of the corporation not later than during the third day immediately preceding the day for the meeting; or by word of mouth, telephone, facsimile or electronic mail, directed to the telephone number, facsimile number or electronic mail address, as the case may be, on file with the Secretary of the corporation, not later than during the second day immediately preceding the day for the meeting. Notice of any such meeting may be waived in writing signed by the person or persons entitled thereto, either before or after the time of the meeting. Neither the business to be transacted at, nor the purpose of, any meeting of the Board of Directors need be specified in the notice or waiver of notice of the meeting.

**Section 4.08.** *The Chairman of the Board of Directors.* The Chairman of the Board of Directors may be chosen by the Board at any meeting of the Board from among the Members, and his tenure shall commence immediately and continue until the next succeeding annual meeting of the Board, or until his successor is chosen, whichever [Deleted: first] occurs **first**. The Chairman of the Board shall [Deleted: be the Chief Executive Officer of the corporation, and ]**preside at all meetings of the Board of directors and at meetings of stockholders. In addition, the Chairman of the Board shall** have such powers and perform such duties as the Board may prescribe. Except as otherwise provided by law, the corporate charter, these Bylaws, or the Board, the Chairman shall have plenary authority to perform all duties [Deleted: ordinarily incident to the office and such other duties] as may be assigned to him from time to time by the Board. [Deleted: The Chairman may prescribe, amend and rescind requirements and procedures governing the manner in which the general business of the corporation shall be conducted. The officers, agents and employees, other than the principal officers, shall be appointed by the Chairman or by any other principal officer to whom the Chairman shall have delegated the authority. During the Chairman's absence or inability to act or during the vacancy of the office, the Vice Chairman and Chief Operating Officer shall perform the duties and exercise the authority of the Chairman.]

**Section 4.08a.** *The Vice Chairman of the Board of Directors.* The Board of Directors may from time to time elect from among the Members of the Board one or more Vice Chairmen of the Board. Any such Vice Chairman shall have such powers and shall perform such duties as the Board of Directors may prescribe or as the Chairman of the Board shall delegate to him.

**Section 4.09.** *Quorum.* The presence, in person or otherwise in accordance with section 4.16 hereof, of a majority of the then incumbent Members of the Board of Directors or of a Board Committee, as applicable, at the time of any meeting of the Board or such

Committee, shall constitute a quorum for the transaction of business. The act of the majority of such Members present at a meeting at which a quorum is present shall be the act of the Board of Directors unless the act of a greater number is required by these Bylaws. Members may not be represented by proxy at any meeting of the Board of Directors.

**Section 4.10.** *Action Without a Meeting.* Any policy or action that may be approved or taken at a meeting of the Board or of any Board Committee may be approved or taken without a meeting if all incumbent Members of the Board or the Committee, as the case may be, consent thereto in writing and the writings are filed with the minutes of the proceedings of the Board or the Committee.

**Section 4.11.** *Facsimile Signatures.* The Board of Directors, the Chairman of the Board or the President may authorize the use of facsimile signatures in lieu of manual signatures.

**Section 4.12.** *Executive Committee.*

    a.  The Executive Committee of the Board shall consist of at least five Members who shall be designated by the Board and serve at the pleasure of the Board. One of the members of the Executive Committee shall be the Chief Executive Officer of the corporation who may also, but is not required to, be chair of the Committee. The designation of such Committee and the delegation thereof of authority shall not alone relieve any director of any duty he owes the corporation. The Executive Committee, during the interim between Board meetings, shall have all the authority of the Board, except that it shall not have the authority to take any of the following actions:

        1.  The submission to stockholders of any action requiring stockholders' authorization.

        2.  The filling of vacancies on the Board of Directors or on the Executive Committee.

        3.  The fixing of compensation of the directors for serving on the Board or on the Executive Committee.

        4.  The appointment or removal of the Chairman of the Board, President, any Vice Chairman, and any Executive Vice President, except that vacancies in established positions may be filled subject to ratification by the Board of Directors.

        5.  The amendment or repeal of these Bylaws or the adoption of new bylaws.

        6.  The declaration of dividends or the authorizing of the issuance of the corporation's stock.

        7.  The amendment or repeal of any resolution of the Board which by its terms is not so amendable or repealable.

        8.  The adoption of an agreement of merger or consolidation or the adoption of a certificate of ownership and merger.

        9.  The recommendation to stockholders of the sale, lease or exchange of all or substantially all of the corporation's property and assets.

        10.  The recommendation to stockholders of a dissolution of the corporation or a revocation of a dissolution.

    b.  The Executive Committee shall meet at the call of its chairman or of a majority of its members, and a majority shall constitute a quorum. The action of the majority of the members of the Committee shall be the action of the Committee. Members of the Committee may not be represented by proxy at any meeting of the Committee.

    c.  Unless otherwise expressly provided by resolution of the Board of Directors, members of the Executive Committee shall be compensated and shall be reimbursed for travel and expenses on the same basis and at the same rate as is provided for Members of the Board of Directors for attendance at meetings of the Board.

    d.  The Executive Committee shall, at each regular meeting of the Board of Directors, present to the Board its report and such recommendations as are in its judgment necessary for the proper operation of the corporation.

**Section 4.13.** *Audit Committee.* The Board of Directors shall have an Audit Committee and, as required by Section 1710.11(b)(1) of the OFHEO corporate governance regulation, the Audit Committee shall comply with the charter, independence, composition, expertise and other requirements of the New York Stock Exchange, as the same may be amended from time to time, unless otherwise required by OFHEO.

**Section 4.14.** *Compensation Committee.* The Board of Directors shall have a Compensation Committee and, as required by Section 1710.11(b)(2) of the OFHEO corporate governance regulation, the Compensation Committee shall include at least three independent directors. The duties of the Compensation Committee shall include overseeing the corporation's compensation policies and plans for executive officers and employees and approving the compensation of senior executive officers of the corporation.

**Section 4.15.** *Other Committees.* In addition to the Executive, Audit and Compensation committees, the Board of Directors may by resolution designate from among its Members such other committees as it deems appropriate, each of which, to the extent provided by resolution of the Board, may exercise all authority of the Board except those actions outside the authority of the Executive Committee. The designation of any such committee and the delegation thereto of authority shall not alone relieve any director of any duty he owes

Source: FEDERAL NATIONAL MOR, 8-K, January 21, 2005

the corporation.

**Section 4.16.** *Remote Meetings.* Any meeting of the Board of Directors or any meeting of a Board Committee may be held with the Members of the Board or members of such Committee participating in such meeting by telephone or by any other means of communication by which all such persons participating in the meeting are able to speak to and hear one another.

**Section 4.17.** *Limitation on Liability.* To the fullest extent permitted by Delaware statutory or decisional law, as amended or interpreted, no director of this corporation shall be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. This Section 4.17 does not affect the availability of equitable remedies for breach of fiduciary duties.

**Section 4.18.** *Eligibility to Make Nominations.* Nominations of candidates for election as directors at an annual meeting of stockholders called for election of directors may be made (i) by any stockholder entitled to vote at such meeting only in accordance with the procedures established by Section 4.19 of these Bylaws, or (ii) by the Board of Directors or by a duly authorized Committee thereof. In order to be eligible for election as a director, any director nominee must first be nominated in accordance with the provisions of these Bylaws.

**Section 4.19.** *Procedure for Nominations by Stockholders.* Any stockholder entitled to vote for the election of a director at an annual meeting may nominate one or more persons for such election only if written notice of such stockholder's intent to make such nomination is delivered to or mailed and received by the Secretary of the corporation. Such notice must be received by the Secretary not later than the following dates: (a) with respect to an annual meeting of stockholders, 60 days in advance of such meeting if such meeting is to be held on a day that is within 30 days preceding the anniversary of the previous year's annual meeting or 90 days in advance of such meeting if such meeting is to be held on or after the anniversary of the previous year's annual meeting; and (b) with respect to an annual meeting of stockholders held on any other date, the close of business on the 10th day following the date of public disclosure of the date of such meeting. The written notice shall set forth: (1) the name, age, business address and residence address of each nominee proposed in such notice; (2) the principal occupation or employment of each such nominee; (3) the number of shares of capital stock of the corporation which are beneficially owned by each such nominee; and (4) such other information concerning each such nominee as would be required, under the rules of the Securities and Exchange Commission in a proxy statement soliciting proxies for the election of such nominee as a director. Such notice shall include a signed consent of each such nominee to serve as a director of the corporation, if elected.

**Section 4.20.** *Compliance with Procedures.* If the chair of the stockholders' annual meeting determines that a nomination of any candidate for election as a director was not made in accordance with the applicable provisions of these Bylaws, such nomination shall be void.

## Article 5: The Officers

**Section 5.01.** *Number.* The principal officers of the corporation shall consist of the Chairman of the Board of Directors, a President, one or more Vice Chairmen of the Board if the Board has elected to fill such position or positions, one or more Executive Vice Presidents and Senior Vice Presidents, a General Counsel, a Controller, a Treasurer, and a Secretary. There shall be such assistant officers, agents, and employees as may be deemed necessary. Any two or more offices may be held by the same person.

**Section 5.02.** *General Authority and Duties.* All officers, agents, and employees of the corporation shall have such authority and perform such duties in the management and conduct of the business of the corporation as may be provided for in these Bylaws, as may be established by resolution of the Board of Directors not inconsistent with these Bylaws, or as may be delegated to them in a manner not inconsistent with these Bylaws.

**Section 5.03.** *Election, Tenure, and Qualifications.* The principal officers shall be selected by the Board of Directors. Each officer shall hold office until his successor is chosen and qualified, or his death, resignation, retirement, or removal from office, whichever event shall first occur. Selection or appointment without express tenure, of an officer, agent, or employee shall not of itself create contract rights.

**Section 5.04.** *Removal.* Any officer, agent, or employee may be removed by the Board of Directors. Any removal shall be in accordance with such procedures and safeguards as the corporation may establish and shall be without prejudice to the contract rights, if any, of the person so removed.

**Section 5.05.** *Vacancies.* Any vacancy in any office shall be filled in the manner prescribed in these Bylaws for selection or appointment to the office.

**Section 5.06.** *The President.* The President shall have such powers and perform such duties as the Board of Directors may prescribe, or as the Chairman of the Board may delegate to him.

**Section 5.07.** *The Vice Presidents.* Each Vice President shall have such powers and perform such duties as the Board of Directors may prescribe or as the Chairman of the Board may delegate to him.

**Section 5.08.** *The Treasurer.* The Treasurer shall, in general, perform all the duties ordinarily incident to the office of Treasurer and such other duties as may be assigned to him by the Board of Directors or by the Chairman of the Board. The Treasurer shall render to

the Chairman and the Board, whenever the same shall be required, an account of all his transactions as Treasurer. The Treasurer shall, if required to do so by the Board, give the corporation a bond in such amount and with such surety or sureties as may be ordered by the Board for the faithful performance of the duties of his office and for the restoration to the corporation, in case of his death, resignation, retirement, or removal from office, of all books, papers, vouchers, money, and other property of whatever kind in his possession or under his control belonging to the corporation. The premium for any such bond shall be paid by the corporation.

**Section 5.09.** *The General Counsel.* The General Counsel shall be the principal consulting officer of the corporation in all matters of legal significance or import; shall be responsible for and direct all counsel, attorneys, employees, and agents in the performance of all legal duties and services for and on behalf of the corporation; shall perform such other duties and have such other powers as are ordinarily incident to the office of the General Counsel; and shall perform such other duties as, from time to time, may be assigned to him by the Board of Directors or by the Chairman of the Board.

**Section 5.10.** *The Secretary.* The Secretary shall keep or cause to be kept in books provided for the purpose the minutes of the meetings of the Board of Directors and the minutes or transcripts of the meetings of the stockholders; shall see that all notices are duly given as required by law and in accordance with the provisions of these Bylaws; shall be responsible for the custody and maintenance of all related records and the blank stock certificates of the corporation; shall be custodian of the records and of the seal of the corporation; and, in general, shall perform all the duties ordinarily incident to the office of Secretary and such other duties as may be assigned to him by the Board or by the Chairman of the Board. The Secretary and any Assistant Secretary are expressly empowered to attest signatures of officers of the corporation and to affix the seal of the corporation to documents.

**Section 5.11.** *The Controller.* The Controller shall keep full and accurate accounts of all assets, liabilities, commitments, receipts, disbursements, and other financial transactions of the corporation; shall certify vouchers for payment by the Treasurer or the Treasurer's designee, and shall designate, with the written concurrence of the Chairman of the Board, such other officers, agents, and employees, severally, who may so certify; and in general, shall perform all the duties ordinarily incident to the office of Controller and such other duties as may be assigned to him by the Board of Directors or by the Chairman of the Board.

**Section 5.12.** *Assistant Officers.* Each assistant to an officer, including but not limited to any Assistant Vice President, any Assistant Treasurer, any Assistant General Counsel, and any Assistant Secretary, and any other such assistant to any officer, shall perform such duties as are, from time to time, delegated to him by the officer to whom he is an assistant, by the Chairman of the Board of Directors or by the Board. At the request of the officer to whom he is an assistant, an assistant officer may temporarily perform the duties of that officer, and when so acting shall have the powers of and be subject to the restrictions imposed upon that officer.

**Section 5.13.** *Compensation.* The compensation of the Chairman, President, any Vice Chairman, and any Executive Vice President shall be fixed, from time to time, by the Board of Directors.

**Section 5.14.** *Repealed.*

**Article 6: Indemnification**

**Section 6.01.** *General Indemnification.* The Board of Directors may, in such cases or categories of cases as it deems appropriate, indemnify and hold harmless, or make provision for indemnifying and holding harmless, Members of the Board of Directors, officers, employees, and agents of the corporation, and persons who formerly held such positions, and the estates of any of them against any or all claims and liabilities (including reasonable legal fees and other expenses incurred in connection with such claims or liabilities) to which any such person shall have become subject by reason of his having held such a position or having allegedly taken or omitted to take any action in connection with such position.

**Section 6.02.** *Indemnification of Board Members and Officers.*

    a. To the fullest extent permitted by the Delaware General Corporation Law for a corporation subject to such law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits a Delaware corporation to provide broader indemnification rights than said law permitted such corporation to provide prior to such amendment), the corporation shall indemnify and hold harmless each Member of the Board and officer of the corporation or any subsidiary against any and all claims, liabilities, and expenses (including attorneys' fees, judgments, fines, and amounts paid in settlement) actually and reasonably incurred and arising from any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, to which any such person shall have become subject by reason of having held such a position or having allegedly taken or omitted to take any action in connection with any such position. However, the foregoing shall not apply to:

        i. any breach of such person's duty of loyalty to the corporation or its stockholders;

        ii. any act or omission by such person not in good faith or which involves intentional misconduct or where such person had reasonable cause to believe his conduct was unlawful; or

        iii. any transaction from which such person derived any improper personal benefit.

    b. The decision concerning whether a particular indemnitee has satisfied the foregoing shall be made by (i) the Board of Directors by a majority vote of a quorum consisting of Members who are not parties to the action, suit, or proceeding giving

rise to the claim for indemnity ("Disinterested Directors"), whether or not such majority constitutes a quorum; (ii) a committee of Disinterested Directors designated by a majority vote of Disinterested Directors, whether or not such majority constitutes a quorum; (iii) if there are no Disinterested Directors, or if the Disinterested Directors so direct, by independent legal counsel in a written opinion; or (iv) a vote of the stockholders.

c.  The Board of Directors may authorize the advancement of expenses to any Member of the Board or officer, subject to a written undertaking to repay such advance if it is later determined that the indemnitee does not satisfy the standard of conduct required for indemnification. The Chairman of the Board is authorized to enter into contracts of indemnification with each Member and officer of the corporation with respect to the indemnification provided in the Bylaws and to renegotiate such contracts as necessary to reflect changing laws and business circumstances.

**Article 7: Amendments**

The power to alter, amend, or repeal these Bylaws, or to adopt new bylaws, is vested in the Board of Directors, but the affirmative vote of two-thirds of the then full number of authorized Members of the Board of Directors shall be necessary to effect any such action; or such action may be effected in the manner provided in Section 4.10 of these Bylaws. Except by unanimous consent of all the then incumbent Members of the Board, no such action shall be undertaken until at least one week shall have elapsed from either (i) the introduction of the proposal at a meeting of the Board of Directors at which a quorum shall have attended, or (ii) the circulation of such proposed action to all the then incumbent Members of the Board.

**Article 8: Regulatory Powers**

Nothing in these Bylaws shall be deemed to affect the regulatory powers of the Secretary of Housing and Urban Development pursuant to the Charter Act, as amended.

2

Created by 10KWizard    www.10KWizard.com

# EXHIBIT

# 7

**United States of America**
**Office of Federal Housing Enterprise Oversight**

**In the Matter of**
**THE FEDERAL NATIONAL MORTGAGE ASSOCIATION ("FANNIE MAE")**
May 23, 2006

**STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER**

The Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") has determined to initiate cease and desist proceedings and has determined to impose a civil money penalty against the Federal National Mortgage Association ("Fannie Mae") pursuant to 12 U.S.C. § 4631 and 12 U.S.C. § 4636.

Fannie Mae, in the interests of compliance and cooperation, consents to the issuance of a Consent Order, dated May 23, 2006 ("Order"), before the filing of any notice and before the finding of any issues of fact or law.

In consideration of the above premises, the Director and Fannie Mae, through its duly authorized representatives, hereby stipulate and agree to the following:

**ARTICLE I**

**Jurisdiction**

Fannie Mae is a corporation chartered pursuant to the Federal National Mortgage Association Charter Act, 12 U.S.C. §§ 1717 *et seq.*, and subject to supervision and regulation by OFHEO pursuant to the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 12 U.S.C. §§ 4501 *et seq.*

## ARTICLE II

### Agreement

Fannie Mae hereby consents and agrees to the issuance of the Order by the Director. In so doing, the Enterprise neither admits nor denies any wrongdoing or any asserted or implied finding or other basis for the Order. Fannie Mae further consents and agrees that said Order shall become effective upon its issuance and shall be fully enforceable by OFHEO under the provisions of 12 U.S.C. §§ 4635 and 4636(d).

## ARTICLE III

### Waivers

Fannie Mae, by signing this Stipulation and Consent, hereby waives:

   (a)   the issuance of a Notice of Charges pursuant to 12 U.S.C. § 4631(c)(1);

   (b)   written notice of the Director's determination to impose a penalty on the record pursuant to 12 U.S.C. § 4636(c)(1)(A);

   (c)   any and all procedural rights available in connection with the issuance of the Order;

   (d)   all rights to seek any type of administrative or judicial review of the Order; and

   (e)   any and all rights to challenge or contest the validity of the Order.

## ARTICLE IV

### Other Terms

   (1)   Fannie Mae agrees that the provisions of this Stipulation and Consent shall not inhibit, estop, bar, or otherwise prevent the Director from taking any other action affecting Fannie Mae in connection with OFHEO's ongoing regulatory oversight of Fannie Mae, with respect to matters not addressed by the September 2004 or May 2006 reports of the Special Examination of

2

Fannie Mae, matters occurring subsequent to the date of the Order or with respect to matters relating to third parties not affiliated with Fannie Mae (including separated senior officers of Fannie Mae) if, at any time, the Director deems it appropriate to do so to fulfill the responsibilities placed upon him by the several laws of the United States of America.

(2)     Fannie Mae agrees that the provisions of this Stipulation and Consent shall not be construed to limit or otherwise affect regulatory actions by other federal regulatory agencies.

(3)     Fannie Mae agrees that the Order represents a written agreement subject to enforcement for violation of its terms by OFHEO and solely by OFHEO.

(4)     Nothing in this Stipulation and Consent prevents Fannie Mae from seeking the Director's determination to modify, terminate, or suspend any or all provisions in the Order.


IN TESTIMONY WHEREOF, the undersigned, the Director of OFHEO, has hereunto set his hand on behalf of himself and OFHEO.


Dated: May 23, 2006

James B. Lockhart III
Acting Director, Office of Federal Housing Enterprise Oversight

IN TESTIMONY WHEREOF, the undersigned, as the duly authorized representatives of Fannie Mae, have hereunto set their hands on behalf of Fannie Mae.


Dated: May 23, 2006

Stephen B. Ashley
Chairman of the Board of Directors
Federal National Mortgage Association


Dated: May 23, 2006

Daniel H. Mudd
Chief Executive Officer
Federal National Mortgage Association


3

**United States of America**
**Office of Federal Housing Enterprise Oversight**
**Order No. 2006-1**

**In the Matter of**
**The Federal National Mortgage Association**

**Consent Order**

Whereas, the Acting Director of the Office of Federal Housing Enterprise Oversight ("OFHEO") has determined to initiate cease and desist proceedings against the Federal National Mortgage Association ("Fannie Mae" or "Enterprise") pursuant to 12 U.S.C. § 4631;

Whereas, the Acting Director has determined to initiate such proceedings based on his view that Fannie Mae engaged in conduct that does not conform with the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "Safety and Soundness Act"), OFHEO rules, guidances and standards, and the Federal National Mortgage Association Charter Act, and that such conduct has resulted in harm to the Enterprise;

Whereas, the Acting Director believes that the conduct involved provides sufficient grounds to initiate administrative or enforcement proceedings against Fannie Mae, including a claim for the award of civil money penalties and other relief;

Whereas, OFHEO and Fannie Mae previously entered into an Agreement dated September 27, 2004, and a "Supplement to the Agreement of September 27, 2004" dated March 7, 2005, and Fannie Mae and its Board have pursued their obligations under those agreements;

Whereas, Fannie Mae has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated May 23, 2006, that is accepted by the Acting Director, and by such Stipulation and Consent Fannie Mae has consented to the issuance of this Order by the Acting Director;

Whereas, the Acting Director believes that it would be in the public interest to enter into this Consent Order with Fannie Mae;

Therefore, the Acting Director, pursuant to the authority vested in him by the Safety and Soundness Act, 12 U.S.C. §§ 4631 and 4636, hereby orders that:

## ARTICLE I.    CORPORATE GOVERNANCE

1.  The Board shall direct the creation and presentation of an annual plan for compliance with this Order. The plan shall include the following elements:

    a.  A review of accomplishments to date and plans to meet goals set forth by the Board, senior management and OFHEO.

    b.  A multi-year program for planning, development, implementation and evaluation to meet Consent Order goals, including but not limited to goals related to improvements in information technology, internal controls, accounting, staffing and other needs set forth in the plan.

    c.  Annual training programs on corporate culture and expectations as well as assurance that new employees hired between annual programs receive thorough training on corporate expectations.

    d.  Provision for the creation of comprehensive manuals available to all employees detailing policies and procedures, available in written and/or electronic forms.

    e.  Quarterly reporting to OFHEO of the Enterprise's implementation progress.

2.  Fannie Mae shall maintain its separation of the functions of CEO and Chairman.

3.  The Board agrees that Mr. Franklin Raines and Mr. Timothy Howard may not be engaged, employed or otherwise provide services to Fannie Mae, whether for compensation or not, subsequent to the separation of these employees from Fannie Mae, unless otherwise required by law. Fannie Mae shall report to OFHEO within 90 days of this Order on whether other employees separated from the Enterprise should not be engaged, employed or otherwise provide services to Fannie Mae as provided herein. Fannie Mae may apply to OFHEO for approval to utilize such individuals to meet obligations it may have under regulations or regulatory agreements. Nothing herein precludes the participation of these individuals in any

2

government inquiry, regulatory matter, litigation, internal investigation or information-gathering related thereto.

4.  The Board will complete its review and appropriate revision of bylaws, codes of conduct and internal policies and procedures to assure that they support legal and regulatory compliance and report the results of its review and any planned changes to OFHEO within 120 days of this Order.

5.  The Board shall continue a program for no less than annual briefings for the Board and senior management on the legal and regulatory requirements applicable to Fannie Mae. Such briefings also will review policies or practices that are designed to ensure effective compliance with such legal and regulatory requirements and the responsibilities of the Board and management under the corporate charter and the code of conduct.

6.  The Board shall cause Fannie Mae to maintain its Compliance, Ethics, and Investigation function that reports to the Chief Executive Officer and independently to the Board's Compliance Committee. Such function shall be headed by an individual who shall have no other responsibilities at Fannie Mae and who shall operate independently, including the ability to communicate with OFHEO and the Board independent of management, particularly on matters of wrongdoing. Such function shall include a separate internal investigation function that has access to adequate resources to perform its duties that shall include, but not be limited to, review of internal complaints, whistleblower reports, ethics matters and related topics. Such investigation function shall report on any investigation and its findings to OFHEO in a prompt manner. The head of the Compliance, Ethics, and Investigation function may only be removed upon approval of the Board.

7.  Fannie Mae shall maintain a Chief Risk Officer ("CRO"). The CRO shall direct a risk management organization with responsibility for overseeing risk management for financial and operational risk throughout Fannie Mae. The CRO shall report directly to the CEO and independently to the Risk Policy and Capital Committee of the Board.

8.  Fannie Mae shall maintain an independent internal auditor. The Chief Auditor shall report directly to the Audit Committee of the Board and the internal audit department shall have independent access to all of Fannie Mae's internal records and systems, including the general

3

ledger. The internal audit division's annual compensation shall be based on individual and department goals unrelated to corporate earnings, including, but not limited to, training, achievement of audit plan, and retention.

9. The Board shall cause Fannie Mae to maintain a procedure directing the Chief Compliance Officer to report directly to the Board in a timely fashion any information the Chief Compliance Officer becomes aware of relating to actual or possible misconduct that relates to or may affect Fannie Mae by an executive officer, as defined by OFHEO regulation, or a Board director, or such actual or possible misconduct of a not inconsequential nature by employees. The procedure shall provide for the Board to inform the Director of OFHEO of the substance of such allegations, with any comments by the Board, in a timely manner. Should the Board fail to notify OFHEO in a timely manner, the Chief Compliance Officer shall notify OFHEO of the information reported to the Board.

10. Fannie Mae shall establish a management Compliance Control Coordination Committee composed of the head of the Office of Compliance, Ethics, and Investigations, the General Counsel, the Chief Risk Officer, and the Chief Audit Executive, to ensure cross-enterprise coordination of legal, compliance, and ethics programs and activities.

11. The Compliance Committee shall establish a tracking system in consultation with OFHEO that will allow the Board and OFHEO to monitor the implementation and progress under this Agreement. The Committee shall appoint a key contact in management to assure prompt attention to questions arising under this Agreement.

## ARTICLE II.    BOARD OF DIRECTORS

1. The Board shall provide written guidance to management regarding the preparation and maintenance of minutes to accurately reflect deliberations of the Board and its committees. The Board shall maintain written policies and procedures for the Board to govern its operations, consistent with legal and regulatory standards and industry best practices. Such policies and procedures should be submitted to OFHEO within 180 days of this Order and shall include a schedule for implementation.

4

2.  The Board and Fannie Mae shall review reports received by the Board to insure appropriate and adequate content, format and distribution. As appropriate, reports may include, at a minimum, useful historical summaries of issues including root causes, indication of limitations of information such as assumption and model risk, trends over a meaningful length of time, narrative descriptions of issues illustrated primarily by numbers and a policy of providing "all meaningful" measures.

3.  The Audit Committee of the Board of Directors shall maintain at least one member with sufficient technical expertise to understand the implications of accounting policies to financial statements.

4.  The Board shall maintain a Compliance Committee to monitor and coordinate legal and regulatory compliance and compliance with this Agreement. Such committee shall consist of outside directors, at least three in number and one of whom shall serve as chair. Upon request, the committee and its chair shall meet with OFHEO representatives.

5.  The Board shall maintain a Risk Policy and Capital Committee, which will oversee the Office of the Chief Risk Officer.

6.  The Board shall maintain its procedure of meeting at least eight times annually, and at least once per calendar quarter.

## ARTICLE III.    CAPITAL PLANS AND LIMITATIONS ON CERTAIN CORPORATE ACTIONS

1.  In consultation with OFHEO, Fannie Mae will continue diligent and good faith pursuit of commitments set forth in the capital restoration plan as approved by OFHEO on February 17, 2005 until such time as the Director determines the requirement should be modified or expire, considering factors such as resolution of accounting and internal control issues.

2.  While the capital restoration plan as approved by OFHEO on February 17, 2005 is in effect, Fannie Mae shall seek the OFHEO Director's approval before engaging in transactions that could have the effect of reducing the capital surplus below the 30% level referenced in the plan.

5

3.    Fannie Mae shall submit a written report to OFHEO detailing the rationale and process for proposed capital distributions before making any such distribution.

4.    Fannie Mae shall not increase its "mortgage portfolio" assets as shown in the minimum capital report to OFHEO for December 31, 2005, except as provided in the following:

(a) Fannie Mae may provide OFHEO within 60 days of this Order a plan for managing its business— either expanding or decreasing its market activities— with particular attention to risk management (related to controls, models, and specific risk measures including operational risk) and to compliance with its capital plan. Such a plan can include a moderate per annum increase in the "mortgage portfolio" assets for reasons including liquidity, housing goals, portfolio flexibility, and competitive considerations. The Director shall make a determination on the plan within 60 days of its submission

(b) This limitation on growth provision shall expire upon the Director's determination that such expiration is appropriate in light of information regarding (i) capital; (ii) market liquidity issues; (iii) housing goals; (iv) risk management improvements; (v) outside auditor's opinion that Fannie Mae's consolidated financial statements present fairly in all material respects the financial condition of the Company; (vi) receipt of an unqualified opinion from an outside audit firm that Fannie Mae internal controls are effective pursuant to section 404 of the Sarbanes Oxley Act; or (vii) other relevant information.

This provision excludes Enterprise guarantees. Compliance with this provision shall be determined at month's end with any non-compliance due to market fluctuations corrected subject to OFHEO examination and guidance.

## ARTICLE IV.   INTERNAL CONTROLS

1.    The Board shall prepare a statement setting forth the respective roles of the Board and management for meeting corporate goals and legal requirements, including the appropriate extent of reliance on outside consultants and experts and the responsibility of the company. This statement shall be provided for review to OFHEO within 180 days of this Order.

2.  Fannie Mae shall develop an effective external testing program for internal controls, including, where appropriate, blind testing (without system operator knowledge). Such program shall be submitted to OFHEO within 90 days of this Order for its approval.

3.  Fannie Mae shall develop a program for regular review of critical financial models. Where appropriate and in consultation with OFHEO, such program shall include review by an external party. Such program shall be submitted to OFHEO for its approval within 90 days of this Order.

4.  Fannie Mae shall have in place a system to assure that a control environment exists to address proper "tone at the top," assignment of authority, consistency of policies and practices and adherence to code of conduct.

5.  Fannie Mae shall provide to OFHEO within 180 days of this Order a plan for the build out of the Enterprise's operational risk oversight function over the next three years. Fannie Mae shall move expeditiously to implement the plan.

6.  The Board shall direct management to establish appropriate policies and procedures to: (a) provide an analytical framework for debt buyback transactions, (b) contemporaneously document debt buyback transactions, and (c) ensure appropriate internal controls regarding debt buyback transactions. Such policies and procedures shall be provided to OFHEO within 120 days of this Order.

7.  The Board shall direct that Fannie Mae maintain a separation of the function of business planning and forecasting from the controller's function.

8.  The Board shall direct that Fannie Mae maintain a separation of the modeling and accounting functions for the amortization of premiums and discounts.

9.  The Board shall cause to be completed the implementation of improved procedures surrounding the preparing, revising, validating, authorizing and recording of journal entries and report to OFHEO on such implementation.

10. The Board shall direct management to complete its development and implementation of written policies and procedures for journal entries. Such policies and procedures must

7

include, but are not limited to, prohibition of employees from falsifying signatures in journal entries as well as from signing such entries without proper authorization; requirements that journal entry preparers understand the purpose for which the journal entry is made; requirements that personnel reviewing or approving journal entries determine that an entry is valid and appropriate; requirements that journal entries be supported by appropriate documentation; and requirements that journal entries be independently reviewed by an authorized person other than the preparer.

11.  The Board shall direct management to complete its development and implementation of a plan that addresses deficiencies in the current portfolio accounting system, including, but not limited to, ensuring the ability to: calculate the amortization of deferred price adjustments pursuant to SFAS 91; automate marking the mortgage-backed securities portfolio to market, to the degree practicable; properly account for mortgage revenue bonds; properly account for dollar roll transactions; and properly account for interest-only strips pursuant to EITF 99-20. The implementation of the plan shall be subject to no less than quarterly reporting to OFHEO until completion.

12.  The Board shall direct management to complete its assessment and correct deficiencies in internal controls relating to modifications of databases supporting the general ledger. The Board shall direct management to adopt appropriate internal controls, including documentation, to govern when, if ever, technology application support personnel, at the direction of management, may overwrite database records in order to make changes or corrections. The report shall be submitted to OFHEO for review and the implementation plan shall be the subject of no less than quarterly status reports until completion.

## ARTICLE V.   ACCOUNTING

1.  Fannie Mae shall complete its ongoing restatement of prior period financial statements as necessary and have such financial statements reaudited by Fannie Mae's external auditor consistent with the auditing standards of the Public Company Accounting Oversight Board. Changes occurring as a result of such reaudit and restatement shall be reported promptly to OFHEO. Fannie Mae's Board of Directors shall direct the Audit Committee to direct

management to take all necessary actions to assure that Fannie Mae's accounting policies and practices conform to GAAP, disclosure and other regulatory standards.

2. Fannie Mae will assure that in any engagement of an external auditor, including its current engagement of Deloitte & Touche LLP, the engagement letter shall provide that: (a) upon OFHEO's request, the external auditor will provide OFHEO with access to senior audit partners on the engagement and any other personnel whom such partners deem necessary, (b) OFHEO will have access to the auditor's working papers prepared in the course of performing the services set forth in the letter, and (c) OFHEO will have such access to the external auditor without Fannie Mae personnel in attendance.

3. Fannie Mae will attempt to assure that in any future engagement of an external auditor, the engagement letter will not contain provisions characterized as "unsafe and unsound" in the "Interagency Advisory on the Unsafe and Unsound Use of Limitation of Liability Provisions in External Audit Engagement Letters."

4. Not less than every two years, the Board should cause to be conducted by an independent consultant or accounting firm, a targeted evaluation of one or more accounting policy areas, such as but not limited to derivatives, securitizations, amortization of premium and discount, and report its findings to the Board and to OFHEO. OFHEO shall review the appointment of such firm, the work plan for such engagement including periodic updates to OFHEO and OFHEO access to such firm during its engagement.

5. Fannie Mae shall develop policies and procedures for Board approval and notice to OFHEO of any transactions or accounting treatments or policies identified as having significant legal, reputational, or safety and soundness risk with a focus on transactions or accounting treatments or policies that do not employ industry standards for preferred methods. Such policies and procedures shall be provided to OFHEO within 90 days of this Order for its approval.

6. Fannie Mae shall provide OFHEO within 90 days of this Order a plan for assuring accounting policies are reviewed and updated on an ongoing basis.

9

7.    Fannie Mae shall, consistent with applicable law, provide OFHEO with any materials or information management comes to possess concerning any actual or alleged misconduct related to Fannie Mae by its outside auditor, including any information received from any federal or state agency, or any other individual or organization.

## ARTICLE VI.   PERSONNEL

1.    The Board shall cause to be prepared by management a plan for succession for senior officers as well as any other levels of officers for which such planning would be prudent. Such plan shall be provided to OFHEO within 120 days of this Order.

2.    The Board shall cause to be conducted an external review of existing controls concerning external relations programs relating to government and industry relations.  Such review of controls shall address activities of internal staff and external consultants, advisors or other retained firms.  A plan must be provided setting policies for activities of external parties for government and industry relations as well as assurance that funds deployed for lobbying are subject to such control environment.  Within 180 days of this Order, Fannie Mae shall provide to OFHEO a report including findings, planned changes and written statements of policy.

3.    The Board shall cause to be conducted a review of all individuals, including Board members, mentioned in OFHEO's report of May 2006, as participating in any misconduct, for suitability to remain in their positions.  Such review shall consider any appropriate disciplinary actions, including removal, transfer or other remedial steps.  Within 30 days, the Board shall report to OFHEO on which individuals are subject to such review. Within 120 days thereafter, the Board shall report to OFHEO on such determinations with respect to any such individual or any other individual identified as bearing responsibility for any misconduct identified by OFHEO in its report.  Such report shall include plans to seek restitution, disgorgement or other remedies to recover funds from individuals, taking into consideration limitations by the Employee Retirement Income Security Act (ERISA), existing contracts, any other applicable law or regulation, and the subsidiary or collateral effect on proceedings.

10

4.    OFHEO shall continue to oversee appointment of officers to OFHEO-named executive offices for five years.

5.    Fannie Mae shall review with OFHEO within 120 days of this Order and annually thereafter the budget and staffing plan for each department in the Enterprise with attention to the number of personnel and the appropriate skills and expertise required.

6.    Fannie Mae should provide OFHEO training plans for all departments to assure skills to perform jobs as well as familiarity with Fannie Mae requirements (including but not limited to bylaws, code of conduct, compliance, employment policies, balance of meeting obligations with earnings per share goals) and legal, regulatory and compliance requirements.

## ARTICLE VII.  COMPENSATION

1.    The Board shall direct that Fannie Mae's compensation practices for officers and employees shall include financial and non-financial metrics and shall not exclusively be tied to earnings-per-share.  Such direction shall ensure that compensation metrics for the internal auditor, chief compliance officer, controller and such others, as determined in consultation with OFHEO, be appropriate to their roles and do not create conflicts of interest.

2.    Fannie Mae shall ensure that any future contracts with senior officers provide for an escrow of benefit payments not protected from alienation or forfeiture under ERISA or any other applicable law or regulation where OFHEO or any other agency has communicated allegations of misconduct concerning such officer's official duties at Fannie Mae and OFHEO has directed Fannie Mae to escrow such funds.  Such contract terms shall be provided to OFHEO within 120 days of this Order for review.

3.    Within 120 days Fannie Mae shall submit to OFHEO for review new contract terms for future employment agreements to appropriately address "termination for cause" or similar provisions as well as so-called "claw-back" provisions by setting clear standards for taking such actions with appropriate thresholds and legal standards, consistent with ERISA, and any other applicable law or regulation.

11

4.    Fannie Mae shall include in any future employment contracts a provision that individuals discharged for misconduct or for cause may not be engaged, employed or otherwise provide services to Fannie Mae, whether for compensation or not, subsequent to the separation of these employees from Fannie Mae, unless otherwise required by law, except upon request to OFHEO in exceptional circumstances. Nothing in such provision shall preclude the participation of any individuals in any government inquiry, regulatory matter, litigation, internal investigation or information-gathering related thereto. Such term shall be provided to OFHEO within 120 days of this Order for review.

## ARTICLE VIII.    REPORTS, DATA AND DISCLOSURES

1.    Fannie Mae shall develop and provide to OFHEO within 120 days of this Order a plan to make improvement to its regulatory reporting, public disclosures, and Board and management reports. Such plan shall include a timetable for implementation and enhancements to data quality to support such reporting and disclosure.

2.    Fannie Mae shall present proposals for enhanced and uniform public disclosures of its performance and risk measures. Fannie Mae shall submit to OFHEO, within 180 days of this Order, proposals detailing performance and risk measures to be disclosed, approaches to attaining uniformity and a timetable for implementation of such disclosures that OFHEO shall supervise.

## ARTICLE IX.    COOPERATION

1.    Fannie Mae shall use reasonable good faith efforts to cooperate with OFHEO in OFHEO's pursuit of administrative or enforcement proceedings or litigation with respect to other persons concerning the subject matter of OFHEO's Special Examination of Fannie Mae, including, under the terms set forth in this Article: (1) by making Fannie Mae's documents and records relating to such proceedings available to OFHEO without subpoena (subject to any privilege or protection available under any applicable law), and (2) by making Fannie Mae personnel available for interviews.

2.    Fannie Mae shall, within 30 days of any request by OFHEO, provide OFHEO with the names of all present and former Fannie Mae employees that Fannie Mae believes have or

12

may have information relevant to the allegations in any Notice of Charges filed by OFHEO in any proceeding concerning the subject matter of OFHEO's Special Examination of Fannie Mae ("Notice of Charges").

3.    Fannie Mae shall arrange and facilitate OFHEO interviewing, normally in a non-transcribed format, any current Fannie Mae employees regarding any Notice of Charges filed by OFHEO and shall encourage its employees to cooperate in such interviews. Fannie Mae shall promptly facilitate the scheduling of interviews upon OFHEO's request and shall provide logistic support for the interviews, if requested by OFHEO. Employee interviews shall be held during the employees' normal work hours, and shall be scheduled on dates and at times and locations that are mutually agreeable, unless an employee and OFHEO otherwise agree. Any current employee may be accompanied to an OFHEO interview by counsel for Fannie Mae and, if the employee so elects, counsel for the employee.

4.    Within 30 days of Fannie Mae's receipt of notification from OFHEO of any former Fannie Mae employees OFHEO wishes to interview, Fannie Mae shall provide OFHEO with the last known address of such former employees as reflected in Fannie Mae's records and, at OFHEO's request, encourage any former employee to cooperate with OFHEO. When OFHEO cannot contact a former employee through his or her last known address provided by Fannie Mae, Fannie Mae shall promptly: (a) make its best efforts to locate the former employee, and (b) report the former employee's whereabouts to OFHEO. Any former employee may be accompanied to an OFHEO interview by counsel for the former employee, if the former employee so elects, and with the agreement of OFHEO, counsel for Fannie Mae.

5.    If OFHEO identifies documents relevant to the allegations in any Notice of Charges filed by OFHEO that it needs Fannie Mae to produce, Fannie Mae either will: (a) search for and produce the documents, (b) produce the documents if no search is required, or (c) provide OFHEO the information necessary to find the documents among the documents already produced by Fannie Mae. If OFHEO, in consultation with Fannie Mae, is still unable to locate the identified documents among the documents it has received from

13

Fannie Mae, Fannie Mae will conduct another search for the identified documents and, if possible, produce them to OFHEO.

6.    Fannie Mae shall take action to determine whether the termination of any former officer can and should be converted to a termination "for cause" and shall report to OFHEO within 60 days any former officers who can and should be so designated. To the extent consistent with ERISA, existing contracts, and any other applicable law, regulation or proceeding Fannie Mae determines termination of any officer can and should be converted to a termination "for cause," Fannie Mae shall (a) seek to terminate any further compensation due such employee; and (b) act to secure reimbursement, indemnification or other redress from such employees terminated for cause for unjust enrichment or for other harm to the Enterprise. Fannie Mae shall report to OFHEO as it proceeds to undertake any such actions.

## ARTICLE X.    REPORTS TO OFHEO

1.    Unless Fannie Mae is otherwise informed by OFHEO of exceptions, all plans, reports and implementation programs required by this Order should provide for quarterly progress reports.

## ARTICLE XI.    PENALTY

1.    Fannie Mae shall pay to the government a penalty of $400 million. Within ten business days from the date of this Order, the Enterprise shall transfer $50 million, in the manner specified by OFHEO, in the name of the United States Treasury. This amount shall constitute a civil money penalty imposed on the Enterprise pursuant to 12 U.S.C. §4636. The Enterprise shall transfer $350 million in a manner directed by the Securities and Exchange Commission.

14

**ARTICLE XII.     PREVIOUS AGREEMENTS**

1.     Pursuant to paragraph VI. 5(a) of the September 27, 2004 agreement and paragraph III.1(a) of the "Supplement to the Agreement of September 27, 2004," this Order supersedes and terminates those agreements.

It is so ordered, this _23rd_ day of May 2006.

_James B. Lockhart III_

James B. Lockhart III
Acting Director, Office of Federal Housing Enterprise Oversight

# EXHIBIT

# 8



## OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT
### 1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3801

**OFFICE OF THE DIRECTOR**

June 19, 2007

Mr. Stephen Ashley
Chairman of the Board of Directors
Fannie Mae
3900 Wisconsin Avenue, NW
Washington, DC 20016-2892

Dear Mr. Ashley:

OFHEO has begun its review of the Board's proposal to make payments under Performance Share Program Cycles 19 and 20, pursuant to your request of June 15, 2007 and the Enterprise's commitment in its February 10, 2005 Capital Plan to "seek approval from OFHEO before making any non-salary compensation award to this group of executive officers."

Payments to employees by the Board under the Performance Share Program Cycles 19 and 20 should be deferred at this time. There exists a core question of whether payments under these cycles would constitute excessive compensation under 12 U.S.C. 4518.

As you know, OFHEO's statute provides that the Director should act in cases where compensation would be provided that is not "reasonable and comparable." OFHEO has frequently requested additional information in individual benefit cases as well as in cases involving broader benefit programs. Here, OFHEO wishes to review the bases on which the Board has made its determination and whether these comport with the statutory standards as well as with industry standards.

The Board should respond to OFHEO by July 9, 2007, submitting a report to OFHEO before any disbursement of PSP grants. In the report, please provide the data and analysis on how the Board determined the appropriateness and size of the PSP awards for Cycles 19 and 20, and in particular, please address the following:

    1. Implicitly the awards of 40 percent and 47.5 percent indicate that the Board believes the non-financial targets for PSP 19 were 80 percent achieved and those for PSP 20 were 95 percent achieved. OFHEO would note, however, that the Enterprise's performance in the years 2003 to 2006 was deficient in many areas beyond simply lack of attainment of earnings goals.

Mr. Stephen Ashley                                                    Page 2
Chairman of the Board of Directors

██████████████████████████████████████████████ Under these
circumstances, OFHEO needs a detailed explanation of the basis for the Board's
determinations, including the factors enumerated here and, specifically, how the percentages
cited above were selected.

2. The Board and company should review and report its findings regarding former
employees eligible for these PSP grants who were mentioned in OFHEO's report of special
examination to determine if their conduct should prevent any or all payments as representing
excessive compensation based on the situation during the time periods for which these
grants were calculated. These include Mr. Franklin Raines, Mr. Timothy Howard, Mr.
Sampath Rajappa and Ms. Ann Kappler.

3. The report should include a review of the comparability of such payments to payments by
companies with similar histories, employee conduct and financials for the periods of the
grants and for the reasonableness of such payments in light of the facts that have confronted
Fannie Mae.

Since transfer of funds could prove irretrievable from individual recipients and could risk liability to
the Enterprise if such amounts are determined to be excessive, the Board should not undertake such
action without first providing the report that OFHEO has directed pursuant to its authority to
secure reports at 12 U.S.C. 4514(a)(2) and receiving OFHEO's approval for such payments.

Please feel free to contact me if you have any questions.

                                        Sincerely,

                                        James B. Lockhart III
                                        Director

cc:
Beth Wilkinson
EVP -- General Counsel

# EXHIBIT

# 9


10k WIZARD
SEC POWER SEARCH

# FORM 8-K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE - FNM

**Filed: January 26, 2007 (period: January 25, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 5.02** Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain

**Item 9.01.** Financial Statements and Exhibits.

SIGNATURE
EXHIBIT INDEX
EX−99.1 (EXHIBIT 99.1)

EX−99.2 (EXHIBIT 99.2)

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549**

FORM 8–K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):                              January 25, 2007

# Federal National Mortgage Association

(Exact name of registrant as specified in its charter)

| Federally Chartered Corporation | 000–50231 | 52–0883107 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 3900 Wisconsin Avenue, NW, Washington, District of Columbia | 20016 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:            202–752–7000

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[  ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[  ]  Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)
[  ]  Pre–commencement communications pursuant to Rule 14d–2(b) under the Exchange Act (17 CFR 240.14d–2(b))
[  ]  Pre–commencement communications pursuant to Rule 13e–4(c) under the Exchange Act (17 CFR 240.13e–4(c))

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

Yesterday Fannie Mae's Board of Directors and its Compensation Committee determined the 2007 salaries, the 2006 performance year cash bonuses and the 2006 performance year variable long–term incentive awards for its executive officers. In accordance with Fannie Mae's capital restoration plan, as agreed to with its regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), all of the non–salary compensation decisions for Fannie Mae's "OFHEO–designated executive officers" (which is a larger group of executive officers than those Fannie Mae has determined are "executive officers" under the rules of the Securities and Exchange Commission) require OFHEO's approval. Fannie Mae has received the required approval from OFHEO for the 2006 bonus and restricted stock awards program.

In determining compensation for the 2006 performance year, the Compensation Committee and the Board focused on Fannie Mae's performance against the corporate performance goals that the Board had established in April 2006 and the importance of the company's ability to recruit, retain and maintain experienced and effective senior management as Fannie Mae works to become current in filing its financial statements, implement its agreements with OFHEO and manage its business. The Compensation Committee, with input from other Board committees, evaluated corporate performance in 2006 against the previously established corporate performance goals, which related to (1) stabilizing the company by building relationships with regulators and investors and restating prior period financial statements; (2) optimizing the company's business model and generating shareholder value through key initiatives; (3) fulfilling Fannie Mae's affordable housing mission; (4) instilling operational discipline into all functions; and (5) renewing the company's culture. The compensation decisions for Fannie Mae's senior management presented in this Form 8–K reflect the assessment of the Board and the Compensation Committee of the company's performance in 2006 against these goals and individual performance of the officers.

Compensation of Fannie Mae's executive officers is determined annually and includes three components: (i) salary, (ii) cash bonuses under an annual incentive plan, and (iii) variable long–term incentive awards. At the senior levels of the company, the largest component of compensation is a variable long–term incentive award, which is delivered as stock that vests, generally over a period of four years. This serves to align management to the company's shareholders.

The Board and the Compensation Committee's decisions discussed below reflect a change in the compensation philosophy that the Board and the Compensation Committee adopted in 2005. Under this approach, management's performance is measured against a broad set of corporate objectives rather than focusing on a single financial measure.

The following table sets forth, opposite the name and title of Fannie Mae's Chief Executive Officer, its Chief Financial Officer and its four most highly compensated officers during 2005 other than the Chief Executive Officer, (i) the 2007 annual base salary for that officer, (ii) the annual cash bonus for the 2006 performance year for that

– 2 –

officer, and (iii) the number of shares of restricted stock or restricted stock units issued to that officer for the 2006 performance year. The executive officers listed in this table are referred to in the discussion below as the "covered executives." More detailed information about the terms of the compensation and the manner in which the Compensation Committee and the Board review and determine compensation for senior management is set forth following the table.

| Name and Title | 2007 Salary | 2006 Cash Bonus | Restricted Shares(1) |
|---|---|---|---|
| Daniel H. Mudd<br>President and Chief Executive Officer | $990,000 | $3,500,000 | 176,506(2) |
| Robert T. Blakely<br>Executive Vice President and Chief Financial Officer | $663,000 | $1,290,575 | 58,236 |
| Robert J. Levin<br>Executive Vice President and Chief Business Officer | $788,000 | $2,087,250 | 117,679 |
| Thomas A. Lund<br>Executive Vice President—Single–Family Mortgage Business | $523,000 | $1,029,515 | 41,945 |
| Peter S. Niculescu<br>Executive Vice President–Capital Markets | $585,000 | $1,029,060 | 50,127 |
| Michael J. Williams<br>Executive Vice President and Chief Operating Officer | $676,000 | $1,630,200 | 92,621 |

(1)    Each award vests at the rate of 25 percent per year, beginning in January 2008. On January 25, 2007, the closing price of Fannie Mae's common stock was $56.57 per share.

(2)    One–fifth of this award (net of taxes) must be retained by Mr. Mudd until his employment with Fannie Mae is terminated. The retained shares will not count toward fulfilling Mr. Mudd's obligation to hold shares of Fannie Mae common stock worth five times his base salary under Fannie Mae's stock ownership guidelines.

Background

Fannie Mae's Board sets the compensation of Fannie Mae's executive vice presidents, while compensation of Fannie Mae's President and Chief Executive Officer is determined by the independent members of the Board. In each case, compensation decisions are based on the recommendation of the Compensation Committee.

In determining compensation for senior management, the goal of the Compensation Committee and the Board is to ensure, as required under the Fannie Mae Charter Act, that Fannie Mae's compensation is reasonable and comparable with the compensation of executives with similar duties and responsibilities in other similar businesses. For these compensation decisions involving senior officers, the Compensation Committee and the Board used as a guideline the 50th percentile of compensation paid at a comparison group of diversified financial services companies. The company's philosophy prior to 2005

– 3 –

Source: FEDERAL NATIONAL MOR, 8–K, January 26, 2007

had been to target total compensation at approximately the 65th percentile of companies in Fannie Mae's comparison group. Information regarding compensation paid at other companies, including actual 2005 compensation and estimated 2006 compensation for chief executive officers, was provided by a nationally recognized executive compensation consulting firm retained to assist in this comparability analysis. The Compensation Committee retained its own nationally recognized compensation consultant to act as an independent advisor with regard to compensation decisions for the covered executives, especially those relating to Mr. Mudd's compensation. The Compensation Committee considered compensation scenarios for each covered executive, taking into account the executive's outstanding stock options, restricted shares, and performance share balances; existing severance arrangements with the executive, if any; and the other benefits (such as life insurance, pension plan participation and health benefits) available to the executive under the terms of his employment.

Salary

The Board (and, in the case of the Chief Executive Officer, the independent members of the Board) established the base salaries for the covered executives based on the recommendation of the Compensation Committee.

Cash Bonuses

The cash bonuses for the covered executives are set each year in accordance with Fannie Mae's Annual Incentive Plan. Fannie Mae's Annual Incentive Plan governs the payment of annual cash incentive awards (i.e., cash bonuses) to Fannie Mae's executive officers and other management–level employees. Pursuant to the terms of the plan, on April 24, 2006 and April 25, 2006, the Board and the Compensation Committee approved the corporate performance goals for 2006 that are described above and bonus award targets for the covered executives and other executive officers. In January 2007, the Compensation Committee, with input from other Board committees, evaluated corporate performance against the goals, including what it determined to be the appropriate weighting of the goals at that time, and determined that it was appropriate to fund the bonus pool. The Board (and, in the case of the President and Chief Executive Officer, the independent members of the Board) then determined, based on the recommendation of the Compensation Committee, the individual bonus amounts for each covered executive.

Variable Long–Term Incentive Awards

Variable long–term incentive compensation awards are awards that vest over a period of years. Fannie Mae believes that providing a portion of senior management compensation through variable long–term incentive awards that have a multi–year vesting schedule and that are based in large part on Fannie Mae common stock aligns the interests of its senior management with those of other Fannie Mae stockholders, reinforcing their shared interests in company performance.

Consistent with this compensation philosophy, on January 25, 2007, the Board determined, based on the recommendation of the Compensation Committee, that variable

– 4 –

long–term incentive awards to Fannie Mae's executive officers for 2006 performance would be made in the form of shares of restricted Fannie Mae common stock or restricted stock units that would vest at the rate of 25 percent per year, beginning in January of 2008. Vesting is contingent on the executive's continued employment with Fannie Mae, subject to accelerated vesting as a result of death, disability, retirement or, under specified circumstances, a negotiated separation from Fannie Mae. Fannie Mae's restricted stock confers voting and dividend rights on its holders. Each restricted stock unit represents the right to receive a share of common stock at the time of vesting. As a result, restricted stock units are generally similar to restricted stock, except that restricted stock units do not confer voting rights on their holders.

Prior to January 2005, Fannie Mae granted long–term incentive awards under its performance share program. Under the program, senior management was compensated for meeting performance objectives over a period of three calendar years. Objectives were set at the beginning of the three–year period, and after the end of the period the Compensation Committee determined achievement against the goals and the amount of the award payout. No award cycles have been established under the program since 2004 and, since January 2005, the Board and the Compensation Committee have deferred the determination of the amount of any payouts under the program.

**Item 9.01. Financial Statements and Exhibits.**

(d)  Exhibits. The exhibit index filed herewith is incorporated herein by reference.

– 5 –

Source: FEDERAL NATIONAL MOR, 8–K, January 26, 2007

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE ASSOCIATION

By:  /s/ Beth A. Wilkinson

Beth A. Wilkinson
Executive Vice President and General Counsel

Date: January 26, 2007

– 6 –

EXHIBIT INDEX

The following exhibits are submitted herewith:

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 99.1 | Form of Restricted Stock Award Document |
| 99.2 | Form of Restricted Stock Units Award Document |

–7–

Source: FEDERAL NATIONAL MOR, 8–K, January 26, 2007

Exhibit 99.1

**FANNIE MAE**
**RESTRICTED STOCK AWARD**
**Award Document**

This grant of Restricted Stock from Fannie Mae (the "Award") is made to you as an Eligible Employee (the "Awardee") effective as of the date of grant set forth in the grant detail available for you to view on the UBS website.

1.    <u>Grant of Stock</u>.   Pursuant to the provisions of the Fannie Mae Stock Compensation Plan of 2003 (the "Plan"), Fannie Mae hereby grants to the Awardee, subject to the terms and conditions of the Plan and subject further to the terms and conditions set forth in this Award Document, restricted shares of Common Stock of Fannie Mae (the "Restricted Stock") as set forth in the grant detail found on the "Restricted" page under the "Grants/Awards/Units" tab on the UBS website.

2.    <u>Definitions</u>.   Unless provided otherwise herein, all defined terms are written with initial capital letters and shall have the meaning stated in the Plan.

3.    <u>Terms and Conditions</u>.   By accepting the Award, the Awardee agrees that the Award is subject to the following terms and conditions:

(a)    <u>Pre−Vesting Limitations</u>.   The Restricted Stock, the right to vote the Restricted Stock, and the right to receive dividends or other distributions with respect to the Restricted Stock may not, except in accordance with Plan provisions, be sold, assigned, transferred, exchanged, pledged, hypothecated or otherwise disposed of or encumbered, either voluntarily or involuntarily, until the restrictions have lapsed. Fannie Mae reserves the right to impose similar restrictions on any cash or property distributed with respect to any shares of Restricted Stock. Restrictions shall lapse in accordance with the vesting schedule set forth in the grant detail or, if earlier, upon the Awardee's Retirement, Early Retirement, Total Disability or death or at such earlier time and in such circumstances, if any, as may be determined under the Plan (including, without limitation, pursuant to Section 4.2(d) of the Plan if applicable). Notwithstanding the foregoing, restrictions shall not lapse upon the Awardee's Retirement or Early Retirement if the Committee determines that the Awardee's termination of employment is "For Cause." For the purpose of this Award, "For Cause" is defined in Section 6 below.

(b)    <u>Treatment of Restricted Stock Upon Termination of Employment</u>.   Unless otherwise provided by the Committee, all shares of Restricted Stock as to which the restrictions have not lapsed in accordance with the provisions hereof shall be immediately forfeited upon the termination of employment of the Awardee. Forfeited shares of Restricted Stock shall be automatically transferred to Fannie Mae without payment of any consideration by Fannie Mae and without any required consent or other action by the Awardee, and all rights of Awardee with respect to such shares of Restricted Stock shall thereupon cease.

(c)    <u>Shareholder Rights</u>.   The Awardee shall be entitled to voting rights and the right to any dividends or other distributions with respect to the shares of Restricted Stock held by the Awardee, regardless of whether such shares are vested or unvested, provided that such rights shall terminate immediately as to any Restricted Stock that is forfeited. Dividends and other distributions paid on unvested shares of Restricted Stock may be taxable to the Awardee as additional compensation.

(d)    <u>Payment of Taxes</u>.   This Award is conditioned upon prompt and timely payment by the Awardee to Fannie Mae of any and all taxes required to be withheld by Fannie Mae with respect to the grant or with respect to the vesting of the Restricted Stock. The Awardee shall pay such taxes as follows: (i) if the withholding obligation arises in connection with the vesting of any shares of Restricted Stock, by electing to have a portion of such shares with a value equal to the required withholding transferred to Fannie Mae, or (ii) by the delivery of a check in form satisfactory to the plan administrator, or (iii) by wire transfer. Fannie Mae's obligation to release unencumbered shares of Common Stock upon the lapse of restrictions on any Restricted Stock shall be subject to the satisfaction by the Awardee of these obligations.

(e)    <u>Award Confers No Rights with Respect to Continuance of Employment</u>.   This Award shall not confer upon the Awardee any right with respect to continued employment by Fannie Mae, nor shall it interfere in any way with the right of Fannie Mae to terminate the Awardee's employment at any time.

(f)    Compliance with Law and Regulations.    This Award and the obligation of Fannie Mae to release unencumbered shares hereunder shall be subject to applicable federal and state laws, rules and regulations, and to such approvals by any government or regulatory agency as may be required.

4.    Awardee Bound by Plan and Administrator's Records.    Awardee is bound by all the terms and provisions of the Plan and the records of the Plan's administrator (including any third–party recordkeeper). In the event of a conflict between the Award Document and the terms of the Plan or the records of the Plan's administrator, the terms of the Plan and records of the Plan's administrator shall control.

5.    Legends. Prior to the lapse of the restrictions on the Restricted Stock, Fannie Mae or its designee shall hold the Restricted Stock in book entry or certificate form and any certificates shall contain the following legend:

> "The shares of stock represented hereby are subject to the terms and conditions (including the risks of forfeiture and restrictions against transfer) contained in the Fannie Mae Stock Compensation Plan of 2003 and the Restricted Stock Award Document. Release from such terms and conditions shall be made only in accordance with the provisions of the Plan and this Award Document, a copy of each of which is on file in the office of the Department of Human Resources of Fannie Mae."

6.    Definition of "For Cause".  "For Cause" means Fannie Mae determines that the Awardee has:

(a)    materially harmed Fannie Mae by, in connection with the Awardee's performance of the Awardee's duties for Fannie Mae, engaging in dishonest or fraudulent actions or willful misconduct, or performing the Awardee's duties in a grossly negligent manner, or

(b)    been convicted of, or pleaded nolo contendere with respect to, a felony.

The Awardee will not be deemed to have been terminated For Cause following an event described in (a) above unless Fannie Mae has provided (i) reasonable notice to the Awardee setting forth Fannie Mae's intention to terminate For Cause, (ii) where remedial action is appropriate and feasible, a reasonable opportunity for such action, (iii) an opportunity for the Awardee, together with the Awardee's counsel, to be heard before the Compensation Committee of the Board of Directors or its delegate, and (iv) the Awardee with a notice of termination stating that the Awardee was guilty of the conduct set forth in (a) above and specifying the particulars thereof in detail. No act or failure to act by the Awardee will be considered "willful" unless it is done, or omitted to be done, by the Awardee in bad faith or without reasonable belief that the Awardee's action or omission was in the best interests of Fannie Mae.

Exhibit 99.2

**FANNIE MAE**
**RESTRICTED STOCK UNITS AWARD**
**Award Document**

This grant of units of Restricted Stock from Fannie Mae (the "Award") is made to you as an Eligible Employee (the "Awardee") effective as of the date of grant set forth in the grant detail available for you to view on the UBS website.

1. Grant of Units. Pursuant to the provisions of the Fannie Mae Stock Compensation Plan of 2003 (the "Plan"), Fannie Mae hereby grants to the Awardee, subject to the terms and conditions of the Plan and subject further to the terms and conditions set forth in this Award Document, restricted units (the "Restricted Stock units") relating to the Common Stock of Fannie Mae as set forth in the grant detail found on "Restricted" page under the "Grants/Awards/Units" tab on the UBS website. Each unit represented by this Award represents the unfunded and unsecured contractual right to the future delivery of one share of Common Stock, subject to the restrictions herein and in the Plan.

2. Definitions. Unless provided otherwise herein, all defined terms are written with initial capital letters and shall have the meaning stated in the Plan.

3. Terms and Conditions. By accepting the Award, the Awardee agrees that the Award evidenced by the Award Document is subject to the following terms and conditions:

(a) Pre–Vesting Limitations. The Restricted Stock units and the right to receive payments from Fannie Mae in lieu of dividends or other distributions with respect to the Common Stock represented by the units may not, except in accordance with Plan provisions, be sold, assigned, transferred, exchanged, pledged, hypothecated or otherwise disposed of or encumbered, either voluntarily or involuntarily. Restrictions shall lapse in accordance with the vesting schedule set forth in the grant detail or, if earlier, upon the Awardee's Retirement, Early Retirement, Total Disability or death or at such earlier time and in such circumstances, if any, as may be determined under the Plan (including, without limitation, pursuant to Section 4.2(d) of the Plan if applicable). Notwithstanding the foregoing, restrictions shall not lapse upon the Awardee's Retirement or Early Retirement if the Committee determines that the Awardee's termination of employment is "For Cause." For the purpose of this Award, "For Cause" is defined in Section 5 below.

(b) Treatment of Restricted Stock Units Upon Termination of Employment. Unless otherwise provided by the Committee, the Awardee's rights under the Restricted Stock units as to which the restrictions have not lapsed in accordance with the provisions hereof, including without limitation the right to the future delivery of shares of Common Stock, shall be immediately forfeited upon the termination of employment of the Awardee without payment of any consideration by Fannie Mae and without any consent or other action by the Awardee, and all rights of Awardee with respect to such Restricted Stock units shall thereupon cease.

(c) Delivery of Shares; Shareholder Rights. As soon as practicable following the vesting of a Restricted Stock unit, Fannie Mae will cause one share of Common Stock to be transferred to the Awardee (or, in the event of the Awardee's death, except, as otherwise provided within the Plan, to the Awardee's estate). Notwithstanding the foregoing, to the extent necessary to avoid the imposition of an additional tax under Section 409A of the Internal Revenue Code, any Restricted Stock units that vest by reason of the Awardee's termination of employment due to the Awardee's Retirement or Early Retirement will be paid no earlier than six months and one day following the Awardee's Retirement or Early Retirement. Until such time as such share of Common Stock is transferred to the Awardee, the Awardee shall not be treated as a shareholder with respect thereto and shall have no rights to related dividends or other distributions, or voting rights; provided, that during such periods, prior to the actual delivery of shares of Common Stock, as the Awardee holds units hereunder, the Awardee shall be entitled to receive payments from Fannie Mae in lieu of the regular cash dividends that would have been payable had such units been actual shares of Common Stock owned by the Awardee. Any such payments in lieu of cash dividends from Fannie Mae shall be taxable as additional compensation to the Awardee. If there is a stock split, stock dividend or similar change affecting the Common Stock, Fannie Mae shall appropriately adjust the outstanding units of Restricted Stock to reflect such change.

(d)  Payment of Taxes.  This Award and Fannie Mae's obligation to deliver shares of Common Stock upon the vesting of this Award are conditioned upon the prompt and timely payment by the Awardee to Fannie Mae of any and all taxes required to be withheld by Fannie Mae with respect to the vesting of the Award or the delivery of shares of Common Stock hereunder. The Awardee shall pay such taxes as follows: (i) if the withholding obligation arises in connection with the delivery of shares of Common Stock, by electing to have a portion of such shares with a value equal to the required withholding held back by Fannie Mae; or (ii) by the delivery of a check in form satisfactory to the plan administrator, or (iii) by wire transfer.

(e)  Award Confers No Rights with Respect to Continuance of Employment.  This Award shall not confer upon the Awardee any right with respect to continued employment by Fannie Mae, nor shall it interfere in any way with the right of Fannie Mae to terminate the Awardee's employment at any time.

(f)  Compliance with Law and Regulations.  This Award and the obligation of Fannie Mae to deliver shares hereunder shall be subject to applicable federal and state laws, rules and regulations, and to such approvals by any government or regulatory agency as may be required.

4.  Awardee Bound by Plan and Administrator's Records.  Awardee is bound by all the terms and provisions of the Plan and the records of the Plan's administrator (including any third–party recordkeeper). In the event of a conflict between the Award Document and the terms of the Plan or the records of the Plan's administrator, the terms of the Plan and records of the Plan's administrator shall control.

5.  Definition of "For Cause".  "For Cause" means Fannie Mae determines that the Awardee has:

(a)  materially harmed Fannie Mae by, in connection with the Awardee's performance of the Awardee's duties for Fannie Mae, engaging in dishonest or fraudulent actions or willful misconduct, or performing the Awardee's duties in a grossly negligent manner, or

(b)  been convicted of, or pleaded nolo contendere with respect to, a felony.

The Awardee will not be deemed to have been terminated For Cause following an event described in (a) above unless Fannie Mae has provided (i) reasonable notice to the Awardee setting forth Fannie Mae's intention to terminate For Cause, (ii) where remedial action is appropriate and feasible, a reasonable opportunity for such action, (iii) an opportunity for the Awardee, together with the Awardee's counsel, to be heard before the Compensation Committee of the Board of Directors or its delegate, and (iv) the Awardee with a notice of termination stating that the Awardee was guilty of the conduct set forth in (a) above and specifying the particulars thereof in detail. No act or failure to act by the Awardee will be considered "willful" unless it is done, or omitted to be done, by the Awardee in bad faith or without reasonable belief that the Awardee's action or omission was in the best interests of Fannie Mae.

---

Created by 10KWizard    www.10KWizard.com

# EXHIBIT

# 10



# FORM 8−K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE − FNM

**Filed: February 23, 2005 (period: February 22, 2005)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 7.01.** Regulation FD Disclosure.

**Item 8.01.** Other Events.

**Item 9.01.** Financial Statements and Exhibits.

SIGNATURE
EXHIBIT INDEX
EX-99.1 (EXHIBIT 99.1)

EX-99.2 (EXHIBIT 99.2)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

**Washington, DC 20549**

# FORM 8−K

CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **February 22, 2005**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | | |
|---|---|---|
| **Federally chartered corporation** | **000−50231** | **52−0883107** |
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification Number)* |

| | |
|---|---|
| **3900 Wisconsin Avenue, NW** | **20016** |
| **Washington, DC** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

**Registrant's telephone number, including area code: 202−752−7000**

*(Former Name or Former Address, if Changed Since Last Report):* _____

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)

☐ Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))

☐ Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

*Item 7.01. Regulation FD Disclosure.*

On February 22, 2005, Fannie Mae (formally, the Federal National Mortgage Association) issued its monthly financial summary release for the month of January 2005. The summary, a copy of which is furnished as Exhibit 99.1 to this report, is incorporated herein by reference.

The information in this item, including the exhibit submitted herewith, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, nor shall it be deemed incorporated by reference in any disclosure document of Fannie Mae, except as shall be expressly set forth by specific reference in such document.

*Item 8.01. Other Events.*

On February 23, 2005, Fannie Mae released an update on capital plan and accounting issues. The release, a copy of which is filed as Exhibit 99.2 to this report, is incorporated herein by reference.

*Item 9.01. Financial Statements and Exhibits.*

*(c) Exhibits.* The exhibit index filed herewith is incorporated herein by reference.

–2–

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

FEDERAL NATIONAL MORTGAGE ASSOCIATION

By    /s/ Ann M. Kappler

Ann M. Kappler
Executive Vice President and
General Counsel

Date: February 23, 2005

–3–

EXHIBIT INDEX

The following exhibits are submitted herewith:

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 99.1 | Monthly summary release for January 2005 issued by Fannie Mae on February 22, 2005. |
| 99.2 | February 23, 2005 Statement by Fannie Mae. |

−4−

EXHIBIT 99.1

**FANNIE MAE**
**MONTHLY SUMMARY**

**January 2005**

**HIGHLIGHTS FOR JANUARY INCLUDE:**

- Total business volume was $48.1 billion in January compared with $50.7 billion the previous month.

- Mortgage portfolio sales rose to $6.4 billion as historically tight mortgage–to–debt spreads provided economically attractive opportunities to sell portfolio assets.

- Portfolio purchases were $11.1 billion, compared with $13.0 billion in December.

- The mortgage portfolio declined at a 16.8 percent annualized rate in January, compared with a 10.1 percent decline in December 2004. Outstanding MBS grew at a 12.0 percent annualized rate in January compared with 8.5 percent in December as a result of mortgage portfolio sales and a reduction in Fannie Mae MBS purchases.

- The conventional single–family delinquency rate fell one basis point to 0.63 percent in December. The multifamily delinquency rate remained stable at 0.10 percent.

- The duration gap on Fannie Mae's mortgage portfolio averaged a minus one month in January, for the third consecutive month.

Source: FEDERAL NATIONAL MOR, 8–K, February 23, 2005


**FannieMae**

**BUSINESS BALANCES AND GROWTH ($ in Millions) 1/**

| | Mortgage Portfolio, Gross 2/ | | Outstanding MBS 3/ | | Book of Business | |
| | End Balance | Growth Rate 4/ | End Balance | Growth Rate 4/ | End Balance | Growth Rate 4/ |
|---|---|---|---|---|---|---|
| February 2004 | $882,124 | (6.1%) | $1,335,714 | 16.6% | $2,217,838 | 7.0% |
| March 2004 | 880,911 | (1.6%) | 1,345,892 | 9.5% | 2,226,803 | 5.0% |
| April 2004 | 880,481 | (0.6%) | 1,353,399 | 6.9% | 2,233,880 | 3.9% |
| May 2004 | 878,386 | (2.8%) | 1,354,160 | 0.7% | 2,232,546 | (0.7%) |
| June 2004 | 891,210 | 19.0% | 1,360,045 | 5.3% | 2,251,255 | 10.5% |
| July 2004 | 892,724 | 2.1% | 1,363,317 | 2.9% | 2,256,041 | 2.6% |
| August 2004 | 895,428 | 3.7% | 1,368,918 | 5.0% | 2,264,345 | 4.5% |
| September 2004 | 904,543 | 12.9% | 1,377,680 | 8.0% | 2,282,223 | 9.9% |
| October 2004 | 913,246 | 12.2% | 1,386,272 | 7.7% | 2,299,518 | 9.5% |
| November 2004 | 912,608 | (0.8%) | 1,393,205 | 6.2% | 2,305,813 | 3.3% |
| December 2004 | 904,555 | (10.1%) | 1,402,761 | 8.5% | 2,307,316 | 0.8% |
| **Full year 2004** | **$904,555** | **0.7%** | **$1,402,761** | **7.9%** | **$2,307,316** | **4.9%** |
| January 2005 | $890,834 | (16.8%) | $1,416,038 | 12.0% | $2,306,871 | (0.2%) |

**BUSINESS VOLUMES ($ in Millions) 1/**

| | MBS | | | | | | |
| | Single-family Issues | Multifamily Issues | Total Lender-originated Issues 5/ | Fannie Mae MBS Purchases 6/ | MBS Issues Acquired by Others | Portfolio Purchases | Business Volume |
|---|---|---|---|---|---|---|---|
| February 2004 | $ 38,605 | $ 200 | $ 38,804 | $ 181 | $ 38,624 | $ 12,170 | $ 50,794 |
| March 2004 | 44,345 | 1,019 | 45,365 | 6,507 | 38,858 | 20,260 | 59,118 |
| April 2004 | 56,117 | 424 | 56,541 | 10,198 | 46,344 | 27,448 | 73,792 |
| May 2004 | 57,629 | 931 | 58,559 | 10,670 | 47,889 | 26,686 | 74,575 |
| June 2004 | 52,981 | 711 | 53,692 | 13,330 | 40,362 | 37,164 | 77,526 |
| July 2004 | 38,719 | 916 | 39,636 | 5,676 | 33,960 | 21,618 | 55,578 |
| August 2004 | 34,685 | 276 | 34,961 | 4,676 | 30,285 | 21,787 | 52,072 |
| September 2004 | 40,647 | 224 | 40,870 | 5,074 | 35,796 | 27,661 | 63,457 |
| October 2004 | 37,594 | 694 | 38,289 | 3,665 | 34,623 | 27,142 | 61,766 |
| November 2004 | 35,739 | 520 | 36,259 | 2,717 | 33,542 | 19,121 | 52,662 |
| December 2004 | 38,941 | 434 | 39,375 | 1,642 | 37,732 | 13,016 | 50,748 |
| **Full year 2004** | **$520,292** | **$6,854** | **$527,146** | **$64,604** | **$462,542** | **$262,647** | **$725,189** |
| January 2005 | $ 35,440 | $2,016 | $ 37,457 | $ 451 | $ 37,006 | $ 11,095 | $ 48,101 |

**MORTGAGE PORTFOLIO COMMITMENTS, PURCHASES, AND SALES ($ in Millions) 1/**

| | | Purchases | | | | Mortgage Portfolio |
| | Retained Commitments | Single-family | Multifamily | Total Purchases | Net Yield 7/ | Sales |
|---|---|---|---|---|---|---|
| February 2004 | $ 12,576 | $ 11,834 | $ 337 | $ 12,170 | 3.68% | $ 1,326 |
| March 2004 | 29,411 | 19,406 | 854 | 20,260 | 4.53% | 1,023 |
| April 2004 | 28,860 | 25,997 | 1,451 | 27,448 | 4.37% | 1,583 |
| May 2004 | 28,389 | 25,461 | 1,226 | 26,686 | 4.55% | 885 |
| June 2004 | 29,668 | 34,775 | 2,389 | 37,164 | 4.44% | 1,695 |
| July 2004 | 19,504 | 20,667 | 950 | 21,618 | 4.44% | 681 |
| August 2004 | 24,683 | 20,747 | 1,040 | 21,787 | 4.14% | 1,932 |
| September 2004 | 30,783 | 24,193 | 3,468 | 27,661 | 3.61% | 1,195 |
| October 2004 | 19,356 | 23,109 | 4,034 | 27,142 | 3.59% | 941 |
| November 2004 | 11,887 | 16,634 | 2,486 | 19,121 | 4.16% | 1,511 |
| December 2004 | 9,330 | 10,980 | 2,036 | 13,016 | 4.71% | 1,653 |
| **Full year 2004** | **$256,144** | **$241,800** | **$20,848** | **$262,647** | **4.22%** | **$16,449** |
| January 2005 | $ 797 | $ 7,783 | $ 3,312 | $ 11,095 | 4.40% | $ 6,360 |

1/    Represents unpaid principal balance.
2/    Excludes mark-to-market adjustments, deferred balances and allowance for losses. Includes $479 billion of Fannie Mae MBS as of January 31, 2005.

Source: FEDERAL NATIONAL MOR, 8-K, February 23, 2005

3/    MBS held by investors other than Fannie Mae's portfolio.
4/    Growth rates are compounded.
5/    Excludes MBS issued from Fannie Mae's portfolio, which was $1,840 million in January 2005.
6/    Included in total portfolio purchases.
7/    Yields shown on a taxable-equivalent basis.

Numbers may not foot due to rounding.

1

**LIQUIDATIONS ($ in Millions) 1/**

| | Mortgage Portfolio Liquidations | | Outstanding MBS Liquidations | |
|---|---|---|---|---|
| | Amount | Annual Rate | Amount | Annual Rate |
| February 2004 | $ 15,419 | 20.92% | $ 22,948 | 20.75% |
| March 2004 | 20,444 | 27.83% | 29,702 | 26.58% |
| April 2004 | 26,086 | 35.54% | 40,419 | 35.94% |
| May 2004 | 27,917 | 38.09% | 48,013 | 42.56% |
| June 2004 | 22,783 | 30.90% | 36,063 | 31.89% |
| July 2004 | 19,467 | 26.19% | 31,363 | 27.64% |
| August 2004 | 17,179 | 23.06% | 26,442 | 23.23% |
| September 2004 | 17,361 | 23.15% | 27,168 | 23.74% |
| October 2004 | 17,529 | 23.14% | 26,970 | 23.42% |
| November 2004 | 18,295 | 24.05% | 28,104 | 24.27% |
| December 2004 | 19,449 | 25.69% | 29,779 | 25.56% |
| Full year 2004 | $240,201 | 26.87% | $374,688 | 27.58% |
| January 2005 | $ 18,480 | 24.70% | $ 30,063 | 25.60% |

**DELINQUENCY RATES**

Single–family Conventional 2/

| | Non–Credit Enhancement 3/ | Credit Enhancement 4/ | Total 5/ | Multifamily Total 6/ |
|---|---|---|---|---|
| February 2004 | 0.31% | 1.70% | 0.61% | 0.24% |
| March 2004 | 0.30% | 1.62% | 0.58% | 0.17% |
| April 2004 | 0.29% | 1.58% | 0.56% | 0.16% |
| May 2004 | 0.29% | 1.61% | 0.57% | 0.14% |
| June 2004 | 0.29% | 1.62% | 0.57% | 0.14% |
| July 2004 | 0.29% | 1.65% | 0.57% | 0.13% |
| August 2004 | 0.30% | 1.67% | 0.58% | 0.13% |
| September 2004 | 0.30% | 1.72% | 0.59% | 0.12% |
| October 2004 | 0.32% | 1.77% | 0.62% | 0.12% |
| November 2004 | 0.33% | 1.84% | 0.64% | 0.10% |
| December 2004 | 0.33% | 1.84% | 0.63% | 0.10% |

**AVERAGE INVESTMENT BALANCES ($ in Millions)**

| | Net Mortgages | Liquid Investments | Total Net Investments |
|---|---|---|---|
| February 2004 | $883,892 | $63,749 | $947,641 |
| March 2004 | 876,205 | 66,996 | 943,201 |
| April 2004 | 870,446 | 75,787 | 946,232 |
| May 2004 | 866,855 | 82,711 | 949,567 |
| June 2004 | 873,386 | 71,698 | 945,084 |
| July 2004 | 883,135 | 63,078 | 946,213 |
| August 2004 | 887,471 | 64,853 | 952,324 |
| September 2004 | 895,590 | 69,256 | 964,846 |
| October 2004 | 903,065 | 61,445 | 964,510 |
| November 2004 | 907,233 | 62,836 | 970,069 |
| December 2004 | 904,200 | 58,877 | 963,077 |
| YTD 2004 | $886,699 | $67,510 | $954,208 |
| January 2005 | $891,533 | $66,667 | $958,200 |

**INTEREST RATE RISK DISCLOSURE**

| | Effective Duration Gap 7/ (in months) |
|---|---|
| February 2004 | –1 |
| March 2004 | 0 |
| April 2004 | 3 |
| May 2004 | 3 |
| June 2004 | 2 |
| July 2004 | 0 |
| August 2004 | –2 |
| September 2004 | –2 |
| October 2004 | 0 |
| November 2004 | –1 |
| December 2004 | –1 |
| January 2005 | –1 |

\*Note:  Fannie Mae's monthly summary excludes net interest income at risk information. On December 15, 2004, the Office of the Chief Accountant of the Securities and Exchange Commission (the "SEC") issued a statement (the "Statement") regarding a review of certain accounting issues relating to Fannie Mae, including a determination by the SEC that Fannie Mae should restate its financial statements to eliminate the use of hedge accounting. The restatement will affect Fannie Mae's net interest income at risk information. On December 16, 2004, Fannie Mae filed a Current Report on Form 8–K with the SEC that includes a copy of the Statement.

1/     Represents unpaid principal balance.
2/     Includes conventional loans three or more months delinquent or in foreclosure process as a percent of the number of loans.

Source: FEDERAL NATIONAL MOR, 8–K, February 23, 2005

3/    Loans without primary mortgage insurance or any credit enhancements.
4/    Loans with primary mortgage insurance and other credit enhancements.
5/    Total of single–family non–credit enhanced and credit enhanced loans.
6/    Includes loans and securities 60 days or more past due and is calculated based on mortgage credit book of business.
7/    The duration gap is a weighted average for the month.

Numbers may not foot due to rounding.

2

Source: FEDERAL NATIONAL MOR, 8–K, February 23, 2005

The information presented in this report is unaudited and includes, in the opinion of management, all adjustments (consisting of normally recurring accruals) necessary for a fair presentation. Fannie Mae has announced that its previously issued financial statements and information should no longer be relied upon in light of the SEC's determination that the financial statements were prepared applying accounting practices that did not comply with generally accepted accounting principles, or GAAP. Fannie Mae has also announced that it will restate its previously issued financial statements and that its audit committee has approved the engagement of new auditors to serve as Fannie Mae's independent auditors for 2001 through 2004. It is possible that the re-audit and restatement of Fannie Mae's financial statements may result in changes to some of the information in this report.

For more information about the restatement and the reaudit, please see the Form 8-Ks Fannie Mae filed with the SEC on December 22, 2004 and January 4, 2005. For more information regarding Fannie Mae, please visit www.fanniemae.com or contact us at (202) 752-7115.

**Exhibit 99.2**

 **FannieMae.**

Chuck Greener
202–752–2616

Janis Smith
202–752–6673

3466

February 23, 2005

**Statement by Fannie Mae**
**Update on Capital Plan and Accounting Issues**

Fannie Mae's management team is committed to work with our regulator, our Board of Directors, our external auditor and our Board's independent counsel to complete the ongoing reviews, complete the restatement and re–audit process, and strengthen our operations to ensure we can continue to achieve our mission in a safe and sound manner. As this process continues, Fannie Mae will continue to provide periodic updates and announcements on key actions and significant information emerging from the reviews.

Fannie Mae has been working closely with OFHEO to fulfill the terms of the September 27, 2004 agreement and to cooperate with the agency's continuing special examination of the company's accounting policies and practices and internal controls. The Board of Directors, in concert with independent counsel engaged by the Board (the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP), and management also continue to make progress on internal reviews as the company works through the restatement of its financial statements. In parallel, new management is undertaking a complete reorganization of the accounting function and a bottom–up review of accounting policies and controls.

Fannie Mae has received approval by OFHEO of the company's proposed capital restoration plan. In addition, OFHEO also has notified Fannie Mae of several issues regarding accounting policies, internal controls and financial reporting processes that the agency has identified in its ongoing special examination.

Last December, after classifying Fannie Mae as significantly undercapitalized, OFHEO directed the company to submit a capital restoration plan that would provide for compliance with its minimum capital requirement, as well as a 30 percent capital surplus. Fannie Mae formally began its capital restoration program last December by issuing $5 billion in preferred stock. In addition, the company reduced its first quarter 2005 common stock dividend by 50 percent to accelerate capital restoration.

Fannie Mae worked with OFHEO to develop and submit a proposed capital restoration plan, and having obtained the agency's approval, the company will work closely and cooperatively with OFHEO to carry out the requirements of the plan.

1

Under the OFHEO–approved plan, Fannie Mae intends to achieve the 30 percent capital surplus by September 30, 2005 through 1) managing total balance sheet asset size by reducing the portfolio principally through normal mortgage liquidations in order to limit overall minimum capital requirements; and 2) increasing core capital through retained earnings, including cost–cutting efforts to augment capital accumulation.

The plan assumes no increase in the company's common stock dividend from its current level. As OFHEO directed, the plan also incorporates a formal process of monitoring and reporting to the agency on Fannie Mae's progress in carrying out the plan. (A summary of the capital restoration plan is attached.)

OFHEO also has notified Fannie Mae's Board of Directors and management of several accounting and internal control issues and questions the agency has identified in its ongoing special examination, and directed that these matters be included in the internal reviews by Fannie Mae's board and management and reviewed by the company's external auditor. OFHEO indicated that it has not completed its review of all aspects of these issues, but has identified policies that it believes appear to be inconsistent with generally accepted accounting principles as well as internal control deficiencies that it believes raise safety and soundness concerns. The issues and questions pertain to the following areas: securities accounting, loan accounting, consolidations, accounting for commitments, and practices to smooth certain income and expense amounts. OFHEO also raised concerns regarding journal entry controls, systems limitations, and database modifications, as well as new developments relating to FAS 91. (A summary of the additional issues and questions raised in OFHEO's special examination of Fannie Mae is attached.)

Fannie Mae's Board and management are addressing the issues and questions raised by OFHEO. Fannie Mae will report to OFHEO regarding each of these issues, and will continue to work with OFHEO to resolve these matters as part of the company's ongoing internal reviews and its restatement process.

* * *

Since December 2004, Fannie Mae has taken a number of significant actions in consultation with OFHEO to address deficiencies the regulator identified in the company's financial reporting and accounting systems and controls. These actions include:

> ➤ Engagement of a new external auditor, Deloitte & Touche LLP;

> ➤ Personnel changes in the Controller's Office and Internal Audit department;

> ➤ Organizational changes in the Controller's Office and the undertaking of enhancements to the Internal Audit function;

> ➤ A series of meetings with OFHEO and Deloitte & Touche to identify particular areas for review during the restatement process.

Pursuant to the September 27, 2004 agreement, Fannie Mae will submit to OFHEO by February 25, 2005 a plan to fundamentally restructure and strengthen the company's financial and risk management organization. Fannie Mae already has appointed an interim Chief Risk Officer, and under the proposed reorganization will appoint a Chief Compliance and Ethics Officer reporting to the Chief Executive Officer.

2

Management has initiated a comprehensive review of accounting routines and controls, the financial reporting process and the application of generally accepted accounting principles. The issues OFHEO has identified described above, as well as issues identified by management and/or Deloitte & Touche, will be reviewed, restated where necessary and submitted to Deloitte & Touche for review as part of its audit. The company is committed to informing OFHEO, Paul Weiss, and Deloitte & Touche of our work on these matters, including the company's approach to completing the restatement, realigning financial control and audit functions and overhauling reporting systems.

\*\*\*

*This statement and the attached summary of Fannie Mae's Capital Restoration Plan include forward−looking statements, including statements regarding Fannie Mae's compliance with and results under the Capital Restoration Plan. These statements are based on beliefs and assumptions by the company's management, and on information currently available to management. A number of important factors could cause actual results to differ materially from those contained in any forward−looking statement. Examples of such factors include, but are not limited to, the progress and outcome of the company's financial restatement, adjustments to the company's financials resulting from the re−audit by the company's new auditors, the market for the company's products and services and competition in the markets in which the company operates, the success of Fannie Mae's cost−cutting efforts, the outcome of the investigation being conducted by independent counsel on behalf of the company's Board of Directors, and unanticipated expenses that result from the foregoing.*

3

**Capital Restoration Plan Summary**

On December 21, 2004, the Office of Federal Housing Enterprise Oversight ("OFHEO") classified Fannie Mae as significantly undercapitalized as of September 30, 2004. The agency directed the company to submit a capital restoration plan that would (a) achieve the company's minimum capital requirements; and (b) provide for a 30 percent capital surplus by September 30, 2005. (After submission of the capital plan and discussion with OFHEO, the agency extended the deadline for meeting the plan to September 30th from the June 30th date included in the September 27, 2004 agreement.) Pursuant to OFHEO's directive, Fannie Mae submitted a Capital Restoration Plan to the agency and has obtained OFHEO's approval of the plan. The plan was based on Fannie Mae's estimate of its financial position as of December 31, 2004 taking into account previously announced financial statement items that require restatement. The restatement process may result in additional adjustments, perhaps material adjustments, to prior and current period financial results that are not reflected in the plan.

**Highlights of the Capital Restoration Plan**

Fannie Mae formally began its capital restoration program on December 30, 2004 with the issuance of $5 billion in preferred stock. In addition, Fannie Mae reduced its first quarter 2005 common stock dividend by 50 percent explicitly to accelerate the company's compliance with OFHEO's direction to achieve a 30 percent minimum capital surplus.

Under the plan, Fannie Mae details how the company expects to meet both its minimum capital requirement on an ongoing basis, as well as achieve OFHEO's 30 percent surplus capital requirement by September 30, 2005. The plan assumes no increase in the company's common stock dividend from its current level and would achieve the capital goal through two key elements:

> ➢ Managing total balance sheet asset size by reducing the portfolio principally through normal mortgage liquidations, in order to limit overall minimum capital requirements;

> ➢ Increasing core capital through retained earnings, including cost–cutting efforts to augment capital accumulation.

The Capital Restoration Plan provides for a small "cushion" of capital above the 30 percent surplus on September 30, 2005 as a contingency against events that might affect the company's ability to achieve the 30 percent surplus level. Should this capital surplus cushion be insufficient to cover extraordinary events, the plan also includes other contingency measures to provide additional capital, such as reductions in mortgage portfolio balances, additional preferred stock issuance, and, as a last resort, a further reduction of the common stock dividend. Mark–to–market fluctuations in interest rate derivatives used to hedge the mortgage portfolio, but not in hedge accounting relationships, may cause volatility in capital account balances.

4

**Cost–control actions**

Given the key role that retained earnings play in restoring capital, OFHEO has directed that the plan also incorporate a discussion and analysis of Fannie Mae's commitment to assess and implement appropriate cost–cutting actions. Cost–control actions began in January with the nonpayment of 2004 non–salary cash awards for senior management. Fannie Mae also has canceled plans to develop major new corporate facilities at Waterside Mall in Southwest Washington, DC, eliminating significant future acquisition and infrastructure costs. In addition, the company will sharply curtail its corporate advertising campaign and use of political consultants. To identify further cost reductions and savings, Fannie Mae's interim Chief Financial Officer has established a comprehensive review of current and planned expenditures associated with ongoing business operations.

**Process and Controls Surrounding Plan Implementation**

As OFHEO directed, Fannie Mae will institute a formal process of monitoring and reporting regularly to the agency on the company's progress in carrying out the capital plan, maintaining the required capital levels and undertaking any contingency measures that may be necessary. At a minimum, weekly meetings will continue with OFHEO staff to review internal documents and customized reports that highlight several key matters, including recent market conditions and business activity.

**Conclusion**

Fannie Mae believes that the Capital Restoration Plan approved by OFHEO will allow the company to meet its minimum capital requirement, as well as OFHEO's required 30 percent surplus by the September 30, 2005 deadline. Indeed, Fannie Mae's Board and management believe that by tightly controlling balance sheet size, and applying additional retained earnings to capital, the company could exceed the surplus capital goal with a cushion for contingencies.

The Board of Directors and management of Fannie Mae appreciate the assistance of OFHEO in developing the plan. Fannie Mae is committed to working closely and cooperatively with OFHEO as the company carries out the plan. Fannie Mae will seek OFHEO's input and approval at the earliest stages possible for actions provided under the plan, as well as for any additional or contingency actions that may be needed. More broadly, Fannie Mae will keep OFHEO apprised of all significant business actions and changes in market conditions that might affect the company's capital position. The Board and management are committed to building a strong and productive working relationship that extends well beyond the restoration of Fannie Mae's capital and other elements of our September 27, 2004 Agreement.

5

**Summary of Additional Issues and Questions**
**Raised in OFHEO's Special Examination of Fannie Mae**

In the course of its ongoing special examination, OFHEO has communicated to Fannie Mae's Board of Directors and management additional issues relating to Fannie Mae's accounting policies and practices and internal controls. OFHEO indicated that it has not completed its review of all aspects of these issues, but has identified policies that it believes do not appear to be consistent with generally accepted accounting principles, as well as internal control deficiencies that it believes raise safety and soundness concerns. OFHEO has advised Fannie Mae's Board of Directors and management that these matters should be included in the internal reviews being conducted by management and the Board and should be reviewed by Fannie Mae's external auditor, with a report of the findings to OFHEO.

The issues are summarized below:

Financial Accounting Standard No. 115, Accounting for Certain Investments in Debt and Equity Securities ("FAS 115"). OFHEO has questioned Fannie Mae's compliance with the requirements of FAS 115 for designating when mortgage–backed securities purchased for Fannie Mae's investment portfolio are designated as "held–to–maturity" or "available–for–sale." Specifically, OFHEO raised concerns about the timing of Fannie Mae's designation and about whether certain designations or redesignations subsequent to acquisition should be accounted for as transfers of securities from one such class to another.

Financial Accounting Standard No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities ("FAS 140"). Fannie Mae regularly enters into agreements pursuant to which it sells mortgage–backed securities and agrees to repurchase substantially similar securities at a later date. These agreements are referred to as "dollar–roll repurchase agreements." Under FAS 140, Fannie Mae accounts for these transactions as secured lending transactions rather than sales of the underlying mortgage–backed securities, because Fannie Mae is entitled and obligated to repurchase these securities, or substantially similar securities, before maturity. Some of the securities involved in these transactions are mortgage–backed securities classified as held–to–maturity. If the requirements of FAS 140 are not met, then the transaction must be recorded as a sale of a held–to–maturity security. If there are recurring sales of held–to–maturity securities, it is possible that all securities classified as held–to–maturity could be required to be reclassified as available–for–sale.

OFHEO raised questions about Fannie Mae's policies and procedures for determining whether securities qualify as "substantially similar " to those sold under FAS 140, as well as Fannie Mae's monitoring of these transactions for compliance with the requirements of FAS 140 and Fannie Mae's policies and procedures regarding when it must be determined that a dollar–roll repurchase transaction has failed to occur as anticipated, and therefore has failed to qualify under FAS 140 for treatment as secured financing instead of as a sale.
OFHEO also raised questions regarding whether Fannie Mae adequately monitors the collateral in these transactions and Fannie Mae's compliance with its policies with regard to ensuring the return of substantially similar securities. OFHEO also questioned Fannie Mae's practice for recognizing failed deliveries under the contracts.

6

Source: FEDERAL NATIONAL MOR, 8–K, February 23, 2005

Financial Accounting Standard No. 65, Accounting for Certain Mortgage Banking Activities ("FAS 65"). Fannie Mae purchases mortgage loans from lenders, which are either securitized or retained as investments in the mortgage portfolio. The loans retained in the portfolio are classified as held–for–investment pursuant to Fannie Mae's policies. The mortgage loans that are securitized are either sold to a third party or held in the portfolio. At the time Fannie Mae acquires mortgage loans, Fannie Mae identifies the loans that will be securitized and at the end of the month of acquisition such loans are classified as held–for–investment or held–for–sale, depending upon the intent for the securities to be created.

OFHEO has identified issues relating to Fannie Mae's classification of loans purchased for Fannie Mae's portfolio as either held–for–investment or held–for–sale. Specifically, a systems upgrade in 2004 identified a long–standing practice of improperly designating all loans intended to be securitized as described above as held–for–investment. OFHEO has directed Fannie Mae to identify and properly record these loans, and has questioned whether Fannie Mae may treat loans acquired in the future as held–for–investment given these past systems errors.

Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin (ARB) 51 (Financial Interpretation No. 46, or "FIN 46"). Fannie Mae uses Qualified Special Purpose Entities (QSPEs) to issue mortgage–backed securities. QSPEs are exempt from FIN 46 unless the company has the unilateral ability to liquidate or change the QSPE. Fannie Mae's policy defines the unilateral ability to liquidate a QSPE as owning 100% of the pool. That policy also provides that wholly–owned pools of securities be transferred from available–for–sale investments to held–to–maturity investments or that we sell 1% of the wholly–owned pool to a third party. OFHEO has questioned whether this policy complies with the requirements of FIN 46 and whether these transfers have a valid business purpose.

Financial Accounting Standard No. 149, Amendments of Statement 133 on Derivative Instruments and Hedging Activities ("FAS 149"). Under FAS 149, Fannie Mae accounts for certain purchase and sale commitments of mortgage–related assets as derivatives. Fannie Mae applies cash flow hedge accounting to certain of these transactions. OFHEO has questioned the adequacy of Fannie Mae's methodology, assumptions and documentation for applying cash flow hedge accounting to these transactions. OFHEO also questioned whether certain transactions have been accounted for inconsistently since the inception of FAS 149 on July 1, 2003.

Timing of Recognition of Certain Income and Expense Amounts. OFHEO has raised questions about Fannie Mae's practice of recognizing interest expense on short–term debt instruments and interest income on certain liquid investments in a monthly ratable manner rather than pursuant to the contractual accrual convention, which had the effect of smoothing certain income and expense amounts. In addition, OFHEO has questioned whether Fannie Mae appropriately deferred recognizing the financial impact of implementing new systems or correcting estimation methodologies.

Controls and Procedures; Systems Limitations. OFHEO has raised a number of questions about Fannie Mae's internal controls and systems, including questions relating to Fannie Mae's procedures for preparing, reviewing, validating, authorizing and recording journal entries relating to amortization adjustments; reliance on software applications and systems relating to portfolio accounting that may be ill–suited or ill–equipped for their intended purposes; and controls surrounding database modifications.

7

Financial Accounting Standard No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases ("FAS 91"). OFHEO raised questions about Fannie Mae's procedures relating to adjusting amortization factors for premiums, discounts, and other deferred purchase and guaranty fee price adjustments under FAS 91.

Fannie Mae's management and Board of Directors are examining each of these issues and will report to, and work with, OFHEO to resolve these matters.

8

Created by 10KWizard    www.10KWizard.com

# EXHIBIT

# 11



# FORM 8−K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE − FNM

**Filed: March 11, 2005 (period: March 07, 2005)**

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 1.01.** Entry into a Material Definitive Agreement.

**Item 8.01.** Other Events.

**Item 9.01.** Financial Statements and Exhibits.

SIGNATURES
Exhibit Index
EX-10.1 (EX-10.1)

EX-10.2 (EX-10.2)

EX-99.1 (EX-99.1)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8−K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):            March 7, 2005

# Federal National Mortgage Association

(Exact name of registrant as specified in its charter)

| Federally Chartered Corporation | 000−50231 | 52−0883107 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |
| 3900 Wisconsin Avenue, NW, Washington, District of Columbia | | 20016 |
| (Address of principal executive offices) | | (Zip Code) |

Registrant's telephone number, including area code:            202−752−7000

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ]  Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)
[ ]  Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))
[ ]  Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

Top of the Form
**Item 1.01. Entry into a Material Definitive Agreement.**

AGREEMENT WITH OFHEO

On September 27, 2004, Fannie Mae (formally, the Federal National Mortgage Association) entered into an agreement with the Office of Federal Housing Enterprise Oversight, or OFHEO, to take a series of steps with respect to its accounting, capital, organization and staffing, compensation, and governance and internal controls. A copy of the agreement is filed as Exhibit 10.1 to Fannie Mae s report on Form 8-K filed on September 29, 2004.

On March 7, 2005, Fannie Mae and OFHEO entered into a supplement to the September 27, 2004 agreement. The Supplemental Agreement is meant to address events that have occurred since September 27, 2004, including concerns at OFHEO with internal controls and resolution of other organizational problems, determinations by the Securities and Exchange Commission, public filings by Fannie Mae, reclassification of the capital position of Fannie Mae and actions taken by Fannie Mae s Board of Directors since the September 27, 2004 agreement. A copy of the Supplemental Agreement is filed as Exhibit 10.1 to this report and is incorporated herein by reference.

Internal Controls

Under the agreement, Fannie Mae s Board of Directors has agreed to take the following actions relating to internal controls:

· Cause to be conducted a review of procedures surrounding the preparing, revising, validating, authorizing and recording of journal entries and a report to OFHEO on the results and proposed resolutions;

· Direct management to develop and implement controls surrounding accounting ledger journal entries, including policies that prohibit false or unauthorized signatures, require entry preparers to understand the purpose of the entry, require that entry reviewers and approvers determine that entries are valid and appropriate, and require that entries be independently reviewed by an authorized person;

· Direct management to develop and implement a plan that ensures the ability of the portfolio accounting systems to, among other things, calculate the amortization of deferred price adjustments pursuant to Financial Accounting Standard No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases (FAS 91); automate marking the mortgage-backed securities portfolio to market, to the degree practicable; properly account for mortgage revenue bonds; properly account for dollar roll transactions and properly account for interest-only strips pursuant to EITF 99-20;

· Direct management to undertake a review to assess and correct deficiencies in internal controls relating to modifications of databases supporting the general ledger. The Board shall direct management to adopt internal controls, including for documentation, to govern when, if ever, technology application personnel may overwrite database records in order to make changes or corrections at the direction of management.

Implementation of the plans to address deficiencies in the portfolio accounting systems and the internal controls relating to database modifications shall be subject to reporting to OFHEO no less than quarterly until completion.

Organization and Staffing

Fannie Mae s Board has separated the functions of Chief Executive Officer and Chairman of the Board.

The Board agreed to consult with OFHEO on organization and staffing matters pursuant to the September 27, 2004 Agreement and the Supplemental Agreement. The Board also agreed to direct management to act expeditiously in response to any concerns raised by OFHEO in the course of its review of matters that are the subject of the September 27, 2004 Agreement and the Supplemental Agreement, especially regarding disciplinary or other actions relating to individuals.

The Board also agreed not to retain Franklin Raines, Fannie Mae s former Chairman and Chief Executive Officer, or Timothy Howard, Fannie Mae s former Vice Chairman and Chief Financial Officer, to provide any services to Fannie Mae unless otherwise required by law or approved by OFHEO to meet regulatory requirements. Fannie Mae agreed to seek OFHEO s approval should it wish to employ or engage other employees separated from the company as a result of matters arising from OFHEO s September 20, 2004 report of findings of its special examination of Fannie Mae.

Governance

The Board agreed to take the following actions relating to governance:

· Cause to be conducted a review of Fannie Mae s legal and regulatory compliance structure and report the results to OFHEO;

· Cause to be conducted a program of annual briefings for the Board and senior management on the legal and regulatory requirements applicable to Fannie Mae as well as review policies and practices that may inhibit effective compliance with such legal and regulatory requirements. The Board shall cause an independent party to audit and review the operation of the company s compliance program within twelve months and provide the results to OFHEO;

· The company has created a new Office of Compliance and Ethics that reports to the chief executive officer and independently to the Board s Audit Committee. The company agreed that such office shall include a separate internal investigation function that shall review internal complaints, whistleblower reports, ethics matters and related topics and report on its findings to OFHEO. The operational, staffing and resources plan of this office shall be submitted to OFHEO within 120 days of the Supplemental Agreement;

· Cause to be created a procedure directing the General Counsel to report to the Board any information the General Counsel becomes aware of regarding actual or possible misconduct that relates to or may affect Fannie Mae by an executive officer, as defined by OFHEO, or a director, or such actual or possible misconduct of a not inconsequential nature by employees. The procedure shall provide for the Board to inform the Director of OFHEO of the substance of such allegations in a timely manner or, if the Board does not do so, for the General Counsel to notify OFHEO. Such procedure shall be submitted to OFHEO for review forty-five days from the date of the Supplemental Agreement; and

· Cause to be conducted a review of the company s bylaws and codes of conduct to assure they support legal and regulatory compliance.

Accounting

Fannie Mae agreed to ensure that any future engagement letters with its auditors permit OFHEO access to the auditors and their working papers.

In addition, Fannie Mae has agreed to conduct a restatement of prior period financial statements as necessary and to have such statements audited by its new external auditor. The Board agreed to direct the Audit Committee to direct management to assure that Fannie Mae s accounting policies and practices conform to GAAP, disclosure and other regulatory standards. In addition to reviewing practices relating to FAS 91 and FAS 133, the company will focus attention on FAS 115, 140, 65, 149 and FIN 46.

### Capital

The Board agreed to oversee management s diligent and good faith pursuit of the commitments set forth in the capital restoration plan Fannie Mae filed with OFHEO, as approved by OFHEO on February 17, 2005.

### Other Matters

The Supplemental Agreement is effective until modified or terminated in writing by OFHEO. It does not supplant any other duties or obligations of the Board and Fannie Mae or affect the authority of other government agencies. In addition, each provision of the agreement will remain effective and enforceable until modified, terminated or suspended in writing by the Director. The agreement provides that in determining whether to take such steps, consideration will be given to whether internal controls of Fannie Mae have been enhanced and are consistent with safety and soundness and whether Fannie Mae s accounting policies and methodology are satisfactory to OFHEO. Nothing prevents Fannie Mae from seeking such modification, termination or suspension.

Nothing contained in the agreement precludes additional actions by OFHEO on matters addressed by the Supplemental Agreement or the September 27, 2004 Agreement or discovered in the course of carrying forward the actions provided for in the agreements nor action by OFHEO on matters subsequently raised by its ongoing review of Fannie Mae.

In entering into the Supplemental Agreement, Fannie Mae neither admits nor denies any wrongdoing or any asserted or implied finding in the Supplemental Agreement.

## COMPENSATION ACTIONS

As part of Fannie Mae s annual compensation review, on March 10, 2005 the Board of Directors of Fannie Mae and the Compensation Committee of the Board (either, as well as the independent members of the Board, referred to below as the "Board") reviewed the annual salaries for certain senior officers, approved long−term incentive awards for senior officers, and established 2005 goals and target awards for the company s annual cash incentive awards plan. The Board also approved a severance program for members of Fannie Mae s management group. In contrast to prior years, the long−term incentive awards are entirely in the form of restricted stock or restricted stock units, and no stock options or performance shares have been awarded. In addition, the new performance goals for 2005 established by the Board in connection with the company s annual cash incentive awards plan are tied not to growth in earnings per share, as in the past, but to four new criteria that are generally related to (1) fulfillment of Fannie Mae s affordable housing mission goals, (2) progress on the restatement of prior period financial statements, (3) implementation of Fannie Mae s September 27, 2004 agreement with OFHEO, as it may be amended or supplemented from time to time, and (4) company culture. All of the actions taken by the Board with respect to the compensation of senior officers who are "OFHEO−designated executive officers" (which is a broader group of officers than those Fannie Mae refers to as "executive officers" under SEC rules) were discussed with OFHEO in advance and were taken only after the Board received the views of OFHEO. The amendment to the employment agreement of Daniel Mudd, Fannie Mae s Vice Chairman and interim Chief Executive Officer, and the change in Mr. Mudd s salary were approved by OFHEO in advance of final Board action, as were the long−term incentive awards for Fannie Mae s OFHEO−designated executive officers.

### Salary Actions

The Board increased the annual base salary for certain executive officers, including Mr. Mudd. Mr. Mudd s salary was increased from $746,209 to $850,000, reflecting his increased responsibilities as interim Chief Executive Officer from his prior responsibilities as Chief Operating Officer. The salary increase was effective as of December 22, 2004, when Mr. Mudd became interim Chief Executive Officer.

### Amendment to Mr. Mudd s Employment Agreement

Under the terms of Mr. Mudd s employment agreement with Fannie Mae, if Mr. Mudd is terminated by the company other than for cause, or if Mr. Mudd terminates his employment because of a reduction in base salary, certain changes adversely affecting his authority or position, or any of certain other specified "Good Reason" events, he would be entitled to receive, among other things, continued vesting of his long−term incentive award described below as if he had remained employed through June 30, 2007.

Under a letter agreement entered into by the company and Mr. Mudd on March 10, 2005, Mr. Mudd voluntarily waived certain of these rights to continued vesting with respect to his March 10, 2005 long−term incentive award. If Mr. Mudd terminates his employment prior to March 10, 2007 for "Good Reason," he has agreed to changes of the vesting of any portion of the award that would vest (were he to remain employed) more than twelve months after his termination and on or before June 30, 2007. These shares will vest unless OFHEO notifies Mr. Mudd and the company within four months of his termination that there has been a final determination that continued vesting would be improper because he had been guilty of misconduct or dereliction in the performance of his duties as Chief Operating Officer of the company. In all other respects, Mr. Mudd s March 10, 2005 long−term incentive award will be entitled to the vesting provisions set forth in his employment agreement. The terms of this letter agreement have been approved by OFHEO.

A copy of Mr. Mudd s employment agreement, as amended through June 30, 2004, was filed with Fannie Mae s quarterly report on Form 10−Q for the quarter ended June 30, 2004; a copy of the September 2004 amendment to his employment agreement was filed as an exhibit to a Form 8−K Fannie Mae filed on September 23, 2004; a copy of the letter agreement described above is filed as Exhibit 10.2 to this report and incorporated by reference herein.

### Long−Term Incentive Awards for Senior Officers

The long−term incentive awards to senior officers of Fannie Mae were made in shares of restricted stock or, in some cases, in restricted stock units. A restricted stock unit represents the right to receive a share of stock from the company upon vesting. The long−term incentive awards approved on March 10, 2005 are scheduled to vest in three equal annual installments beginning on March 10, 2006. These shares, including the shares issuable upon vesting of units, cannot be sold until vested, and vesting is contingent on the recipient s continued employment with Fannie Mae, subject to accelerated vesting due to death, disability, retirement or, under certain circumstances, negotiated separation. As discussed in more detail above, Mr. Mudd s award is also subject to accelerated vesting under certain circumstances under the terms of his employment agreement with Fannie Mae. As a holder of restricted stock, an officer will have the rights and privileges of a shareholder as to the restricted common stock, other than the ability to sell or otherwise transfer it, including the right to receive any dividends declared with respect to the stock and the right to provide instructions on how to vote the stock. As a holder of restricted stock units, an officer will not have the rights and privileges of a shareholder prior to vesting but will receive additional compensation equal to the amount of any dividends paid with respect to the stock issuable upon vesting of the units. Awards made to the five most highly compensated executive officers of Fannie Mae as of December 31, 2004 (determined without regard to any officer who has since left Fannie Mae and, accordingly, received no award) were as follows:

Daniel H. Mudd, Vice Chairman and interim Chief Executive Officer: 95,710 shares

Robert J. Levin, Executive Vice President and interim Chief Financial Officer: 54,149 shares

Thomas E. Donilon, Executive Vice President Law and Policy and Secretary to the Board: 44,646 shares

Julie St. John, Executive Vice President and Chief Information Officer: 34,548 shares

Michael J. Williams, Executive Vice President Regulatory Agreements and Restatement: 38,013 shares

Annual Incentive Plan

Fannie Mae s Annual Incentive Plan governs the payment of annual cash incentive awards, or cash bonuses, to Fannie Mae s executive officers and other management level employees. Pursuant to the terms of the plan, on March 10, 2005 the Board approved corporate performance goals for 2005 under the plan and individual bonus target awards for management group employees. Under the plan the Board retains discretion to take action that would result in no bonuses being paid for 2005. In addition, the bonus, if any, received by any individual will be determined based on the individual's performance. Any bonuses to officers considered "executive officers" under OFHEO rules are currently subject to OFHEO approval.

In prior years, performance goals for the plan have been tied to growth in earnings per share of Fannie Mae s common stock. For 2005, the goals are related to (1) fulfillment of Fannie Mae s affordable housing mission goals, (2) progress on the restatement of prior period financial statements, (3) implementation of Fannie Mae s September 27, 2004 agreement with the Office of Federal Housing Enterprise Oversight, as it may be amended or supplemented from time to time, and (4) company culture. After year−end 2005, the Compensation Committee, with input from other Board committees, will evaluate corporate performance against the goals, including the appropriate weighting of the goals in light of circumstances existing at that time. Based on its determination, the Committee will determine the level of funding for the pool from which bonuses will be paid. For example, if the Committee determines that corporate performance was 100% versus the goals, it will fund the bonus pool in an amount equal to the sum of the individual target awards established for management group employees. Generally, the Committee, based on its determination of corporate performance, may decide to fund the pool at an amount that is less than the sum of the individual target awards, equal to such sum, or as high as 125% of such sum. However, under the plan, the Board retains discretion to take action that would result in funding the pool at a higher or lower amount, or not funding it at all.

The Board approved individual bonus target awards for each management group employee. These targets are established as a percentage of base salary. The target award for Fannie Mae s interim chief executive officer is 235% and the target award for each executive vice president is 160%. The amount any individual will receive depends not just on corporate performance, but also on the individual s performance against his or her goals. Once the amount of the bonus pool has been determined, the size of individual awards will be determined by the Board for executive vice presidents, by the independent members of the Board for the chief executive officer, by the Compensation Committee for senior vice presidents and by management for other officers and employees participating in the plan. An individual s award may be less than, equal to, or greater than the individual s target award (as adjusted for any decrease or increase in funding of the pool), provided the aggregate awards are not greater than the amount funded.

Severance Program

The Board approved a severance program that provides guidelines regarding the severance benefits management level employees at Fannie Mae, including executive officers, may receive if their employment is terminated as a result of corporate restructuring, reorganization, consolidation, staff reduction, or other similar circumstances, and only where there are no performance related issues, and the termination has not been for cause. Under the program, which is effective through December 31, 2006, eligible participants would receive a severance payment of one year s salary plus two to four weeks salary (three to four weeks salary in the case of executive officers) for each year of service to Fannie Mae up to a maximum of one and a half years salary. Participants terminated after the first quarter of a fiscal year would also receive a pro−rata payout of their annual cash incentive award target for that year, adjusted for corporate performance. Consistent with the terms of the company s stock compensation plans, the vesting of options scheduled to vest within 12 months of termination would be accelerated and the post−termination exercise period of options would be extended to 12 months or longer under certain circumstances. Restricted stock and restricted stock unit awards vesting within 12 months of termination would be subject to accelerated vesting, and unpaid performance shares for completed cycles would be paid out. Participants would be required to execute a separation agreement to receive these benefits containing, where permitted, a one−year non−compete clause. The program also provides for outplacement services and continued access to Fannie Mae s medical and dental plans for up to five years, with the first 18 months premiums to remain at a level no higher than they would be if the participant were still an active employee. Employee eligibility for the program is determined by the Chairman of Fannie Mae s Board of Directors, the highest ranking officer of Fannie Mae, or a designee of either. In addition, management would receive OFHEO s approval prior to offering the program to any OFHEO−designated executive officer.

Item 8.01. Other Events.

On March 11, 2005, Fannie Mae released a statement by Joe Pickett, Chairman of the Compensation Committee of the Fannie Mae Board of Directors. The statement, a copy of which is filed as Exhibit 99.1 to this report, is incorporated herein by reference.

Item 9.01. Financial Statements and Exhibits.

The exhibit index filed herewith is incorporated herein by reference.

Source: FEDERAL NATIONAL MOR, 8-K, March 11, 2005

Top of the Form

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Federal National Mortgage Association

*March 11, 2005*

By:     *Ann M. Kappler*
_____

Name: *Ann M. Kappler*
Title: *Executive Vice President and General Counsel*

Exhibit Index

| Exhibit No. | Description |
|---|---|
| 10.1 | Supplement to the Agreement of September 27, 2004 between Fannie Mae and OFHEO, dated March 7, 2005. |
| 10.2 | Letter Agreement between Fannie Mae and Daniel Mudd, dated March 10, 2005. (This exhibit is a management contract or compensatory plan or arrangement.) |
| 99.1 | March 11, 2005 Statement of Joe K. Pickett. |

United States of America

### Office of Federal Housing Enterprise Oversight (OFHEO)
### and
### Federal National Mortgage Association (Fannie Mae)

### Supplement to the Agreement of September 27, 2004

The Office of Federal Housing Enterprise Oversight (OFHEO) and the Federal National Mortgage Association (Fannie Mae), as authorized by its Board of Directors (the Board), agree that events have transpired that support supplemental terms ("Supplement") to the Agreement of September 27, 2004 ("Agreement"). Because of concerns at OFHEO with internal controls and resolution of other organizational problems and following determinations by the Securities and Exchange Commission, public filings by Fannie Mae, reclassification of the capital position of Fannie Mae and actions taken by the Board since the Agreement of September 27, 2004, OFHEO and Fannie Mae hereby agree to the following:

## I. Agreement of September 27, 2004

Except as noted in this Supplement, the Agreement of September 27, 2004 remains in effect and undertakings by Fannie Mae under the Agreement should proceed.

## II. Supplementary Actions

In addition to the commitments made in the September 27, 2004 Agreement, the Board consistent with its fiduciary duties, shall take the following actions:

## A. Internal Controls

1. The Board shall cause to be conducted a review of procedures surrounding the preparing, revising, validating, authorizing and recording of journal entries and a report to OFHEO on the results of such review, including a description of how deficiencies will be resolved.

2. The Board shall direct management to develop and implement written policies and procedures for journal entries. Such policies and procedures must include, but are not limited to,

   prohibition of employees from falsifying signatures in journal entries as well as from signing such entries without proper authorization;

   requirements that journal entry preparers understand the purpose for which the journal entry is made;

1

2

requirements that journal entry reviewers and approvers determine that an entry is valid and appropriate;

requirements that journal entries be supported by appropriate documentation; and,

requires that journal entries be independently reviewed by an authorized person other than the preparer.

3. The Board shall direct management to develop and implement a plan that addresses deficiencies in the current portfolio accounting system, including, but not limited to, ensuring the ability to:

calculate the amortization of deferred price adjustments pursuant to SFAS 91;

automate marking the mortgage−backed securities portfolio to market, to the degree practicable;

properly account for mortgage revenue bonds;

properly account for dollar roll transactions; and,

properly account for interest−only strips pursuant to EITF 99−20.

The implementation of the plan shall be subject to no less than quarterly reporting to OFHEO until completion.

4. The Board shall direct management to undertake a review to assess and correct deficiencies in internal controls relating to modifications of databases supporting the general ledger. The Board shall direct management to adopt appropriate internal controls, including for documentation, to govern when, if ever, technology application support personnel, at the direction of management, may overwrite database records in order to make changes or corrections. The report shall be submitted to OFHEO for review and the implementation plan shall be the subject of no less than quarterly status reports until completion.

**B. Organization and Staffing**

1. CEO and CFO Positions

The Board has separated the functions of Chief Executive Officer and Chairman of the Board and shall report to OFHEO on the segregation of duties between these two positions within forty

2

3

five days. The Board shall provide OFHEO within ten business days its written requirements for a new Chief Executive Officer and Chief Financial Officer, the status of its search for these positions and its search criteria.

2. Personnel

The Board shall consult with OFHEO on matters relating to organization and staffing pursuant to the Agreement and this Supplement and the Board shall direct management to act expeditiously to make changes, particularly regarding disciplinary or other actions relating to individuals, to address concerns raised by OFHEO in the course of its review of matters that are the subject of the Agreement and this Supplement.

3. Separated Employees

The Board agrees that Mr. Franklin Raines and Mr. Timothy Howard may not be engaged, employed or otherwise provide services to Fannie Mae, whether for compensation or not, subsequent to the separation of these employees from Fannie Mae, unless otherwise required by law. Fannie Mae may apply to OFHEO for approval to utilize such individuals to meet obligations it may have under regulations or regulatory agreements. Nothing herein precludes the participation of these individuals in any government inquiry, regulatory matter, litigation, internal investigation or information—gathering related thereto. Fannie Mae shall seek OFHEO's approval should it wish to engage, employ or otherwise secure services from other employees separated from the company as a result of matters arising from OFHEO's report of finding of September 20, 2004.

**C. Governance**

1. Legal and Regulatory Compliance

The Board shall cause to be conducted a review of Fannie Mae's legal and regulatory compliance structures. Such review shall include recommendations for changes to organizational structures, responsibilities and personnel. Such review shall address as well the structures needed to meet compliance requirements under law and regulation, particularly for regulatory reporting (internal controls and validation of the accuracy of regulatory reporting) and for related data processing services. The Board shall report to OFHEO on the results of such review and shall consult with OFHEO on changes Fannie Mae proposes to undertake.

2. Annual Reviews of Compliance Program and Responsibilities

The Board shall cause to be created a program for no less than annual briefings for the Board and senior management on the legal and regulatory requirements applicable to Fannie Mae as well as reviewing policies or practices that may inhibit effective compliance with such legal and

4

Source: FEDERAL NATIONAL MOR, 8−K, March 11, 2005

regulatory requirements. Within twelve months of the date of this Supplement, the Board shall oversee the conduct of an audit and review, by an independent external party, of the operation of its compliance program and a report of this independent audit and review shall be provided to OFHEO on a timely basis.

3. Internal Investigation Function

The Board has directed management to create a new Office of Compliance and Ethics that reports to the Chief Executive Officer and independently to the Board's Audit Committee. Such office shall be headed by an individual who has no other responsibilities at Fannie Mae and who shall operate independently, including the ability to communicate with OFHEO and the Board independent of management, particularly on matters of wrongdoing. Such office shall include a separate internal investigation function that has access to adequate resources to perform its functions that shall include review of internal complaints, whistleblower reports, ethics matters and related topics. Such investigation function shall report on its findings to OFHEO in a prompt manner. The head of such office may only be hired or removed upon approval of the Board.

OFHEO will review the operational, staffing and resource plans for this office which shall be submitted within one hundred and twenty days of this Supplement.

4. Report of General Counsel

The Board shall cause to be created a procedure directing the General Counsel, in meeting the counsel's professional and ethical duties to Fannie Mae, to report in a timely fashion directly to the Board any information the counsel becomes aware of relating to actual or possible misconduct that relates to or may affect Fannie Mae by an executive officer, as defined by OFHEO regulation, or a Board director, or such actual or possible misconduct of a not inconsequential nature by employees. The procedure shall provide for the Board to inform the Director of OFHEO of the substance of such allegations, with any comments by the Board, in a timely manner. Should the Board fail to notify OFHEO in a timely manner, the General Counsel shall notify OFHEO of the information reported to the Board. Such procedure shall be submitted to OFHEO for its review forty–five days from the date of this Agreement.

5. Review of Bylaws and Codes of Conduct

The Board shall cause to be conducted a review and appropriate revision of bylaws and codes of conduct to assure that they support legal and regulatory compliance.

4

5

**D. Accounting**

1. Fannie Mae will assure that in any future engagement of an external auditor the engagement letter shall provide that (a) upon OFHEO's request, the external auditor will provide OFHEO with access to senior audit partners on the engagement and any other personnel whom such partners deem necessary, (b) OFHEO has access to the auditor's working papers prepared in the course of performing the services set forth in the letter and (c) OFHEO has such access to the external auditor without Fannie Mae personnel in attendance.

2. Fannie Mae will conduct a restatement of prior period financial statements as necessary and have such financial statements reaudited by Fannie Mae's new external auditor consistent with the auditing standards of the Public Company Accounting Oversight Board. Changes occurring as a result of such reaudit and restatement shall be reported promptly to OFHEO. The Board shall direct the Audit Committee to direct management to take all necessary actions to assure that Fannie Mae's accounting policies and practices conform to GAAP, disclosure and other regulatory standards. In addition to reviewing current practices concerning SFAS 91 and SFAS 133, Fannie Mae should focus attention on, among other standards, SFAS 115, 140, 65, 149 and FIN 46.

3. The following provisions of the September 27th Agreement, because of intervening events, are hereby rescinded— Section I (2)(b)(i), (iv)–(vi) and (3)(c) and (d).

**E. Capital**

The Board authorized Fannie Mae's filing of a capital restoration plan on February 10, 2005, as provided in the September 27, 2004 Agreement and consistent with such other requirements as provided by OFHEO in written communications with OFHEO. The Board shall oversee management's diligent and good faith pursuit of the commitments set forth in such plan, as approved by OFHEO on February 17, 2005.

**III. Other Provisions**

1. Effect of Supplementary Agreement

(a) This Supplement to the Agreement of September 27, 2004 is binding and may be enforced by OFHEO as a "written agreement" for purposes of 12 USC 4631. This Supplement is effective until modified or terminated in writing by OFHEO.

(b) This Supplement and the Agreement do not supplant any other duties or obligations of the Board and Fannie Mae or affect the authority of other government agencies.

5

6

(c) Each provision of this Supplement and the Agreement shall remain effective and enforceable until modified, terminated or suspended in writing by the Director. The Director and Fannie Mae understand that in determining whether to take such steps, consideration shall be given to whether internal controls of Fannie Mae have been enhanced and are consistent with safety and soundness and whether Fannie Mae's accounting policies and methodology are satisfactory to OFHEO.

(d) Nothing in this Supplement or the Agreement prevents Fannie Mae from seeking the Director's determination to modify, terminate or suspend any provision therein.

2. Savings Clauses

(a) Nothing contained herein precludes additional actions by OFHEO on matters addressed by this Supplement or the Agreement or discovered in the course of carrying forward the actions
provided for herein nor action by OFHEO on past or present matters or matters subsequently raised by its ongoing review of Fannie Mae.

(b) In entering into this Agreement, Fannie Mae neither admits nor denies any wrongdoing or any asserted or implied finding in this Agreement.

Agreed to this 7th day of March, 2005.


/s/ Armando Falcon, Jr.
Armando Falcon, Jr.
Director
Office of Federal Housing Enterprise Oversight

/s/ Stephen B. Ashley

Stephen Ashley
Non−Executive Chairman of the

 Board of Directors

on behalf of Fannie Mae

6

Exhibit 10.2

[Letterhead]

March 10, 2005

Mr. Joe K. Pickett, Chair
Compensation Committee of the

  Board of Directors

Fannie Mae
3900 Wisconsin Avenue, N.W.
Washington, D.C. 20016

Dear Joe:

I understand that the Compensation Committee of the Fannie Mae Board of Directors and the Board of Directors is proposing to grant me a 2005 variable long–term award under the 2003 Stock Compensation Plan consisting of Restricted Stock (as defined) vesting over a multi–year period.

Under my Employment Agreement with Fannie Mae, if my employment terminates by reason of a "Qualifying Termination" (as defined) other than death, any Restricted Stock that I hold will continue to vest on the same basis as if I remained employed through June 30, 2007. A "Qualifying Termination" includes a termination by me for "Good Reason" (as defined in my Employment Agreement).

By this letter, I voluntarily waive a portion of my rights to continued vesting of the 2005 award of Restricted Stock in the event I were to terminate my employment for "Good Reason." In those circumstances, I do not waive my right to continued vesting of the portion of the 2005 award that would vest were I to remain employed for twelve months following the date of termination or until June 30, 2007, if earlier. Therefore, this waiver will have no potential effect on the portion of the 2005 award that vests in 2006. However, I agree that the portion of the 2005 award that would vest (were I to remain employed) more than twelve months after the date of termination and on or before June 30, 2007 will be subject to a different rule. The Restricted Stock shares described in the immediately preceding sentence will vest in accordance with my Employment Agreement unless the Office of Federal Housing Enterprise Oversight ("OFHEO") has notified the Company and me within four (4) months of my termination that there has been a final determination that continued vesting would be improper because I had been guilty of misconduct or dereliction in the performance of my duties as Chief Operating Officer.

Please indicate the Company's acknowledgment of, agreement to and acceptance of the foregoing by signing the enclosed copy of this letter in the space indicated below and returning a fully executed copy of the letter to my attention.

Joe, I appreciate the Board's consideration, affirm my desire to do whatever it takes to do the right thing for Fannie Mae, and hope this voluntary act demonstrates this commitment. As always, thank you.

Sincerely yours,

/s/ Daniel H. Mudd

AKNOWLEDGED, AGREED TO AND ACCEPTED:

FANNIE MAE

/s/ Joe K. Pickett
Joe K. Pickett
Chair
Compensation Committee of the

  Board of Directors

**Statement by Joe K. Pickett**
**Chairman of the Compensation Committee**
**Of the Fannie Mae Board of Directors**
**March 11, 2005**

The Compensation Committee of Fannie Mae's Board of Directors and the full Board yesterday made compensation decisions for senior executives. The principal decisions, as discussed further below, related to finalizing 2005 base salary for certain executive officers, restructuring and granting long–term incentive awards for senior officers, and restructuring goals under the Annual Incentive Plan.

The actions the Board and the Committee took with respect to the compensation of officers considered "executive officers" under OFHEO rules were reviewed by OFHEO in advance, and were taken only after the Board and the Committee received the views of OFHEO. The restricted stock grant awards for Fannie Mae's executive officers were approved in advance by OFHEO.

The compensation actions seek to balance two critical considerations: the company's performance, as well as the need to recruit, retain and maintain experienced and effective leadership as Fannie Mae works through this period, and in consideration of the long–term well being of the company. The Board was especially cognizant of the importance of retaining experienced personnel in order to strengthen the company's risk profile and to ensure its safety and soundness.

With those considerations in mind, the compensation actions approved by the Compensation Committee and the Board include the following key components:

- The Board changed the components of long–term incentive compensation. The Board determined that no compensation awards would be made to the senior executive group in the form of stock options and determined not to establish a new performance share award cycle. For these grants in 2005, the two components of long–term incentive awards were replaced by restricted stock awards that will vest over a three–year period. In setting these restricted stock awards, the Board targeted total compensation at the 50th percentile of the company's comparator group, versus the company's previous target of the 65th percentile.

- The Board determined to change the goals for the 2005 Annual Incentive Plan, a key element of performance–based compensation, from growth in earnings per share to four new corporate objectives: affordable housing mission goals; progress on restatement of prior financial statements; implementation of the September 27, 2004 agreement with OFHEO and subsequent agreements; and corporate culture. Under the company's capital restoration plan, any Annual Incentive Plan awards made to executive officers must be reviewed and approved in advance by OFHEO.

- The Board approved a Management Group Severance Program that provides guidelines regarding the severance benefits of management–level employees at Fannie Mae, which includes executive officers, may receive if their employment is terminated as a result of corporate restructuring, reorganization, consolidation, staff reduction, or other similar circumstances. The program is effective through December 31, 2006, and OFHEO approval is required for severance benefits given to executive officers.

The effect of the compensation decisions described above, including the decision not to pay bonuses and substantially reduced long–term incentive awards for the 2004 performance year, is that overall compensation for the group of OFHEO–designated executive officers was reduced on average by approximately 45 percent compared to 2003.

The Board prepared the plan in consultation with its independent external compensation consultant, Semler Brossy. Pursuant to the September 27, 2004 agreement, the Board has submitted to OFHEO a report on the company's compensation approach and will be consulting with OFHEO to determine a long–term compensation plan for the company.

Created by 10KWizard   www.10KWizard.com

Source: FEDERAL NATIONAL MOR, 8-K, March 11, 2005

# EXHIBIT

# 12

 **FannieMae**

Ann M. Kappler

Executive Vice President
and General Counsel
Legal Department

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
202 752 4850
202 752 6952 (fax)
ann_kappler@fanniemae.com

December 21, 2004

**BY HAND, FACSIMILE AND ELECTRONIC MAIL**

Mr. Leonard F. Reid, Jr.
Associate Director
Office of Capital Supervision
Office of Federal Housing Enterprise Oversight
1700 G Street, N.W.
Washington DC  20552

Dear Mr. Reid:

This letter responds to Director Falcon's letter to Mr. Raines, dated December 20, 2004, regarding OFHEO's preliminary capital classification for Fannie Mae as of September 30, 2004.

Pursuant to 12 U.S.C. 4618(c), Fannie Mae has submitted to the Director information the company believes is relevant for consideration by the Director in determining whether to take the proposed classification action.  It is our understanding that the Director has considered this information as required by 12 U.S.C. 4618(d) and has determined to take the proposed action.

Since the procedural requirements of 12 U.S.C. 4618(b) have been satisfied, and, in the interest of facilitating expeditious resolution of any safety and soundness concerns that might result from the classification, Fannie Mae hereby waives its right to the 30-day response period set forth in the 1992 Act.

Sincerely,

Ann M. Kappler

# EXHIBIT

# 13

# FANNIE MAE REPORT ON COMPENSATION

## TO

## THE COMMITTEE ON FINANCIAL SERVICES

## OF THE U.S. HOUSE OF REPRESENTATIVES

## AND

## THE COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

## OF THE U.S. SENATE

### PURSUANT TO P.L. 102-550

### SECTION 1381(j)(2)

**JUNE 30, 2005**

## TABLE OF CONTENTS

**Introduction**                                                                1

I.      *Comparability of Compensation Policies*                                 1

    A.      Similar Businesses                                              2

    B.      Compensation Process                                            2

    C.      Comparability of Compensation Policies                          4

II.     *Executive Compensation and Performance-Based Pay*                       4

    A.      Compensation Program Components for 2004                        5

    B.      Performance-Based Cash Compensation and Benefits for 2004       6

    C.      Compensation Review Pursuant to Agreement with OFHEO           8

III.    *Comparability of Financial Performance*                                8

**Conclusion**                                                                  9

**Appendix**                                                                    i

## INTRODUCTION

Section 1381(j)(2) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "1992 Act") requires that Fannie Mae ("the company") annually submit a report on compensation to the House Committee on Financial Services and the Senate Committee on Banking, Housing, and Urban Affairs ("the Committees").  The report must address:

> "(i)    the comparability of the compensation policies of the corporation with the compensation policies of other similar businesses,
>
> (ii)    in the aggregate, the percentage of total cash compensation and payments under employee benefit plans (which shall be defined in a manner consistent with the corporation's proxy statement for the annual meeting of shareholders for the preceding year) earned by executive officers of the corporation during the preceding year that was based on the corporation's performance, and
>
> (iii)    the comparability of the corporation's financial performance with the performance of other similar businesses.  The report shall include a copy of the company's proxy statement for the annual meeting of shareholders for the preceding year."[1]

As of the filing of this report, Fannie Mae has not issued a proxy statement for 2005, and is therefore unable to provide a copy to the Committees.[2]  Fannie Mae will promptly provide a 2005 proxy statement to the Committees when it becomes available.[3]

This report is organized into three sections, corresponding to each of the statutory requirements above.  As discussed further in this report, Fannie Mae regularly reviews its compensation policies against the policies of other similar businesses.  In addition, a significant portion of total potential cash compensation is based on company performance.

## I.    COMPARABILITY OF COMPENSATION POLICIES

The 1992 Act requires Fannie Mae to report on the comparability of its compensation policies to those of similar businesses.  In formulating and implementing its compensation philosophy,

---

[1] 12 U.S.C. 1723a(d)(3)(A).

[2] On December 15, 2004, the SEC's Office of the Chief Accountant ("OCA") delivered to Fannie Mae its views that Fannie Mae's accounting practices did not comply in material respects with the accounting requirements of FAS 91 and FAS 133.  The OCA advised Fannie Mae that it should, among other things, restate its financial statements filed with the SEC to eliminate the use of hedge accounting and evaluate the accounting under FAS 91 and restate its financial statements filed with the SEC if the amounts required for correction are material.

Fannie Mae will restate its financial results to comply with the SEC's determination.  As a result, Fannie Mae has not issued a proxy statement for 2005.  For more information, please see the Form 12b-25 Fannie Mae filed with the SEC on May 11, 2005.

[3] Some compensation-related information that would have been captured in the company's annual proxy statement has been publicly disclosed in other Fannie Mae filings with the Securities and Exchange Commission ("SEC").  Relevant excerpts from Fannie Mae's January 21, 2005 and March 11, 2005 filings are included as part of this report *(See Appendix-- Excerpts from SEC Form 8-K, filed by Fannie Mae on January 21, 2005 and Excerpt from Form 8-K, filed by Fannie Mae on March 11, 2005).*

Fannie Mae benchmarks against other large, diversified financial institutions - the businesses that are most similar to Fannie Mae, and against which Fannie Mae must compete for professional talent.

### A.  Similar Businesses

Fannie Mae became a shareholder-owned corporation in 1968, and today is one of the world's largest financial institutions.  Because of the scope and complexity of Fannie Mae's activities, and its role in the U.S. economy and housing finance system, Fannie Mae must compete with other large, sophisticated financial services companies for the talent it needs.  Fannie Mae's activities necessitate a work force well versed in such disciplines as finance, computer information systems, compliance, law, accounting and affordable housing issues.  Fannie Mae also considers the attraction and retention of a diverse work force as a key business strategy that ensures the company's continued excellence in the mortgage finance market.[4]  In order to attract people with these competencies, Fannie Mae must compete directly with major financial institutions.[5]

Fannie Mae's Board of Directors has therefore adopted a compensation policy designed to help the corporation compete with major, diversified financial institutions and financial services companies.

### B.  Compensation Process

The Compensation Committee of Fannie Mae's Board of Directors ("Compensation Committee") establishes and oversees the company's compensation policies and practices.  Fannie Mae continually monitors the comparability of its pay and policies to ensure compliance with Congressional, regulatory, and Board of Directors mandates.  The company uses external consultants, carefully selects comparison groups for both executive and staff compensation packages, and has developed a thorough pay comparison process.  In addition, the Compensation Committee uses an independent consultant to advise the committee, as appropriate.

- The comparative review process - Fannie Mae's process for setting compensation levels each year involves: (1) determining competitive practices in the marketplace; (2) comparing Fannie Mae's current compensation packages (both the level of compensation and the mix of various compensation elements) to the market; (3) employing compensation elements that emphasize the company's business and mission goals; and (4) developing recommendations for each compensation element

---

[4] As of the end of 2004, 25 percent of Fannie Mae's officer group (Vice President level and above) are minorities and 36 percent are women.

[5] Congress, also, has recognized that Fannie Mae must compete with other large financial institutions for the purpose of setting reasonable compensation.  Section 309(d)(2) of the Federal National Mortgage Association Charter Act, 12 U.S.C. 1723a(d)(2), establishes the authority of Fannie Mae's board of directors to hire employees and to set reasonable compensation that is "comparable with compensation for employment in other similar businesses (including other publicly held financial institutions or major financial services companies)."

so that, in the aggregate, they result in competitive total compensation packages.

To determine what competitive practices exist in the marketplace, Fannie Mae gathers data from a variety of sources. Specific Fannie Mae positions are compared to positions involving similar duties and responsibilities. The market data reviewed by the Compensation Committee for specific positions comes from companies included in the S&P Financials Index, as well as other publicly held financial institutions and major financial services companies. The Compensation Committee also utilizes a nationally recognized executive compensation consulting firm to assist in this comparability analysis.

While Fannie Mae reviews each element of compensation in evaluating competitiveness and comparability, it stresses *total* compensation in its analyses. This is because other companies vary the weight they assign to different elements of compensation depending upon their own strategic needs.

- The role of compensation consultants - Fannie Mae employs external, nationally recognized compensation consultants to provide the company with an independent view of its compensation programs. Compensation consulting firms typically have greater access to other companies' compensation policies and actual pay practices. Fannie Mae frequently uses data from different consultants to ensure that the results are not influenced by unique characteristics of the specific group of companies that one consultant might examine. Separately, the Compensation Committee retains its own, independent compensation consultant, as discussed in the role of the Board, below.

- The comparison groups - The comparison groups considered in the annual compensation analyses may vary depending on the position. In general, the company examines a cross-section of diversified financial services companies including organizations from which we attract employees, as well as those to which our former employees have moved. For certain positions, Fannie Mae looks primarily to local labor markets for comparative data. For other (usually higher-level) positions, Fannie Mae recruits from across the nation and considers national compensation practices.

Consistent with both Fannie Mae's charter and its compensation philosophy, the company's executive compensation packages are evaluated relative to the pay of individuals in comparable positions in other similar businesses, including publicly held financial institutions and major financial services companies. In addition to selecting comparison companies based on their line of business and similarity of jobs, Fannie Mae considers their performance and size, and ensures that their general compensation approach is consistent with Fannie Mae's compensation philosophy.

- The role of the Board - The Compensation Committee discharges the responsibilities of the Board relating to compensation of Fannie Mae officers, except that, based on the Compensation Committee's recommendations, the Board of Directors determines compensation for executive vice presidents and the independent members of the Board determine compensation for the Chief Executive Officer. The Committee

3

oversees and advises the Board on the adoption of policies that govern Fannie Mae's annual compensation and stock ownership plans. It also produces an annual report on executive compensation for inclusion in the company's annual proxy statement. The Compensation Committee is composed entirely of independent directors.

### C.  Comparability of Compensation Policies

The central tenets of Fannie Mae's compensation philosophy are pay for performance and comparability. Fannie Mae's compensation policies are designed to meet the following objectives:

- provide compensation that is reasonable and comparable with compensation for employment in other similar businesses, including publicly-held major financial companies, involving similar duties and responsibilities;

- closely link pay with performance (the more senior the position in the company, the stronger the link between pay and company performance); and,

- attract and retain the best possible talent.

Based on these objectives, Fannie Mae's Compensation Committee has developed an employee compensation program comprised of the following elements: base salary, employee benefits, annual incentives, and variable long-term incentives.[6]

The company's annual comparative review process ensures that Fannie Mae's compensation policies are comparable to those of similar businesses, and that it is able to compete with those businesses in attracting talent. The external compensation consultants who regularly review Fannie Mae's compensation policies have consistently found them reasonable and comparable to policies of other major employers with similar human resource needs.

## II. EXECUTIVE COMPENSATION AND PERFORMANCE-BASED PAY

Fannie Mae structures its compensation program in light of its statutory obligations under the Federal National Mortgage Association Charter Act, 12 U.S.C. 1716 et. seq. ("Charter Act"). The Charter Act requires that compensation be reasonable and comparable to that of similar businesses and that a significant portion of potential compensation for all executive officers of Fannie Mae be based on the performance of Fannie Mae.[7]

---

[6] Fannie Mae uses these different elements, especially annual and variable long-term incentives, to compensate for short- and long-term performance. The relative weight of each element depends on the employee's level of responsibility, with executive-level employees' compensation more heavily weighted towards the long-term performance of the company. All employees are eligible for common stock-based incentives linked to corporate performance.

[7] 12 U.S.C. 1723a(d).

The more senior the position at Fannie Mae, the more compensation is based on corporate performance. Moreover, at higher-level positions, the performance component of compensation is more heavily weighted towards long-term performance, as a greater percentage of the compensation package is delivered through stock-based incentives that provide rewards based on company performance over time.

Consistent with the company-wide compensation philosophy, the core principles of Fannie Mae's executive compensation philosophy are comparability and pay for performance. For Fannie Mae's executives, the linkage of pay to performance reinforces individual accountability and provides an incentive for executive focus on annual and long-term financial and public policy goals.

### A. Compensation Program Components in 2004[8]

In 2004, Fannie Mae's executive compensation and benefits program consisted of two components: basic compensation and performance-based compensation.

- Basic compensation includes:

  - base salary;
  - other annual compensation (e.g., health insurance); and
  - all other compensation (e.g., Fannie Mae's matching contributions under the company's Retirement Savings Plan).

- Performance-based compensation includes:

  - **Annual Incentive Awards** - These awards relate directly to the achievement of certain annual goals and performance objectives. Goals established by the Board at the beginning of the year and achievements against these goals determine the funding of the bonus pool from which the actual bonuses are paid. The actual award paid to a participant is based on his or her performance against objectives and relative to other participants. The 2004 goal for Fannie Mae's annual incentive award was an earnings per share ("EPS") growth measure. Annual incentive awards are a common form of compensation for executives at publicly-held financial institutions and major financial services companies.

  - **Long-Term Incentive Awards** - Long-term incentive awards provide potential value based on the performance of the company over several years. Awards are delivered in the form of stock options, performance shares, and/or restricted

---

[8]  The Compensation Committee has approved changes to the performance-based elements of the company's compensation plan for the 2004 performance year. (*See Appendix- Excerpts from SEC Form 8-K, filed by Fannie Mae on March 11, 2005*). As one part of the ongoing review of compensation, the Compensation Committee and Fannie Mae management are working to ensure compliance with regulations recently promulgated by the Office of Federal Housing Enterprise Oversight, that address compensation. 12 CFR Part 1710 (2005).

stock.[9]  The Board has determined that long-term incentive awards granted in
early 2005 for the 2004 performance year were solely in the form of restricted
stock. Previously, executives at the senior vice president level and above were
granted stock options and performance shares while other employees were granted
stock options and/or restricted stock.

- **Stock Options** - Stock options enable employees to purchase shares of common
  stock at a set price over a prescribed period of time.  The option price is set at the
  fair market value of the stock on the option grant date.  The future value of stock
  options is, therefore, completely dependent upon increases, if any, in the
  company's stock price.  Stock options generally vest over a period of four years at
  a rate of 25 percent per year and generally have a ten-year term.

- **Performance Shares** - These pay-for-performance awards compensate senior
  management for attaining certain Fannie Mae performance goals over a
  designated performance period, currently three years. The Compensation
  Committee establishes program targets based on both financial and non-financial
  goals. The last performance share grant was made in January 2004, covering the
  2004 through 2006 performance period.  The financial goals for this award are
  tied to growth in EPS over the three-year period and the non-financial goals are
  tied to the company's strategic plan.  The Compensation Committee determines
  actual achievement of goals at the conclusion of each cycle. Payout can range
  from 40 percent of the performance shares granted for threshold goal achievement
  to 150 percent for goal achievement at maximum levels.   In January 2005, the
  Compensation Committee decided to defer any decisions on the payment of
  concluded cycles in light of the pending restatement of the company's financial
  statements.

- **Restricted Stock Grants** - Restricted stock grants are awards of common stock
  that vest over time. The grants, made as part of the annual compensation review
  process, generally vest at a rate of either 25 percent or 33.3 percent per year. The
  actual value received by the employee upon vesting is a function of stock price
  performance over time.  In general, employees forfeit unvested shares if they leave
  the company prior to retirement.

### B. Performance-Based Cash Compensation and Benefits for 2004

As discussed above, Fannie Mae's performance-based compensation consists of annual
incentive awards and long-term incentive awards, linked to goals established by the
Board of Directors.  For 2004, consistent with its long-standing compensation
philosophy, the Compensation Committee and the Board of Directors determined that
senior management compensation should be reduced substantially in light of the events
faced by the company in 2004.  In implementing this decision, no annual bonuses were

---

[9]  Reference to restricted stock includes both restricted stock and restricted stock units.  A restricted stock unit
represents the right to receive a share of stock from the company upon vesting.

provided to executive officers[10] or any officer at the Senior Vice President level and above (except partial year awards for those promoted into this level during the year). Long-term incentive grants for this year took the form of restricted stock. In setting these restricted stock awards, the Board set the long-term incentive award guidelines at the 50th percentile of the company's comparator group of similar businesses. As a result, the long-term incentive grants, in conjunction with market median base salaries and no annual bonuses, positioned actual total compensation at about the 25th percentile of other comparable financial service firms, with actual delivery of this level of compensation linked to the three-year vesting of the shares and continued employment.[11] This compares with actual total compensation for 2003, which was positioned at approximately the 65th percentile of other comparable financial services companies.

Of the aggregate compensation earned by Fannie Mae's executive officers in 2004, 74 percent was based on the company's performance.[12] Executive officers' total compensation for the 2004 performance year was approximately 45 percent lower than pay levels for the previous year. As no bonuses were awarded to executive officers for 2004 performance and because the value of the long-term grants were smaller than in previous years, salary — which is not based on company performance — represents a greater percentage of total compensation than in the prior years.

Additionally, in March 2005, the Board of Directors, recognizing the current transition period, changed the goals for the 2005 Annual Incentive Plan, a key element of performance-based compensation, from growth in earnings per share to four new corporate objectives: fulfillment of affordable housing mission goals; progress on restatement of prior financial statements; implementation of the September 27, 2004 agreement with the Office of Federal Housing Enterprise Oversight ("OFHEO") and

---

[10] As defined in the 1992 Act, "executive officers" means "the chairman of the board of directors, chief executive officer, the chief financial officer, president, vice chairman, and executive vice president and any senior vice president in charge of a principal business unit, division, or functions."

[11] The long-term incentive awards to senior officers of Fannie Mae were made in shares of restricted stock or, in some cases, in restricted stock units. A restricted stock unit represents the right to receive a share of stock from the company upon vesting. The long-term incentive awards approved on March 10, 2005 are scheduled to vest in three equal annual installments beginning on March 10, 2006. These shares, including the shares issuable upon vesting of units, cannot be sold until vested, and vesting is contingent on the recipient's continued employment with Fannie Mae, subject to accelerated vesting due to death, disability, retirement or, under certain circumstances, negotiated separation. The award for Mr. Mudd, who at the time of the award was Fannie Mae's Interim Chief Executive Officer, also is subject to accelerated vesting under certain circumstances under the terms of his employment agreement with Fannie Mae. (See Appendix—Excerpts from SEC Form 8-K, filed by Fannie Mae on March 11, 2005).

[12] Compensation components are valued at the time they are granted even though they may never result in payments to the executive officer. For example, when stock options are granted, they are valued using a model that considers the company's stock price volatility, dividends, option strike price and stock-incentive plan provisions (a modified "Black-Scholes" model). The value derived using "Black-Scholes" is an estimate; it is not a cash payment. Actual cash payments under the stock-based incentives depend upon Fannie Mae's stock price performance and whether the stock incentives have vested. Stock incentives vest over a period of time and, until such incentives have vested, have no value and cannot be converted to cash.

subsequent agreements; and the corporate culture. Goals for 2006 and beyond will be determined after a careful assessment and can be expected to evolve over time, including the reintroduction of standard financial and shareholder metrics. Under the company's capital restoration plan, any Annual Incentive Plan awards made to executive officers must be reviewed and approved in advance by OFHEO.

### C. Compensation Review Pursuant to Agreement with OFHEO

On September 27, 2004, Fannie Mae's Board of Directors entered into an agreement with OFHEO. With respect to compensation, the Board agreed to "cause to be prepared a report to OFHEO on the compensation regime and its relation to strategic plans and their impact on accounting and transaction decisions and any revisions to avoid inappropriate incentives." The Compensation Committee retained an external compensation consultant to conduct a study that included an examination of prevailing compensation practices as well as an evaluation of Fannie Mae's consistency and alignment with those practices for its director-level and above management. The consultant reported to the Compensation Committee and the report was submitted to OFHEO in accordance with the agreement. The Committee will take the compensation report into account in the Committee's future compensation actions.

## III.    COMPARABILITY OF FINANCIAL PERFORMANCE

In order to make a comparative assessment of its financial performance, Fannie Mae has measured shareholders' cumulative return on investment for the five years ending in 2004. The return for Fannie Mae's shareholders is measured against two indices – Standard & Poor's S&P 500 and S&P Financials. Both indices are comprised of companies similar to Fannie Mae, and offer a reasonable basis for comparison.

As of year-end 2004, Fannie Mae's Five-Year Cumulative Total Return[13] fell between that of the S&P 500 and of the S&P Financials, as illustrated by the chart below. A $100 investment in Fannie Mae common stock at the end of 1999 would have yielded $125.90 by the end of 2004. A similar $100 investment at the end of 1999 in companies included in the S&P 500 would have yielded $88.90, and $100 invested in S&P Financials would have yielded $141.10, by the end of 2004.

---

[13] Cumulative Total Return is calculated under the assumption of dividend reinvestment.



**Comparison of Five-Year Cumulative Total Return**

(12/31/99 = 100)

Values are for December 31 of each year
Data Source: Bloomberg

|        | Fannie Mae | S&P 500 | S&P Financials |
|--------|------------|---------|----------------|
| 1999   | 100        | 100     | 100            |
| 2000   | 140.7      | 91      | 125.3          |
| 2001   | 130.9      | 80.2    | 114.1          |
| 2002   | 108.1      | 62.6    | 97.6           |
| 2003   | 129        | 80.3    | 127.4          |
| 2004   | 125.9      | 88.9    | 141.1          |

## CONCLUSION

Fannie Mae's compensation policies, as verified by external consultants, continue to remain comparable to policies at other similar businesses and major financial services companies. Fannie Mae's compensation review process helps ensure continued comparability and compliance with statutory and regulatory requirements, and Board of Directors policy.

9

# APPENDIX

## Excerpts from SEC Form 8-K, filed by Fannie Mae on January 21, 2005.*

### Senior Management Compensation

On January 17, 2005 and January 18, 2005, the Compensation Committee and the Board of Directors of Fannie Mae (formally, the Federal National Mortgage Association) determined that for 2004 no cash bonuses would be paid to the company's executive officers or senior vice presidents under the company's Annual Incentive Plan or otherwise.

The Compensation Committee and the Board also determined to defer certain actions under Fannie Mae's performance share program until Fannie Mae has reliable financial data for prior fiscal years. Under the program, each year members of senior management become entitled to receive shares of common stock in an amount based upon and subject to Fannie Mae's meeting corporate performance objectives over a three-year period. These objectives are based on both financial and non-financial goals, equally weighted. The financial goals under the performance share program are currently tied to growth in core business earnings per share. Generally, the Compensation Committee determines in January of the year following completion of the cycle the number of shares of common stock each awardee is entitled to receive, and the shares are paid out in two annual installments beginning that January. Accordingly, in January 2004 awardees received 50% of the shares they were determined to be entitled to receive for the three-year performance cycle ended December 31, 2003, and the remaining shares were expected to be paid in January 2005.

As previously announced, Fannie Mae will restate its previously issued financial statements and re-evaluate previously issued non-GAAP financial information, including core business earnings. The Board and Compensation Committee have determined to defer consideration of the impact of Fannie Mae's restatement and re-evaluation on both unpaid performance shares and the performance share cycle completed on December 31, 2004 until reliable financial data for the relevant periods are available.

The Board and Compensation Committee also established base salaries for executive officers. The executive officers named below represent the six executive officers of Fannie Mae as of December 31, 2004 who received the highest compensation for 2004. Presented below are the 2005 and 2004 annual salaries for such officers:

Daniel H. Mudd, Vice Chairman and interim Chief Executive Officer, $746,209 and $746,209. (The Compensation Committee and the independent directors will consider Mr. Mudd's 2005 salary at the February Board meeting in light of his new duties as interim Chief Executive Officer.)

Robert J. Levin, Executive Vice President and interim Chief Financial Officer, $675,000 and $592,250. (Mr. Levin will receive the 2005 salary rate as long as he serves as interim Chief Financial Officer.)

Thomas E. Donilon, Executive Vice President--Law and Policy and Secretary to the Board, $669,760 and $644,000.

Louis W. Hoyes, Executive Vice President, Single-Family Mortgage Business, $540,800 and $520,000.

Julie St. John, Executive Vice President and Chief Information Officer, $516,724 and $496,850.

Michael J. Williams, President--Fannie Mae e-Business, $516,724 and $496,850.

# Excerpts from SEC Form 8-K, filed by Fannie Mae on March 11, 2005.*

The following information was reported by Fannie Mae in a public filing with the Securities and Exchange Commission on March 11, 2005.

## COMPENSATION ACTIONS

As part of Fannie Mae's annual compensation review, on March 10, 2005 the Board of Directors of Fannie Mae and the Compensation Committee of the Board (either, as well as the independent members of the Board, referred to below as the "Board") reviewed the annual salaries for certain senior officers, approved long-term incentive awards for senior officers, and established 2005 goals and target awards for the company's annual cash incentive awards plan. The Board also approved a severance program for members of Fannie Mae's management group. In contrast to prior years, the long-term incentive awards are entirely in the form of restricted stock or restricted stock units, and no stock options or performance shares have been awarded. In addition, the new performance goals for 2005 established by the Board in connection with the company's annual cash incentive awards plan are tied not to growth in earnings per share, as in the past, but to four new criteria that are generally related to (1) fulfillment of Fannie Mae's affordable housing mission goals, (2) progress on the restatement of prior period financial statements, (3) implementation of Fannie Mae's September 27, 2004 agreement with OFHEO, as it may be amended or supplemented from time to time, and (4) company culture. All of the actions taken by the Board with respect to the compensation of senior officers who are "OFHEO-designated executive officers" (which is a broader group of officers than those Fannie Mae refers to as "executive officers" under SEC rules) were discussed with OFHEO in advance and were taken only after the Board received the views of OFHEO. The amendment to the employment agreement of Daniel Mudd, Fannie Mae's Vice Chairman and interim Chief Executive Officer, and the change in Mr. Mudd's salary were approved by OFHEO in advance of final Board action, as were the long-term incentive awards for Fannie Mae's OFHEO-designated executive officers.

### Salary Actions

The Board increased the annual base salary for certain executive officers, including Mr. Mudd. Mr. Mudd's salary was increased from $746,209 to $850,000, reflecting his increased responsibilities as interim Chief Executive Officer from his prior responsibilities as Chief Operating Officer. The salary increase was effective as of December 22, 2004, when Mr. Mudd became interim Chief Executive Officer.

### Amendment to Mr. Mudd's Employment Agreement

Under the terms of Mr. Mudd's employment agreement with Fannie Mae, if Mr. Mudd is terminated by the company other than for cause, or if Mr. Mudd terminates his employment because of a reduction in base salary, certain changes adversely affecting his authority or position, or any of certain other specified "Good Reason" events, he would be entitled to receive, among other things, continued vesting of his long-term incentive award described below as if he had remained employed through June 30, 2007.

Under a letter agreement entered into by the company and Mr. Mudd on March 10, 2005, Mr. Mudd voluntarily waived certain of these rights to continued vesting with respect to his March 10, 2005 long-term incentive award. If Mr. Mudd terminates his employment prior to March 10, 2007 for "Good Reason," he has agreed to changes of the vesting of any portion of the award that would vest (were he to remain employed) more than twelve months after his termination and on or before June 30, 2007. These shares will vest unless OFHEO notifies Mr. Mudd and the company within four months of his termination that there has been a final determination that continued vesting would be improper because he had been guilty of misconduct or dereliction in the performance of his duties as Chief Operating Officer of the company. In all other respects, Mr. Mudd's March 10, 2005 long-term incentive award will be entitled to the vesting provisions set forth in his employment agreement. The terms of this letter agreement have been approved by OFHEO.

A copy of Mr. Mudd's employment agreement, as amended through June 30, 2004, was filed with Fannie Mae's quarterly report on Form 10-Q for the quarter ended June 30, 2004; a copy of the September 2004 amendment to his employment agreement was filed as an exhibit to a Form 8-K Fannie Mae filed on September 23, 2004; a copy of the letter agreement described above is filed as Exhibit 10.2 to this report and incorporated by reference herein.

## Long-Term Incentive Awards for Senior Officers

The long-term incentive awards to senior officers of Fannie Mae were made in shares of restricted stock or, in some cases, in restricted stock units. A restricted stock unit represents the right to receive a share of stock from the company upon vesting. The long-term incentive awards approved on March 10, 2005 are scheduled to vest in three equal annual installments beginning on March 10, 2006. These shares, including the shares issuable upon vesting of units, cannot be sold until vested, and vesting is contingent on the recipient's continued employment with Fannie Mae, subject to accelerated vesting due to death, disability, retirement or, under certain circumstances, negotiated separation. As discussed in more detail above, Mr. Mudd's award is also subject to accelerated vesting under certain circumstances under the terms of his employment agreement with Fannie Mae. As a holder of restricted stock, an officer will have the rights and privileges of a shareholder as to the restricted common stock, other than the ability to sell or otherwise transfer it, including the right to receive any dividends declared with respect to the stock and the right to provide instructions on how to vote the stock. As a holder of restricted stock units, an officer will not have the rights and privileges of a shareholder prior to vesting but will receive additional compensation equal to the amount of any dividends paid with respect to the stock issuable upon vesting of the units. Awards made to the five most highly compensated executive officers of Fannie Mae as of December 31, 2004 (determined without regard to any officer who has since left Fannie Mae and, accordingly, received no award) were as follows:

Daniel H. Mudd, Vice Chairman and interim Chief Executive Officer: 95,710 shares

Robert J. Levin, Executive Vice President and interim Chief Financial Officer: 54,149 shares

Thomas E. Donilon, Executive Vice President, Law and Policy and Secretary to the Board: 44,646 shares

Julie St. John, Executive Vice President and Chief Information Officer: 34,548 shares

Michael J. Williams, Executive Vice President Regulatory Agreements and Restatement: 38,013 shares

## Annual Incentive Plan

Fannie Mae's Annual Incentive Plan governs the payment of annual cash incentive awards, or cash bonuses, to Fannie Mae's executive officers and other management level employees. Pursuant to the terms of the plan, on March 10, 2005 the Board approved corporate performance goals for 2005 under the plan and individual bonus target awards for management group employees. Under the plan the Board retains discretion to take action that would result in no bonuses being paid for 2005. In addition, the bonus, if any, received by any individual will be determined based on the individual's performance. Any bonuses to officers considered "executive officers" under OFHEO rules are currently subject to OFHEO approval.

In prior years, performance goals for the plan have been tied to growth in earnings per share of Fannie Mae's common stock. For 2005, the goals are related to (1) fulfillment of Fannie Mae's affordable housing mission goals, (2) progress on the restatement of prior period financial statements, (3) implementation of Fannie Mae's September 27, 2004 agreement with the Office of Federal Housing Enterprise Oversight, as it may be amended or supplemented from time to time, and (4) company culture. After year-end 2005, the Compensation Committee, with input from other Board committees, will evaluate corporate performance against the goals, including the appropriate weighting of the goals in light of circumstances existing at that time. Based on its determination, the Committee will determine the level of funding for the pool from which bonuses will be paid. For example, if the Committee determines that corporate performance was 100% versus the goals, it will fund the bonus pool in an amount equal to the sum of the individual target awards established for management group employees. Generally, the Committee, based on its determination of corporate performance, may decide to fund the pool at an amount that is less than the sum of the individual target awards, equal to such sum, or as high as 125% of such sum. However, under the plan, the Board

retains discretion to take action that would result in funding the pool at a higher or lower amount, or not funding it at all.

The Board approved individual bonus target awards for each management group employee. These targets are established as a percentage of base salary. The target award for Fannie Mae's interim chief executive officer is 235% and the target award for each executive vice president is 160%. The amount any individual will receive depends not just on corporate performance, but also on the individual's performance against his or her goals. Once the amount of the bonus pool has been determined, the size of individual awards will be determined by the Board for executive vice presidents, by the independent members of the Board for the chief executive officer, by the Compensation Committee for senior vice presidents and by management for other officers and employees participating in the plan. An individual's award may be less than, equal to, or greater than the individual's target award (as adjusted for any decrease or increase in funding of the pool), provided the aggregate awards are not greater than the amount funded.

## Severance Program

The Board approved a severance program that provides guidelines regarding the severance benefits management level employees at Fannie Mae, including executive officers, may receive if their employment is terminated as a result of corporate restructuring, reorganization, consolidation, staff reduction, or other similar circumstances, and only where there are no performance related issues, and the termination has not been for cause. Under the program, which is effective through December 31, 2006, eligible participants would receive a severance payment of one year's salary plus two to four week's salary (three to four weeks' salary in the case of executive officers) for each year of service to Fannie Mae up to a maximum of one and a half years' salary. Participants terminated after the first quarter of a fiscal year would also receive a pro-rata payout of their annual cash incentive award target for that year, adjusted for corporate performance. Consistent with the terms of the company's stock compensation plans, the vesting of options scheduled to vest within 12 months of termination would be accelerated and the post-termination exercise period of options would be extended to 12 months or longer under certain circumstances. Restricted stock and restricted stock unit awards vesting within 12 months of termination would be subject to accelerated vesting, and unpaid performance shares for completed cycles would be paid out. Participants would be required to execute a separation agreement to receive these benefits containing, where permitted, a one-year non-compete clause. The program also provides for outplacement services and continued access to Fannie Mae's medical and dental plans for up to five years, with the first 18 months' premiums to remain at a level no higher than they would be if the participant were still an active employee. Employee eligibility for the program is determined by the Chairman of Fannie Mae's Board of Directors, the highest ranking officer of Fannie Mae, or a designee of either. In addition, management would receive OFHEO's approval prior to offering the program to any OFHEO-designated executive officer.

_____

*Note: These excerpts from Fannie Mae SEC Filings reference compensation actions affecting Thomas E. Donilon and Louis W. Hoyes. Mr. Hoyes resigned his position with Fannie Mae on January 31, 2005, and Mr. Donilon resigned his position with the company on April 29, 2005. [This note is for informational purposes and is not excerpted from any Fannie Mae filing with the SEC.]*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| J. TIMOTHY HOWARD, ) | |
| ) | No. 1:07-cv-01196 (RJL) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| OFFICE OF FEDERAL HOUSING ) | |
| ENTERPRISE OVERSIGHT, and ) | |
| JAMES B. LOCKHART, III, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

and

|  |  |
|---|---|
| _____ ) | |
| FRANKLIN D. RAINES, ) | |
| ) | No. 1:07-cv-01202 (RJL) |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| OFFICE OF FEDERAL HOUSING ) | |
| ENTERPRISE OVERSIGHT, and ) | |
| JAMES B. LOCKHART, III, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## [PROPOSED] ORDER

Upon consideration of PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING

ORDER AND PRELIMINARY INJUNCTION, Defendants' Opposition, and the entire record in

this case, it is hereby ORDERED that Plaintiffs' motions are denied.

Dated:                                    _____
                                          Richard J. Leon
                                          UNITED STATES DISTRICT JUDGE