# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————————————

J. TIMOTHY HOWARD, )
)
)    No. 1:07-cv-01196 (RJL)
           Plaintiff, )
)
   v. )
)
OFFICE OF FEDERAL HOUSING )
ENTERPRISE OVERSIGHT, and )
JAMES B. LOCKHART, III, )
)
           Defendants. )

————————————————————

and

————————————————————

FRANKLIN D. RAINES, )
)
)    No. 1:07-cv-01202 (RJL)
           Plaintiff, )
)
   v. )
)
OFFICE OF FEDERAL HOUSING )
ENTERPRISE OVERSIGHT, and )
JAMES B. LOCKHART, III, )
)
           Defendants. )

————————————————————

## DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION[1]

---

[1]    At the July 5, 2007 hearing, the Court informed all parties that they were permitted to file any supplemental materials by July 12, 2007.  This brief and attached exhibits are filed accordingly.

## INTRODUCTION

Plaintiffs J. Timothy Howard and Franklin D. Raines, former executive officers of the Federal National Mortgage Association ("Fannie Mae"), filed motions seeking temporary restraining orders and preliminary injunctions to prevent the Office of Federal Housing Enterprise Oversight ("OFHEO") from reviewing the Fannie Mae Board of Directors' ("the Board") proposed award of benefits made pursuant to the performance share payment ("PSP") benefits program. Defendants OFHEO and James B. Lockhart, III, opposed, noting that OFHEO has the authority pursuant to, inter alia, the Capital Restoration Plan and a Consent Order, to review all non-salary executive compensation proposed to be paid out by Fannie Mae. Defendants will discuss four points in their supplemental brief.

First, Defendants have the authority, separate and apart from the authority available pursuant to 12 U.S.C. § 4518, to review non-salary executive compensation benefits pursuant to the Capital Restoration Plan and Consent Order. Second, such review of benefits does not constitute a freeze of the benefits, interference with their payment, or a pre-judgment attachment. It is simply one step in a multi-step process of ascertaining what level of benefits will be distributed by Fannie Mae. Third, OFHEO is reviewing the Board's proposed determinations and, in particular, what percentages to use when calculating PSP benefits for Cycles 19 and 20. Fourth, the letter from OFHEO requesting information from Fannie Mae, about which Plaintiffs complain, is not substantively similar to the letters at issue in the Brendsel and Clarke cases. See Clarke v. OFHEO, 355 F. Supp. 2d 56 (D.D.C. 2004); Brendsel v. OFHEO, 339 F. Supp. 2d 52 (D.D.C. 2004). In fact Plaintiffs' underlying objection and the relief they seek relate not to the

letter at all, but to the Capital Restoration Plan and Consent Order that require OFHEO approval of the specific benefits they seek to have paid.

Finally, it is important to keep in mind that, at this point, Plaintiffs are seeking preliminary injunctions. As noted in Defendants' opening brief, such relief is improper where, as here, Plaintiffs seek mandatory injunctive relief that would permanently change the status quo and award them the full relief sought in their complaints. Defs' Memo at 14-15.[2] Further, Plaintiffs' only alleged irreparable injury is based on the notion that the price of the stock may go down.[3] Such speculative injury is insufficient to establish irreparable injury. Id. at 15-17. For the same reasons that Plaintiffs were not able to establish sufficient injury for a temporary restraining order, they are unable to establish irreparable injury for a preliminary injunction.[4]

---

[2]     The Memorandum in support of Mr. Raines' Motion for Temporary Restraining Order and Preliminary Injunction will be referred to as "Raines Memo." The Memorandum in support of Mr. Howard's Motion for Temporary Restraining Order and Preliminary Injunction will be referred to as "Howard Memo." Defendants' Opposition to Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction will be referred to as "Defs' Memo." Mr. Howard's Reply to OFHEO's Opposition to Motion for Temporary Restraining Order and Preliminary Injunction will be referred to as "Howard Reply."

[3]     The price of Fannie Mae stock has gone up and down, as stock does, over the last few months. See Howard Memo at Exhs. 12 & 13; Raines Memo at Exh. 6. In the time since the hearing on July 5, 2007, the stock once again went up, then slightly down, then slightly up again today. See Exh. 21. There is no way of knowing whether the stock price on the day that Fannie Mae ultimately distributes whatever stock is determined to constitute Plaintiffs' PSP benefits will be higher or lower than it is today. It is this unpredictable, ever-changing nature of stock prices that makes Plaintiffs' claim so speculative.

[4]     As noted in Defendants' opening brief, Plaintiffs have not, in fact, established any injury at all, much less an irreparable one. Defs' Memo at 17-20.

I.     THE CAPITAL RESTORATION PLAN AND CONSENT ORDER PROVIDE LEGAL
       AUTHORITY FOR OFHEO TO REVIEW THE PSP BENEFITS FOR ALL CYCLE 19
       AND 20 RECIPIENTS.

       Plaintiff Howard asserted in his Reply that OFHEO does not have the authority to

"interfere with the payment of compensation or benefits to enterprise executives" other than

through a temporary cease and desist order.  Howard Reply at 1.  This assertion is not only an

incomplete statement of OFHEO's authority, but it attempts to divert the Court from the fact that

OFHEO is exercising its statutory "cease and desist" authority only with respect to Fannie Mae –

not with respect to Messrs. Howard or Raines.  Specifically, Mr. Howard's statement incorrectly

suggests that OFHEO lacks the authority to enter into, ensure compliance with and, if necessary,

enforce the existing consent cease and desist order entered into between Fannie Mae and

OFHEO on May 23, 2006.   Exh. 7.

       Pursuant to 12 U.S.C. § 4616, OFHEO has the authority to take supervisory actions

against significantly undercapitalized enterprises.  Specifically, a significantly undercapitalized

enterprise is required to submit a capital restoration plan to OFHEO.  12 U.S.C. § 4616(a)(1).  In

addition, OFHEO is authorized to take a number of discretionary supervisory actions, which

include the authority to "terminate, reduce, or modify any activity that the Director determines

creates excessive risk to the enterprise" and to "appoint a conservator for the enterprise."  12

U.S.C. §§ 4616(b)(4) and (6).  The capital restoration plan required to be submitted "shall set

forth a feasible plan" for restoring the core capital and total capital of the enterprise, and shall,

inter alia, "describe the actions that the enterprise will take to comply."  12 U.S.C. § 4622(a).

       Fannie Mae was designated significantly undercapitalized in December 2004.  Exh. 2;

Raines Memo at Exh. 2; Howard Memo at Exh. 4.  Due to this determination, Fannie Mae was

required to submit a capital restoration plan to OFHEO for approval.  12 U.S.C. § 4616(a)(1).

OFHEO approved a Capital Restoration Plan that took effect on February 17, 2005, and that plan

requires that Fannie Mae "seek the agency's prior approval for all payment of bonuses or other

non-salary compensation awards for executive officers."  See Exh. 4 at 5.  The Capital

Restoration Plan is enforceable by OFHEO.  See 12 U.S.C. §§ 4631(a)(3)(B) (cease and desist

enforcement of violations of any written agreement entered into by the enterprise with the

Director); 12 U.S.C. § 4636(a)(1)(3) (civil money penalties for violations of any written

agreement entered into by the enterprise with the Director).

 On May 23, 2006, Fannie Mae and OFHEO entered into a consent cease and desist order.

In entering that Consent Order, OFHEO exercised its authority under 12 U.S.C. § 4631.  See

Exh. 7 at 1; 12 U.S.C. § 4631(c)(2) (Director is authorized to issue an order requiring a party to

cease and desist from any conduct or violation, and to take affirmative action to correct or

remedy the conditions resulting from any such conduct or violation).  Thus, the Consent Order

has the effect of a cease and desist order within the meaning of § 4631.  Id.; Henry v. Office of

Thrift Supervision, 43 F.3d 507, 512 (10th Cir. 1994) (rejecting contention that a consent order

was not a cease and desist order under 12 U.S.C. §1818(i)(1)).  OFHEO's authority to enforce a

cease and desist order requiring a party to cease and desist its conduct, and to remedy violations

is well-grounded in the body of case law arising from the area of banking regulation.  See

Abercrombie v. Clarke, 920 F.2d 1351, 1353 (7th Cir. 1990) (cease and desist order may be

imposed by consent); Henry, 43 F.3d at 513; Stanley v. Bd. of Governors of Fed. Reserve Sys.,

940 F.2d 267, 273 (7th Cir. 1991); Horvath v. Fed. Deposit Ins. Corp., 20 F. Supp. 2d 844, 848-

49 (E.D. Pa. 1998) (court denied request for temporary restraining order and preliminary

injunction with respect to enforcement of a stipulated cease and desist order); Fed. Deposit Ins.

Corp. v. Lenz, 323 F. Supp. 2d 342, 348-49 (D. Conn. 2004) (in an action seeking enforcement

of a temporary cease and desist order, court rejected former bank director's argument that the

FDIC's order froze assets of third parties on grounds that the bank director had interest in the

asset).

　　　　To the extent that Plaintiffs' suits seek to challenge the Consent Order and Capital

Restoration Plan themselves, this Court lacks jurisdiction over such claims.  Section 4635(b) of

Title 12 limits federal court jurisdiction by, inter alia,  precluding the district courts from

interfering with the entry or enforcement of a cease and desist order under section 4632, or the

imposition of civil money penalties under section 4636.  See Henry, 43 F.3d at 511-13

(interpreting similar language in 12 U.S.C. § 1818(i)).  Rather, it reserves judicial review of such

actions to the United States Court of Appeals for the District of Columbia.  See 12 U.S.C.

§ 4634(a).  Caselaw interpreting language virtually identical to section 4635(b) has clearly and

consistently found that district courts lack jurisdiction to hear challenges to consent orders.[5]  See,

e.g., Bd. of Governors of Fed. Reserve Sys. v. Mcorp Fin., Inc., 502 U.S. 32, 39-44 (1991); Bd.

of Governors of Fed. Reserve Sys. v. DLG Fin. Corp., 29 F.3d 993, 999 (5th Cir. 1994) (holding

that 12 U.S.C. § 1818(i)(1)'s bar of district court jurisdiction over regulators' investigations

---

[5]　　　　Moreover, even if this Court had jurisdiction to review the validity and propriety of the Consent Order at issue in this case, the only party that could bring such a challenge would be the enterprise, Fannie Mae, pursuant to the statutory scheme established for that purpose. Under the controlling law in this circuit, the Court does not have jurisdiction over a challenge to a cease and desist order brought by plaintiffs who were not party to the Order or to the administrative case that gave rise to it.  See Ridder v. Office of Thrift Supervision, 146 F.3d 1035, 1039 (D.C. Cir. 1998) (court lacked jurisdiction where former officers sought to challenge a requirement in a temporary cease and desist order that required approvals of the payment of their attorneys fees by the company to be approved in advance by the regulator).

applies even before enforcement action is filed); <u>Leuthe v. Office of Fin. Inst. Adjudication</u>, 977 F. Supp. 357, 360-63 (E.D. Pa. 1997) (legal and constitutional challenge to appointment of administrative law judges by respondent in two enforcement actions before OTS held to be barred in district court under 12 U.S.C. § 1818(i)(1), because issues should be raised in court of appeals through orderly enforcement framework established by law).

It is plainly within OFHEO's statutory authority to utilize such remedies as the Capital Restoration Plan and the Consent Order.  These documents provide ample authority for OFHEO to conduct the review of PSP benefits at issue in this case.

II.   <u>OFHEO'S REVIEW OF THE PSP BENEFITS DOES NOT CONSTITUTE A FREEZE OF BENEFITS, INTERFERENCE WITH FANNIE MAE'S PAYMENT OF THE BENEFITS, OR A PREJUDGMENT ATTACHMENT.</u>

Plaintiffs attempt to make their situation appear comparable to that of Messrs. Brendsel and Clarke by referring to the June 19, 2007 letter as "freezing" their benefits, "interfering" with the payment of their benefits, or as a "prejudgment attachment."  Howard Memo at 1, 6-8; Raines Memo at 1, 5, 7; Howard Reply at 1-2.  However, none of these descriptions are remotely accurate.  Rather, the letter is a typical communication from a financial institution regulator to a regulated enterprise requesting additional background information to assist in the process of regulating.  <u>See</u> Exhibit 8; 12 U.S.C. § 4514.  As noted previously, the letter is irrelevant to Fannie Mae's decision not to release the stock, <u>see</u> Defs' Memo at 18-19, as Fannie Mae never intended to release the stock without OFHEO's approval.  <u>See</u> Exhs. 19 & 20;  Howard Memo at Exh 1; Raines Memo at Exh 3.   A letter that enables OFHEO to gather the information needed to decide whether to approve the proposed distribution of stock benefits, when Fannie Mae will

not release the stock benefits without such approval, cannot logically be construed as "interference" with the release of the stock.

It would be just as logical for Plaintiffs to have argued that, as soon as Cycles 19 and 20 ended, they should have been awarded their PSP stock for that cycle. A reasonable response to this contention would be that they <u>could not</u> have been awarded their stock at that time, because it had not yet been determined how much stock they would receive. That is still the case. All that is known at this point is the Fannie Mae Board's <u>proposed</u> percentage to be used in calculating PSP benefits for Cycles 19 and 20. The Board's initial calculation does not constitute a final determination as to the amount of stock that the participants in the PSP benefit program will receive. Rather, the Board's proposal must be reviewed by OFHEO, pursuant to the Capital Restoration Plan. <u>See</u> Exhs. 4, 7, 19, & 20; Raines Memo at Exh. 5; Howard Memo at Exh. 11. Thus, it is not presently known what amount of stock the PSP participants will receive; that amount will not be known until OFHEO has completed its review and a final number has been determined. Just as the amount of stock was unknown at the time that Cycles 19 & 20 ended, it remains unknown until the Board determines the final percentage – with OFHEO's approval.

The lack of finality of Fannie Mae's proposed percentages is made clear both by the 8-K form filed by Fannie Mae and in the resolutions adopting the proposed percentages. The June 21, 2007 8-K Form states "The payment of the awards to each of the company's 'OFHEO-designated executive officers' is subject to approval of . . . OFHEO." Howard Exh. 1; Raines Exh. 3. The resolutions adopting the proposed percentages both state as follows:

> RESOLVED, that management is hereby directed to seek approval from OFHEO for the payment of PSP 19 and PSP 20 to Fannie Mae's OFHEO-designated officers in accordance with Fannie Mae's capital restoration plan; and it is further
>
> RESOLVED, that no payment shall be made under PSP 19 or PSP 20 until OFHEO has approved the payment of PSP 19 and PSP 20 for the OFHEO-designated executive officers.[6]

Exhs. 19 & 20. Plaintiffs do not deny that Fannie Mae has the ability to decide when it is appropriate to release the PSP benefits. See Howard Memo at Exh. 2, p.1 & Exh. 3, p.1. Clearly, Fannie Mae has no intention of releasing the PSP benefits until it has received approval from OFHEO, consistent with the Capital Restoration Plan's requirements. Thus, OFHEO is not freezing the benefits or interfering with Fannie Mae. Rather, OFHEO is doing exactly what OFHEO and Fannie Mae both agree is proper – reviewing the proposed executive compensation benefits.

Plaintiffs' claim that OFHEO is interfering with Fannie Mae's award of their benefits should be considered in the overall Fannie Mae-OFHEO regulatory context as well. Fannie Mae was deemed significantly undercapitalized in December 2004. See 12 U.S.C. § 4612; Exhs. 1 & 2. When an enterprise is significantly undercapitalized, OFHEO has the authority to take a wide range of actions, up to and including putting Fannie Mae into conservatorship. 12 U.S.C.

---

[6] Notably, this last section of the resolutions prevents payment of PSP Cycle 19 and 20 benefits until OFHEO's review is complete. Exhs. 19 & 20. Thus, even if the Court were to determine that Plaintiffs are somehow not among the executives whose benefits are reviewed pursuant to the Capital Restoration Plan, they would still not receive their shares until OFHEO's review of the proposed percentages is complete because Fannie Mae has determined that even individuals who are not "OFHEO-designated executive officers" will not receive their benefits until the review is complete. This determination makes sense, as the same percentage is applied to all participants in the PSP benefits program for each cycle. Plaintiffs do not deny that it is within Fannie Mae's authority to withhold their benefits for such a purpose.

§ 4616(b)(6).  OFHEO found it sufficient to utilize other remedies such as the Capital

Restoration Plan and Consent Order, which allow Fannie Mae to be run by the Board but require

that certain actions must be approved by OFHEO.  Such review of Board actions is well within

the ambit of power available to OFHEO in light of the determination that Fannie Mae was

significantly undercapitalized.  OFHEO's exercise of its authority in this circumstance has been

reasonable and judicious, and Plaintiffs' challenge to it is unavailing.

Finally, the history of events related to this review demonstrates that OFHEO is

conducting this review in an expeditious manner that is intended to achieve an accurate and

prompt decision.  The Board submitted its proposed percentages to OFHEO on June 15, 2007.

See Declaration of Patrick Lawler ("Lawler Decl.") ¶ 6.  On June 19, 2007, OFHEO requested

additional information.  See Exh. 8.  The Board provided a special report in late June.  See

Raines Memo at Exh. 5; Howard Memo at  Exh. 11.  OFHEO reviewed that report and

determined that it did not adequately answer the questions asked.  See Exh. 14.  OFHEO next

responded by letter on July 6, 2007, providing more specific questions for the Board to answer to

enable OFHEO to evaluate the proposed percentages.  Id.  The entire process to date has taken

less than one month.  Thus, OFHEO is acting quickly to gather and review all relevant

information so that it can reach a decision on the proposed benefits.  Such action is well within

the authority of OFHEO, as regulator, particularly in the context of the Capital Restoration Plan.

III.    OFHEO IS REVIEWING THE FANNIE MAE BOARD'S DETERMINATION TO PAY
        CYCLE 19 AT 40% AND CYCLE 20 AT 47.5%.

Plaintiffs' objections to OFHEO's review appear to be related to their misconception that

OFHEO will be reviewing their individual benefits.  This is not the case.  Rather, OFHEO is

reviewing the Board's proposal that Cycle 19 benefits be paid at 40%, because the qualitative

goals were 80% achieved, and that Cycle 20 benefits be paid at 47.5%, because the qualitative goals were 95% achieved.[7]  See Exhs. 19 & 20; Lawler Decl. ¶ 9; Raines Memo at Exh. 5; Howard Memo at  Exh. 11.  To that end, OFHEO has sent two letters to Fannie Mae seeking additional information that will help OFHEO understand what Fannie Mae considered and how Fannie Mae arrived at the proposed stock awards.  See Exhs. 8 & 14.

As the July 6, 2007 letter demonstrates, OFHEO is reviewing the Board's proposed determination that Fannie Mae met its qualitative goals at 80% in Cycle 19 and at 95% in Cycle 20, after earlier determining for the two immediately prior cycles (which overlap in part with Cycles 19 and 20) that it would pay out nothing because the goals were not met at the minimum 40% level.  See Exhs. 14 &18.  OFHEO is seeking, inter alia, information that will help it to understand how Fannie Mae determined the qualitative percentages for Cycles 19 and 20 in contrast to the determinations made for Cycles 17 and 18.  The questions asked in the July 6, 2007 letter illuminate OFHEO's focus on the Board's action in proposing the 80 and 95% achievement of qualitative goals, rather than at the specific benefit that will be awarded to any particular individual under the program.[8]  See id.; Exh. 14.  The June 19, 2007 letter similarly asks questions of Fannie Mae regarding what information was considered and how Fannie Mae arrived at the percentages in question.  See Exh. 8.  The letter requests specific data regarding

---

[7]        The quantitative goals for Cycles 19 and 20 were less than 40% achieved, and are therefore treated as zero for purposes of determining PSP benefits.  See Lawler Decl. ¶ 9.

[8]        The June 19, 2007 letter's reference to individuals such as Messrs. Howard and Raines is consistent with OFHEO's review of the Board's action.  The letter asks whether the Board has considered certain options and factors in reaching its decision as to what percentages to propose.  See Exh. 8.  Clearly, OFHEO was seeking information on the Board's deliberations and whether the Board believed it could or did consider individual contributions to corporate performance or non-performance during the years in question.

the issue of comparability, as OFHEO is seeking to determine whether the percentages proposed by Fannie Mae are consistent with the industry standard. See id. Thus, OFHEO's review of the Board's determination of what percentage is to be applied across the board to determine PSP benefits for Cycles 19 and 20 is not an examination of any individual's benefit and is fully authorized pursuant to, inter alia, the Capital Restoration Plan and the Consent Order.

IV.    THE JUNE 19, 2007 LETTER IS FACTUALLY DISSIMILAR FROM THE LETTERS AT ISSUE IN *BRENDSEL* AND *CLARKE*.

Messrs. Raines and Howard seek to equate OFHEO's actions here with the facts in the Brendsel and Clarke cases in the hope of reproducing the same results. But OFHEO's actions here are significantly different from the letter instructions the agency previously provided to Freddie Mac in June 2003 that formed the basis for the Court's decisions in the Brendsel and Clarke cases. In truth, any similarities are facial and few.

In Brendsel and Clarke, the letters instructed Freddie Mac not to take any action to fulfill the terms of the employment agreements of three individuals, in particular their termination benefits, including stock or stock options, until such time as OFHEO completed the special examination, completed its review and informed Freddie Mac of its views on the agreements, and removed the restrictions. See Exhs. 15-17. The Director wrote: "OFHEO will inform you of its reviews regarding the packages once its investigation is complete. "Please be reminded that these benefits are not to be provided until we have completed our review and a determination is provided to you." See Exh. 16. Thus, OFHEO's instructions as to those limitations contained no time limit and restricted the individuals from all benefits. By contrast, the letters in this case apply only to PSP benefits for Cycles 19 and 20, rather than to all termination benefits, and there has been no claim or showing of unreasonable or arbitrary delay by OFHEO. See Exhs. 8 & 14.

-12-

OFHEO's letters to Freddie Mac targeted three specific executive officers.  For example, in a letter to Freddie Mac, dated June 12, 2003, Deputy Director Blumenthal reiterated "that Freddie Mac is not to take any action to fulfill any of the terms of the three executive officers' [respective employment] agreements [with Freddie Mac] that relate to termination benefits, including but not limited to, the vesting, accelerated or otherwise, of any stock or stock options." See Exh. 15.  By contrast, the review of executive benefits in this case is of the percentages determined by the Board and therefore effects all participants in PSP Cycles 19 and 20, rather than being limited to particular individuals.  See Exhs. 8 & 14.

The Brendsel and Clarke letters are also remarkable for what they do not state or do not request.  There is no mention in any of these letters of the manner in which the benefit programs are managed.  See Exhs. 15-17.  The letters do not seek information from the Board or senior management on how the benefits were calculated or justifications for the analysis.  Id.  Here, by contrast, the letters set out clearly what information OFHEO needs in order to complete its review.  See Exhs. 8 & 14.

In this case, OFHEO has not acted to deny a specific individual access to his entire package of termination benefits.  Rather, OFHEO is reviewing how a compensation plan is being administered.  OFHEO, in response to Fannie Mae's request for approval to go forward with the proposed PSP payments, sought additional information sufficient to evaluate whether the Board has properly taken into account all relevant information concerning the internal controls and other failures during the period at issue in assessing the qualitative factors for the subject PSP cycles.  "OFHEO has frequently requested additional information in individual benefit cases as well as in cases involving broader benefit programs.  Here, OFHEO wishes to review the bases

on which the Board has made its determination and whether these comport with the statutory standards as well as with industry standards." Exh. 8.

In sum, the letters that were central to <u>Brendsel</u> and <u>Clarke</u> are not similar to the letter about which Plaintiffs complain in this case, which letter is, in any event, not the reason that these PSP benefits have not yet been awarded. <u>See</u> Defs' Memo at 18-19. The <u>Brendsel</u> and <u>Clarke</u> letters focused on holding all of the termination benefits of specific individuals with no clear end in sight. Here, by contrast, only one type of benefit is at stake, all individuals eligible for PSP benefits for Cycles 19 and 20 will receive their benefits at the same time, and OFHEO is taking reasonable and timely steps in looking at the action taken by the Board rather than any individual's benefit package.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons provided in Defendants' prior opposition brief, Plaintiffs' motions for preliminary injunction should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

         /s/    Marcia N. Tiersky
OF COUNSEL:                          ARTHUR R. GOLDBERG, D.C. Bar 180661
DAVID FELT                           MARCIA N. TIERSKY, Ill. Bar 6270736
OFHEO                                Attorneys, Department of Justice
1700 G Street, N.W.                  20 Mass. Ave., N.W., Room 7206
Washington, D.C. 20552               Washington, D.C. 20530
Tel: (202) 414-3750                  Tel: (202) 514-1359
                                     Fax: (202) 318-0486
                                     E-mail: marcia.tiersky@usdoj.gov
                                     Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| J. TIMOTHY HOWARD, | ) | |
| | ) | |
| | ) | No. 1:07-cv-01196 (RJL) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF FEDERAL HOUSING | ) | |
| ENTERPRISE OVERSIGHT, and | ) | |
| JAMES B. LOCKHART, III, | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |

and

| | | |
|---|---|---|
| FRANKLIN D. RAINES, | ) | |
| | ) | |
| | ) | No. 1:07-cv-01202 (RJL) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF FEDERAL HOUSING | ) | |
| ENTERPRISE OVERSIGHT, and | ) | |
| JAMES B. LOCKHART, III, | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |

## DECLARATION OF CHARLOTTE REID

I, Charlotte Reid, hereby state as follows:

1.    I am employed as Associate General Counsel at the Office of Federal Housing Enterprise Oversight (OFHEO).  I submit this declaration in support of Defendants' Supplemental Brief in Opposition to Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction.

2.    I know the following attached Exhibits to be true and correct copies:

a.      Exhibit 14 is a letter dated July 6, 2007 from James B. Lockhart, Director of OFHEO, to Stephen Ashley, Chairman of the Fannie Mae Board of Directors.

b.      Exhibit 15 is a letter dated June 12, 2003 from Stephen Blumenthal, Counsel to the Director, to Allen Ratner, Vice President and Deputy General Counsel at Freddie Mac.

c.      Exhibit 16 is a letter dated June 12, 2003, from Armando Falcon, Jr., Director of OFHEO, to Shaun F. O'Malley, Chairman of the Fannie Mae Board of Directors.

d.      Exhibit 17 is a letter dated June 17, 2003, from Stephen Blumenthal, Counsel to the Director, to Allen Ratner, Vice President and Deputy General Counsel at Freddie Mac.

e.      Exhibit 18 is Fannie Mae Form 8-K, which was filed with the Securities and Exchange Commission on February 20, 2007.

f.      Exhibit 19 is the Compensation Committee Resolution regarding proposed benefits for Cycles 19 and 20.

g.      Exhibit 20 is the Nonmanagement Board of Directors Resolution regarding proposed benefits for Cycles 19 and 20.

h.      Exhibit 21 is a printout from Yahoo! Finance showing the price performance of shares of Fannie Mae stock from June 22, 2007 through July 12, 2007.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 12th day of July 2007.


_Charlotte Reid_
Charlotte Reid

EXHIBIT 14



## OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT
### 1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3801

**OFFICE OF THE DIRECTOR**

July 6, 2007

**DELIVERED BY FACSIMILE**
**AND FIRST CLASS MAIL**

Mr. Stephen Ashley
Chairman of the Board of Directors
Fannie Mae
3900 Wisconsin Avenue, NW
Washington, DC  20016-2892

Dear Mr. Ashley,

Thank you for your prompt response to OFHEO's June 19 request for additional information regarding payment of PSP 19 and 20.  The response, however, is insufficient for OFHEO to understand the basis of the Board's determinations.

An initial and significant item is the response to item 1 of OFHEO's request.  The information is unclear how the Board's determination that the non-financial goals were 80 percent and 95 percent achieved in the two performance cycles.  Your letter states that the Board's Compensation Committee considered evaluations provided by management on each of five strategic goals and that the Committee explained its evaluation to the non-management members of the Board.  There is almost no discussion in your letter specifically relating to how well individual goals were met during the relevant time periods.  A single specific example is offered, concerning Fannie Mae's loss of market share.

The letter of June 19 sought "data and analysis on how the Board determined the appropriateness and size of the PSP awards," how several specific performance concerns were incorporated, and "a detailed explanation of the basis for the Board's determination, including [those concerns] and, specifically, how the percentages…were selected."  The response provided does not address the factors set forth in OFHEO's letter, that is, no response is provided as to how the problems that continued at Fannie Mae were made part of the evaluation and determination by the Board on the PSP grants.

Please provide more detailed and specific responses as to the following:

1.  What would have justified a 150 percent of target payout for PSP 19 and 20?  What would have justified payments at the 100 percent level?   What level was actually used?

2.  For each of the five qualitative criteria, what percent did the Board assign to each of PSPs 19 and 20 and why?

Mr. Ashley                                                          Page 2
Chairman of the Board of Directors

3. How did the Board calculate that the qualitative deficiencies in 2003 and 2004 were offset by asserted qualitative improvements in subsequent years to justify setting the proposed awards at the 80 and 95 percent levels? (a) For example, PSP 19 contained two years of significant management issues and only one year of remediation. How could that result in an 80% attainment? (b) How did the Board calculate the role of current and former employees in their contribution to attaining qualitative goals where performance was deficient and a large number of recipients did not participate in years where performance was improving?

4. The Board also should provide any more information, as requested in paragraph 3 of the June 19 letter, that it believes will go to providing a fuller description of its deliberations and support for its proposals.

Accordingly, OFHEO is asking again for detailed information. OFHEO cannot complete its review or provide its approval absent a more adequate basis describing actual deliberative factors, data utilized and calculations employed by the Board. If you have any questions, do not hesitate to contact me.

Sincerely,

James B. Lockhart
Director

cc:
Beth Wilkinson
Executive Vice President
General Counsel and Corporate Secretary

# EXHIBIT 15

COVINGTON & BURLING 11 COPY ROOM → 98332292          NO.641     P.1/2      D02



**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800

June 12, 2003

**BY COURIER.**

Allan Ratner
Vice President and
Deputy General Counsel for
Mortgage Law
Freddie Mac
8200 Jones Branch Drive
McLean, VA  22102-3107

Dear Mr. Ratner:

This letter memorializes the discussion that occurred today during an 11:20 a.m. telephone conference call between yourself and Deputy General Counsel David W. Roderer, concerning compensation related to the agreements of certain executive officers of Freddie Mac.

Specifically, Mr. Roderer stated that he was speaking on behalf of the Director with respect to the agreements between Freddie Mac and Leland Brendsel, David W. Glenn, and Vaughn A. Clarke (collectively, "the executive officers"), which relate to their employment. In that capacity, Mr. Roderer instructed you that Freddie Mac is not to take any action to fulfill any of the terms of the three executive officers' agreements that relate to termination benefits, including, but not limited to, the vesting, accelerated or otherwise, of any stock or stock options.

Notably, the employment agreements of the executive officers are being reviewed by OFHEO under the Director's broad supervisory oversight of the executive compensation policies and practices of Freddie Mac, which includes safety and soundness and specific prior approval authorities.

Any inquiries regarding the instruction noted above should be directed to me (202) 414-3802.

Sincerely,

Stephen Blumenthal
Counsel to the Director

cc: David W. Roderer, Deputy General Counsel

PAGE 1/2 * RCVD AT 6/25/2003 6:10:03 PM [Eastern Daylight Time] * SVR:/16 * DNIS:27724 * CSID: * DURATION (mm-ss):00-50

# EXHIBIT 16



**OFHEO** OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT
1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800
Office of the Director

June 12, 2003

Shaun F. O'Malley
Chairman of the Board
Freddie Mac
8200 Jones Branch Drive
McLean, VA 22102

*Via Facsimile*

Dear Mr. O'Malley:

We are in receipt of the compensation packages for Messrs. Leland Brendsel, David Glenn and Vaughn Clarke.

OFHEO has begun its review including preliminary meetings with Freddie Mac staff. OFHEO will inform you of its views regarding the packages once its investigation is complete.

Please be reminded that these benefits are not to be provided until we have completed our review and a determination is provided to you.

Thank you for your cooperation.

Sincerely,

[signed Armando Falcon, Jr.]

Armando Falcon, Jr.
Director

Copy to:      Gregory J. Parseghian
              Chief Executive Officer
              Freddie Mac

# EXHIBIT 17

05/17/2003   15:55   COVINGTON & BURLING CONF. CENTER → 92024166899      NO.422   0002

Jun-18-03   02:08am   From-                                                    T-220   P.004/006   F-562



**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
*1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800*
*Office of the Director*

June 17, 2003

Allan Ratner
Vice President and
Deputy General Counsel
Freddie Mac
8200 Jones Branch Drive
McLean, VA  22102-3107

Dear Mr. Ratner:

This letter is in reference to our telephone conference calls on June 13, 2003 concerning agreements and related termination benefits of Leland Brendsel, David W. Glenn, and Vaughn A. Clarke (collectively, "the executive officers"), and responds to various issues raised by you.  As you know, the employment agreements of the executive officers are being reviewed by OFHEO. You request clarification of my letter to you dated June 12, 2003, concerning the compensation provided under the executive officers' agreements.

With respect to your first question, you stated that Freddie Mac has been informed by a representative of Mr. Brendsel of his desire to move a certain amount of stock from two accounts at Salomon Smith Barney to his account with Charles Schwab & Company. The two accounts are: (1) a restricted share account that includes shares for which the restriction period has lapsed and (2) an employee stock purchase plan account in the employee stock purchase program of Freddie Mac.

Until such time as the special examination is completed, and OFHEO removes the restrictions, OFHEO has determined that neither Freddie Mac nor any of its employees or agents, without the approval of this agency, is to take any action to effect or facilitate Mr. Brendsel, or either of the other two executive officers, in transferring, selling, or otherwise disposing of or encumbering previously restricted stock on which the restrictions have lapsed or will lapse.

Although not raised by you or other representatives of Freddie Mac in our conversations but related to the issue under discussion, is the sale on June 5, 2003 of 4,228 of previously restricted shares of stock by David Glenn. In a telephone conversation with you on June 13, 2003, a human resources attorney for Freddie Mac confirmed that these shares are sold back to the company with a portion being withheld and maintained in an account at the company for the purpose of meeting a tax liability.

06/17/2003   15:55   COVINGTON & BURLING CONF. CENTER → 92024166899                    NO.422   P003

Jun-18-03   02:08am   From-                                      T-229  P.005/006  F-962

06/17/03   Page 2

Insofar as OFHEO will not approve the sale of previously restricted shares of stock on which the restrictions lapsed on June 5, 2003 by Mr. Brendsel, similarly the sale of such stock by Mr. Glenn is to be restricted. OFHEO instructs Freddie Mac to reverse and cancel Mr. Glenn's June 5, 2003 transaction, credit the shares back to his account, and prohibit him from making any other sales, transfers, or otherwise disposing of or encumbering any of these shares until such restrictions are removed by OFHEO. Initially, in our review, it does not appear that Mr. Clarke has any restricted stock, the restrictions on which would have expired on June 5, 2003. If subsequent examination discloses that he does, he will be similarly restricted.

You also seek clarification of my letter of June 12, 2003 regarding whether Freddie Mac may make payments relating to termination benefits of the executive officers. You stated that Freddie Mac understands from the instruction in that letter that Freddie Mac is to take whatever actions are necessary to preclude the three referenced executive officers from exercising vested stock options. You are correct in your understanding as to the meaning of the instructions in this regard. Freddie Mac is to take whatever actions are necessary to preclude the three executive officers from exercising vested stock options.

Remaining is the request of Mr. Brendsel to transfer approximately 4,600 shares of stock from an employee stock purchase plan account at Salomon Smith Barney to his account at Charles Schwab & Company. You explained that in this plan an employee purchases stock in his or her name but the stock is not directly available to the employee until Freddie Mac, at the request of the employee, directs Salomon Smith Barney to release the shares. The shares in the plan are fully paid for by the employee at the time of the purchase. Specifically, you asked whether OFHEO would authorize Freddie Mac to approve the transfer.

Based on representations, including the representation that Mr. Brendsel will not, on his own initiative, sell the stock, which were made in discussions with you and our subsequent conversations with John Dugan of Covington and Burling and Lawrence Lorber of Proskauer Rose as well as with Mssrs. Richard Grimes and Gregory Faragasso of the Enforcement Division of the Securities and Exchange Commission, OFHEO will not object to this transaction transferring fully paid for employee stock from the employee stock purchase plan account maintained for the benefit of Mr. Brendsel at Salomon Smith Barney to his account at Charles Schwab & Company.

Any inquiries regarding the instruction noted above should be directed to me at (202) 414-3802).

Sincerely,

Stephen Blumenthal
Counsel to the Director

cc: David W. Roderer, Deputy General Counsel

# EXHIBIT 18



# FORM 8-K

## FEDERAL NATIONAL MORTGAGE ASSOCIATION FANNIE MAE - FNM

Filed: February 20, 2007 (period: February 08, 2007)

Report of unscheduled material events or corporate changes.

# Table of Contents

**Item 5.02** Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain

**Item 7.01** Regulation FD Disclosure.

**Item 9.01** Financial Statements and Exhibits.

SIGNATURES
Exhibit Index
EX–99.1 (EX–99.1)

EX–99.2 (EX–99.2)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8−K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):  February 8, 2007

# Federal National Mortgage Association

(Exact name of registrant as specified in its charter)

| Federally Chartered Corporation | 000−50231 | 52−0883107 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |
| 3900 Wisconsin Avenue, NW, Washington, District of Columbia | | 20016 |
| (Address of principal executive offices) | | (Zip Code) |

Registrant's telephone number, including area code:    202−752−7000

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ]  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ]  Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)
[ ]  Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))
[ ]  Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

Top of the Form
Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On February 15, 2007, the Board of Directors established 2007 corporate performance goals for cash bonuses for executive officers and other employees under the company s Annual Incentive Plan. The company also decided to eliminate certain perquisites or personal benefits previously available to some or all of the company s officers. In addition, the Board of Directors determined not to make any payouts to any current or former officers under the company s long-term, incentive performance share program for the three-year award cycle ended in 2004 and not to pay the unpaid second installment of the award for the three-year cycle ended in 2003. As a result of the Board s decision relating to the performance share program, Fannie Mae will take into income approximately $44.4 million that it had previously expensed, on a pre-tax basis, for unpaid performance share awards for the 2003 and 2004 award cycles.

CORPORATE PERFORMANCE GOALS FOR 2007

Fannie Mae s Annual Incentive Plan governs the payment of annual cash incentive awards, or cash bonuses, to Fannie Mae s management-level employees, including executive officers. Under the plan, both corporate performance goals and individual award targets are established for each year and, as a result, the amount of the cash bonus that any officer or management-level employee actually receives for performance during any calendar year depends both on Fannie Mae s achievement of the corporate performance goals for that year and on the officer s or employee s achievement of his or her individual goals.

On February 15, 2007, the Board set performance goals for the company for 2007 as follows.

" Business goals relating to new business, book growth and economic returns.

" Mission goals relating to regulatory and affordable housing goals.

" Financial goals relating to completion and filing of the company s Forms 10-K for the years ended December 31, 2005 and December 31, 2006; remediation of significant deficiencies and material weaknesses; and controlling administrative expenses.

· " Risk goals relating to risk tolerances for the company s business segments and compliance with risk policies and risk limits.

" Compliance and culture goals relating to ensuring compliance with the provisions of the company s compliance, ethics and investigations program; continuing to build and maintain constructive relationships with regulators; and taking steps to accelerate culture change.

Consistent with the Board s determination in 2006, the performance goals for employees in the company s Internal Audit department and the company s Office of Compliance and Ethics for 2007 will be based on achievement of goals tailored specifically to these departments  unique roles in the company, rather than achievement of corporate-wide performance goals. As a result, bonuses for management-level employees in the company s Internal Audit department and in its Office of Compliance and Ethics will be paid from separate bonus pools that will be funded at levels based on achievement of department-specific goals. Attainment of these goals will be determined by the Board s Audit Committee in the case of the Internal Audit department and by the Board s Compliance Committee in the case of the Office of Compliance and Ethics.

· ELIMINATION OF PERQUISITES

On February 14, 2007, Fannie Mae decided to eliminate the following perquisites or personal benefits that the company previously provided to its officers:

" payment for financial counseling, effective as of July 1, 2007;

" use of company transportation for any non-business purpose which, effective as of January 1, 2007, will be required to be reimbursed to the company;

" company-owned memberships at country clubs, effective as of January 1, 2008;

" excess liability insurance, effective as of January 1, 2008 for all officers, and effective as of March 1, 2007 for any person who becomes an officer on or after that date;

" any "gross-up," or increase, in income to cover taxes due on any excess liability insurance provided by the company to any officer, effective as of January 1, 2008; and

" any "gross-up," or increase, in income to cover taxes due on any life insurance provided by the company to any officer, effective as of January 1, 2008.

DETERMINATION OF PERFORMANCE SHARE PROGRAM AWARDS

Overview

On February 15, 2007, Fannie Mae s Board of Directors (with only the nonmanagement directors voting) determined not to make any payouts to any current or former officers under the company s long-term, incentive performance share program for the three-year award cycle ended December 31, 2004 and not to pay the unpaid second installment of the award for the three-year cycle ended December 31, 2003. The Board s decision followed its review of qualitative and quantitative analyses of company performance during these award cycles, including a review of the company s Form 10-K for the year ended December 31, 2004, filed with the SEC on December 6, 2006, which included restated audited financial statements, and a review of supplemental financial information. As a result of the Board s decision, the company will take into income approximately $44.4 million that it had previously expensed, on a pre-tax basis, for unpaid performance share awards for the 2003 and 2004 award cycles.

Background

Prior to 2005, Fannie Mae granted long-term incentive awards under its performance share program. Under the program, senior management received shares of common stock of Fannie Mae if the company met performance objectives over a period of three calendar years, with each three-year period constituting a single award cycle. In accordance with the program, the Board of Directors set both financial goals (based on growth in core business earnings) and non-financial goals at the beginning of the three-year award cycle for the entire three-year period, with each set of goals weighted at 50 percent. Under the program, the Board of Directors established minimum, target and maximum payout levels for each set of goals. The Compensation Committee determined achievement against the goals and the amount of the award payout in January of the year following the end of the award cycle. Each participant typically then received one-half of the payout immediately following the Compensation Committee s determination and the second half one year later.

Source: FEDERAL NATIONAL MOR, 8-K, February 20, 2007

The Compensation Committee and the Board of Directors have established no award cycles under the program since January 2004. In addition, as a result of the company s restatement of prior period financial statements announced in December 2004, the Compensation Committee and the Board determined in January 2005 that, even though the award for the cycle ended in December 2003 had been determined and the first installment paid in early 2004, the company would defer the second (and final) installment of the payout for that award cycle. On December 6, 2006, Fannie Mae filed with the SEC its Form 10–K for the year ended December 31, 2004, including audited financial statements for the years ended December 31, 2002, 2003 and 2004.

Set forth below is a discussion of the status of performance share cycles that ended in the years 2003 through 2006.

Performance Share Cycle ended on December 31, 2003

Based on the restated audited financial statements contained in the 2004 Form 10–K and additional qualitative and quantitative analyses relating to the company s performance during the award cycle that had become available to the Compensation Committee and the Board, the Compensation Committee and the Board reviewed the company s performance against the financial and non–financial goals originally established for the award cycle that ended in 2003. Based on these reviews, the Compensation Committee and the Board determined not to pay the second installment of the award for the 2003 award cycle to the 18 current and 18 former officers eligible to participate in the program for that cycle.

Performance Share Cycle ended on December 31, 2004

For the three–year award cycle ended on December 31, 2004, the Compensation Committee and the Board determined that no award was due to the 21 current and 21 former officers eligible to participate in the program for that cycle. The Compensation Committee and the Board based this determination on their review of the restated audited financial statements contained in the 2004 Form 10–K and additional qualitative and quantitative analyses relating to the company s performance during the award cycle.

Performance Share Cycles ended on December 31, 2005 and 2006

Because Fannie Mae does not have reliable financial data for all years within the award cycles ended on December 31, 2005 and 2006, the Compensation Committee and the Board have decided not to determine payouts under the performance share program for those award cycles at this time.

Item 7.01 Regulation FD Disclosure.

On February 8, 2007, in a speech by the Chief Financial Officer of Fannie Mae and a simultaneous news release reporting on that speech, Fannie Mae provided new guidance on the expected timing of the company s filing of its Annual Report on Form 10–K for the year ended December 31, 2006, and confirmed previous guidance as to the expected timing of the filing of its Annual Report on Form 10–K for the year ended December 31, 2005. A copy of the news release is furnished as Exhibit 99.1 to this report.

On February 15, 2007, Fannie Mae announced that its Board of Directors had approved the redemption of all of the outstanding shares of the company s Variable Rate Non–Cumulative Preferred Stock, Series K. The announcement, a copy of which is furnished as Exhibit 99.2 to this report, is incorporated herein by reference.

The information in this item, including Exhibits 99.1 and 99.2, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

Item 9.01 Financial Statements and Exhibits.

(d) Exhibits. The exhibit index filed herewith is incorporated herein by reference.

Top of the Form

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Federal National Mortgage Association

February 20, 2007

By:     G. Scott Lesmes
_____

Name: G. Scott Lesmes
Title: Senior Vice President and Deputy General Counsel

Source: FEDERAL NATIONAL MOR, 8-K, February 20, 2007

Top of the Form

Exhibit Index

| Exhibit No. | Description |
|---|---|
| 99.1 | February 8, 2007 News Release Reporting Guidance on Expected Timing of Filing of 2005 and 2006 Forms 10-K |
| 99.2 | February 15, 2007 News Release Regarding Redemption of Variable Rate Non-Cumulative Preferred Stock, Series K |

# FANNIE MAE

# news release

Media Hotline: 1–888–326–6694
Consumer Resource Center: 1–800–732–6643

Contact: Janis Smith at 202–752–6673

Number: 3922

Date: February 8, 2007

### Fannie Mae CFO Addresses Credit Suisse Financial Services Forum; Provides New Guidance on Timing of Company's 2006 10-K Filing

WASHINGTON, DC — Fannie Mae (FNM/NYSE) Chief Financial Officer Robert T. Blakely today provided new guidance on the timing of the Company's 2006 Annual Report filing with the U.S. Securities and Exchange Commission (SEC).

"I'd like today to provide new guidance on the timing of our 2006 10-K – specifically, we believe we will file our 2006 results and 10-K before the year is over," Blakely said in remarks delivered at the Credit Suisse Financial Services Forum in Naples, Florida. "We plan to file the 2005 10-K no later than the end of August of this year, and then the 2006 10-K before the end of the year."

Thomas A. Lund, Fannie Mae's Executive Vice President, Single–Family Mortgage Business, also addressed the Forum and provided details on the Company's business outlook. Lund highlighted Fannie Mae's competitive advantages, noting that, "Going into a potentially less benign credit environment, the characteristics of our credit book of business are extremely strong. This is a key point of differentiation between Fannie Mae and many other market participants."

Blakely added that the Company has demonstrated a conservative and effective approach to managing the interest rate risk in mortgage assets it purchases. "This has been reflected in our portfolio's duration gap, which has not exceeded plus or minus one month for over two years," he said.

Commenting on Fannie Mae's portfolio and funding activities, Blakely said, "The reclassification of our mortgage portfolio to available for sale, from hold to maturity, allowed us to enhance our portfolio strategy. We now both buy and sell based on pricing dynamics in the market, with a focus on maximizing total return over time—subject to our risk constraints."

(more)

1

Source: FEDERAL NATIONAL MOR, 8–K, February 20, 2007

**Credit Suisse Financial Services Forum**
**Page Two**

"Demand for our debt is a cornerstone of our investment activities and a key determinant of our ability to maximize long–term fair value over time," said Blakely. "We've continued to see consistently strong demand for our debt from domestic institutional investors. And, in recent years, we have seen a marked increase in demand for our debt from investors globally."

Fannie Mae's 2007 priorities are focused on making the Company more competitive, and Blakely emphasized that increasing competitiveness isn't just about running a company faster and better. It's also about running a company cheaper. "Bottom line, we want to run our business as efficiently as possible," he said. "We're focused on both identifying tactical, immediate opportunities to capture cost–saves, and on longer–term initiatives to help reduce normalized expenses going forward." Blakely reiterated the Company's commitment to reduce planned operating expenses by $200 million in 2007 and indicated that normalized operating expenses (excluding non–recurring costs associated with returning to timely financial reporting) are expected to approximate $2 billion per year.

Fannie Mae also provided a positive outlook for its Single–Family business, and Lund noted: "We also see very solid growth opportunities for our Single–Family business this year, next year and for the long term. We expect growth in our MBS to be slightly higher than the growth of the mortgage market."

An audio webcast of their presentations, along with Blakely's slide presentation, is available on Fannie Mae's Web site at www.fanniemae.com.

###

*Fannie Mae is a New York Stock Exchange Company. It operates pursuant to a federal charter. Fannie Mae has pledged through its American Dream Commitment to expand access to homeownership for millions of first–time home buyers; help raise the minority homeownership rate to 55 percent; make homeownership and rental housing a success for millions of families at risk of losing their homes; and expand the supply of affordable housing where it is needed most. More information about Fannie Mae can be found on the Internet at http://www.fanniemae.com.*

2

Source: FEDERAL NATIONAL MOR, 8–K, February 20, 2007

# FANNIE MAE

## news release

Media Hotline: 1–888–326–6694
Consumer Resource Center: 1–800–732–6643

Contact: Janis Smith at 202–752–6673

Number: 3931

Date: February 15, 2007

### Fannie Mae to Redeem its Preferred Stock Series K

WASHINGTON, DC – Fannie Mae (FNM/NYSE) today announced that its Board of Directors has approved the redemption of all eight million outstanding shares of the company's Variable Rate Non–Cumulative Preferred Stock, Series K, with an aggregate stated value of $400 million, in accordance with the Certificate of Designation of Terms of the Series K preferred stock.

"Redeeming costly variable–rate preferred stock in this rising rate environment will result in millions of dollars in annual after-tax savings for the Company going forward," said Chief Financial Officer Robert Blakely. "This action is consistent with our responsibility to manage our shareholders' capital prudently."

Fannie Mae also announced earlier this year that the Company will redeem all outstanding shares of its Variable Rate Non–Cumulative Preferred Stock, Series J, with an aggregate stated value of $700 million, on February 28, 2007.

Outstanding shares of Series K preferred stock will be redeemed on April 2, 2007, at a redemption price of $50 per share plus a dividend, which will accrue at the Swap Rate (as defined in the Series K Certificate of Designation) plus 1.33 percent for the period from and including March 31, 2007, to but excluding April 2, 2007.

On January 19, 2007, the Board of Directors declared a dividend to be paid to the registered holders of Series K preferred stock, as shown on the books of the corporation at the close of business on March 20, 2007. The dividend will accrue at an annual rate of (i) 5.396 percent for the period from and including December 31, 2006 to but excluding March 18, 2007 and (ii) the Swap Rate plus 1.33 percent (subject to a cap of 8.000 percent per annum) for the period from and including March 18, 2007 to but excluding March 31, 2007. The dividend will be payable on March 31, 2007.

(more)

1

**Preferred Stock Series K**
**Page Two**

The corporation will announce the dividend per share amount for the first quarter and the redemption price for the Series K preferred stock when the corporation determines the Series K dividend rate (which resets on March 18, 2007).

Computershare Trust Company, N.A., 250 Royall Street, Canton, Massachusetts 02021 will act as the redemption agent. A Notice of Redemption will be mailed to holders of the Series K preferred stock next week.

### ###

*Fannie Mae is a New York Stock Exchange Company. It operates pursuant to a federal charter. Fannie Mae has pledged through its American Dream Commitment to expand access to homeownership for millions of first–time home buyers; help raise the minority homeownership rate to 55 percent; make homeownership and rental housing a success for millions of families at risk of losing their homes; and expand the supply of affordable housing where it is needed most. More information about Fannie Mae can be found on the Internet at http://www.fanniemae.com.*

2

Created by 10KWizard    www.10KWizard.com

# EXHIBIT 19

## Compensation Committee
## Resolution

RESOLVED, the Compensation Committee (the "Committee") of the Board of Directors (the "Board") recommends that the nonmanagement Board adopt the following resolution:

WHEREAS, the Board, upon the recommendation of the Compensation Committee, resolved in January 2006 for PSP Cycle 19 (covering the years 2003 – 2005) and in January 2007 for PSP Cycle 20 (covering the years 2004 – 2006) that no determination would be made with respect to payments until such time as information is available to make such determination or such other time as the Board or the Compensation Committee determines that action should be taken regarding payments; and

WHEREAS, the Board has determined that it now has sufficient information to assess PSP Cycles 19 and 20; and

REDACTED: Privileged and Confidential

RESOLVED, that PSP 19 shall be paid out at the level of 40 percent of target; and

RESOLVED, that PSP 20 shall be paid out at the level of 47.5 percent of target; and

RESOLVED, that management is hereby directed to seek approval from OFHEO for the payment of PSP 19 and PSP 20 to Fannie Mae's OFHEO-designated officers in accordance with Fannie Mae's capital restoration plan; and it is further

RESOLVED, that no payment shall be made under PSP 19 or PSP 20 until OFHEO has approved the payment of PSP 19 and PSP 20 for the OFHEO-designated executive officers.

Confidential - Internal Distribution

# EXHIBIT 20

## Nonmanagement Board of Directors
## Resolution

WHEREAS, the Board, upon the recommendation of the Compensation Committee, resolved in January 2006 for PSP Cycle 19 (covering the years 2003 – 2005) and in January 2007 for PSP Cycle 20 (covering the years 2004 – 2006) that no determination would be made with respect to payments until such time as information is available to make such determination or such other time as the Board or the Compensation Committee determines that action should be taken regarding payments; and

WHEREAS, the Board has determined that it now has sufficient information to assess PSP Cycles 19 and 20; and

REDACTED: Privileged and Confidential

RESOLVED, that PSP 19 shall be paid out at the level of 40 percent of target; and

RESOLVED, that PSP 20 shall be paid out at the level of 47.5 percent of target; and

RESOLVED, that management is hereby directed to seek approval from OFHEO for the payment of PSP 19 and PSP 20 to Fannie Mae's OFHEO-designated officers in accordance with Fannie Mae's capital restoration plan; and it is further

RESOLVED, that no payment shall be made under PSP 19 or PSP 20 until OFHEO has approved the payment of PSP 19 and PSP 20 for the OFHEO-designated executive officers.

Confidential - Internal Distribution

# EXHIBIT 21

FNM: Historical Prices for FANNIE MAE - Yahoo! Finance    http://finance.yahoo.com/q/hp?s=FNM&a=05&b=22&c=2007&d=06&...

Yahoo! | My Yahoo! | Mail | More   New User? Sign Up | Sign In | Help

Search:                                    Web Search

Dow ⬆ 0.60% Nasdaq ⬆ 0.54%          Thursday, July 12, 2007, 9:35AM ET - U.S. Markets close in 6 hours and 25 minutes.

Enter Symbol(s)    GET QUOTES    Symbol Lookup    Finance Search

## FANNIE MAE (FNM)

On Jul 11: **64.67**  0.00 (0.00%)

Switch to Scottrade and get up to $100 back    100 FREE TRADES  E*TRADE Securities    AMERITRADE The Independent Spirit    Active Traders Fidelity

## Historical Prices

Get **Historical Prices** for:          GO

### SET DATE RANGE

**Start Date:** Jun  22  2007    Eg. Jan 1, 2003
**End Date:** Jul  12  2007

- ● Daily
- ○ Weekly
- ○ Monthly
- ○ Dividends Only

Get Prices

First | Prev | Next | Last

ADVERTISEMENT

Simulate your options trades without spending a dime.

Test before you trade with OptionTrader Pro℠

Fidelity Smart move℠

Click here to view eligibility requirements. Options trading entails significant risk and is not appropriate for all investors. Before trading options, you must receive a copy of "Characteristics and Risks of Standardized Options" by calling 1-800-FIDELITY, and be approved for options trading. See fee and commission schedule at fidelity.com for more details.

Fidelity Brokerage Services, Member NYSE, SIPC #33324

### PRICES

| Date | Open | High | Low | Close | Volume | Adj Close* |
|------|------|------|-----|-------|--------|-----------|
| 11-Jul-07 | 64.02 | 65.05 | 63.51 | 64.67 | 3,899,000 | 64.67 |
| 10-Jul-07 | 65.70 | 65.92 | 63.83 | 63.94 | 4,088,100 | 63.94 |
| 9-Jul-07 | 66.64 | 66.68 | 65.55 | 65.94 | 2,261,700 | 65.94 |
| 6-Jul-07 | 66.72 | 66.74 | 65.98 | 66.49 | 1,939,300 | 66.49 |
| 5-Jul-07 | 66.80 | 67.02 | 66.50 | 66.87 | 3,823,200 | 66.87 |
| 3-Jul-07 | 66.69 | 67.37 | 66.68 | 66.85 | 1,457,200 | 66.85 |
| 2-Jul-07 | 65.94 | 66.65 | 65.62 | 66.65 | 2,427,200 | 66.65 |
| 29-Jun-07 | 66.50 | 66.88 | 64.76 | 65.33 | 4,550,500 | 65.33 |
| 28-Jun-07 | 66.65 | 67.25 | 65.41 | 65.53 | 4,521,500 | 65.53 |
| 27-Jun-07 | 66.15 | 66.69 | 65.61 | 66.40 | 5,118,800 | 66.40 |
| 26-Jun-07 | 66.91 | 67.49 | 65.89 | 66.69 | 4,269,700 | 66.69 |
| 25-Jun-07 | 66.00 | 67.17 | 65.98 | 66.24 | 27,213,300 | 66.24 |
| 22-Jun-07 | 67.34 | 67.47 | 65.79 | 66.00 | 5,156,800 | 66.00 |

* Close price adjusted for dividends and splits.

First | Prev | Next | Last

⬇ Download To Spreadsheet

✉ Add to Portfolio   ☆ Set Alert   ✉ Email to a Friend

Get **Historical Prices** for Another Symbol:          GO | Symbol Lookup

- Stock Screener
- Mergers & Acquisitions
- Splits

Copyright © 2007 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are available

through our premium service. You may turn streaming quotes on or off. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

FNM: Summary for FANNIE MAE - Yahoo! Finance                        http://finance.yahoo.com/q?s=FNM

Yahoo! | My Yahoo! | Mail | More  New User? Sign Up  Sign In  Help

[Search] [Web Search]

Dow ↑ 2.09%  Nasdaq ↑ 1.88%                Thursday, July 12, 2007, 4:21PM ET - U.S. Markets Closed.

[Enter Symbol(s)] [GET QUOTES]    Symbol Lookup    Finance Search

# FANNIE MAE (FNM)

At 4:00PM ET: **66.36** ↑1.69 (2.61%)

   
Switch to Scottrade and get up to $100 back · Active Traders Fidelity · TD AMERITRADE The Independent Spirit · 100 FREE TRADES E*TRADE Securities

Streaming Quotes:

**FANNIE MAE** (NYSE:FNM)                                                    Edit

After Hours: **66.36** 0.00 (0.00%) as of 4:00PM ET on 07/12/07

| | | | |
|---|---|---|---|
| Last Trade: | 66.36 | Day's Range: | 64.55 - 66.45 |
| Trade Time: | 4:00PM ET | 52wk Range: | 46.30 - 69.94 |
| Change: | ↑1.69 (2.61%) | Volume: | 2,613,300 |
| Prev Close: | 64.67 | Avg Vol (3m): | 4,602,790 |
| Open: | 65.00 | Market Cap: | N/A |
| Bid: | N/A | P/E (ttm): | N/A |
| Ask: | N/A | EPS (ttm): | N/A |
| 1y Target Est: | 74.37 | Div & Yield: | N/A (N/A) |

New! Try our new Charts in Beta

FNM 12-Jul 3:47pm (C)Yahoo!

66.5
66.0
65.5
65.0
64.5
10am   12pm   2pm   4pm
1d 5d 3m 6m 1y 2y 5y max

Annual Report for FNM

NEW Add Quotes to Your Web Site · Add FNM to Portfolio · Set Alert · Download Data

Quotes delayed, except where indicated otherwise. For consolidated real-time quotes (including real-time pre/post market data), sign up for a free trial of Real-time Quotes.

**HEADLINES**  Change Display [ hide $$ edit ]

- HUD to Monitor Mortgage Policies at GSEs
  **AP** (Thu 2:56pm)
- The Newest Homeowners: Big Banks
  **Motley Fool** (Thu 9:58am)
- Five Things You Need to Know: Why No One
  Wants Sallie Mae
  at Minyanville.com (Thu 8:40am)
- Mass. Creates $250M Refinancing Fund
  **AP** (Wed 4:45pm)
- UPDATE - Fannie Mae sells $1 bln 10-year notes
  in reopen
  at Reuters (Wed 2:43pm)
- Manager: Corporate Bond Risk Needs More
  Reward
  at TheStreet.com (Wed 1:50pm)
- Fannie Mae Announces 10-Year Reopening
  Benchmark Notes(R) Auction Results
  **PR Newswire** (Wed 11:58am)
- Fannie Mae Prices New Issue 2-Year Benchmark
  Notes(R)
  **PR Newswire** (Wed 10:00am)
- Fannie Mae sells $4.0 billion in bills
  at Reuters (Wed 9:50am)
- Fannie Mae sells $4 bln 2-year benchmark notes
  at Reuters (Wed 9:10am)
  **More Headlines for FNM...**
Add FNM News to My Yahoo!:
[MY YAHOO!] [RSS]

**FINANCIAL BLOGS**

- Housing Bubble and Real Estate Market Tracker
  **Seeking Alpha** (Tue, Jul 10)
- Financial Sector Opportunities: A Mid-Year
  Evaluation
  **Seeking Alpha** (Tue, Jul 10)
- Housing Bubble and Real Estate Market Tracker
  **Seeking Alpha** (Wed, Jun 27)
  **More Financial Blogs for FNM...**
Add FNM Blogs to My Yahoo!:

ADVERTISEMENT

ZACKS

**FNM Free Stock Analysis**

Buy? Sell? Hold?

Find out now. Click here for free stock
analysis from the industry's leading
independent research firm proven to beat
the market.

[ Get Analysis Now ]

**Featured Video**



Tech, Health Care Earnings Set
to Shine
**TheStreet.com TV**
▶ Play Video

- Basic food prices on the rise BBC News
- Leaders & Losers: Sony, Microsoft Forbes.com

» More Videos

**KEY STATISTICS**

| | |
|---|---|
| Forward P/E (1 yr): | 12.94 |
| P/S (ttm): | N/A |
| Dividend Date: | 25-May-07 |
| Ex-Dividend Date: | N/A |



**REPORTS**

A Measure of Liquidity - The Investment Rate
Jul 13 - Stock Traders Daily

FNM: Risk/Reward Rating: Full Report: Cash Truth
Behind the Reported Earnings
Jul 12 - New Constructs, LLC

Plunkett's Real Estate Financing & Investment
Industry Overview 2007 (Summary)
Jul 12 - Plunkett Research, Ltd.

**More Reports for FNM...**

**ANALYST**

| | |
|---|---|
| Annual EPS Est (Dec-06) : | 5.47 |
| Quarterly EPS Est (Mar-06) : | 1.51 |
| Mean Recommendation*: | 2.3 |
| PEG Ratio (5 yr expected): | 1.22 |

* (Strong Buy) 1.0 - 5.0 (Strong Sell)

**Analyst Opinion - Estimates**

**BUSINESS SUMMARY**

No business summary available for FNM.

✍ Add to Portfolio    ☆ Set Alert    ✉ Email to a Friend

Get **Summary** for Another Symbol: [        ]  GO | Symbol Lookup

• Market Overview        • US Indices

**Quotes delayed for FNM. Get streaming real-time quotes - FREE trial.**

Copyright © 2007 Yahoo! All rights reserved. Terms of Service - Copyright/IP Policy
To learn more about Yahoo!'s use of personal information, please read the Privacy Policy.

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off. Financials data provided by Edgar Online. Dividend data provided by Hemscott Americas. Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart and daily updates provided by Hemscott Americas. Fund summary, fund performance and Morningstar Index data provided by Morningstar. Analyst estimates data provided by Thomson Financial Network. All data provided by Thomson Financial Network is based solely upon research information provided by third party analysts. Yahoo! has not reviewed, and in no way endorses the validity of such data. Yahoo! and ThomsonFN shall not be liable for any actions taken in reliance thereon. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.