**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| J. TIMOTHY HOWARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 07-1196 (RJL) |
| | ) |
| OFFICE OF FEDERAL HOUSING | ) |
| ENTERPRISE OVERSIGHT, and | ) |
| JAMES B. LOCKHART III, | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____

### J. TIMOTHY HOWARD'S SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJUNCTION

In *Brendsel v. Office of Federal Housing Enterprise Oversight*, 339 F. Supp. 2d 52 (D.D.C. 2004), and *Clarke v. Office of Federal Housing Enterprise Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004), this Court held that, short of issuing cease-and-desist orders pursuant to 12 U.S.C. §§ 4631 and 4632, which provide for the opportunity to challenge OFHEO's actions in federal court, the agency has no authority to interfere with the payment of compensation or benefits to former executives of OFHEO-regulated enterprises. Despite these decisions, OFHEO has directed Fannie Mae to withhold payment of 7,823 shares of Fannie Mae stock to Mr. Howard – which the Board of Fannie Mae has approved and to which Mr. Howard is entitled under an employment agreement that OFHEO previously approved – without according him any of the procedural safeguards provided in §§ 4631 and 4632. Although OFHEO attempts to distinguish its present conduct by reference to Fannie Mae's February 10, 2005 Capital Restoration Plan and the Consent Order entered into by Fannie Mae and OFHEO on May 23, 2006, its position is nothing more than an attempt to end-run the limits on the agency's authority

as established by Congress and as unambiguously construed by this Court. The applicable law governing the scope of OFHEO's regulatory authority has not changed since this Court issued its decisions in *Brendsel* and *Clarke*, and in all material respects, OFHEO is attempting to do precisely what this Court twice enjoined it from doing in the recent past – interfere with an enterprise's payment of benefits in a manner not authorized by law. For the reasons demonstrated below, the Court should enjoin OFHEO's unlawful conduct.

**A.       The June 19, 2007 Letter Directive is Unlawful.**

OFHEO now has disclosed its June 19, 2007 letter in which the agency directed Fannie Mae to withhold payment of shares of Fannie Mae stock owed to Mr. Howard and to other former and current employees of Fannie Mae pending the Director's approval of such payments. (OFHEO's July 5, 2007 Opp'n, Exh. 8.)[1]  Although the letter makes passing reference to Fannie Mae's "commitment," pursuant to its February 10, 2005 Capital Restoration Plan, to seek OFHEO's approval for payment of bonuses and non-salary compensation, the letter does not purport to derive any authority to direct Fannie Mae to withhold payment of shares to Mr. Howard from the statutory provisions regarding capital restoration plans or the Director's supervisory powers with respect to undercapitalized enterprises.[2]  Instead, the letter relies solely on the Director's authority to determine whether compensation is "reasonable or comparable" under 12 U.S.C. § 4518. (OFHEO's July 5, 2007 Opp'n, Exh. 8.)[3]  The letter also reveals that,

---

[1] Despite repeated requests, directed to both Fannie Mae and OFHEO, for a copy of OFHEO's June 19, 2007 letter prior to filing the instant action (*see* Howard's July 2, 2007 Mem. at 5 n.6), Mr. Howard was not provided a copy of it until being served with OFHEO's opposition papers, which attach a redacted version of the letter at Exhibit 8.

[2] As discussed below, Fannie Mae is not currently classified as undercapitalized, and therefore, no direction to Fannie Mae to withhold payment of the shares to Mr. Howard can legally rest on that fact.

[3] Not only does the June 19, 2007 letter demonstrate on its face that the Director is purportedly acting pursuant to his authority under § 4518 rather than his supervisory powers regarding an enterprise's capital levels, but OFHEO's opposition to Mr. Howard's motion also reveals as much. While OFHEO repeatedly claims in its opposition papers that OFHEO's "authority to review the PSP benefits pursuant to the excessive compensation authority set out at 12

with respect to Mr. Howard and other former employees, the Director's review for reasonableness and comparability will include consideration of the individuals' "conduct." (*Id.*)

This letter directly contravenes this Court's decisions in *Brendsel* and *Clarke*. First, those decisions make clear that § 4518 does not authorize the Director to direct an enterprise to withhold payment of compensation or benefits to former executives. *See Brendsel*, 339 F. Supp. 2d at 61-63; *Clarke*, 355 F. Supp. 2d at 63-64. Second, those decisions also make clear that consideration of alleged employee misconduct is not even a permissible factor for the Director to consider in reviewing executive compensation, let alone a legal basis in which to direct an enterprise to withhold payment. *See*, *e.g.*, *Clarke*, 355 F. Supp. 2d at 64 ("[S]ection 4518 does not permit the Director to withhold the payment of compensation it subsequently deems 'excessive' based on the incompetence or misconduct of the payee.").[4]

Third, and perhaps most importantly, this Court made clear that when OFHEO seeks to interfere with an enterprise's payment of compensation and benefits, it cannot do so through the issuance of a letter. Rather, the agency must act through the Director's authority to issue cease-and-desist orders pursuant to §§ 4631-33, which provide the opportunity to challenge OFHEO's actions administratively and/or in federal court. *See Brendsel*, 339 F. Supp. 2d at 64-66; *Clarke*,

---

U.S.C. § 4518" is "irrelevant to the analysis of this case" (OFHEO's July 5, 2007 Opp'n at 20), the agency, in the same breath, asserts that an order from this Court enjoining OFHEO "would undermine OFHEO's role as regulator by interfering with one of its critical roles: reviewing compensation to determine whether it is excessive." (*Id.* at 28.)

[4] Section 4518 similarly does not permit the Director or OFHEO to re-review the payment of benefits pursuant to an agreement that the agency already has reviewed and approved. *See Clarke*, 355 F. Supp. 2d at 64 (noting that OFHEO previously had approved Mr. Clarke's separation agreement and rejecting argument that the agency has "'dual review authority' to review excessive compensation on an 'ongoing basis' under section 4518"). OFHEO previously reviewed, and by letter dated December 13, 2004, affirmatively approved the payment of compensation and benefits to Mr. Howard following his termination of employment, as provided in Mr. Howard's employment agreement and, by reference, Fannie Mae's employee compensation plans. (Howard's July 2, 2007 Mem., Exh. 6.) The compensation and benefits that OFHEO approved include the payment of shares of Fannie Mae common stock pursuant to Fannie's Mae's performance share program.

355 F. Supp. 2d at 65.   In reaching this conclusion, the Court expressly rejected OFHEO's

contention:

> that "[t]hose actions which OFHEO can accomplish through formal means, such
> as cease and desist orders, may also be accomplished informally if the enterprise
> willingly complies with OFHEO's supervisory directives."   In arguing so,
> however, OFHEO misconceives the statutory issue before the Court as being one
> of formality versus informality.   To the contrary, the issue is whether OFHEO
> was intended by Congress to be able to accomplish this action through *informal*
> means.   The temporary cease-and-desist authority, on its face, authorizes pre-
> judgment attachment only under certain narrow circumstances, none of which are
> present in this case.   It is axiomatic that "administrative agencies are vested only
> with the authority given to them by Congress."   *Gibas v. Saginaw Min. Co.,* 748
> F.2d 1112, 1117 (6th Cir.1984).   Because the scope of an implied authority can
> not, and should not, exceed that of the express authority from which it flows,
> OFHEO can not informally effect a temporary hold under circumstances where it
> is unable to effect a formal one.
>
> OFHEO's informal procedures here diverge from the formal ones in
> another important way: an enterprise, executive officer, or director that has been
> served with a temporary cease-and-desist order can challenge the order *in this
> Court.*   12 U.S.C. § 4632(d).   Although OFHEO argues that Freddie Mac was
> free to disobey its letters in this case, a simple review of the language in the
> letters reveals that OFHEO was ordering, not suggesting, that it refrain from "any
> action to fulfill any of the terms of" Brendsel's termination agreement and to
> restrict all of Brendsel's accounts at Freddie Mac.   In the absence of procedural
> safeguards allowing Freddie Mac [or Mr. Brendsel] to challenge such a directive,
> it is patently unrealistic, if not naive, to expect Freddie Mac to do anything other
> than comply.

*Brendsel*, 355 F. Supp. 2d at 64-65 (internal record citations omitted).  The June 19 letter is yet

another attempt by OFHEO to restrain an enterprise it regulates via informal means devoid of

any procedural safeguards, rather than through the statutory procedures required by Congress.

**B.    OFHEO's Reliance on Fannie Mae's Capital Restoration Plan, the Consent Order
and Related Statutes is Unavailing.**

Attempting to distinguish its present conduct from that which this Court twice found to

be unlawful less than two years ago, OFHEO has responded to Mr. Howard's motion for a

temporary restraining order and preliminary injunction by claiming that its interference with

Fannie Mae's payment of the shares to Mr. Howard is authorized by Fannie Mae's February 10, 2005 Capital Restoration Plan, the Consent Order entered into by Fannie Mae and OFHEO on May 23, 2006, and various statutes pertinent to both. For several reasons, OFHEO's arguments are without merit.

First, and foremost, none of the statutes that OFHEO cites in its opposition papers – namely, §§ 4612, 4614, 4616 and 4622 – authorize the agency to direct Fannie Mae to withhold payment of the shares to Mr. Howard. Indeed, none even mention compensation or benefits, let alone OFHEO's regulatory authority with respect to compensation or benefits. *See*, *e.g.*, 12 U.S.C. §§ 4612 (requiring enterprises to maintain certain minimum capital levels), 4614 (authorizing the Director to classify enterprises based on their level of capitalization), 4622 (setting forth the requirements of any plan submitted to the Director regarding an enterprise's restoration of capital levels).

As this Court recognized in *Brendsel*, Congress has clearly spoken with respect to OFHEO's authority to review compensation and, by enacting § 4518, has circumscribed the scope of that authority. *See Brendsel*, 339 F. Supp. 2d at 61-62. In light of § 4518's "obvious limitations on OFHEO's authority" to review executive compensation, *id.* at 62, it simply is unreasonable to assume that Congress granted OFHEO the implicit authority to act as it has here in statutes that are silent on the issue. *See Nevada v. Dep't of Energy,* 400 F.3d 9, 16 (D.C. Cir. 2005) (noting that the Supreme Court has "reiterated repeatedly . . . that a more specific statute will be given precedence over a more general one") (internal quotation marks omitted).

Second, the fact that the Director, in December of 2004, classified Fannie Mae as significantly undercapitalized as of September 30, 2004, is irrelevant. Relying on this fact, OFHEO points to the Director's supervisory authority, pursuant to § 4616(b)(4), to require an

enterprise "that is classified as significantly undercapitalized" to "terminate, reduce, or modify any activity that the Director determines creates an excessive risk to the enterprise."  This provision has no application here.  Fannie Mae is not an enterprise that currently "is classified as significantly undercapitalized."  On May 19, 2005, OFHEO announced that its Director had reclassified Fannie Mae as adequately capitalized as of March 31, 2005.  A copy of OFHEO's May 19, 2005 news release is attached as Exhibit 1.  Not only has the Director continued to classify Fannie Mae as adequately capitalized in each subsequent quarter, but in its most recent announcement to that effect on March 30, 2007, the agency reported that, as of December 31, 2006, Fannie Mae held a core capital surplus of nearly $13 billion dollars over its statutory minimum capital requirement.  A copy of OFHEO's March 30, 2007 news release is attached as Exhibit 2.  To suggest that any powers OFHEO may have once possessed resulting from the Director's classification of Fannie Mae as significantly undercapitalized continue to authorize the agency, in July of 2007, to interfere with Fannie Mae's payment of 7,823 shares of stock to Mr. Howard, is baseless.

Third, OFHEO cannot, by agreement, expand the scope of its authority – particularly when the exercise of that authority affects those who are not parties to the agreement.  *See La. Public Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 375 (1986) ("An agency may not confer power upon itself.  To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress."); *Brendsel*, 339 F. Supp. 2d at 64 ("It is axiomatic that administrative agencies are vested only with the authority given to them by Congress.") (internal quotations and citation omitted).  As a result, Fannie Mae's commitment, contained in its Capital Restoration Plan, "to seek the agency's prior approval for all payment of bonuses or other non-salary compensation awards for executive

officers" (OFHEO's July 5, 2007 Mem., Exh. 4 at 5), which OFHEO contends is incorporated

into the Consent Order, cannot serve as the basis upon which OFHEO has interfered with Mr.

Howard's receipt of the shares owed to him.

Significantly, this provision of Fannie Mae's Capital Restoration Plan was forced upon

the company by OFHEO.[5]  The initial plan that Fannie Mae submitted to OFHEO contained no

provision regarding OFHEO's review of executive compensation.  (*See* OFHEO's July 5, 2007

Opp'n at 8.)  But OFHEO rejected this initial plan.  It insisted on new language requiring Fannie

Mae to obtain "prior approval from OFHEO for all payments of bonuses or other non-salary cash

or stock-based awards." (*Id.*, Exh. 3 at 1.)  Only after having been so directed by OFHEO, did

Fannie Mae submit a plan that included a commitment from the company to seek such prior

approval.  As OFHEO's opposition papers make clear, the "consequences" would have been

"severe" had Fannie Mae failed to obtain OFHEO's approval of the plan.  (*Id.* at 8 n.9.)  Facing

such drastic consequences, "it is patently unrealistic, if not naive, to expect [Fannie Mae] to do

anything other than comply" with OFHEO's directive.  *Brendsel*, 339 F. Supp. 2d at 65.

Fourth, even assuming that Fannie Mae's Capital Restoration Plan or the Consent Order

could somehow authorize OFHEO to act beyond the confines of its limited grant of authority,

neither document actually permits OFHEO to direct Fannie Mae to withhold payment of benefits

owed to Mr. Howard.  First of all, the Consent Order does not, as OFHEO contends,

"incorporate[] all of the provisions of the Capital Restoration Plan."  (OFHEO's July 5, 2007

Opp'n at 22.)  To the contrary, the Consent Order merely provides that "Fannie Mae will

continue diligent and good faith pursuit of commitments set forth in the capital restoration plan."

(*Id.*, Exh. 7 at 5.)

---

[5] No less significantly, OFHEO forced this requirement upon Fannie Mae after this Court's decisions in *Brendsel* and *Clarke*.

Moreover, the Consent Order addresses compensation expressly, and it does not confer on OFHEO the authority it purports to exercise here. Indeed, Article VII of the Consent Order is devoted to compensation, and it contains no provision regarding OFHEO's ability to review or otherwise interfere with the payment of benefits or compensation to former executives. Instead, its provisions are entirely prospective in application. For example, the Consent Order imposes various requirements on Fannie Mae with respect to certain "future employment contracts" and "new contract terms;" it requires OFHEO approval with respect to certain "future" employment contracts; and it directs Fannie Mae's Board of Director's to ensure that future compensation practices for officers and employees shall not exclusively be tied to earnings-per-share. (*Id.*, Exh. 7 at 11-12.)

### C.    OFHEO's Actions Violate Mr. Howard's Due Process Rights.

OFHEO's interference with Fannie Mae's payment of shares to Mr. Howard – which Fannie Mae's Board has approved and to which Mr. Howard is contractually entitled – constitutes a deprivation of Mr. Howard's property without due process of law in violation of the Due Process Clause of the Fifth Amendment. OFHEO's June 19, 2007 directive to Fannie Mae reflects none of the procedural safeguards provided in §§ 4631-33 and does not otherwise provide Mr. Howard with an opportunity to be heard or to challenge the agency's actions administratively or in federal court. It is plainly unconstitutional. *See Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 342 (1969) ("Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing [prejudgment attachment procedures] violate[] the fundamental principles of due process.").

In concluding that OFHEO is not authorized to interfere in an enterprise's payment of benefits or compensation to former executives without following the procedures provided in §§

4631-33, this Court expressly declined to reach the constitutional claims asserted by Messrs. Brendsel and Clarke. *See Brendsel*, 339 F. Supp. 2d at 60 n.8; *Clarke*, 355 F. Supp. 2d at 63 n.2.[6] To the extent it accepts OFHEO's arguments here, however, the Court must reach Mr. Howard's constitutional claim. Construing the scope of OFHEO's statutory authority in a manner consistent with the Court's decisions in *Brendsel* and *Clarke* will allow the Court to avoid deciding this significant constitutional issue. *See Chamber of Commerce v. Fed. Election Comm'n*, 69 F.3d 600, 605 (D.C. Cir. 1995) ("We are obliged to construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress."); *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1340-01 (D.C. Cir. 2002) (recognizing that "constitutional avoidance canon of statutory interpretation trumps *Chevron* deference").

## III. CONCLUSION

For the foregoing reasons and for the reasons in Mr. Howard's opening memorandum, this Court should enjoin OFHEO and its Director from freezing, placing a hold on, or otherwise interfering with or preventing Mr. Howard's immediate receipt of 7,823 shares of Fannie Mae common stock. OFHEO does not have such authority; Mr. Howard is suffering irreparable injury by OFHEO's ongoing action; the injunction will harm neither OFHEO nor Fannie Mae; and the public interest will be served by preventing OFHEO from acting outside of its authority.

---

[6] As was the case in *Brendsel* and *Clarke*, the hold that OFHEO has placed on Fannie Mae's payment of shares to Mr. Howard is ripe for review by this Court under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (the "core question is whether an agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). OFHEO's directive to the company to withhold payment is both final and one that directly – and irreparably – affects Mr. Howard. OFHEO's assertion that the agency "is currently in the midst of determining whether PSP benefits are appropriate" (OFHEO's July 5, 2007 Opp'n at 24), is irrelevant and mirrors an argument the agency made, to no avail, in *Brendsel*.

Dated:  July 12, 2007                    Respectfully submitted,


                                         /s/ Steven M. Salky
                                         Steven M. Salky (D.C. Bar No. 360175)
                                         Eric R. Delinsky (D.C. Bar No. 460958)
                                         Miles Clark (D.C. Bar No. 489338)
                                         ZUCKERMAN SPAEDER LLP
                                         1800 M Street, N.W., Suite 1000
                                         Washington, DC 20036-5802
                                         202-778-1800 (phone)
                                         202-822-8106 (facsimile)

                                         *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF.


/s/ Miles Clark_____
Miles Clark

# EXHIBIT 1



**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3800

# NEWS RELEASE

**For Immediate Release**
May 19, 2005

**Contacts:**  **Corinne Russell  202.414.6921**
**Stefanie Mullin   202.414.6376**
**www.ofheo.gov**

## OFHEO CLASSIFIES FANNIE MAE AS
## SIGNIFICANTLY UNDERCAPITALIZED FOR FOURTH QUARTER 2004
## AND
## ADEQUATELY CAPITALIZED FOR FIRST QUARTER 2005

**WASHINGTON, D.C.** — Armando Falcon, Jr., Director of the Office of Federal Housing Enterprise Oversight (OFHEO), safety and soundness regulator for Fannie Mae and Freddie Mac (the Enterprises), has classified Fannie Mae as significantly undercapitalized as of December 31, 2004 and adequately capitalized as of March 31, 2005.[1]

Fannie Mae's capital classification is based on estimated financial information provided by the Enterprise and the application of accounting policies currently under review by OFHEO. The capital classification also utilizes current best estimates as certified and represented by Fannie Mae management of its financial condition, including adjustments for additional accounting errors. This capital classification is subject to change as additional information becomes available; such as Fannie Mae's certification of its financial statements; and, OFHEO's completion of its review of Fannie Mae's accounting policies and practices.

Both the release of the December 31, 2004 classification, and the early release for the March 31, 2005 capital classification are a result of the circumstances surrounding the review of Fannie Mae's accounting policies and practices. Estimates provided by Fannie Mae of the accounting errors' impact on capital required OFHEO's review and analysis to assess the year-end capital impact. Further, as a result of ongoing monitoring and the filing of the March 31, 2005 capital position by Fannie Mae, a more accurate assessment of the capital adequacy can now be made.

---

[1] The Federal Housing Enterprises Financial Safety and Soundness Act of 1992 requires the OFHEO Director to determine the capital level and classification of the Enterprises not less than quarterly, and to report the results to Congress. OFHEO classifies the Enterprises as adequately capitalized, undercapitalized, significantly undercapitalized or critically undercapitalized. The Enterprises are required by Federal statute to meet both minimum and risk-based capital standards to be classified as adequately capitalized.

### December 31, 2004 Classification

As of December 31, 2004, based upon the information provided by Fannie Mae and adjustments for the estimated accounting errors' impact on capital, Fannie Mae's estimated core capital exceeded the minimum capital requirement by a small margin. However, given the significant control weaknesses and the remaining uncertainties associated with the ongoing review of Fannie Mae's financial controls and accounting policies, a significant risk remains that accounting adjustments could deplete Fannie Mae's core capital to an amount below the required minimum for this time period. The small surplus at year-end 2004 leaves little room for discrepancies in the estimated capital position. Accordingly, OFHEO has retained the significantly undercapitalized position as of December 31, 2004.

### March 31, 2005 Classification

As of March 31, 2005, based upon the information provided by Fannie Mae and adjustments for the estimated accounting errors' impact on capital, Fannie Mae has achieved an estimated $4 billion surplus through earnings retention and asset sales. This projected surplus over the minimum capital requirement is sufficient to absorb uncertainties in the estimated impact to capital of the accounting errors, based on current information. Accordingly, OFHEO has determined that Fannie Mae is adequately capitalized as of March 31, 2005.

### Continuing Capital Conditions

While Fannie Mae's capital classification at March 31, 2005 is adequately capitalized, Fannie Mae remains subject to the requirements imposed by the Agreement dated September 27, 2004, including the supplement dated March 7, 2005, and the Capital Restoration Plan dated February 10, 2005, which require Fannie Mae to achieve a 30% capital surplus over the minimum capital requirement by September 30, 2005. OFHEO is actively monitoring Fannie Mae's compliance with the Capital Restoration Plan on a weekly basis. At this time, incorporating estimated accounting impacts, Fannie Mae remains on target and has adequate contingencies in place to achieve the required 30% surplus over minimum capital by September 30, 2005.

*Technical questions regarding these results should be directed to: rbcquestions@ofheo.gov.*

*Media questions regarding these results should be directed to Corinne Russell at: crussell@ofheo.gov or 202.414.6921, or Stefanie Mullin at: stefanie.mullin@ofheo.gov or 202.414.6376.*

3

## CAPITAL RESULTS:[2]

As of December 31, 2004, Fannie Mae's estimated <u>risk-based capital</u> requirement was $10.039 billion. Fannie Mae's estimated total capital of $35.878 billion on that date exceeded the estimated risk-based capital requirement by $25.839 billion. As of March 31, 2005, Fannie Mae's estimated total capital of $35.495 billion on that date exceeded the estimated risk-based capital requirement by $29.140 billion.

As of December 31, 2004, Fannie Mae's adjusted <u>minimum capital</u> requirement was $32.166 billion. Fannie Mae's adjusted core capital of $32.641 billion exceeded the estimated minimum capital requirement by $475 million. As of March 31, 2005, Fannie Mae's adjusted minimum capital requirement was $30.959 billion. Fannie Mae's adjusted core capital of $34.998 billion exceeded the estimated minimum capital requirement by $4.039 billion.

*Capital data for Fannie Mae as of September 30, 2004, December 31, 2004 and March 31, 2005:* [3]

| Risk Based Capital | Fannie Mae | | | | | |
|---|---|---|---|---|---|---|
| | 31-Mar-05 | | 31-Dec-04 | | 30-Sep-04 | |
| Interest Rate Scenario | Up | Down | Up | Down | Up | Down |
| Risk Based Capital Requirement | 6.355 | 1.214 | 10.039 | 6.582 | 13.026 | 18.342 |
| Total Capital | 35.495 | | 35.878 | | | 38.762 |
| Surplus (Deficit) | 29.140 | | 25.839 | | | 20.420 |

| Minimum Capital | Fannie Mae | | |
|---|---|---|---|
| | 31-Mar-05 | 31-Dec-04 | 30-Sep-04 |
| Adjusted Minimum Capital Requirement | 30.959 | 32.166 | 31.837 |
| Adjusted Core Capital | 34.998 | 32.641 | 28.856 |
| Estimated Surplus (Deficit) | 4.039 | 0.475 | (2.981) |

| Critical Capital | Fannie Mae | | |
|---|---|---|---|
| | 31-Mar-05 | 31-Dec-04 | 30-Sep-04 |
| Adjusted Critical Capital Level | 15.861 | 16.455 | 16.287 |
| Adjusted Core Capital | 34.998 | 32.641 | 28.856 |
| Estimated Surplus (Deficit) | 19.137 | 16.186 | 12.569 |

---

[2] Fannie Mae's capital calculation is based on financial information and the application of accounting policies currently under review by OFHEO. The outcome of the review may result in a restatement of prior period results and a revision of the respective capital calculations. The results have been adjusted for the estimated capital impact of accounting errors identified to date.
[3] Numbers may not add due to rounding.

## DEFINITION OF CAPITAL STANDARDS

**Minimum** capital represents an essential amount of capital needed to protect an Enterprise against broad categories of business risk.  For purposes of minimum capital, an Enterprise is considered adequately capitalized if core capital — common stock; perpetual noncumulative preferred stock; paid in capital; and retained earnings — equals or exceeds minimum capital. The minimum capital standard is 2.5 percent of assets plus 0.45 percent of adjusted off-balance-sheet obligations.

OFHEO's **risk-based** capital requirement is the amount of total capital — core capital plus a general allowance for loan losses less specific reserves — that an Enterprise must hold to absorb projected losses flowing from future adverse interest-rate and credit-risk conditions specified by statute, plus 30 percent mandated by statute to cover management and operations risk.  The risk-based capital standard is based on stress test results calculated for the two statutorily prescribed interest rate scenarios, one in which 10-year Treasury yields rise 75 percent (up-rate scenario) and another in which they fall 50 percent (down-rate scenario).  Changes in both scenarios are generally capped at 600 basis points.  The risk-based capital level for an Enterprise is the amount of total capital that would enable it to survive the stress test in whichever scenario is more adverse for that Enterprise, plus 30 percent of that amount to cover management and operations risk.

The **critical** capital level is the amount of core capital below which an Enterprise must be classified as critically undercapitalized and generally must be placed in conservatorship. Critical capital levels are computed consistent with the Federal Housing Enterprises' Safety and Soundness Act of 1992 as follows:   One-half of the portion of minimum capital requirement associated with on-balance-sheet assets plus five-ninths of the portion of the minimum capital requirement associated with off-balance-sheet obligations.

###

# EXHIBIT 2



**Office of Federal Housing Enterprise Oversight (OFHEO)**

<u>CONTACT:</u>  Corinne Russell (202) 414-6921
Stefanie Mullin  (202) 414-6376
www.ofheo.gov

# NEWS RELEASE

<u>**FOR IMMEDIATE RELEASE**</u>
March 30, 2007

## OFHEO ANNOUNCES FOURTH QUARTER 2006
## MINIMUM AND RISK-BASED CAPITAL CLASSIFICATION
## FOR FANNIE MAE and FREDDIE MAC
### Reclassifies Fannie Mae Q1-3 2002, 2003 and 2004 as Significantly Undercapitalized and
### Reaffirms Freddie Mac Q1-3 2006 as Adequately Capitalized

**WASHINGTON, DC** — James B. Lockhart III, Director of the Office of Federal Housing Enterprise Oversight (OFHEO), the safety and soundness regulator for Fannie Mae and Freddie Mac, classified Fannie Mae and Freddie Mac as adequately capitalized as of December 31, 2006. Fannie Mae's classification is based on estimated numbers submitted by Fannie Mae and not financial statements released to shareholders. Freddie Mac's classification is based upon numbers consistent with the information statement and annual report it released on March 23, 2007.

Fannie Mae had a 10.9 percent surplus above the OFHEO-directed requirement, which is 30 percent above required minimum capital. Freddie Mac's surplus above that requirement was 7.7 percent.

The Federal Housing Enterprises Financial Safety and Soundness Act of 1992 requires the OFHEO Director to determine the capital level and classification of the Enterprises not less than quarterly, and to report the results to Congress. OFHEO classifies the Enterprises as adequately capitalized, undercapitalized, significantly undercapitalized or critically undercapitalized. The Enterprises are required by federal statute to meet both minimum and risk-based capital standards to be classified as adequately capitalized.

**Fannie Mae**

Fannie Mae's fourth quarter 2006 classification of adequately capitalized remains subject to change as the company continues its ongoing accounting review and issuance of public statements. Fannie Mae's quarterly numbers carry forward its 2004 accounting adjustments, as well as ongoing estimates of additional accounting changes for 2005 and 2006. The ongoing disclosures provide OFHEO additional assurance that the company is maintaining a capital surplus in excess of the OFHEO-directed requirement.

Fannie Mae's surplus as a percent of the OFHEO-directed requirement decreased slightly to 10.9 percent from 11.4 percent the prior quarter. The slight change is due mainly to an increased capital

requirement due to on- and off-balance sheet growth. Fannie Mae continues to operate under growth restrictions for its retained portfolio and has maintained compliance with this agreement throughout the quarter. There are no restrictions on its issuance of guaranteed MBS.

On December 28, 2006, OFHEO released 2002, 2003, and 2004 year-end classifications of significantly undercapitalized following Fannie Mae's release of its 2004 10-K, which was filed with the Securities and Exchange Commission (SEC) on December 6, 2006. Consistent with the year-end classifications and following resubmissions of the interim quarter information by Fannie Mae, OFHEO is now providing public notification of its reclassification of Fannie Mae from adequately capitalized to significantly undercapitalized for the interim 2002, 2003, and 2004 quarters. Because Fannie Mae was not required to restate quarterly results for Q1-3 2002 and 2003 per an SEC waiver, OFHEO agreed to accept estimates of the minimum and critical capital positions for these periods. The additional effort to produce the quarter-end positions for OFHEO outweighed the precision necessary to appropriately classify the capital position for these periods as significantly undercapitalized. Although Fannie Mae is now classified as having been significantly undercapitalized, the estimates do provide assurance that Fannie Mae did not fall below critical capital levels for these periods. For Q1-3 2004 Fannie Mae provided actual restated capital results, which were used in OFHEO's reclassification. All capital data for these historical quarters can be found on OFHEO's website in the historical charts at http://www.ofheo.gov/CapClass.asp.

While progress is evident and OFHEO is classifying Fannie Mae as adequately capitalized for the fourth quarter 2006, significant work remains before Fannie Mae becomes a timely financial filer and corrects its internal control and operational weaknesses. It continues to remain prudent for Fannie Mae to hold capital in excess of the OFHEO-directed requirement to compensate for these uncertainties.

**Freddie Mac**

Freddie Mac's fourth quarter 2006 classification of adequately capitalized is based upon results consistent with its recently filed information statement and annual report. Freddie Mac resubmitted Q1-3 2006 capital results to OFHEO on March 22, 2007 that showed higher core capital numbers than originally submitted. This resubmission coincided with the 2006 information statement and annual report filing on March 23, 2007. OFHEO reaffirms the adequately capitalized classification for these quarters. The restated quarterly results for these periods can be found on OFHEO's website at http://www.ofheo.gov/CapClass.asp. OFHEO determined that risk-based capital results did not require resubmission.

Freddie Mac's surplus as a percent of the OFHEO-directed requirement decreased to 7.7 percent from 9.1 percent the prior quarter due to a core capital reduction of $0.9 billion, mostly from mark-to-market losses resulting in lower retained earnings. Freddie Mac has agreed to growth restrictions on their retained portfolio as of July 1, 2006 and remains in compliance with these restrictions. There are no restrictions on its issuance of guaranteed MBS.

While the filing of the 2006 information statement and annual report is a significant move forward for Freddie Mac, internal control and operational weaknesses remain evident. Significant work remains before Freddie Mac becomes a timely filer and SEC registrant. It continues to remain prudent for Freddie Mac to hold capital in excess of the OFHEO-directed requirement to compensate for these uncertainties.

## FOURTH QUARTER CAPITAL RESULTS

**Minimum and Critical Capital**

**Fannie Mae's adjusted[1] OFHEO-directed capital requirement on December 31, 2006 was $38.1 billion and its adjusted statutory minimum capital requirement was $29.3 billion. Fannie Mae's adjusted core capital of $42.3 billion exceeded the adjusted OFHEO-directed capital requirement by $4.2 billion. Fannie Mae's adjusted core capital exceeded the adjusted statutory critical capital requirement by $27.1 billion.**

**Freddie Mac's reported OFHEO-directed capital requirement on December 31, 2006 was $33.6 billion and its reported statutory minimum capital requirement was $25.8 billion. Freddie Mac's reported core capital of $36.2 billion exceeded the OFHEO-directed minimum capital requirement by $2.6 billion. Freddie Mac's core capital exceeded the statutory critical capital requirement by $22.9 billion.**

| Enterprise Minimum Capital Requirement (Billions of Dollars) [a] | | | | |
|---|---|---|---|---|
| | **Fannie Mae** | | **Freddie Mac** | |
| | 31-Dec-06 [b,d] | 30-Sept-06 [b,d] | 31-Dec-06 [c] | 30-Sept-06 [c, e] |
| Minimum Capital - Statutory Requirement | 29.332 | 29.010 | 25.844 | 25.979 |
| Minimum Capital - OFHEO Directed Requirement | 38.131 | 37.714 | 33.597 | 33.773 |
| Core Capital | 42.295 | 42.008 | 36.170 | 37.035 |
| Surplus (Deficit) (based on OFHEO Directed Requirement) | 4.163 | 4.294 | 2.573 | 3.262 |

| Enterprise Critical Capital Requirement (Billions of Dollars) [a] | | | | |
|---|---|---|---|---|
| | **Fannie Mae** | | **Freddie Mac** | |
| | 31-Dec-06 [b,d] | 30-Sept-06 [b,d] | 31-Dec-06 | 30-Sept-06 [e] |
| Critical Capital Level | 15.134 | 14.959 | 13.237 | 13.293 |
| Core Capital | 42.295 | 42.008 | 36.170 | 37.035 |
| Surplus (Deficit) | 27.161 | 27.049 | 22.933 | 23.743 |

a. Numbers may not add due to rounding.

b. Subject to revision based upon results of ongoing financial restatement and audit processes.

c. OFHEO has directed both Fannie Mae and Freddie Mac to maintain an additional 30% capital in excess of the statutory minimum capital requirement. These requirements have been an additional requirement since January 28, 2004, for Freddie Mac and since September 30, 2005, for Fannie Mae. The OFHEO-directed minimum capital requirement and capital surplus numbers stated in these charts reflect the inclusion of the additional 30% OFHEO-directed capital requirement.

d. Fannie Mae's minimum capital, critical capital, and core capital are adjusted for accounting errors identified to date.

e. Restated by Freddie Mac on March 23, 2007.

---

[1] The term "adjusted" reflects that Fannie Mae's minimum capital submissions adjust book capital based upon estimated accounting change impacts, including the roll-forward of 2004 adjustments.

During the fourth quarter of 2006, Fannie Mae's minimum capital surplus decreased by $0.1 billion to $4.2 billion, 10.9 percent over the OFHEO-directed capital requirement of $38.1 billion. The reported capital surplus fell because the OFHEO-directed requirement rose by $0.4 billion due to growth in on-balance sheet assets, primarily short-term liquid investments, and in off-balance sheet obligations, primarily MBS outstanding. Core capital increased by $0.3 billion in the fourth quarter to $42.3 billion due to a growth in retained earnings that more than offset dividends of $521 million.

Freddie Mac's surplus was 7.7 percent over the OFHEO-directed capital requirement. Its surplus fell by $0.7 billion to $2.6 billion from the prior quarter's surplus of $3.3 billion due to a reduction in core capital, partially offset by a decline in the OFHEO-directed requirement. Core capital fell by approximately $0.9 billion due to an equal decrease in retained earnings. The reduction in retained earnings was the result of reported losses of $480 million including mark-to-market losses of approximately $1.0 billion, which are a result of a decline in the level and volatility of interest rates, and dividends of $415 million.

Changes in critical capital mirrored changes in minimum capital.

**Risk-Based Capital**

**As of December 31, 2006, Fannie Mae's <u>risk-based capital</u> requirement was $26.9 billion. Fannie Mae's total capital of $43.0 billion on that date exceeded the requirement by $16.1 billion.**

**As of December 31, 2006, Freddie Mac's <u>risk-based capital</u> requirement was $15.3 billion. Freddie Mac's total capital of $36.7 billion on that date exceeded the requirement by $21.4 billion.**

| | Enterprise Risk-Based Capital Requirement (Billions of Dollars) [a] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fannie Mae [b] | | | | Freddie Mac | | | |
| | 31-Dec-06 | | 30-Sep-06 | | 31-Dec-06 | | 30-Sep-06 | |
| Interest Rate Scenario | Up | Down | Up | Down | Up | Down | Up | Down |
| Risk Based Capital Requirement | 26.870 | 9.134 | 22.524 | 16.447 | 15.320 | 12.934 | 14.879 | 13.785 |
| Total Capital | 43.046 | | 41.820 | | 36.742 | | 37.202 | |
| Surplus (Deficit) | 16.176 | | 19.296 | | 21.422 | | 22.323 | |

a. Numbers may not add due to rounding.
b. Subject to revision based upon results of ongoing financial restatement and audit processes.

By statute, stress test interest rate levels are a function of the average 10-year Constant Maturity Treasury (CMT) over the most recent nine months. At the end of the third quarter of 2006, the nine-month average of the 10-year CMT rose to 4.87 percent, 14 basis points higher than the nine-month average at the end of the second quarter of 2006. As a result, 10-year CMT levels at the end of the first year in the risk-based capital stress test increased from 8.24 percent to 8.48 percent in the up-rate stress test, and from 2.35 percent to 2.42 percent in the down-rate stress test.

While year-end stress test rate levels rose slightly, market interest rates actually fell in the fourth quarter as the yield curve flattened further. As a consequence, expected prepayment speeds increased and the duration of fixed-rate mortgage assets decreased. In response, Fannie Mae correspondingly shortened the duration of its debt and derivative portfolio to maintain an asset/liability match. Freddie Mac also adjusted its funding and derivative portfolio to match changes in asset duration.

Fannie Mae's rebalancing actions increased its exposure in the up-rate scenario and reduced exposure in the down-rate scenario. As a result, the up-rate stress test remained binding in the fourth quarter. Fannie Mae's risk-based capital requirement in the up-rate stress test rose $4.4 billion to $26.9 billion. By

contrast, the risk-based capital requirement in the down-rate stress test fell $7.3 billion to $9.1 billion. Overall, Fannie Mae's risk-based capital surplus decreased from $19.3 billion to $16.2 billion.

Freddie Mac's risk-based capital surplus decreased from $22.3 billion to $21.4 billion due to a higher risk-based capital requirement and a decline in total capital. Falling rates in the quarter caused rebalancing actions that increased exposure moderately in the binding up-rate scenario. Freddie Mac's risk-based capital requirement in the up-rate stress test was $15.3 billion for the fourth quarter versus $14.9 billion in the third quarter. Freddie Mac's risk-based capital requirement in the down-rate stress test decreased by $0.9 billion to $12.9 billion driven in part by an increase in its receive-fixed swaption positions.

## QUALIFICATIONS AND COMPLIANCE

Fannie Mae's capital classification is based upon Fannie Mae's best estimates of its financial condition, as certified and represented as true and correct to the best of Fannie Mae management's belief and knowledge. The fourth quarter 2006 capital classification remains subject to revision pending Fannie Mae's submission of audited 2006 financial statements and corresponding regulatory capital reports.

Fannie Mae remains subject to the requirements imposed by the Consent Order dated May 23, 2006 and the Capital Restoration Plan approved February 17, 2005. The Capital Restoration Plan required Fannie Mae to achieve a 30 percent capital surplus over the minimum capital requirement by September 30, 2005 (OFHEO-directed capital requirement). Fannie Mae is required to maintain a capital surplus above the OFHEO-directed requirement on an ongoing basis. Fannie Mae met the initial September 30, 2005 achievement of 30 percent surplus and it has continued to maintain the surplus through the fourth quarter 2006.

Freddie Mac's capital classification is based upon its financial condition, as certified and represented as true and correct by Freddie Mac's management, and consistent with the publicly disclosed information statement and annual report. The annual report and financial statements were given an unqualified opinion by PricewaterhouseCoopers. OFHEO imposed a capital surcharge of 30 percent of the minimum capital requirement for Freddie Mac in January 2004 due to increased operational risk. Freddie Mac continued to maintain its minimum capital surplus in excess of the OFHEO-directed capital requirement through the fourth quarter 2006.

## FOURTH QUARTER QUALIFYING SUBORDINATED DEBT RESULTS

Additionally, OFHEO is releasing qualifying subordinated debt positions of Fannie Mae in accordance with the September 1, 2005 Agreements between OFHEO and the Enterprises. (See 9/2/05 release at http://www.ofheo.gov/News.asp?FormMode=Releases&ID=237)

Fannie Mae's total capital and qualifying subordinated debt for the fourth quarter 2006 exceeded the requirements outlined in the Agreement dated September 1, 2005.

Freddie Mac's total capital and qualifying subordinated debt for the fourth quarter 2006 exceeded the requirements outlined in the Agreement dated September 1, 2005.

Qualifying subordinated debt levels are disclosed below.

| Enterprise Qualifying Subordinated Debt Disclosure (Billions of Dollars) [a] | | | | |
|---|---|---|---|---|
| | Fannie Mae | | Freddie Mac | |
| | 31-Dec-06 | 30-Sep-06 | 31-Dec-06 | 9/30/2006 [b] |
| Total Capital & Qualifying Subordinated Debt | 50.705 | 50.453 | 42.602 | 42.743 |
| Capital Requirement at 4% for On-Balance Sheet Assets and at 0.45% for Net MBS / PCs Outstanding | 41.798 | 41.488 | 37.576 | 37.966 |
| Surplus (Deficit) | 8.908 | 8.965 | 5.026 | 4.777 |

Footnote:

a.  Qualifying Subordinated Debt is defined as subordinated debt that contains the interest deferral feature.  The interest deferral requires the deferral of
     interest payments for up to 5 years if:
     1) The corporation's core capital falls below 125% of critical capital, or
     2) The corporation's core capital falls below minimum capital AND, pursuant to the corporation's request, the Secretary of the Treasury exercises
        discretionary authority to purchase the company's obligations under Section 306(c) of the Freddie Mac Charter Act and Section 304(c) of the Fannie Mae
        Charter Act.
b.   Restated by Freddie Mac on March 23, 2007.

## DEFINITION OF CAPITAL STANDARDS

**Core Capital** is the sum of outstanding common stock, perpetual, noncumulative preferred stock, paid-in capital, and retained earnings.  Core capital does not include Accumulated Other Comprehensive Income (AOCI), which is captured as part of stockholder's equity.

**Total Capital** is the sum of Core Capital plus the allowance for loan losses.

**Minimum capital** represents an essential amount of capital needed to protect an Enterprise against broad categories of business risk. For purposes of minimum capital, an Enterprise is considered by law adequately capitalized if core capital — common stock; perpetual noncumulative preferred stock; paid in capital; and retained earnings — equals or exceeds minimum capital.  The minimum capital standard is 2.5 percent of assets plus 0.45 percent of adjusted off-balance-sheet obligations, including guaranteed mortgage securities.

**The OFHEO-directed capital requirement** is the amount of capital the Enterprise needs to maintain to compensate for increased operational risks including systems, accounting, and internal control risks.  The level is prescribed by the Director of OFHEO.  At this time, both Enterprises are required to hold 30 percent over the statutory minimum capital requirement.  This is calculated by multiplying the minimum capital requirement by 1.3 times.

**OFHEO's risk-based capital requirement** is the amount of total capital — core capital plus a general allowance for loan losses less specific reserves — that an Enterprise must hold to absorb projected losses flowing from future adverse interest-rate and credit-risk conditions specified by statute, plus 30 percent mandated by statute to cover management and operations risk. The risk-based capital standard is based on stress test results calculated for the two statutorily prescribed interest rate scenarios, one in which 10-year Treasury yields rise 75 percent (up-rate scenario) and another in which they fall 50 percent (down-rate scenario).  Changes in both scenarios are generally capped at 600 basis points. The risk-based capital level for an Enterprise is the amount of total capital that would enable it to survive the stress test in whichever scenario is more adverse for that Enterprise, plus 30 percent of that amount to cover management and operations risk.

The **critical capital** level is the amount of core capital below which an Enterprise must be classified as critically undercapitalized and generally must be placed in conservatorship. Critical capital levels are computed consistent with the Federal Housing Enterprises Safety and Soundness Act of 1992 as follows:  One-half of the portion of minimum capital requirement associated with on-balance-sheet assets plus five-ninths of the portion of the minimum capital requirement associated with off-balance-sheet obligations.

QUALIFYING SUBORDINATED DEBT

Qualifying subordinated debt is defined as subordinated debt that contains the interest deferral feature described below:
> The interest deferral requires the deferral of interest payments for up to 5 years if:
> o  The corporation's core capital falls below 125 percent of critical capital, or
> o  The corporation's core capital falls below minimum AND, pursuant to the corporation's request, the Secretary of the Treasury exercises discretionary authority to purchase the company's obligations under Section 306(c) of the Freddie Mac Charter Act and Section 304(c) of the Fannie Mae Charter Act.

The September 1, 2005 agreement requires that:
> Subordinated debt will be issued in a quantity such that the sum of total capital (core capital plus general allowance for losses) plus the outstanding balance of qualified subordinated debt will equal or exceed the sum of outstanding net MBS times 0.45 percent and total on-balance sheet assets times 4 percent.

Technical questions regarding these results should be directed to: rbcquestions@ofheo.gov.

###

*OFHEO's mission is to promote housing and a strong national finance system by ensuring the safety and soundness of Fannie Mae and Freddie Mac.*